# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

**AMERICAN CIVIL RIGHTS UNION,** in its individual and corporate capacities

*Plaintiff,*

v.

**BRENDA SNIPES,** in her official capacity as the SUPERVISOR OF ELECTIONS of BROWARD COUNTY, FLORIDA

*Defendant,*

**1199SEIU UNITED HEALTHCARE WORKERS EAST**,

*Defendant-Intervenor.*

**CASE NO.:** 0:16-CV-61474-BB

## DEFENDANT BRENDA SNIPES'S AND DEFENDANT-INTERVENOR 1199SEIU UNITED HEALTHCARE WORKERS EAST'S MOTION FOR AND MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT ON COUNT I OF PLAINTIFF'S AMENDED COMPLAINT

## MOTION FOR SUMMARY JUDGMENT

Defendant Dr. Brenda Snipes, in her official capacity as Supervisor of Elections in Broward County, Florida, and Defendant-Intervenor 1199SEIU United Healthcare Workers East respectfully move this Court, pursuant to Federal Rule of Civil Procedure 56(a), for the entry of an order granting summary judgment to Defendant as to Plaintiff American Civil Rights Union's (ACRU's) claim in Count I that Dr. Snipes has violated Section 8 of the National Voter Registration Act (NVRA), 52 U.S.C. § 20507. Plaintiff alleges that Defendant has failed to make reasonable efforts to conduct a voter registration list maintenance program, as required by statute. Defendant and Defendant-Intervenor are entitled to summary judgment because no disputed material facts create a triable issue, as Defendant's maintenance of Broward County's voter registration list unquestionably complies with the NVRA.

## MEMORANDUM OF LAW

Congress passed the NVRA to increase opportunities for voter registration and to provide greater avenues for electoral participation. 52 U.S.C. § 20501. The NVRA achieves this purpose, in part, by regulating state voter roll maintenance programs and by requiring states to maintain accurate voter registration rolls. A state's duty to maintain accurate voter registration rolls is met primarily through two functions, which operate as two sides of the same coin: (1) the state must ensure that registered voters remain on the rolls for as long as they continue to be eligible, *id.* § 20507(a)(1), (a)(3); and (2) the state must "conduct a general program that makes a reasonable effort" to remove voters who become ineligible due to death or change of residence, *id.* § 20507(a)(4). To this end, the NVRA permits states to remove registrants from the rolls only for specific reasons and in accordance with specific procedures as set forth in Section 8. *See* 52 U.S.C. § 20507.

1

Plaintiff claims that Defendant violates Section 8's mandate to "to make reasonable efforts to conduct voter list maintenance programs." Am. Compl. ¶ 28. As the Court has previously noted, "[w]hile Count I does not list the specific subsection of Section 8 Defendant allegedly violated," this claim falls under § 20507(a)(4) of the NVRA, which "requir[es] that election officials 'conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters *by reason of*—(A) the death of the registrant; or (B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d).'"). *Bellitto v. Snipes*, No. 16-cv-61474, ___ F. Supp. 3d ___, 2016 WL 6248602, at *7 (S.D. Fla. Oct. 26, 2016) (quoting 52 U.S.C. § 20507(a)(4)).

However, Section 8 expressly provides a safe harbor procedure that identifies how a state may comply with the Section's requirement—specifically by using information provided by the United States Postal Service's National Change of Address Program ("NCOA"). *See* 52 U.S.C. § 20507(c)(1). The safe harbor provides that:

> (1) A State may meet the requirement of subsection (a)(4) by establishing a program under which—
>
> (A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and
>
> (B) if it appears from information provided by the Postal Service that—
>
> (i) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or
>
> (ii) the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

*Id.* As this Court has already found, "full compliance with subsection (c)(1) 'would comply with the NVRA's mandates and accompanying constraints.'" *Bellitto*, 2016 WL 6248602, at *8 (citing *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 707 (6th Cir. 2016) ("*APRI*"), *petition for cert. filed*, 85 U.S.C.W. 3375 (U.S. Feb. 8, 2017) (No. 16-980)).

Accordingly, a jurisdiction such as Broward County that follows a program using the Postal Service's change of address information in the prescribed manner "meet[s] the requirements of subsection (a)(4)." *See* 52 U.S.C. § 20507(c)(1). Because the undisputed facts of this case demonstrate that Defendant is implementing the NCOA program in accordance with the safe harbor provision, the county's program meets the requirements of subsection (a)(4). *See id.* For this reason alone, summary judgment is warranted on Count I.

But even putting aside Defendant's compliance with the safe harbor provision, summary judgment is also appropriate because the undisputed facts of the case show that Defendant takes several additional list maintenance steps—above and beyond the safe harbor process—to maintain the voter registration lists. These steps, combined with the NCOA process, satisfy Defendant's obligations under the NVRA's list maintenance requirement. *See* 52 U.S.C. § 20507(a)(4); *Bellitto*, 2016 WL 6248602, at *7-8.

Yet despite these undisputed facts—or perhaps because of them—Plaintiff argues that Defendant's list maintenance obligations somehow extend beyond those imposed by the statute. This is plainly untrue and contradicts the NVRA's unambiguous language. Indeed, subject to certain specified restrictions, Section 8 allows jurisdictions great latitude to determine the methods by which they maintain their voter lists. While subsection 20507(a)(4) provides the general principle to which states must adhere, i.e., they must conduct a "general program . . . mak[ing] a reasonable effort" to remove ineligible registrants who have moved or died, it notably does not

command that any particular process be employed. In fact, the only specific process for removing ineligible voters contained in the statute is found in the safe harbor provision, which suggests one method a state "may" follow to "meet the requirement of subsection (a)(4)." 52 U.S.C. § 20507(c)(1). This is in stark contrast to the rest of Section 8, which proscribes elaborate procedures that *must* be followed to protect eligible voters from removal.  The statute thus affords officials great discretion to design compliant list maintenance programs.

Thus, Plaintiff's claim is unconnected to both the facts of this case and the governing law. Plaintiff tries to create disputed issues where no genuine issues of material fact are in dispute by imposing obligations where the statute decidedly does not. Based on the actual requirements of the NVRA and the undisputed material facts in this case, Defendant and Defendant-Intervenor are entitled to summary judgment on Count I of Plaintiff's complaint.

## UNDISPUTED FACTUAL BACKGROUND[1]

Dr. Brenda Snipes is the Supervisor of Elections in Broward County, Florida. In her official capacity in this role, Dr. Snipes is entrusted with fulfilling certain statutory obligations, under the NVRA and otherwise, related to voter registration list maintenance.[2] SUF ¶¶ 2, 4.

### A.  Registration List Maintenance Activities

Defendant regularly and actively maintains Broward County's voter registration rolls.  SUF ¶¶ 16-37. Defendant uses a number of tools and reviews and relies upon a variety of data to verify that registered voters remain eligible to vote in Broward County. *See id.* Through these methods

---

[1]  For a more detailed recitation of facts, please see Defendant-Intervenor's Statement of Undisputed Facts ("SUF"), filed separately.

[2]  Dr. Snipes also oversees Broward County's voter registration activities related to adding new voters to the official list of eligible voters. *See* SUF ¶¶ 11-12.

4

and means, Defendant conducts a robust program to remove ineligible registrants, including persons who have moved out of the county or are deceased. *Id.*

### 1. Broward County Uses Voter Registration Database Software to Interface with Florida's Statewide Voter Registration Database.

Defendant manages the Broward County voter registration list using voter registration database software provided by the company VR Systems (the "VR Systems database"). SUF ¶ 9. The VR Systems database interfaces with the statewide voter registration database. SUF ¶¶ 8, 9. Most of the 67 other counties in Florida also use the VR Systems voter registration database system. SUF ¶ 10.

### 2. Defendant's NCOA List Maintenance Program

Defendant performs voter registration list maintenance using the United States Postal Service's NCOA program. SUF ¶ 19. In conjunction with "Commercial Printers, Inc." a third-party organization that is licensed by the U.S. Postal Service to receive NCOA data, Defendant compares voter records in the VR Systems database against the NCOA database to identify changes to registrant information. The results of Commercial Printers' comparison are then reported to Jorge Nuñez, Defendant's Information Technology Director. SUF ¶¶ 6, 20-21.

If, as a result of this comparison, a registrant is identified as having information on record in the VR Systems database that conflicts with the registrant's information in the NCOA database, Defendant will take action to communicate with the registrant by mail, via a notice to the registrant identifying the problem and asking the registrant to confirm or update her address. SUF ¶ 21; *see also id.* ¶ 16; Fla. Stat. § 98.0655. Ultimately, a registrant who fails to update her registration information is sent an Address Confirmation Final Notice ("Final Notice"). *See* SUF ¶ 22. After a registrant receives a Final Notice, she has thirty (30) days to respond. *Id.* If the registrant does not respond within that time, the registrant's status is changed from "active" to "inactive" in the VR

Systems database. *Id.* Once a registrant is designated "inactive," she may become "active" again if the registrant votes, appears to vote, or otherwise communicates with the SOE during the course of two general federal election cycles following the Final Notice. SUF ¶ 22; *see also* Florida Department of State Division of Elections, "2016 Florida Voter Registration and Voting Guide" (Updated 1/6/17), *available at* http://dos.myflorida.com/media/693760/voter-registration-guide.pdf (last visited May 25, 2017). If the registrant does not vote or contact the Defendant's office in two general election cycles, the SOE changes the registrant's status to "ineligible," and that individual is no longer registered to vote. SUF ¶ 23.

### 3. Defendant's Other List Maintenance Activities

Defendant conducts additional list maintenance activities to verify or seek updated registration information before registrants are removed from the voter roll. Specifically, Defendant performs routine maintenance activities on a daily basis using data received from the State. Each day, for example, Defendant electronically receives from Florida Secretary of State's Division of Elections ("Division of Elections" or "DOE") a verified list of voters who have recently died. SUF ¶¶ 15, 26. Defendant cancels the voter registration records of those individuals included on DOE's verified list. SUF ¶ 26. Because the State verifies the information on deceased voters prior to providing it to Defendant, Defendant does not need to request additional information to confirm the data or to run any further comparison or analysis in VR Systems before removing the voter from the registration rolls.[3] SUF ¶¶ 15, 26.

---

[3] Alternatively, if Defendant receives non-verified information indicating that a registrant has died, Defendant may attempt to get a copy of the death certificate by contacting a family member through a mailing to the registrant's last known address. SUF ¶ 27. Once Defendant receives the death certificate, she removes the individual from the registration rolls. *Id.* If Defendant receives no response, she will send another notice and will contact the DOE to request an investigation into the voter's status. SUF ¶ 27.

Defendant also electronically receives daily lists from the State that identify registrants with felony convictions, SUF ¶¶ 15, 32, and registration records identified as duplicates, SUF ¶ 29. With respect to registrants identified as having a felony conviction, Defendant mails a letter to each registrant so identified, and the registrant has 30 days to reply to confirm or contest the conviction information. SUF ¶ 32. If there is no reply, Defendant publishes a notice in the newspaper. *Id.* If there is no response within another 30 days, the registrant is automatically removed from the voter roll. *Id.* With respect to registration records identified as duplicates, Defendant reviews the information and consolidates the registrant's information so that only one registration per individual will remain active. SUF ¶ 29. Defendant uses the most recently provided address to update the registrant's consolidated record. *Id.*

In fulfilling her voter registration roll maintenance obligations as Supervisor, Defendant works with a number of key personnel, each of whom plays a pivotal role in maintaining the voter roll. SUF ¶ 4. Jorge Nuñez, for example, is integrally involved in the list maintenance process, overseeing the voter registration database and the registration lists. SUF ¶ 6. Mr. Nuñez is the primary liaison between Defendant's office and the outside vendors involved with the list-maintenance process. *Id.* He also is responsible for reporting Defendant's activities to the state: twice per year, Mr. Nuñez prepares Certifications of Address List Maintenance Activities and Certifications of Eligibility Records Maintenance that are then provided to the Division of Elections. *Id.* ¶¶ 6, 14. The Certification of Address List Maintenance Activities reports the actions taken to identify voters who have changed residence, to cancel the registrations of those who no longer reside in Broward County, and to update the registrations of voters who have moved within the county. SUF ¶ 14. The Certification of Eligibility Records Maintenance describes actions taken to remove voters who are ineligible because of death, felony conviction, mental incapacity, or

because they are not U.S. citizens. *Id.* In addition to Mr. Nuñez, Mary Hall, Defendant's Voter Services Director, and Sonia Cahuasqui, a voter registration clerk, help to maintain the voter rolls by performing voter outreach and entering information into the county's voter registration database. SUF ¶¶ 5, 7.

During her time in office, Defendant has regularly used this arsenal of tools to maintain the county's voter registration roll. SUF ¶¶ 16, 19, 25, 29, 31. Through these list maintenance activities, between January 1, 2014, and December 31, 2016, Defendant removed more than 240,000 registrants from the voter rolls in Broward County. SUF ¶ 39. Similarly, from January 2015 to January 2017, the Defendant updated the registration records of, at minimum, close to 150,000 registered voters living in Broward County who had changed their street address to a new address within the county. SUF ¶ 41. These numbers reflect the large-scale impact of Defendant's list maintenance activities on the voter registration rolls. SUF ¶ 38. Defendant has made and continues to make reasonable efforts to conduct a general program aimed at removing registrants from the voter registration rolls who have moved or died, while ensuring that those who continue to be eligible to vote remain on the rolls with their right to vote preserved. SUF ¶¶ 16, 19, 25, 29, 31.

### B. This Lawsuit

Plaintiff[4] ACRU filed the original complaint against Defendant Snipes on June 27, 2016. Dkt. No. 1. Plaintiff filed a First Amended Complaint on August 4, 2016. Dkt. No. 12. Defendant-

---

[4] Plaintiff ACRU initially filed this action, and its amended complaint, along with a co-plaintiff named Andrea Bellitto. In its Order on Motions to Dismiss dated October 26, 2016, Dkt. No. 64, the Court dismissed Plaintiff Bellitto from the case for lack of standing. *Bellitto*, 2016 WL 6248602, at *6.

Intervenor 1199SEIU moved to intervene on September 19, 2016, Dkt. No. 23, and the Court granted the motion on September 21, 2016, Dkt. No. 29.

## ARGUMENT

### I.    STANDARD OF REVIEW

A motion for summary judgment must be granted if the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A genuine issue of material fact exists only when "a reasonable jury could return a verdict [in favor of] the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be evidence from which a jury could reasonably find for the non-moving party." *Baloco v. Drummond Co.*, 767 F.3d 1229, 1246 (11th Cir. 2014), *cert. denied*, 136 S. Ct. 410 (2015). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issues of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

Moreover, the burden on the moving party to show the absence of a genuine issue of material fact may be discharged by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "[I]f the record, taken as a whole, cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is proper." *Hawaiian Airlines, Inc. v. AAR Aircraft Servs., Inc.*, 167 F. Supp. 3d 1311, 1316 (S.D. Fla. 2016).

When the evidence in the record is viewed in the light most favorable to Plaintiff, no triable facts exist that could support Plaintiff's claim under Section 8 of the NVRA. Accordingly, Defendant Snipes and Defendant-Intervenor 1199SEIU are entitled to summary judgment on Count I of Plaintiff's Amended Complaint.

## II. DEFENDANT'S LIST MAINTENANCE PROGRAM COMPLIES WITH THE NVRA.

As the Court has noted, Plaintiff's Section 8 claim is premised on Defendant's alleged failure to make a "reasonable effort" to comply with the NVRA by establishing a program to remove registrants who have died or moved, and accordingly falls under 52 U.S.C. § 20507(a)(4). *See Bellitto*, 2016 WL 6248602, at *7. But even when viewed in the light most favorable to Plaintiff, the record simply does not support this conclusion. While this Court found that Plaintiff's allegations were sufficient to survive a motion to dismiss, Plaintiff has not subsequently put forth sufficient evidence to survive summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). Indeed, a review of the record reveals that there is no genuine issue of material fact disputing Defendant's implementation of an NCOA program, which renders her program compliant with Section 8 under the safe harbor provision of subsection (c)(1). Moreover, the undisputed evidence also establishes that Defendant's program employs a multitude of tools in addition to the NCOA process to maintain Broward County's registration list while ensuring that eligible voters are not improperly removed. For either of these reasons, Defendant is entitled to summary judgment on Count I.

### A. The NVRA's Removal Requirement is Narrow and Gives Defendant Discretion to Choose How to Reasonably Maintain Broward County's Voter Registration List.

The NVRA requires that states, in administering their voter registration rolls, "*ensure that any eligible applicant is registered* to vote in an election" where that applicant has taken the appropriate steps to register. 52 U.S.C. § 20507(a)(1) (emphasis added). To facilitate Congress's

goal that eligible voters *remain* registered to vote, the statute prescribes only a narrow set of circumstances in which election officials may *remove* the names of registrants from the voter rolls. In particular, the law provides that election officials may not remove the names of registrants unless:

- The registrant requests to be removed, *id.* § 20507(a)(3)(A);

- The registrant is convicted of a crime or adjudicated mentally incompetent, and state law requires that such individuals be removed, *id.* § 20507(a)(3)(B);

- The registrant has died, *id.* § 20507(a)(4)(A); or

- The registrant's residence has changed, *and*

  - The registrant confirms in writing that she has changed residence to a place outside the registrar's jurisdiction (i.e., the county); or

  - The registrant fails to respond to written notice from the registrar (which must satisfy certain enumerated requirements) *and* fails to vote in any election in the subsequent period that includes two general Federal elections, *id.* § 20507(d)(1)(B)(i)-(ii).

Moreover, systematic removal programs cannot be conducted within 90 days of a federal election, with certain exceptions.[5] 52 U.S.C. § 20507(c)(2)(A); *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1343-44 (11th Cir. 2014). Within this framework of preserving eligible voters' right to remain on the registration rolls, the NVRA requires election officials to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" death or change in residence, as noted above. *Id.* § 20507(a)(4); *Bellitto*, 2016 WL 6248602, at *7.

---

[5] The NVRA only allows states to conduct three types of removals in the 90 days before a federal election: (1) at the request of the registrant; (2) as provided by State law, by reason of criminal conviction or mental incapacity; and (3) upon death of the registrant. *Arcia*, 772 F.3d at 1345 (citing 52 U.S.C. § 20507(c)(2)(B); *id.* § 20507 (a)(3)–(4)).

The NVRA gives election officials discretion to use any of a variety of sources of information to identify voters who are believed to have become ineligible, but does not mandate the use of any particular source. The law simply sets a floor for any list maintenance program: it must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act . . . ." 52 U.S.C. § 20507(b)(1). And the NVRA expressly provides that list maintenance programs cannot result in the removal of any registrant due to the person's failure to vote. *Id.* § 20507(b)(2).

**B. Defendant's Use of the National Change of Address Database Satisfies Her List Maintenance Obligations Under the NVRA.**

In prescribing the framework within which a state must conduct its registration list maintenance efforts, the NVRA provides a "safe harbor." The safe harbor is a procedure that, if followed, satisfies the election official's statutory obligation to conduct a reasonable removal program. *See A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 707 (6th Cir. 2016) ("*APRI*"), *petition for cert. filed*, 85 U.S.C.W. 3375 (U.S. Feb. 8, 2017) (No. 16-980). Under the safe harbor provision, "[a] State may meet the requirement of subsection (a)(4)" by establishing a program that uses change of address information provided by the U.S. Postal Service "to identify registrants whose addresses may have changed." 52 U.S.C. § 20507(c)(1)(A). Such a program requires a state or locality to provide certain notifications to the potentially ineligible registrants, and to take prescribed action if it appears from the information provided by the Postal Service that a registrant has moved. *Id.* § 20507(c)(1)(B). As this Court has recognized, "full compliance with subsection (c)(1) 'would comply with the NVRA's mandates and accompanying constraints.'" *Bellitto*, 2016 WL 6248602, at *8 (quoting *APRI*, 838 F.3d at 707).

It is undisputed that Defendant's list maintenance efforts and voter-removal program use change-of-address information supplied by the U.S. Postal Service through the NCOA program. SUF ¶ 19-24. Indeed, certifications issued by Defendant's office indicate that Defendant has

conducted consistent list maintenance activities using NCOA since at least 2009, with subsequent removals following the expiration of the statutory waiting period. *Id.* ¶ 19.

As discussed *supra*, Defendant's NCOA program involves a comparison between the voter address information contained in VR Systems and the NCOA database to identify voters who have moved. SUF ¶ 20. Defendant then sends notices to the registrants who were flagged by the address comparison process. SUF ¶ 21; *see also id.* ¶ 16. Ultimately, if a Final Notice does not result in a response from the registrant, the registrant's status is changed from active to inactive, and the registrant is removed in accordance with the NVRA's requirements, including, where applicable, the mandatory waiting period. SUF ¶ 22.

Defendant's use of the NCOA data in this way establishes—as a matter of law—that Defendant complies with her obligations under Section 8 of the NVRA. There is simply no material evidence that Defendant does not use the NCOA program in her list maintenance activities. Plaintiff's unsupported contentions otherwise simply fail as a matter of law. There is no genuine issue of dispute on this matter. Defendant unquestionably satisfies the safe harbor provision, and this alone warrants summary judgment on Count 1 in Defendant's favor.

> **C. Putting Aside Defendant's Compliance with Section 8's NCOA Safe Harbor, the Undisputed Facts Show, on an Independent Basis, that Defendant's Voter Removal Program is Reasonable Under the Statutory Standard.**

Even setting aside that Defendant has "me[t] the requirement of subsection (a)(4)" by using NCOA data as prescribed in § 20507(c)(1), summary judgment is appropriate for the independent reason that Defendant's list-maintenance activities, as established beyond genuine dispute by the evidence in the record, constitute "a general program that makes a reasonable effort to remove the

names of ineligible voters from the official lists of eligible voters" by reason of death or change in residence, as required by § 20507(a)(4).

As discussed *supra*, Defendant conducts list maintenance activities separate and apart from the NCOA program.  Defendant receives daily updates from the Division of Elections, reflecting a verified list of voters who have recently died, SUF ¶ 26, a list of registrants with felony convictions, *id.* ¶ 32, and a list or registration records identified as duplicates, *id.* ¶ 29. With respect to those individuals included on the DOE's verified list of deceased registrants, Defendant cancels those registration records. SUF ¶ 26. With respect to registrants identified as having a felony conviction, Defendant solicits a response from the registrant in question via both mail and a newspaper publication, and if the registrant does not respond within the prescribed time, the registrant is removed from the registration list. SUF ¶ 32. And with respect to registration records identified as duplicates, Defendant reviews and consolidates the registrant's information so that only one registration per individual remains valid, using the most recently provided address to update the registrant's record. SUF ¶ 29.

Defendant's registration maintenance program also includes additional processes for when she receives information indicating that a registrant has died. SUF ¶ 27. If Defendant is informed of a registrant's death by a family member, for example, she will ask for a copy of the death certificate. *Id.* If one is provided, Defendant will remove the registrant from the voter rolls. *Id.* If Defendant learns of a registrant's death from someone other than a family member, she will attempt to contact a family member of the registrant to seek confirmation and to obtain a copy of the death certificate by sending a mailing to the registrant's last known address. *Id.* Again, if Defendant receives a copy of the death certificate, she will remove the registrant from the rolls. *Id.* If there is no response to the mailing or if Defendant is unable to get a copy of the death certificate,

Defendant will send another notice and will also contact the DOE and ask it to investigate the voter's status. *Id.*

The objective results of Defendant's general program of list maintenance activities demonstrate that her program has a real, substantial outcome in terms of the removal of registrants deemed ineligible. Between January 1, 2014, and December 31, 2016, Defendant removed over 240,000 registrants from the voter rolls in Broward County. SUF ¶ 39. Over 9,000 of the registration records removed during this period were duplicate registration records. SUF ¶ 30. During this same period, Defendant also removed over 37,000 registrants from Broward County's voter registration rolls because the registrant was determined to be deceased. SUF ¶ 28. Taking a different slice of time shows that these numbers are not anomalous: between January 7, 2015 and January 10, 2017, Broward County removed over 192,000 registrants from its voter rolls. SUF ¶ 40. These facts are not in dispute.

In addition to executing her program to identify and remove from Broward County's voter roll registrants who have died or moved out of Broward County, Defendant also works to ensure that the voter registration rolls do not include registrants who are or become ineligible to vote under the law—including those ineligible due to criminal conviction or mental incapacity pursuant to Florida state law, and non-citizens. *See* SUF ¶¶ 31-37. For example, Defendant uses information received directly from the Division of Elections to manage the removal of registrants based on disenfranchisement for conviction of a felony, as applicable. SUF ¶¶ 15, 31-32. And if an individual who is applying for citizenship is found to have registered to vote as a non-citizen, Defendant immediately removes that person from the rolls. SUF ¶ 36.

III. **PLAINTIFF HAS PRESENTED NO EVIDENCE TO CREATE A GENUINE DISPUTE OF MATERIAL FACT AS TO THE REASONABLENESS OF DEFENDANT'S VOTER REMOVAL PROGRAM.**

Plaintiff has not presented a genuine issue of material fact disputing that Defendant takes the above-described, statutorily prescribed steps as part of her broader list maintenance and voter removal program. Rather, Plaintiff relies on two arguments in an attempt to cast doubt on the reasonableness of Defendant's list maintenance: *first*, that Broward County has an "implausibly high number of registrants," Am. Compl. ¶ 11; and *second*, that there are other methods that Defendant could employ, but does not, *see id.* ¶¶ 13, 19. Not only are these arguments meritless, but they do nothing to speak to the reasonableness of the efforts that Defendant unquestionably takes to maintain the voter registration rolls in Broward County.

*First*, the NVRA has no outcome-based criteria for compliance. In other words, there is no registration rate threshold against which a state's or locality's list maintenance program is measured and deemed reasonable or unreasonable. Appropriately so, as the NVRA is designed first and foremost to *increase* voter registration and participation, 52 U.S.C. § 20501, and to *protect* eligible voters from improper removal, *id.* § 20507(a)(1). As the Court noted in its Order on Intervenor's Motion to Dismiss, the protections and precautions built into the NVRA could plausibly explain Broward County's allegedly high voter registration rate. *See Bellitto*, 2016 WL 6248602, at *8; Intervenor's Mot. to Dismiss, Dkt. No. 36, at 9-10. The NVRA deliberately slows the removal process in order to keep eligible voters from being improperly removed. *See, e.g.*, 52 U.S.C. § 20507(d)(1)(B)(ii) (requiring the passage of two election cycles before an inactive voter can be removed from the registration rolls). This is a beneficial feature of the NVRA—not a flaw. And even if Broward County's registration rate could plausibly imply some potential failure by

Defendant under a motion to dismiss standard, Plaintiff has failed to present any evidence to prove its case that can survive summary judgment.[6]

*Second*, lacking any evidence that Defendant has failed to take reasonable efforts to maintain the Broward County voter registration rolls, Plaintiff appears to argue that there are specific sources of information that Defendant is not using and that therefore, Defendant's efforts are not reasonable. Plaintiff's Amended Complaint offers just two—and only two—examples of this—(i) a list of registered voters in the Wynmoor Community of Broward County who Plaintiff believes have moved or died, Am. Compl. ¶ 13, and (ii) jury excusal forms, *id.* ¶ 19. Even if they could be supported by admissible evidence, these allegations fall flat.

With respect to jury forms, the NVRA does not require election officials to employ any particular type of list maintenance technique for identifying potentially ineligible voters. In particular, there is no requirement that Defendant review jury excusal forms as part of her list maintenance efforts.[7] That Defendant chooses to maintain Broward County registration rolls using multiple tools as described above, but has chosen not to include jury excusal forms in her arsenal, is not evidence that her program is unreasonable.

Moreover, with respect to the list of Wynmoor residents, Plaintiff's reliance on this list to support its argument is short-sighted. To begin with, the identification of registrants that Plaintiff *alleges* are improperly on the Broward County voter roll is—at best—circumstantial evidence regarding the efficacy of Defendant's list maintenance program, and does not stack up against the

---

[6] Indeed, Plaintiff has not presented any admissible evidence that the registration rate is in fact "high." *See* Intervenor-Defendant 1199SEIU United Healthcare Workers East's Motion to Exclude the Opinions and Testimony of Proposed Experts and Memorandum in Support (filed May 26, 2017).

[7] Jury forms are an unreliable source of information for the purposes of voter list maintenance because, among other things, individuals who were noncitizens when called for jury duty may have subsequently been naturalized before they registered to vote.

undisputed evidence that Defendant *is* taking reasonable steps. Moreover, Plaintiff conveniently overlooks the fact that Defendant is prohibited by law from immediately removing registrants from the registration list based on information from a third party claiming that certain registrants should be removed. 52 U.S.C. § 20507(d); *see also N.C. State Conf. of NAACP v. N.C. State Bd. of Elections*, 1:16cv1274, 2016 WL 6581284, at *7-*8 (N.D.N.C. Nov. 4, 2016) (granting preliminary injunction under Section 8's notice-and-waiting-period provisions). Rather, as Defendant's Voter Services Director Mary Hall testified, if Defendant receives information from a source other than the Division of Elections indicating that a registrant may have changed addresses or died, Defendant appropriately and lawfully seeks to verify the information and determine whether removal would be appropriate. *See* SUF ¶¶ 16, 27. And as described above, this notice process necessarily takes some time to ensure that Defendant complies with the NVRA's protections and does not improperly remove an eligible voter from her list. So the fact that Defendant did not immediately cancel the registrations of certain Broward County registrants who a third party *claimed* were ineligible does not prove or even support an argument that Defendant's roll maintenance efforts are unreasonable. Rather, it indicates that Defendant is complying with her legal obligation to avoid the hasty removal of registrants from the registration list without proper verification, which, as discussed above, takes time. *See* 52 U.S.C. § 20507(d); *see also Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1081 (D. Mont. 2008) ("a state cannot prevent a citizen from voting on the ground that the citizen has changed his or her address. This rule is . . . designed to protect the citizen's right to vote for at least two federal election cycles while the citizen updates his or her registration information.").

Because Plaintiff has not presented a genuine issue of material dispute as to the reasonableness of Defendant's list maintenance program, Defendant Snipes and Defendant-Intervenor 1199SEIU are entitled to summary judgment as a matter of law on Plaintiff's Claim I.

## REQUEST FOR HEARING

Defendant Snipes and Defendant-Intervenor 1199SEIU request that the Court hold a hearing on this motion, which they estimate would require approximately 120 minutes. Defendant and Defendant-Intervenor believe that a hearing would be helpful to the Court to assess the validity *vel non* of Plaintiff's legal theories in this case.

## CONCLUSION

WHEREFORE, Defendant Snipes and Defendant-Intervenor 1199SEIU respectfully request the Court enter an Order granting this Motion for Summary Judgment on Claim I of Plaintiff's First Amended Complaint.


Dated: May 26, 2017


Respectfully submitted,

*/s/ Kathleen M. Phillips, Esq.*
Kathleen M. Philips, Esq.
Florida Bar No.: 287873
Phillips, Richard & Rind, P.A.
9360 SW 72nd Street, Ste. 283
Miami, FL 33173
T. (305) 412-8322
Email: kphillips@phillipsrichard.com

*Of Counsel:*

Katherine Roberson-Young, Associate General Counsel
Service Employees International Union
11601 Biscayne Blvd., Ste. 209

Miami, FL 33181
T. (954) 804-2719
Email: Katherine.roberson-young@seiu.org

Trisha Pande, Law Fellow*
Service Employees International Union
1800 Massachusetts Ave, NW
Washington, DC 20036
T. (202) 730-7383
Email: trisha.pande@seiu.org

Michelle E. Kanter Cohen, Election Counsel*
Catherine M. Flanagan, Sr. Election Counsel*
PROJECT VOTE
1420 K Street N.W., Suite 700
Washington, DC  20005
T. (202) 546-4173
Email: mkantercohen@projectvote.org
Email: cflanagan@projectvote.org

Stuart C. Naifeh, Senior Counsel*
Cameron A. Bell, Legal Fellow*
DEMOS
80 Broad Street, 4th Floor
New York, NY 10004
T. (212) 485-6240
Email: snaifeh@demos.org
Email: snovakowski@demos.org
Email: cbell@demos.org

Jessica R. Amunson*
Kali N. Bracey*
Carrie F. Apfel*
Marina K. Jenkins*
Tassity S. Johnson*
Jenner & Block LLP
1099 New York Ave., N.W., Suite 900
Washington, DC 20001
Email: jamunson@jenner.com
Email: kbracey@jenner.com
Email: mjenkins@jenner.com
Email: tjohnson@jenner.com
*Admitted Pro Hac Vice
Counsel for Intervenor 1199SEIU United
Healthcare Workers East

20

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on the 26th day of May, 2017, the foregoing was served via this Court's

CM/ECF system to all counsels of record listed in the attached service list.

<u>*/s/ Kathleen M. Phillips, Esq.*        </u>
Kathleen M. Phillips, Esp.

## SERVICE LIST

*Counsel for Plaintiffs*

William E. Davis (Fla. 191680)
Mathew D. Gutierrez (Fla. 0094014)
FOLEY & LARDNER LLP
Two South Biscayne Boulevard, Suite 1900
Miami, FL 33131
T. (305) 482-8404
F. (305) 482-8600
Email: wdavis@foley.com
Email: mgutierrez@foley.com

J. Christian Adams
Joseph A. Vanderhulst
Kaylan L. Phillips
PUBLIC INTEREST LEGAL FOUNDATION
32 E. Washington, Suite 1675
Indianapolis, IN 46204
317-203-5599
F. (888) 815-5641
Email: adams@publicinterestlegal.org
Email: jvanderhulst@publicinterestlegal.org
Email: kphillips@publicinterestlegal.org

H. Christopher Coates
LAW OFFICE OF H. CHRISTOPHER COATES
934 Compass Point
Charleston, SC 29412
T. (843) 609-7080
Email: curriecoates@gmail.com

Kenneth A. Klukowski
AMERICAN CIVIL RIGHTS UNION
3213 Duke Street, #625
Alexandria, VA 22314
877-730-2278
Email: kklukowski@theacru.org

*Counsel for Defendant*

Burnadette Norris-Weeks (Fla. 0949930)
BURNADETTE NORRIS-WEEKS, P.A.
401 North Avenue of the Arts
Fort Lauderdale, FL 33311
T. (954) 768-9770
F. (954) 786-9790
Email: bnorris@bnwlegal.com