# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

| | |
|---|---|
| **AMERICAN CIVIL RIGHTS UNION,** in its individual and corporate capacities | **CASE NO.:** 0:16-CV-61474-BB |
| *Plaintiff,* | |
| v. | |
| **BRENDA SNIPES,** in her official capacity as the SUPERVISOR OF ELECTIONS of BROWARD COUNTY, FLORIDA | |
| *Defendant,* | |
| **1199SEIU UNITED HEALTHCARE WORKERS EAST**, | |
| *Defendant-Intervenor.* | |

## INTERVENOR-DEFENDANT 1199SEIU UNITED HEALTHCARE WORKERS EAST'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF PROPOSED EXPERTS AND MEMORANDUM IN SUPPORT

## MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF PROPOSED EXPERTS

Pursuant to Federal Rule of Evidence 702, Defendant-Intervenor 1199SEIU United Healthcare Workers East ("1199SEIU") respectfully moves this Court for the entry of an order excluding Plaintiff American Civil Rights Union's (ACRU's) Proposed Experts Steven Camarota and Scott Gessler. Because Dr. Camarota and Mr. Gessler are both unqualified to offer any opinion in this case, and because the opinions they do offer are unreliable, speculative, and unhelpful, an order excluding their opinions must be entered.

## MEMORANDUM OF LAW

In June of 2016, ACRU filed a lawsuit against Defendant Brenda Snipes, the Supervisor of Elections of Broward County, Florida, alleging that she violated the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507. Plaintiff alleges that Broward County's voter roll contains "either more total registrants than eligible voting-age citizens" or "an implausibly high number of registrants," and that Dr. Snipes has not implemented any of ACRU's preferred list maintenance activities.[1] Am. Compl. ¶¶ 12-13, 19. To rebut the opinion of 1199SEIU's expert Dr. Daniel A. Smith and to support its case, ACRU proffers the expert testimony of Dr. Steven Camarota and Scott Gessler, respectively. This testimony falls far short of what is required for expert testimony and must be excluded.

Dr. Camarota is an immigration policy researcher who has no credentials related to voter registration policy or voter roll maintenance, and whose statistical training consists of a three-month statistics course taken two decades ago. Despite this lack of relevant training and

---

[1] ACRU also claims that Dr. Snipes has violated the NVRA by failing to provide access to records on its programs for ensuring the accuracy and currency of its voter list. *Id.* ¶ 33. Neither of Plaintiff's experts' opinions appear to be offered in support of this allegation.

experience, Dr. Camarota performs his own statistical analysis of U.S. Census Bureau data on voter populations of Broward County, and concludes that the voter registration rate in the County is higher than the rate nationally, in Florida statewide, or in any other state, and that the margins of error for the citizen population data are statistically small. *See* Expert Rebuttal Declaration of Steven A. Camarota, Ph.D., attached hereto as Exhibit A ("Camarota Decl.") at 2.  This opinion lacks the intellectual rigor, reliability, and soundness necessary to qualify as an expert opinion.

Simply put, because Dr. Camarota is not versed in voter registration policy and is not a statistician, he is therefore wholly unqualified to offer an opinion—let alone an expert opinion—on the issues in dispute in this case. As an immigration policy researcher for a non-academic institution who writes "general-interest" articles and "op-eds" on immigration policy, and who has published ***nothing***—academic or otherwise—on voter registration or county maintenance of voter rolls, he has no qualifications relevant to any aspect of voting policy. Moreover, he offers nothing more than his *ipse dixit* to support his calculations—no error rates for his methodology, no evidence of its general acceptability within any scholarly community, and no peer-reviewed publications of his own, or from scholars in any field, applying it. This is not surprising because, by using an apples-and-oranges comparison of data covering two different time periods, his methodology is unsound. In short, Dr. Camarota has no expertise that will help the trier of fact in this case, and his report—which fails to satisfy the qualification or reliability requirements set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 (1993)—must be excluded.

The testimony of Scott Gessler fares no better. As an attorney and former Secretary of State of Colorado who lacks any knowledge of Broward County's voting registration policy or voter roll maintenance, the voting policy of any state other than Colorado, or the implementation of such

policy at the county level, Mr. Gessler is unsuited to provide an expert opinion in this case. Based on nothing more than his review of the record and law of this case, Mr. Gessler opines on whether Dr. Snipes has "failed to conduct a general program and has failed to take reasonable steps to maintain the accuracy of the county voter rolls." Expert Declaration of Scott E. Gessler, attached hereto as Exhibit B ("Gessler Decl.") ¶ 12. But whether Dr. Snipes conducts a general program that takes reasonable steps to maintain the accuracy of the county's voter rolls is a legal question at the very heart of this case. *Cf.* 52 U.S.C. § 20507(a)(4) (requiring the state to "conduct a general program that makes a reasonable effort" to remove voters who become ineligible due to death or change of residence). Thus, rather than assist the factfinder, Mr. Gessler's opinion substitutes his judgment of the law and evidence of this case for that of the factfinder—a substitution that is impermissible under the law.

Moreover, Mr. Gessler's opinions on how Broward County should manage its voter registration and voter roll maintenance systems are rooted not in his independent knowledge of or experience with these systems, but instead in his own *ipse dixit* as to what the county could do better and calculations he derives from the same flawed statistical methodology used by Dr. Camarota that Mr. Gessler is even more unqualified to apply. Accordingly, Mr. Gessler's proposed expert opinion does not satisfy the qualification, reliability, or helpfulness requirements set forth in Federal Rule of Evidence 702 and *Daubert*, and should be excluded.

## FACTUAL BACKGROUND

### I.  DR. CAMAROTA

#### A.  Dr. Camarota's Opinions

As a rebuttal to the expert report of Daniel A. Smith, submitted in support of the Intervenor-Defendant, Dr. Camarota offers two opinions. First, he opines that the voter registration rate in

Broward County is "dramatically higher" than the rate nationally, in Florida overall, or in any other state. Camarota Decl. at 2, 8. This opinion was derived using calculations based on different combinations of three data sources: the U.S. Election Assistance Commission's Election Administration Voting Survey ("EAVS"), the U.S. Census Bureau's population estimates for Broward County, and the U.S. Census Bureau's American Community Survey ("ACS").  Second, in an effort to rebut Dr. Smith's opinion that Plaintiff's registration rate calculations are likely inaccurate due to the imprecision of ACS estimates, Dr. Camarota claims that the margins of error for the ACS estimates are easily calculable and ultimately small, and thus produce accurate registration rates.  *Id.* at 2, 8-9.

### B.  Dr. Camarota's Qualifications

Dr. Camarota is a public policy analyst by training and an immigration policy researcher by profession. He has a master's degree in political science from the University of Pennsylvania and a doctorate in public policy analysis from the University of Virginia. *See* Deposition testimony of Steven A. Camarota, attached hereto as Exhibit C ("Camarota Dep.") at 13:23—14:12. Since the completion of his doctorate, he has been employed with the Center for Immigration Studies (CIS), a non-profit organization that advocates restrictive immigration policies, where he currently serves as the Director of Research. *See* Camarota Dep. at 25:19-24, 26:9-16, 27:8-10. He has also worked as an outside consultant on immigration policy for the past six years. Camarota Dep. at 30:9–31:2. From around 2000 to 2007, he served as lead researcher examining the quality of immigration data in the ACS. Camarota Dep. at 38:12-19.

Dr. Camarota has no educational, scholarly, or professional experience with voter registration policy or voter roll maintenance, and in fact has virtually no experience of any kind relevant to any issue in this case. During his doctoral studies, Dr. Camarota conducted no research

on voter registration, state voter roll maintenance, or voting more generally, and his only academic exposure to voting policy came from coursework in "how . . . people's . . . attitudes and ideas influence how they vote, who they vote for . . .," Camarota Dep. 15:19–16: 13, a topic not relevant to the issues at hand.

As a graduate student and while employed with CIS, Dr. Camarota has conducted a fair amount of research and generated a long list of publications, the vast majority of which has focused on immigration policy, and none of which pertains to the impact of voter registration on voter participation rates or on voter registration efforts. Camarota Dep. at 22:20-23, 41:20-24. And despite having around 260 publications to his name, few address any subject other than immigration policy. Camarota Decl. at 10 (selected articles); Center for Immigration, "Steven A. Camarota: Director of Research," http://cis.org/Camarota-Publications (last accessed May 21, 2017) [hereinafter "Camarota Publications"]. Indeed, the majority of Dr. Camarota's publications are non-peer-reviewed "general-interest articles," "CIS publications," or op-eds that almost exclusively concern immigration policy. Camarota Dep. at 19:20-22, 29:5-7; Camarota Decl. at 10; Camarota Publications. The few articles that do touch on voting policy address the intersection of immigration and voter impact—issues categorically unrelated to voter registration or voter roll maintenance. *See id.*

Though Dr. Camarota has frequently offered his expertise before Congress and, to a lesser extent, in litigation, the province of this expertise has been immigration policy, with few exceptions. Despite having (by his estimate) "testified before Congress more than any other non-government expert on the economic and fiscal impact of immigration," he has never provided congressional testimony that focuses on voter registration policy. Camarota Decl. at 1, 10; Camarota Dep. at 38:5-10. In addition, of the four cases in which Dr. Camarota has prepared or

submitted expert testimony, two involved only matters of immigration.[2] One case involved the impact of Kansas's documentary proof of citizenship requirement on voter registration rates.[3] Camarota Dep. at 32:15-24; Camarota Decl. at 2. And finally, Dr. Camarota was retained by ACRU for a Texas case similar to this one. Camarota Dep. at 33:3–34:3, 42:19–43:6, 44:7-19.

Not only does Dr. Camarota lack any education or experience in voter registration policy or voter roll maintenance, but he likewise has no formal statistical training outside of a three-month "statistical boot camp" he attended two decades ago during graduate school. Camarota Dep. at 16:15-20. He has published no articles in peer-reviewed statistics journals and has never published any articles—peer-reviewed or otherwise—using EAVS data; his only published usage of Census Bureau population data has been in CIS-published projections or demographic breakdowns of voter turnout. Camarota Dep. at 44:24–45:3, 45:4-11.

### C.  Dr. Camarota's Methodology

To make it plain, in order to calculate voter registration rates for the citizen voting age population in Broward County, Dr. Camarota used an apple for a numerator and an orange for a denominator. Moreover, he relied entirely on estimates; he did not study the official lists of registered voters provided directly by the Florida Secretary of State or Broward County. Camarota Dep. at 32:7-14, 42:19–43:6, 44:7-19.

---

[2] One case concerned "the size of the illegal immigrant population" in Hazleton, Pennsylvania; the other case concerned the incidence of traffic stops involving individuals with Latino surnames in Maricopa County, Arizona. Camarota Dep. at 32:7-14.

[3] In that case, *Fish v. Kobach*, No. 2:16-cv-02015 (D. Kan. 2016), the district court preliminarily enjoined Kansas from requiring documentary evidence of citizenship for voting, based in part on its finding that the state failed to make a showing that substantial numbers of noncitizens had successfully registered to vote prior to the documentary citizenship requirement's implementation. *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1138, 1151-52 (D. Kan. 2016). The Tenth Circuit upheld the injunction. *Fish v. Kobach*, 840 F.3d 710, 717 (10th Cir. 2016).

Dr. Camarota first provides a calculation for the registration rate for the total voting-age population in Broward County using a total population (18+) estimate. He used EAVS data from 2010, 2012, and 2014—reflecting the number of both active and inactive registrants at a particular point in time—to provide an estimate for the numerator. He then used data from the Census Bureau's 2010, 2012, and 2014 population estimates—the total voting age population in Broward County, including both citizens and non-citizens[4]—for the denominator. Camarota Decl. at 3, 5 (Table 1).

Dr. Camarota then attempts to provide a calculation of Broward's citizen voting-age population. This calculation uses a new denominator: the 2010, 2012, and 2014 ACS data.[5] For the numerator, he again uses the EAVS data for those years. Camarota Decl. at 3, 6 (Table 2).[6]

Based on this calculation, Camarota concluded that the registration rates for voting-age citizens in Broward County during the tested years "indicate that nearly every eligible person in Broward County is registered to vote." Camarota Decl. at 7, 8. Camarota also asserted that these rates were "much higher" than the Florida, national, and state-wide voting-age citizen populations registered to vote as reported by the U.S. Bureau in the Current Population Survey November Supplement.[7] *Id.* at 8 & n.11.

---

[4] The Census Bureau's population estimate can only account for total population because that data set does not include citizenship information. Camarota Decl. at 3.

[5] ACS data estimates the population as of January 1 of each year. Camarota Decl. at 3 n.6. Dr. Camarota's opinion calculates the voting-age citizen population in Broward County for these three years based on both 1-year and 5-year ACS data. *Id.* at 6. For 2010, the 5-year data spans 2006 to 2010; for 2012, 2008 to 2012; and for 2014, 2010 to 2014. *Id.*

[6] Camarota calculated and applied 90% and 96% confidence intervals based on the standard errors and instructions for combining the errors provided by the Census Bureau. Camarota Decl. at 4 & n.10. Camarota's estimated registration rates include rates adjusted for both confidence intervals. *Id.* at 6, 7, 9.

[7] The Current Population Survey, conducted jointly by the Census Bureau and the U.S. Bureau of Labor Statistics, is the primary source of labor force statistics for the population of the United States. *See* https://www.census.gov/programs-surveys/cps.html (last visited May 24, 2017).

## II.    MR. GESSLER

### A.  Mr. Gessler's Opinions

Mr. Gessler offers an opinion that Dr. Snipes "has failed to conduct a general program," and that she has "failed to take reasonable steps to maintain the accuracy of the county voter rolls." Gessler Decl. ¶ 12. After reviewing and outlining Florida's law on voter list maintenance, Mr. Gessler charges that Broward County has failed to implement the "minimum activities" for compliance with state law, and that it has not "taken reasonable steps to address well-known or easily identified problems with its list maintenance programs," namely, "bloated" voter rolls and the existence of deceased voters on the rolls. Gessler Decl. ¶¶ 18-20, 42, 75. He then provides his recommendation on "reasonable steps" that the County should take "in order to develop a general program and maintain the accuracy of the county voter rolls." *Id.* ¶ 87. Mr. Gessler does not detail how his experience or other knowledge supports any of these judgments.

### B.  Mr. Gessler's Qualifications

Mr. Gessler is presently an attorney in Colorado. *See* Deposition of Scott Gessler, attached hereto as Exhibit D ("Gessler Dep.") at 10:6-11:1; Gessler Decl. ¶ 6. He has been an attorney, with the exception of a few brief forays into other fields, for nearly three decades. Gessler Dep. at 9:17-24, 10:6-11:1. Mr. Gessler currently divides his practice between commercial, transactional, and election law. Gessler Dep. at 15:22–16:14. He has practiced election law in Colorado, on and off, since 2001, and has taught election law at the University of Denver and University of Colorado law schools. Gessler Decl. ¶ 7. His election law experience is limited to election issues arising in Colorado. Gessler Dep. at 20:22-21:19.

From January 2011 to January 2015, Mr. Gessler was the Colorado Secretary of State; in this capacity, he acted as the chief election officer for the state, and likewise fulfilled several

additional responsibilities. Gessler Decl. ¶ 5; Gessler Dep. at 10:20-11:1, 22:15–23:22. As the chief election officer, his responsibilities included ensuring Colorado's compliance with federal election laws, overseeing election officials in Colorado counties, reviewing the election practices and procedures of Colorado localities, maintaining the voter database and voter registration systems for Colorado, and maintaining Colorado's voter rolls. Gessler Decl. ¶ 5.

In Colorado, the duty of implementing election policy belongs to the state's counties. Gessler Dep. at 29:10-13. Mr. Gessler has never handled county election data or directly supervised anyone handling this data. Gessler Dep. at 27:21-24. He has never managed a statewide voter registration database: as Secretary of State, he never directly interacted with the database, and possessed only a general familiarity with its functions and capabilities. Gessler Dep. at 26:1-27:24, 29:7-13. And the only time his office ever issued mailings to individuals registered in the database was when, at Mr. Gessler's direction, it issued a limited number of mailings to alleged noncitizens (the vast majority of whom turned out to be citizens). Gessler Dep. at 29:14-20.

The only familiarity Mr. Gessler has with the voter registration and list maintenance activities of other states comes from his attendance at National Association of Secretaries of State conferences, as well as other unspecified conferences, where presentations on different state voter registration systems were made and state Secretaries "exchange[d] ideas [and] talk[ed] about what their state was like [and] what other states were like." Gessler Decl. ¶ 8; Gessler Dep. at 37:25-38:2, 38:12-39:4. Mr. Gessler does not appear to have engaged in any such conversations, formally or informally, with the Florida Secretary of State, or attended any presentations on Florida's voter registration system. *Id.*

Excluding his preparation for this case, Mr. Gessler has little—if any—knowledge of Florida's or Broward County's voter registration and voter roll maintenance systems. Other than

what was discussed in deposition testimony, Mr. Gessler has no familiarity with Florida's statewide voter registration database or Broward County's voter registration database, does not know how the County's voter registration and list maintenance activities are coordinated with the statewide database, does not know whether Florida's motor vehicle agency coordinates with the Secretary of State to automatically update voter registration rolls, and does not know "all the specifics of Florida's elections and what they do and don't have in odd [election] years." Gessler Dep. at 85:4-16, 86:6-21, 86:24-87:8, 130:16-18, 162:11-163:7. He does, however, know that Florida's voter registration system differs from Colorado's: "[C]omparing [Colorado] to Florida, we have a more centralized system, and the clerks and recorders have a little bit less latitude than it seems the supervisor of elections within Florida has." Gessler Dep. at 47:4-8.

### C.  Mr. Gessler's Methodology

No clear methodology is discernible from Mr. Gessler's opinion. He appears to have arrived at his conclusions by simply applying his personal knowledge of Colorado's voter registration system at the state level and his review of Florida law to the information about Broward County found in documents produced and the data sources generated for this case.

Mr. Gessler relies on two data sets drawn from calculations and analysis of population statistics covering different time periods and regions. Gessler Decl. ¶¶ 43, 76. The first data set estimates the registration rate in Broward County in 2010, 2012, 2014, and 2016 based on data prepared by ACRU and produced in this litigation. *Id.* ¶ 43; Gessler Dep. at 150:20-151:6. For this, Mr. Gessler, like Dr. Camarota, compared ACS population data to the EAVS data containing the number of registered voters reported by Florida to the Election Assistance Commission. Gessler Dep. at 150:5-151:6. The data from 2016 is estimated based on Mr. Gessler's estimate of "historical growth," that he "extrapolated" from the Florida Supervisor of Elections website.

10

Gessler Dep. at 156:6-21; Gessler Decl. ¶ 43. The second dataset compares the number of expected centenarians in Broward County (based on ACS data) to the actual number of centenarians on voter rolls. Gessler Decl. ¶ 76. Mr. Gessler "adjusts" the national number of centenarians from ACS by comparing it to the national and county percentages of residents who are at least 85 years old. *Id*. ¶¶ 77-78. He does not further explain his methodology or his qualifications to develop or apply it.

Notably, Mr. Gessler is not a statistician. He has taken, at most, "a couple courses in statistics" at the Department of Agriculture over twenty years ago, and he admits that statistics is a "perishable skill," and that "unless you maintain that on a regular basis, you forget some of it." Gessler Dep. at 8:1-11, 42:17-43:7. He has little familiarity with EAVS data; he does not know whether it is collected before or after an election and does not think the timing impacts his analysis, Gessler Dep. at 152:1-153:14. And he has no basis for determining at what level a registration rate becomes potentially problematic, and concedes that high registration rates do not necessarily indicate a failure to maintain the voter rolls. Gessler Dep. at 154:1-24.

## LEGAL STANDARD

Pursuant to Federal Rule of Evidence ("FRE") 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, district courts serve as "gatekeepers" responsible for ensuring that "speculative, unreliable expert testimony does not reach the jury." *Daubert*, 509 U.S. at 589; *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). This function "inherently require[s] the

trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility." *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

To prevent unreliable expert testimony from reaching a jury, district courts must ensure that (1) the expert is qualified to testify competently regarding the matters he or she intends to address; (2) the methodology by which the expert reaches his or her conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See Daubert*, 509 U.S. at 589; *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). "The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *McCorvey*, 298 F.3d at 1256.

## ARGUMENT

### I.   NEITHER DR. CAMAROTA NOR MR. GESSLER IS A QUALIFIED EXPERT; THEIR UNRELIABLE AND SPECULATIVE OPINIONS MUST BE EXCLUDED.

#### A. Dr. Camarota Has No Education in or Professional Experience Related to Voter Registration and Voter Roll Maintenance Policy.

Dr. Camarota has never studied voter registration or voter roll maintenance policy, never conducted research on the impact of voter registration on voter participation rates or registration efforts, and not published a single article, peer-reviewed or otherwise, on voter registration, voter roll maintenance, or voting policy. His few non-peer-reviewed immigration-focused articles on voter perception and projections of voter turnout, which are at best peripheral to the contested issues in this case, do not supply him with adequate foundation to be considered an expert in voter registration or voter roll maintenance policy. Dr. Camarota's declaration, curriculum vitae, and deposition testimony thus make exceedingly clear that he lacks the relevant "knowledge, skill,

experience, training, or education" to assist the factfinder in determining any facts in issue—a prerequisite to proffering an expert opinion. Fed. R. Evid. 702; *see also McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004) ("An expert . . . is one who qualifies as such by reason of special knowledge and experience . . ." (internal quotation marks omitted)).

To the extent that Dr. Camarota has any expertise to offer, that expertise is limited to immigration policy, which is far afield of anything relevant in this case and consequently of no service to the factfinder. Merely having expert knowledge in one area does not provide Dr. Camarota with a blanket qualification to opine on unrelated issues; for his opinion to be admissible, it must be tailored to his actual education and experience. *See United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) ("[T]he opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert."); *see also United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) (upholding district court's refusal to qualify a chemistry consultant as an expert in controlled substances because he did not have a chemistry degree and had only worked with the chemical substance at issue in the case on "isolated projects"); *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1305-06 (N.D. Ga. 2008) (excluding the opinion of a proposed expert who had "received no education or training specific" to the subject of the opinion, and had no experience with the subject of the opinion in the course of his profession).  Dr. Camarota's opinion fails to meet this minimum standard and must be excluded.

**B.  Mr. Gessler's Opinions Are Uninformed by Relevant Experience or Independent Knowledge of Broward County's Voter Registration or Voter Roll Maintenance Systems.**

Throughout Mr. Gessler's lengthy account of how voter registration and voter roll maintenance work in Colorado at the state level, he never explains how or why Colorado's

practices have any bearing on what is or should be done in Broward County, Florida. Indeed, as discussed *supra*, Mr. Gessler confesses that he is completely unfamiliar with the statewide and County-based voter registration databases, or how the County coordinates its voter registration and maintenance activities with the statewide database or the state motor vehicle agency. Because Mr. Gessler fails to articulate a nexus between his state-level experience in Colorado and voter registration and roll maintenance in Broward County, he does not qualify as an expert on this topic. *See* Fed. R. Evid. 702 advisory committee's note (2000 amends.) ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'").

Nor has Mr. Gessler independently researched the voter registration and roll maintenance systems of Broward County, or, for that matter, of any counties outside of or states other than Colorado.  Citing no comparative studies of state voter registration systems, no national guidelines, and no widely accepted best practices, his opinion instead rests entirely on his unsubstantiated claims and judgments about what a county voting office should and should not do, with no explanation of how his limited Colorado experience suffices as support for his opinions on Broward County's practices. But as the Eleventh Circuit has recognized, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.,* 402 F.3d 1092, 1111 (11th Cir. 2005) (citation omitted). Mr. Gessler's "unexplained assurance" that his opinions rest on accepted principles, then,

"is not enough" to convert them into expert evidence. *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1130 (M.D. Fla. 2007).

### C.  Neither Dr. Camarota nor Mr. Gessler is a Qualified Statistician.

Not only do Dr. Camarota and Mr. Gessler each lack expertise in the substantive areas at issue in this case, but they each lack the skills to support their opinions. Despite Dr. Camarota's best efforts, he cannot transform himself into a "population statistician" simply by referring to himself as such in his proposed expert opinion. *See* Camarota Decl. at 1. Any knowledge of statistics he has retained from his decades-old three-month-long "statistical boot camp" is insufficient to render him an expert in the field. His occasional foray into statistical analysis in non-peer-reviewed "general-interest" articles—articles that do not promise scholarly rigor or even accuracy—does not counsel otherwise. Mr. Gessler, who is not a statistician by education, profession, publication, or in any other sense, fares no better. Having taken, at most, "a couple courses in statistics" from the Department of Agriculture over twenty years ago, Gessler Dep. at 8:1-11, and having admitted that statistics is a "perishable skill" that is forgotten unless regularly practiced, *id.* at 42:17-43:1, Mr. Gessler cannot pass off his layman estimates as the trustworthy statistical conclusions of an actual expert.

Given Dr. Camarota's and Mr. Gessler's utter lack of credentials to analyze complex population statistics, both are decidedly unqualified to offer statistics-based opinions. As a result, their respective data sets and the conclusions drawn from them must be excluded. *See IMPACT v. Firestone*, 893 F.2d 1189, 1192, 1195 (11th Cir. 1990) (finding no error in excluding testimony from a political scientist regarding statistical disparities in employment decisions, where the witness did not have training or significant experience as a statistician); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) ("While [the excluded expert] may have

used statistics in his work (as most people do to one extent or another) this does not mean that he is sufficiently qualified to testify to the statistical significance of [offered expert findings].").

## II.   DR. CAMAROTA'S AND MR. GESSLER'S METHODOLOGY IS TECHNICALLY UNSOUND AND UNRELIABLE.

To form their respective opinions, Dr. Camarota and Mr. Gessler appear to use the same methodology—a methodology that has not been peer-reviewed, has no error rate, has not been generally accepted in the social science community, and thus lacks the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Further, because the methodology compares apples to oranges to arrive at a pre-determined conclusion, it is fundamentally flawed. For these reasons too, this Court should exclude both expert reports.

### A. Dr. Camarota and Mr. Gessler offer no evidence of peer review, error rate, or general acceptance in the social science community to explain or validate their chosen methodology.

Noticeably absent from either Dr. Camarota's or Mr. Gessler's proposed expert report is any evidence that the methodology used in both reports has been subject to peer review or used by other statisticians. Nor does either report include any evidence of the methodology's error rate or evidence that it involves reliable, recognized statistical techniques. Without any information about the status of this methodology in its field, the Court cannot know if it is widely practiced or widely discredited, and thus whether it is at all reliable. *Cf. Daubert*, 509 U.S. at 593 (the "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected."). Consequently, Dr. Camarota's and Mr. Gessler's chosen methodology is unreliable and must be excluded. *See Malletier*, 525 F. Supp. 2d at 643 (noting, as grounds for excluding proposed expert opinion, that proposed expert "gave no indication that he employed reliable statistical methods to his findings").

16

In an effort to bolster the credibility of his opinion, Dr. Camarota describes himself as a "population statistician." Camarota Decl. at 1. But such self-proclamation cannot transform his unsupported methodology into a reliable scientific method.   Fed. R. Evid. 702 advisory committee's note (2000 amends.); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.* (on remand), 43 F.3d 1311, 1316 (9th Cir.1995) (because the gatekeeping role requires a district court to make a reliability inquiry, an "expert's bald assurance of validity is not enough"). Dr. Camarota does not even attempt to detail his experience as a population statistician, let alone establish how that experience informs his choice of methodology. Mr. Gessler never claims any experience as a statistician; moreover, he implies that he has forgotten much that he learned in the few statistics classes he took over twenty years ago. Both proposed experts, then, ask this Court to simply take their words on faith. But this the Court cannot do without undermining the reliability test required by Rule 702. *See, e.g.*, *Frazier*, 387 F.3d at 1261 ("If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.").

### B. Dr. Camarota's and Mr. Gessler's methodology consists of a flawed comparison between dissimilar data points.

Given both proposed experts' failure to establish that their chosen methodology is reliable and recognized in statistics or any other field, it is perhaps no surprise that the methodology is, in fact, fundamentally flawed.

Dr. Camarota's report puts this on full display. As discussed above, Dr. Camarota conducts two calculations to look at: (1) the registration rate of the total voting-age population, and (2) the registration rate of the citizen voting-age population. But in each of these calculations, Dr. Camarota is using a numerator and a denominator that are characteristically different in important ways. As he notes, in his calculation of the total voting-age population registration rate,

Dr. Camarota uses a ratio that measures registered voters at a point in time immediately prior to each federal election—when registration rates peak—against an eligible population figure that is a five-year average based on limited surveys conducted by the Census Bureau each year. *Compare* Camarota Decl. at 3 n.4 to *id.* at 3 n.6; *see also* Expert Report on Voter Records in Broward County, Florida by Dr. Daniel A. Smith, attached hereto as Exhibit E ("Smith Report") at 9. This comparison is flawed for two reasons: (1) he is comparing an *actual* registration number to an *estimated* population number, and (2) he is comparing a registration number at *a single point in time* when registration rates are highest to an *average* population number over a five-year period.

But even more critically, in calculating the citizen voting-age population registration rate, Dr. Camarota divides the EAVS registered voter figure by ACS eligible population estimates *for the same year*. This is a fatal error to Dr. Camarota's calculations. While Dr. Camarota correctly states that the ACS 5-year data he uses reflects information collected during a five-year period of time ending in the reporting year, *see* Camarota Decl. at 3 n.8 and Table 2, his use of that data does not account for the fact—as he explained himself—that the ACS data was "collected throughout the year and then totaled back and weighted to a midyear control point." Camarota Dep. at 48:10-12; *see also id.* at 49:22—50:4 ("[T]hink of it this way: it has basically the same effect as if you were to take all the years and average them together. . . . So you can think of it as the midyear of that year."). In other words, the 2006-2010 5-Year ACS estimate, the median year of which is 2008, should not be used as a denominator for a 2010 EAVS numerator. Thus, even if Dr. Camarota's apple-and-orange arithmetic were otherwise appropriate, the *2010* EAVS numerator should be compared against a denominator that more closely estimates the 2010 population, which would come from the 2008-2012 5-Year ACS data. *See* Expert Rebuttal in Response to Declaration of Scott E. Gessler by Dr. Daniel A. Smith, attached hereto as Exhibit F ("Smith Rebuttal") at 7

18

("[T]he median year of the 5-year 2014 ACS is 2012, not 2014, and should certainly not be used as a denominator to calculate voter registration rates in Broward County in 2014.") Dr. Camarota's misuse of the data sources he employs renders his methodology unreliable.

Mr. Gessler employs the same fatally flawed analysis. *See* Gessler Decl. ¶¶ 43, 76.

Simply put, the analysis used by both Dr. Camarota and Mr. Gessler compares different sets of numbers reflecting different periods of time, which therefore are not at all comparable. The method lacks any basis of reliability and must not be accepted.

## III.   MR. GESSLER'S OPINIONS SHOULD ALSO BE EXCLUDED BECAUSE THEY ARE UNHELPFUL LEGAL CONCLUSIONS THAT SUPPLANT RATHER THAN ASSIST THE FACTFINDER.

An expert opinion is admissible under *Daubert* only if "it concerns matters that are beyond the understanding of the average lay person," *Cook*, 402 F.3d at 1111, and only if "it assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue," *City of Tuscaloosa*, 158 F.3d at 565. Mr. Gessler's opinion fails to do either.

Rather, Mr. Gessler reviewed only the documents and sources of data prepared for or generated by this litigation, and evaluated the veracity of statements made by Dr. Snipes and other witnesses regarding Broward County's voter registration and voter roll maintenance practices. Gessler Decl. ¶¶ 12-17, 43-44. But weighing the evidence in a case—including making inferences based on evidence—and applying the governing law is precisely the role of the trier of fact, which "is entirely capable of determining whether or not to draw such conclusions without any technical assistance from" an expert opinion. *City of Tuscaloosa*, 158 F.3d at 565; *see also United States v. Billue*, 994 F.2d 1562, 1565 (11th Cir.1993). By offering opinions on such topics, Mr. Gessler improperly usurps the role of the fact-finder.

Equally problematic, Mr. Gessler provides an opinion on the ultimate legal questions presented by Count I of ACRU's complaint. *See* Gessler Decl. ¶ 12 (opining that Dr. Snipes "has failed to conduct a general program" and has "failed to take reasonable steps to maintain the accuracy of the county voter rolls"). Yet, it is well established that an expert "will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing argument." *Frazier*, 387 F.3d at 1262-63; *cf. Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("An expert may not . . . merely tell the jury what result to reach."); Fed. R. Evid. 702 advisory committee's note (2000 amends.) (merely telling jury what result to reach is not helpful to the jury and therefore is not admissible testimony). For this reason too, Mr. Gessler's opinion must be excluded. *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts."); *Cordoves v. Miami-Dade County*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015) ("[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied.").

Because Mr. Gessler's opinion does what the factfinder must do and nothing more, it is of no assistance to this Court and must be excluded.

## CONCLUSION

For the foregoing reasons, 1199SEIU requests that this Court exclude the opinions and testimony of Steven Camarota and Scott Gessler.

Dated: May 26, 2017

Respectfully submitted,

*/s/ Kathleen M. Phillips, Esq.*
Kathleen M. Philips, Esq.
Florida Bar No.: 287873
Phillips, Richard & Rind, P.A.
9360 SW 72nd Street, Ste. 283
Miami, FL 33173
T. (305) 412-8322
Email: kphillips@phillipsrichard.com

*Of Counsel:*

Katherine Roberson-Young, Associate General Counsel
Service Employees International Union
11601 Biscayne Blvd., Ste. 209
Miami, FL 33181
T. (954) 804-2719
Email: Katherine.roberson-young@seiu.org

Trisha Pande, Law Fellow*
Service Employees International Union
1800 Massachusetts Ave, NW
Washington, DC 20036
T. (202) 730-7383
Email: trisha.pande@seiu.org

Michelle E. Kanter Cohen, Election Counsel*
Catherine M. Flanagan, Sr. Election Counsel*
PROJECT VOTE
1420 K Street N.W., Suite 700
Washington, DC  20005
T. (202) 546-4173
Email: mkantercohen@projectvote.org
Email: cflanagan@projectvote.org

Stuart C. Naifeh, Senior Counsel*
Cameron A. Bell, Legal Fellow*
DEMOS
80 Broad Street, 4th Floor
New York, NY 10004
T. (212) 485-6240

21

Email: snaifeh@demos.org
Email: cbell@demos.org

Jessica R. Amunson*
Kali N. Bracey*
Carrie F. Apfel*
Marina K. Jenkins*
Tassity S. Johnson*
Jenner & Block LLP
1099 New York Ave., N.W., Suite 900
Washington, DC 20001
Email: jamunson@jenner.com
Email: kbracey@jenner.com
Email: mjenkins@jenner.com
Email: tjohnson@jenner.com
* *Admitted Pro Hac Vice*
*Counsel for Intervenor 1199SEIU United
Healthcare Workers East*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 26th day of May, 2017, the foregoing was served via this Court's

CM/ECF system to all counsels of record listed in the attached service list.

<u>/s/ Kathleen M. Phillips, Esq.</u>
Kathleen M. Phillips, Esp.

## SERVICE LIST

*Counsel for Plaintiffs*

William E. Davis (Fla. 191680)
Mathew D. Gutierrez (Fla. 0094014)
FOLEY & LARDNER LLP
Two South Biscayne Boulevard, Suite 1900
Miami, FL 33131
T. (305) 482-8404
F. (305) 482-8600
Email: wdavis@foley.com
Email: mgutierrez@foley.com

J. Christian Adams
Joseph A. Vanderhulst
Kaylan L. Phillips
PUBLIC INTEREST LEGAL FOUNDATION
32 E. Washington, Suite 1675
Indianapolis, IN 46204
317-203-5599
F. (888) 815-5641
Email: adams@publicinterestlegal.org
Email: jvanderhulst@publicinterestlegal.org
Email: kphillips@publicinterestlegal.org

H. Christopher Coates
LAW OFFICE OF H. CHRISTOPHER COATES
934 Compass Point
Charleston, SC 29412
T. (843) 609-7080
Email: curriecoates@gmail.com

Kenneth A. Klukowski
AMERICAN CIVIL RIGHTS UNION
3213 Duke Street, #625
Alexandria, VA 22314
877-730-2278
Email: kklukowski@theacru.org

*Counsel for Defendant*

Burnadette Norris-Weeks (Fla. 0949930)
BURNADETTE NORRIS-WEEKS, P.A.
401 North Avenue of the Arts
Fort Lauderdale, FL 33311
T. (954) 768-9770
F. (954) 786-9790
Email: bnorris@bnwlegal.com

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| AMERICAN CIVIL RIGHTS UNION, in its individual and corporate capacities, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Civil Action No. 16-cv-61474 |
| BRENDA SNIPES, in her official capacity as the SUPERVISOR OF ELECTIONS of BROWARD COUNTY, FLORIDA, | ) ) ) ) | |
| *Defendant,* | ) ) | |
| v. | ) ) | |
| 1199SEIU UNITED HEALTHCARE WORKERS EAST, | ) ) ) | |
| *Intervenor-Defendant* | ) ) | |

## EXPERT REBUTTAL DECLARATION OF STEVEN A. CAMAROTA, Ph.D.

### Voter Registration in Broward County, Florida in 2010, 2012, and 2014

**Background and Experience:** I have been asked by the American Civil Rights Union ("ACRU") to provide an opinion in rebuttal to the expert report of Daniel A. Smith submitted by the Intervenor-Defendant on the registration rate in Broward County. This report covers voter registration rate data in Broward County, Florida, in 2010, 2012, and 2014.

In developing this opinion, I have relied upon documents provided to me by ACRU, additional documents I have retrieved from the U.S. Census Bureau and Florida Secretary of State, as well as my experience as a population statistician.

I serve as the Director of Research for the Center for Immigration Studies, a Washington, DC-based research institute that examines the consequences of legal and illegal immigration on the United States. In recent years I have testified before Congress more than any other non-government expert on the economic and fiscal impact of immigration. In addition, I served as the lead researcher on a contract with the Census Bureau examining the quality of immigration data in the American Community Survey.

My research has been featured on the front pages of The New York Times, The Washington Post, and USA Today as well as numerous other media outlets. My academic articles have been published for journals, including the Public Interest and Social Science Quarterly. I have also written general interest pieces for such publications as the Chicago Tribune and National Review. My analysis and commentary are frequently heard on radio and television news programs including CNN, MSNBC, Fox News Channel, NBC Nightly News, and ABC World News Tonight, CBS Evening News, National Public Radio, and NewsHour on PBS.

I received my master's degree in political science from the University of Pennsylvania. I then received my doctorate from the University of Virginia in public policy analysis.

ACRU has retained me to review documents and provide an opinion. My rate for this matter is $150 per hour.

**Other Cases in Which the Witness Testified as an Expert in the Last 4 Years:**

1. *Fish v. Kobach*, No. 2:16-cv-02105 (D. Kan. 2016).
2. *Melendres v. Arpaio*, No. 2:07-cv-02513 (D. Az. 2013).

**Publications:**

See attached list of publications.

**Introduction:** The U.S. Census Bureau estimates the size of the population by age in each county annually. These population estimates can be compared to the number of people registered to vote in Broward County, Florida to determine the share of the adult population that is registered. The Census Bureau's population estimates do not include any information on citizenship. However, the Census Bureau does collect citizenship data in its American Community Survey (ACS). This data can be used as a denominator, with voter registration figures as a numerator, to calculate the share of eligible citizens who are registered in Broward. This analysis uses voter registration figures and data from the ACS to calculate registration rates in the county. The results show that compared to other data collected by the Census Bureau, the registration rate in Broward country is dramatically higher than rate nationally or in any other state.

In his written testimony, defendant's expert Daniel A. Smith argues that because the ACS is subject to imprecision due to sampling error -- as nearly all surveys are -- citizen counts from the ACS cannot be used to calculate registration rates. This argument is clearly mistaken, not least because it would mean that a large amount of data that the government relies upon every day is invalid. More importantly, basic statistical methods can quantify the effect of sampling error. As I show below, the confidence intervals around the voter registration figures are tight, meaning the estimates have a high degree of certainty. Simply put, the existence of sampling error in the ACS does not preclude its use in calculating registration rates.

**Data Source:** The voter registration information used for this analysis comes from the U.S. Election Assistance Commission's Election Administration Voting Survey

2

(EAVS). Localities are required to report the number of registered voters in their jurisdiction to the commission. The results for each jurisdiction, including for Broward County, can be downloaded from the U.S. Election Assistance Commission's web site.[1] The EAVS variable QA3a reports the number of individuals on the active voting rolls, and variable QA1a reports the total number of people eligible to vote, both active and inactive.[2] In Broward, both active and inactive registrants are eligible to vote. This analysis uses the EAVS from 2010, 2012, and 2014 as the numerator to calculate registration rates in the county.

      The denominator used to calculate registration rates for the total voting-age population (citizen and non-citizen) comes from the Census Bureau's 2010, 2012, and 2014 population estimates by county.[3] Each year the Census Bureau estimates the population by age, sex, and race in each of the nation's counties.[4] However, these annual estimates do not include citizenship information. Even the full decennial census from 2010 does not ask about citizenship. Therefore, the population estimates can be used only to calculate the registration rates for the total (citizen and noncitizen) population age 18 and over. Table 1 reports those total registration rates in Broward, with rates for all registrations versus active registrations displayed separately.[5]

      The Census Bureau's American Community Survey (ACS), an annual mini-census with more detailed demographic information, does contain citizenship data, allowing a second set of calculations using the voting-age population of *citizens* as the denominator.[6] The ACS is the largest survey collected by the Census Bureau, interviewing some 2 million households nationally.[7] This analysis reports the number of voting-age citizens in Broward County using the ACS for 2010, 2012, and 2014. Figures from the five-year ACS file are also reported.[8] All figures are from the Census Bureau's

---

[1] Data for 2014 can be found here: https://www.eac.gov/research/election_administration_and_voting_survey.aspx. Data for 2012 and 2010 can be found here: https://www.eac.gov/registration-data/.

[2] In 2012 the EAVS reports the same number of people in both variables. In contrast, in 2010 and 2014 the inactive registrations are reported separately and are included in the total number eligible to vote. It is not clear why the data is incomplete in 2012 for Broward County.

[3] https://factfinder.census.gov/faces/nav/jsf/pages/programs.xhtml?program=pep.

[4] The population estimates are controlled to a July 1st total, which means they reflect the population on July 1st of that year.

[5] The Census Bureau population estimates are not subject to the same kind of sampling error as surveys are. The estimates are created by the Bureau based on variety of data sources.

[6] Like the population estimates, the ACS reflects the population on 1st of the year the survey was collected.

[7] The methodology of the ACS can be found here: http://www.census.gov/programs-surveys/acs/about.html.

[8] Data for 2010 comes from the five-year ACS file collected in the 2006 to 2010 ACS, data for 2012 comes from the five-year file collected from the 2008 to 2012 ACS, and data for 2014 comes from the five-year file collected from the 2010 to 2014 ACS.

American Factfinder website.[9] Confidence intervals are shown using a 90% and 95% level for both the one-year and five-year ACS.[10] Note that a confidence interval is simply the estimate plus or minus the margin of error. A 95% confidence interval means that the true value falls within the interval 95% of the time.

---

[9] https://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

[10] American Factfinder reports standard errors for Broward County's voting-age citizens in four separate populations, Male 18+ Native born, Female 18+ Native born, Male 18+ Naturalized citizens, Female 18+ Naturalized citizens. Factfinder reports a 90% margin of error for each of these subpopulations. To combine the errors, it is necessary to perform the following operations: First, divide each margin of error by 1.645 to get the standard error. (In statistics, 1.645 is the value by which the standard error is multiplied to obtain a margin of error using a 90% confidence interval, so the above procedure simply reverses this.) Next, it is necessary to square each standard error, sum the squares, and then calculate the square root of the sum. Multiply this new standard error by 1.645 to get a 90% margin of error, or by 1.96 for a 95% margin of error. The Census Bureau has clear instructions for combining standard errors and calculating margins of error from American Factfinder when the raw ACS data is not available to the public. This Census Bureau presentation (beginning on slide 23) shows how to calculate standard errors from multiple populations derived from Factfinder. *American Community Survey (ACS) Using American Community Survey Estimates and Margins of Error* Webinar Transcript April 6, 2016 by Sirius Fuller of Census Bureau's Decennial Statistical Studies Division http://www.census.gov/content/dam/Census/programs-surveys/acs/guidance/training-presentations/2016_MOE_Transcript_01.pdf. The New York State Data Center's staff at Empire State Development has also developed a spreadsheet that allows one to combine standard errors from Factfinder. Using that tool confirms the results reported in this analysis. The tool can be downloaded here: https://sdcclearinghouse.com/2009/03/03/spreadsheet-to-calculate-acs-margins-of-error-and-statistical-significance-for-sums-proportions-and-ratios/.

| Table 1 | | | |
|---|---|---|---|
| **Registration Rates for the 18+ Population in Broward County Florida in 2010, 2012 and 2014** | | | |
| | **2010** | **2012** | **2014** |
| **Population estimate** | 1,361,787 | 1,421,895 | 1,467,042 |
| **Total Registration** | 1,214,714 | n/a | 1,198,616 |
| **Active registration** | 1,042,290 | 1,140,454 | 1,071,305 |
| **Share registered (Total Registration)** | 89.2% | n/a | 81.7% |
| **Share registered (Active Registration)** | 76.5% | 80.2% | 73.0% |

Source: Registration figures are from the U.S. Election Assistance Commission's Election Administration Voting Survey.  Population figures are from the Census Bureau's population estimates.  Census.gov

| Table 2 | | | |
|---|---|---|---|
| **Voting-Age Citizen Population in Broward County Florida in 2010, 2012 and 2014** | | | |
| Target population | Number | 90% Confidence interval | 95% Confidence interval |
| **2010** | | | |
| **ACS Citizens 18+ (1 Yr. data)** | 1,119,528 | ±13,106 | ±15,616 |
| **ACS Citizens 18+ (5 Yr. data)\*** | 1,098,140 | ±5,687 | ±6,776 |
| **2012** | | | |
| **ACS Citizens 18+ (1 Yr. data)** | 1,187,350 | ±15,201 | ±18,112 |
| **ACS Citizens 18+ (5 Yr. data)\*** | 1,134,383 | ±5,512 | ±6,568 |
| **2014** | | | |
| **ACS Citizens 18+ (1 Yr. data)** | 1,239,345 | ±14,081 | ±16,778 |
| **ACS Citizens 18+ (5 Yr. data)\*** | 1,187,020 | ±6,082 | ±7,247 |
| Source: American Community Survey (ACS) from American Factfinder at Census.gov | | | |
| *Five-year ACS data for 2010 is from 2006-2010, for 2012 it is from 2008-2012 and for 2014 it is from 2010 to 2014. | | | |

| Table 3 | | | | | |
|---|---|---|---|---|---|
| **Registration Rates for Voting-age Citizens in Broward County Florida in 2010, 2012 and 2014** | | | | | |
| | ACS Citizens 18+ (1 Yr. data) | | | ACS Citizens 18+ (5 Yr. data) | | |
| | **Share registered** | Using a 90% confidence interval | Using a 95% confidence interval | **Share registered** | Using a 90% confidence interval | Using a 95% confidence interval |
| **Total Registration 2010** | 108.5% | ±1.3% | ±1.5% | 110.6% | ±0.6% | ±0.7% |
| **Active registration 2010** | 93.1% | ±1.1% | ±1.3% | 94.9% | ±0.5% | ±0.6% |
| **Total Registration 2012** | n/a | n/a | n/a | n/a | n/a | n/a |
| **Active registration 2012** | 96.1% | ±1.2% | ±1.5% | 100.5% | ±0.5% | ±0.6% |
| **Total Registration 2014** | 96.7% | ±1.1% | ±1.3% | 101.0% | ±0.5% | ±0.6% |
| **Active registration 2014** | 86.4% | ±1.0% | ±1.2% | 90.3% | ±0.5% | ±0.6% |

Source: Confidence intervals are calculated by taking the high and low range populations from the ACS as reported in Table 2 and dividing them by the registration number as reported in Table 1.

**Results:** The first row of Table 1 reports the Census Bureau's estimates of the number of people (citizen and noncitizen) in Broward who were 18 and older in 2010, 2012, and 2014. The second and third rows show total registration in the county and active registration in the county, respectively, from the EAVS. The bottom two rows show the corresponding registration rates, which are simply the registrations divided by the Bureau's population estimates for the 18 and older population. The total registration rate was nearly 90% in 2010, falling to 82% in 2014. Because fewer registrations are "active," the active registration rates are lower.

Table 2 reports the number of voting-age *citizens* in Broward for 2010, 2012, and 2014, based on the ACS. The right side of the table shows the margin of error using 90% and 95% confidence levels. The 2014 ACS 1-year file shows there were 1,239,345 citizens in the county 18 years of age and older, with a margin of error of 14,081 using a

90% confidence level, and a margin of error of 16,778 using a 95% confidence level. These error margins are small, equal to between 1.1% and 1.4% of the population.

If we take the number of registrations from Table 1 and divide by the number of voting-age citizens as shown in Table 2, we get the results in Table 3. The left half of Table 3 reports registration rates using the 1-year ACS. For example, 96.7% of voting-age citizens in the county were registered to vote in that year. The 96.7% estimate has a 90% margin of error of 1.1 percentage points. This means that we can be 90 percent confident that the true value falls within 1.1 percentage points of the estimate, or between 95.6% and 97.8%. Using a 95% confidence interval, the share of citizens registered falls in the slightly wider range of 95.4% and 98%. Taken at face value, these numbers indicate that nearly every eligible person in Broward County is registered to vote.

**Placing the figures in context.** How do the above registration rates compare to rates nationally or in Florida? Every two years during federal elections the U.S. Census Bureau surveys the population in November and reports the share of the population registered to vote. Nationally, the Bureau reported 65.1% of voting-age citizens were registered in 2010, 71.2% were registered in 2012 (a presidential election year), and 64.6% in 2014. In Florida as a whole, the corresponding figures for these same years were 63%, 68.3%, and 62.6%.[11] Table 3 in this analysis shows that the registration rate in Broward was 96.7% in 2014 when all registrations are the numerator, and 86.4% when only active registrations are the numerator. These figures are much higher than the registration rate reported by the Census Bureau both nationally and for Florida in 2014. The same pattern holds for 2012 and 2010.

Furthermore, the rate for Broward County in 2014 shown in Table 3 is much higher than for any state as reported by the Census Bureau. Even in Maine, the state with the highest registration rate in 2014 according the Census Bureau, the registration rate was still 76.5% (±2.4%). In sum, the registration rates for Broward County as shown in Table 3 are much higher than the rates in Florida, the nation, and any other state.

**Imprecision in the ACS.** Unless every person in the entire population is interviewed, a survey will have some imprecision due to sampling error, which is the error that results from the survey sample not having exactly the same characteristics as the population as a whole. Defendant's expert Daniel A. Smith argues that because the ACS, being a survey, contains sampling error, population counts from the ACS cannot be used to calculate registration rates. That argument is clearly wrong. Smith's position would essentially throw away a wide range of official data that governments rely on

---

[11] The November supplement to the Bureau's Current Population Survey asks respondents whether they are citizens, whether they are registered, and whether they voted. Registration and voting figures from the Census Bureau for 2010 can be found here: http://www.census.gov/data/tables/2010/demo/voting-and-registration/voting-registration-2010-election.html, results for 2012 are here: http://www.census.gov/data/tables/2012/demo/voting-and-registration/p20-568.html and results for 2014 are found here: http://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html. In each case Table 4a has national- and state-level figures.

every day, for everything from allocating resources, identifying target populations for services, and planning transportation routes. The Census Bureau itself reports the number of voting-age citizens nationally and by state based on 1-year of data from the ACS, including margins of error.[12] To suggest that the ACS cannot be used to estimate the size of a populations (such as voting-age citizens) is to imply that the ACS is useless for one of the main purposes for which it was developed.

More to the point, a survey's natural imprecision can be quantified using basic statistics to produce a confidence interval around any particular estimate. As discussed above, Table 2 and Table 3 report confidence intervals using margins of error at different significance levels. The margins of error are small, and subsequently the variation in likely registration rates in the county is also small.

**Supplementation:** Following a review of those documents or any other relevant information, I will supplement this report if the new information leads me to believe this report is incomplete or inaccurate.

I <u>Steven A. Camarota</u>, under penalty of perjury under the laws of the United States of America, attest that the foregoing is true and correct.

Executed on February 24, 2017

_____

Steven A. Camarota

---

[12] http://www.census.gov/data/tables/time-series/demo/voting-and-registration/electorate-profiles-2016.html.

**Articles**
"Immigration Worked Out Fine in the Past, so Relax, Say Authors of an Influential New Study," *National Review*, Dec. 3, 2015.
"Heavy Welfare Use by Legal Immigrants – Yes, Legal Immigrants," *National Review Online*, Sept. 10, 2015.
"Give Me Your Tired Arguments, Your Poor Reasoning," *National Review Online*, Mar. 28, 2015.
"Senator Sessions Is Right: No STEM Worker Shortage," *Human Events*, Sept. 25, 2014.
"Immigration Exaggeration," *National Review Online*, Apr. 30, 2014.
"The Fiscal Impact of Immigration," *National Review Online*, May 14, 2013.
"Commentary: Rubio's Idea of Immigration Reform Would Hurt Florida," *The Palm Beach Post*, Mar. 28, 2013.
"The Cost of Cheap Labor," *National Review Online*, Feb. 27, 2013.
"Immigration Views Didn't Cost Romney," *USA Today*, Nov. 8, 2012.
"Perry's Ambiguous Employment Record," *National Review Online*, Sept. 22, 2011.
"The Problem with Obama's Immigration Plan," *CNN.com*, May 13, 2011.
"What's Next for Arizona?" *NYTimes.com*, Aug. 17, 2010.
"The G.O.P. and Birthright Citizenship," *NYTimes.com*, Aug. 17, 2010.
"Immigration Enforcement Must Come First: Feds Can't Change Neglected System Overnight," *The Washington Times*, July 14, 2010.
"How Many Americans?" *Washington Post*, Sept. 2, 2008.

**Invited Testimony**
The Fiscal and Economic Impact of Administrative Amnesty, House Committee on Oversight and Government Reform, Mar. 17, 2015.
Why Less-Skilled Immigration and Amnesty Are So Costly to Taxpayers, Senate Committee on the Judiciary, Apr. 22, 2013.
The Case for State and Local Immigration Enforcement, Pennsylvania Legislature, Aug. 31, 2011.
Immigrant Gains and Native Losses in the U.S. Job Market, 2000 to 2010, House Judiciary Committee, Mar. 10, 2011.
Immigration and the U.S. Economy, House Judiciary Committee, Sept. 30, 2010.
Immigration's Impact on U.S. Workers, House Judiciary Committee, Nov. 19, 2009.
The H-2B Visa Program and a "Shortage" of American Workers, House Judiciary Committee, Apr. 15, 2008.
Immigration and Black Americans: Assessing the Impact, U.S. Commission on Civil Rights, Apr. 5, 2008.

**Book Chapters**
"Immigration's impact on public coffers in the United States," in *The Effects of Mass Immigration on Canadian Living Standards and Society*, Fraser Institute, 2009.

**Center for Immigration Studies Reports and Papers:** cis.org/Camarota-Publications

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| AMERICAN CIVIL RIGHTS UNION, in its individual and corporate capacities, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Civil Action No. 16-cv-61474 |
| BRENDA SNIPES, in her official capacity as the SUPERVISOR OF ELECTIONS of BROWARD COUNTY, FLORIDA, | ) ) ) ) | |
| *Defendant*, | ) ) | |
| v. | ) ) | |
| 1199SEIU UNITED HEALTHCARE WORKERS EAST, | ) ) ) | |
| *Intervenor-Defendant* | ) ) | |

## EXPERT DECLARATION OF SCOTT E. GESSLER

1.      I have been asked by the American Civil Rights Union ("ACRU") to provide an opinion on whether the Broward County Supervisor of Elections conducts reasonable voter list maintenance activities in order to remove the names of ineligible voters from the Broward County voter rolls.

2.      In developing this opinion, I have relied upon documents provided to me by ACRU, additional documents I have retrieved from the U.S. Census Bureau and Florida Secretary of State, as well as my experience as an election attorney, election law professor, and former Secretary of State for the State of Colorado.

3.      ACRU has retained me to review documents and provide an opinion. My rate for this matter is $350 per hour.

### Education and Experience

4.      My education is as follows: I received a B.A. from Yale University, a J.D. from the University of Michigan Law School, and an M.B.A. from the J.L. Kellogg School of Management at Northwestern University. I also received a certificate for the Senior

1

Executives in State and Local Government at the Kennedy School of Government at Harvard University.

5.     I served as the Colorado Secretary of State from January, 2011, until January, 2015. In Colorado, the Secretary of State serves as the state's chief election officer. In that capacity my responsibilities included: supervising the conduct of primary, general, congressional vacancy, and statewide ballot issue elections in Colorado; enforcement of the Colorado election code; interpretation of the election code and promulgation of statewide regulations; statewide coordination and compliance with all federal election laws, including the Voting Rights Act ("VRA"),  the National Voter Registration Act ("NVRA"), the Help America Vote Act ("HAVA"), and the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"); training, review, and oversight of local countywide election officials and local election practices and procedures; maintenance and modifications to the statewide voter database and state voter registration systems, maintenance of the statewide voter rolls, testing and certification of voting equipment, implementation and enforcement of campaign finance laws, and development of election policies; development of statewide election legal strategy and responses to legal actions; and management of office personnel, policies, and procedures.

6.     I have worked as an attorney, primarily in the area of election law, from 2001 until 2010, and again from 2015 until the present. In this capacity I have represented candidates, parties, ballot issue committees, and independent groups in nearly all aspects of election-related activities. Further, I have litigated voter registration issues, primarily involving petition signatures and ballot access.

7.     In addition, I am an adjunct professor at the University of Denver Law School, where I teach election law. I have previously taught election law at the University of Colorado Law School.

8.     I have attended multiple conferences involving voter registration and list maintenance activities, include conferences conducted by the National Association of Secretaries of State, the Pew Foundation, and the Heritage Foundation, among others.

9.     As Secretary of State I implemented various new programs and initiatives involving the administration of Colorado's elections. These include:

     a.     Participation in the Election Registration Information Center ("ERIC") program, launched by the Pew Charitable Trusts. As Secretary of State, I evaluated the ERIC program and ensured Colorado was one of the very first states to join. During my time Colorado served as one of the first states to use voter registration and driver's license matching to improve voter registration efforts, as well as improve the accuracy of voter rolls.

     b.     The expansion and rebuilding of online voter registration in Colorado, which enabled voters not only to register online, but to also maintain their registration records online and remove their names from Colorado's voter rolls. To my knowledge,

this system has been the most popular and heavily used system nationwide, from 2012 until the present. For this, Colorado was awarded the 2013 "State Technology Innovator Award" from the National Association of State Chief Information Officers.

      c.     The review of all election procedures and the implementation of process mapping to improve and refine statewide and local procedures for election administration. This includes voter list maintenance and voter registration procedures and policies.

      d.     A complete rewriting and streamlining of Colorado's election regulations.

      e.     Development of a program to remove non-citizens from the voter registration rolls. During my time as Secretary of State, Colorado became the first state to match driver's license and voter roll information to identify potential non-citizens on the voter rolls, and Colorado and Florida were the first two states to obtain access to the Systematic Verification for Entitlements ("SAVE") program for purposes of maintaining voter rolls.

      f.     In response to new legislation, the development of an online, statewide electronic poll book and real-time access to the statewide voter database, to allow election-day voter registration and voting throughout the state. Colorado developed this complete system overhaul in nine months and is the only state to have such a system.

      g.     Development of new online training programs for the public and for local election officials. For this program, Colorado won the 2014 "Ideas Award" from the National Association of Secretaries of State.

      h.     Development and implementation of the "Accountability in Colorado Elections" ("ACE") program, which provides online, interactive maps for election information, including voter registration statistics, registration by districts, voter turnout, election cost statistics, and county election activity and legal compliance information. For this project, Colorado was a finalist for the 2016 "Ideas Award" from the National Association of Secretaries of State.

      i.     The launch and improvement of a statewide electronic delivery system for ballots to military and overseas civilian voters, which resulted in a substantial turnout increase.

10.   Relevant to this matter, while serving as Secretary of State I was served with a completed, but unfiled, legal complaint for a federal lawsuit, alleging noncompliance with Section 8 of the NVRA. Following a series of discussions and the release and posting of information online, the Secretary of State's office was able to satisfy the potential plaintiff's concerns and the plaintiff did not file the suit. I personally developed the office's strategy and served as lead negotiator in responding to that potential lawsuit.

### Documents and Materials Relied Upon

11.    I reviewed and used the following materials and documents in preparing this Report:

     a.     Deposition of Brenda Snipes, Broward County Supervisor of Elections;

     b.     Deposition of Mary Hall, Director of Voter Services;

     c.     Deposition of Dolly Gibson, Voter Services Clerk;

     d.     Deposition of Sonia Cahuasqui, Voter Services Clerk;

     e.     Pleadings and other filings in *ACRU v. Snipes*, Case No. 16-cv-61474 (S.D. Fla., 2016).

     f.     The National Voter Registration Act (NVRA);

     g.     Florida Election Laws;

     h.     2010, 2012, and 2014 datasets and reports from the EAC Election Administration and Voting Survey Comprehensive Reports to Congress;

     i.     Documents provided to Plaintiff by Defendant in discovery;

     j.     Documents provided to Defendant by Plaintiff in discovery;

     k.     American Community Survey datasets for population and citizen population from 2010 to present;

     l.     Defendant's Responses to Plaintiff's Requests for Admissions, Interrogatories, and Requests for Production;

     m.     Deposition exhibits;

     n.     Election data from the Florida Secretary of State website; and

     o.     Information from the Florida DHSMV website.

### Summary of Opinion

12.    It is my opinion that the Broward County Supervisor of Election has failed to conduct a general program and has failed to take reasonable steps to maintain the accuracy of the county voter rolls.

### Lack of a General Program

13.    A modern election is complicated. It requires voter registration and voter roll maintenance for thousands, sometimes millions of voters. Election officials must use and compare databases, consistently and regularly update information, implement procedures to ensure that all citizens can exercise the fundamental right to vote, and simultaneously take steps to avoid fraud and abuse. Finally, election officials must follow state and federal law, and oftentimes are constrained by technological issues or local public opinion.

14.    Because of the complexity and importance of elections, it is my opinion that any list maintenance system or program must include consistent and well-articulated policies and procedures. These are necessary for several reasons: to ensure equal and consistent treatment of all voters, to ensure the same steps are followed every time; to minimize human error and forgetfulness; to ensure consistency in the face of personnel turnover;

and to enable election officials to examine policies and procedures to identify deficiencies and problems. Consistent with my education and experience as an election official, any general program of list maintenance must include written or online training programs, written or online policies and procedures, and adequate recordkeeping and reporting to allow for later examination, analysis, or audit.

15.     Broward County does not have, in my view, a reasonable list maintenance program that includes training, documentation, and reporting, and it has not taken reasonable steps to create one. My opinion is based on the following:

     a.     Ms. Mary Hall, the Broward County Voter Services Director, has stated that Broward County has no written policies or procedures for list maintenance.[1]

     b.     Likewise, Ms. Dolly Gibson, a registration clerk at the Supervisor of Elections office, stated that there were no policies or procedures for updating voter registration records.[2]

     c.     Ms. Sonia Cahuasqui, a voter services clerk at the Supervisor of Elections office, stated that she does not use training materials when she trains people working for her. Instead, newly trained employees take notes and use them for reference. She further stated there are no manuals or procedures built into the voter registration database.[3]

     d.     In response to discovery requests, the Supervisor of Elections could not produce any written office policies, manuals, directives, or procedures concerning its programs for maintaining an accurate and current voter registration list and conducting a general program that makes a reasonable effort to remove the names of ineligible votes from the official lists of eligible voters.[4]

     e.     County officials are unable to search or sort the registration list to discover registrations that have been terminated based on the reason for termination, such as non-citizenship or felony disenfranchisement.[5]

     f.     Dr. Brenda Snipes, the Broward County Supervisor of Elections, personally expressed frustration about the lack of a process to verify or validate registrations. She believed that the State of Florida should participate in the ERIC system, because of the responsibilities placed on county Supervisors of Elections.[6]

---

[1] Hall Deposition 13:17-14:4.
[2] Gibson Deposition 32:15-24.
[3] Cahuasqui Deposition 16:20-17:3.
[4] Def. Resp. to Production Request No. 12.
[5] Def. Resp. to Production Request No. 17; Hall Deposition 20:17-24.
[6] Snipes Deposition 129:11-130:10.

g.      Exhibit A, attached to this report, contains a summary of the semi-annual *Certification of Address List Maintenance Activities* completed by the Supervisor of Elections for Broward county and submitted to the Florida Secretary of State, from 2011 to 2016.[7] Additionally, it contains notices for printing mail pieces sent to the Supervisor's outside vendor for the years 2014 to 2016. As seen on that exhibit, the total number of mail notices sent fluctuates wildly from year to year. Likewise, the number of inactive voters removed from the voter rolls fluctuates wildly. I have been unable to discern any pattern to explain this variation. These haphazard, varying numbers are inconsistent with a program of list maintenance. There is no semblance of consistency, which in my opinion shows a lack of regular activities or pattern of activities that would serve as a "program."

h.      According to her statement, Ms. Hall does not recognize the semi-annual *Certification of Address List Maintenance Activities* completed by the Supervisor of Elections office and signed by Dr. Snipes,[8] even though she is the Director of Voter Services and in charge of voter list maintenance activities for the office.[9] These documents contain basic information about address list maintenance activities and are the official record sent to the Florida Secretary of State.

i.      Finally, Ms. Hall, the voter services director, was not familiar with the term "mass non-forwardable mailing to all registered voters"[10] on the certifications sent to the Florida Secretary of State every six months. Further, she had no knowledge and could not confirm whether no voters were removed from inactive status in 2016. In my opinion, the Director of Voter Services, who is responsible for voter list maintenance activities, should be generally aware of basic information regarding the removal of inactive voters from the voter rolls.

16.      Taken together, these factors show an absence of training materials, an absence of written policies and procedures, and office leadership's lack of familiarity regarding basic voter maintenance data.

17.      Accordingly, it is my opinion that Broward County does not have a general program that allows election officials to properly manage, train, or consistently engage in list maintenance activities.

### Adherence to Minimum Statutory Requirements

18.      Florida law grants Supervisors of Elections considerable latitude and authority to conduct list maintenance. For example, Florida law expressly allows Supervisors of Elections to:

---

[7] *See* Defendant's Response to Plaintiff's Requests for Production, Exhibit A.
[8] Hall Deposition 43:25-44:13.
[9] Hall Deposition 69:9-12.
[10] Hall Deposition 64:13-23.

a.     Request and use information from out-of-state voter registration officials in order to identify duplicates.[11]

b.     Use National Change of Address ("NCOA") database information to identify registered voters who may have moved.[12]

c.     Use nonforwardable mailings sent to all registered voters in the county, both active and inactive, to identify registrants who may have moved.[13]

d.     Send mailings to registrants who have not voted or contacted the office in 2 years.[14]

e.     Obtain and use information from returned jury notices for list maintenance purposes.[15]

f.     Obtain and use information from the Department of Highway Safety and Motor Vehicles for list maintenance purposes.[16] The DHSMV has such a system that is free for Supervisors to use called DAVID.[17]

g.     Obtain and use information from "other sources" for list maintenance purposes.[18]

h.     Obtain and use information regarding death, felony status, non-citizen status, or change of address from "sources other than those identified."[19]

i.     Remove ineligible registrants based on information from other sources, not explicitly stated in the statute.

19.   Florida law does, however, establish a minimum level of activity for Supervisors of Elections. Specifically, Supervisors must engage in at least one of the following three activities biannually:

(a)   Change-of-address information supplied by the United States Postal Service through its licensees is used to identify registered voters whose addresses might have changed;

---

[11] Fla. Stat. 98.045(2)(b).
[12] Fla. Stat. 98.065(2)(a).
[13] Fla. Stat. 98.065(2)(b).
[14] Fla. Stat. 98.065(2)(c).
[15] Fla. Stat. 98.065(4)(a).
[16] Fla. Stat. 98.065(4)(a).
[17] Snipes Deposition 61:13-25, 62:1-15.
[18] Fla. Stat. 98.065(4)(b)
[19] Fla. Stat. 98.075(6)

(b)   Change-of-address   information   is   identified   from   returned nonforwardable return-if-undeliverable mail sent to all registered voters in the county; or

(c)   Change-of-address   information   is   identified   from   returned nonforwardable   return-if-undeliverable   address   confirmation   requests mailed to all registered voters who have not voted in the last 2 years and who did not make a written request that their registration records be updated during that time.[20]

20.     It is my opinion that Broward County does not engage in any of the above minimum activities. My basis for this opinion is as follows.

*Section (2)(a)*

21.     First, Broward County does not identify registered voters whose address might have changed by using "change-of-address information supplied by the United States Postal Service through its licensees." According to Ms. Hall, the only information the office receives from the Post Office is returned mail with yellow labels stating that a particular mail piece is not deliverable at a particular address.[21] Ms. Hall was clear that this is the only information from the post office used by the Supervisor of Elections.[22]

22.     The yellow labels are not "change-of-address information supplied by the United States Postal Service through its licensees." Although Ms. Hall stated that her office uses NCOA data because it processes information on the yellow return labels,[23] her understanding of NCOA data is incorrect. The United States Postal Service has developed and maintains a database of all address changes and forwarding information throughout the United States. It licenses this information to vendors, who in turn use the information to provide updated address information to customers. Election officials will purchase services from the vendors and use NCOA data to learn, among other things, if and where a voter has moved. This allows officials to communicate with the voter (usually by mail) to confirm whether, in fact, the NCOA data is correct. By doing this, an election official may begin the deregistration or registration update process *without* sending mail and having it returned as undeliverable. It is a way to save substantial time and money, because an election official can avoid sending mail that the Postal Service already believes is undeliverable. According to the statute, when a supervisor receives change of address information from the NCOA database, the supervisor "must change the registration records to reflect the new address" and then send an address change notice to that new address.[24]

_____

[20] Fla. Stat. 98.065(2)(a)-(c).
[21] Hall Deposition 50:19-51:20
[22] *Id.*
[23] *Id.*
[24] Fla. Stat. 98.065(4)(a).

23.     Further, in response to a request for production, the Supervisor could not produce any records of "United States Postal Service National Change of Address database requests."[25]

24.     In its responses to interrogatories, the Supervisor stated that she does not obtain or use data from commercial vendors regarding changes of address for registrants on the rolls.[26] Accordingly the Supervisor does not receive NCOA information from any USPS vendor.

25.     Finally, processing information from yellow return labels is not using "change-of-address information supplied by the United States Postal Service through its licensees."

*Section (2)(b)*

26.     Second, the Supervisor of Elections does appear to use "change of address information" from "returned nonforwardable return-if-undeliverable mail." But the Supervisor does not receive this information from "mail sent to all registered voters in the county," as required by Section (2)(b).

27.     To be sure, Ms. Hall stated that the county sends a mailing to all registered active and inactive voters every odd year,[27] and that the mail is nonforwardable.[28] But it is my opinion that Ms. Hall is incorrect. As an initial matter, Ms. Hall is mistaken about NCOA information,[29] and she does not appear to recognize or understand reporting terms used by the Florida Secretary of State, such as "mass non-forwardable mailing to all registered voters."[30]

28.     More importantly, responses and documentary evidence produced by the Supervisor of Elections directly contradicts Ms. Hall's testimony.

29.     Every six months, the Supervisor certifies Address List Maintenance Activities to the Florida Secretary of State. These activities are personally signed and certified by Dr. Brenda Snipes, and they were provided by the Supervisor in response to Plaintiff's requests for production.[31] In my opinion, an election official like the Supervisor would only certify these documents, send them to the Secretary of State, and provide them in this case, if the official believes they contain accurate information regarding list maintenance activities conducted by the Supervisor.

---

[25] Def. Resp. to Production Requests No. 1.
[26] Def. Resp. to Interrogatory No. 17.
[27] Hall Deposition 31:25-32:23.
[28] Hall Deposition 34:8-11
[29] *See* ¶ 22, *supra*.
[30] Hall Deposition 64:13-23.
[31] Def. Resp. to Production Requests, Exh A.

30.     Exhibit A summarizes information in the certified address list maintenance activities conducted by the Supervisor from 2011 through 2016.

   a.     During these years, not once did the Supervisor certify that she had done a "Mass (nonforwardable) mailing to all registered voters in county."

   b.     The number of mailings sent is wholly inconsistent with the number of registered voters in Broward County. In 2015 and 2016, the number of registered voters in Broward County ranged from approximately 1.2 million to 1.3 million. The year 2015 saw a total of 67,648 pieces of mail sent, which is extremely small compared to the number of voters.

   c.     These certified numbers are corroborated by the notices for mail sent to the off-site printer. The numbers sent to the off-site printer are extremely close to the certified numbers, and in some instances they match exactly.

31.     Based upon the documentary evidence in this case, my opinion is that the Supervisor has not sent mail to every registered voter in the county in accordance with Section (2)(b).

*Section (2)(c)*

32.     Third, Section (2)(c) allows a supervisor to use "change-of-address information" that is identified from returned nonforwardable return-if-undeliverable address confirmation requests. These address confirmation requests must be "mailed to all registered voters who have not voted in the last 2 years and who did not make a written request that their registration records be updated during that time."[32]

33.     None of the testimony addressed this situation. Therefore, for this opinion relies upon the summary contained in Exhibit A of the certified reports produced by the Supervisor. The Supervisor certified that she met this section for all or part of every year, by checking the box titled "Targeted address confirmation request (nonforwardable) mailing to registered voters who have not voted or requested an update to their records within the last 2 years."

34.     Although the supervisor certified compliance, the number of mail pieces is impossibly small. In other words, based upon the amount of mail sent by the Supervisor, it is impossible for her to have sent mail to all voters who failed to vote or requested an update.

35.     Section (2)(c) requires the Supervisor to send "address confirmation requests." For the half-years from 2011 to 2016, the number of address confirmation requests fluctuated between 456 at the lowest (in 2011 H2) to 7,025 (in 2015 H2). But the number

---

[32] Fla. Stat. 98.065(2)(a)-(c).

of voters who did not vote in the previous two years was far, far higher. Take, for example, the two years prior to the second half of 2015, which would be June 2013 through June 2015. In the 2014 November election, Florida had 51% turnout.[33] I assume that Broward County had a similar voter turnout of 51%, which would be 476,474.[34] That means in the two years prior to the second half of 2015, approximately 447,788 voters did not vote.

36.    Even though approximately 448,000 voters did not vote in the two years preceding the second half of 2015, the Supervisor only sent out 7,025 address confirmation requests.

37.    Even if Broward County had slightly greater or lower turnout than statewide turnout, it makes no material difference. The difference between approximately 448,000 non-voters and 7,025 address confirmation pieces is too large. Likewise, it does not matter whether the Florida Secretary of State calculates voter turnout based on active voters or all registered voters. In either instance, the number of non-voters dwarfs the number of address confirmation requests sent. And in my experience, there is no possibility that nearly all of non-voters in the preceding two years requested a change of address.

38.    Even if one adds up all of pieces of mail sent in the second half of 2015 (67,648), it still does not come even close to the number of non-voters.

39.    As with my earlier analysis, the number of mail pieces sent in 2015 is corroborated by the notices sent to the off-site printer. Accordingly, the certified numbers accurately reflect the number of mail pieces mail sent.

40.    Finally it is impossible that the Supervisor sent mail to all non-voters in other years, even the two-year period following a presidential election. For example, take the second half of 2013. Using the same analysis:

> Preceding two years: June 2011 to June 2013
> Federal Election: 2012 (presidential election)
> Statewide voter turnout: 72%
> Broward County voters: 762,345[35]
> Broward County non-voters: 296,468
> Address confirmation requests sent in 2013 H2: 5,034
> Total of all mailings sent in 2013 H2: 61,495

---

[33] Florida Department of State, *Voter Turnout*, available at http://dos.myflorida.com/elections/data-statistics/elections-data/voter-turnout/.
[34] Florida Department of State, *Ballots by Type Activity for 2014 General Election*, available at http://dos.myflorida.com/media/694976/2014ballotscast.pdf.
[35] Florida Department of State, *Ballots by Type Activity for 2012 General Election,* available at http://dos.myflorida.com/media/693340/2012ballotscast.pdf.

41.     Accordingly, it is my opinion that the Broward County Supervisor of Elections has not conducted a mail program that meets the requirements of Section (2)(c).

### Bloated Voter Rolls and Other Warning Signs

42.     In my opinion and experience, election officials must look closely at voter registration or list maintenance problems and determine whether they have implemented procedures and policies to address the problems. The Broward County Supervisor of Elections has not, in my opinion, taken reasonable steps to address well-known or easily identified problems with its list maintenance programs.

43.     An unusually high percentage of registered voters serves as one of the main indicators that a jurisdiction does not take reasonable steps to maintain voter registration lists. Broward County is a classic example of a jurisdiction that has alarmingly high voter registration rates, often exceeding the voting age population. The following exhibit table shows Broward County's registration rates.

*Broward County Registration Rates*

| Year | 2010 | 2012 | 2014 | 2016 |
|---|---|---|---|---|
| Citizen Voting Age Population | 1,098,140 | 1,134,385 | 1,187,020 | 1,240,000 |
| Total Active Voters | 1,042,290 | 1,140,454 | 1,071,305 | 1,194,192 |
| Total Active and Inactive voters | 1,214,714 | not avail | 1,198,616 | 1,301,470 |
| Registration rate, active only | 95% | 101% | 90% | 96% |
| Registration rate, all voters | 111% | Not available | 101% | 105% |

Sources:
- ACS data, 5-year CVAP estimates for 2010 (ACRU00720), 2012 (ACRU00721-00724), 2014 (ACRU00726-00729)
- EAC data, 2010 (ACRU00317), 2012 (ACRU00403), and 2014 (ACRU00715) Election Administration and Voting Survey Comprehensive Report
- The data has been produced by Plaintiff's in discovery as document numbers ACRU00237-00730
- 2016 Citizen Voting Age Population was estimated, based on historical growth
- 2016 total current active was taken from the SOE's website
- Total registration at the time of the 2016 election was taken from the Voter Extract File CD available from the Florida Division of Elections

44.     These registration rates range from 101% to 111%. Accordingly, in each election year Broward County had more registered voters than eligible voters living in the county. Even if one takes registration rates for active voters only, in my opinion and experience the numbers are still exceedingly high.

45.     Bloated voter rolls do not, standing alone, show an unreasonable list maintenance program. They do, however, serve as a warning sign that problems exist. With voter registration rates in these ranges, it is my opinion that any election official must analyze his or her processes and procedures to determine whether he or she is taking reasonable steps to maintain voter rolls.

46.     Broward County has not taken reasonable steps to maintain voter rolls, as evidenced by the county's lack of documented and consistent procedures, inadequate mail program, and bloated voter rolls. As noted above, the county does not use NCOA data, does not mail to all registered voters, and does not mail to even a substantial portion of non-voters. But Broward County's exceedingly high registration rates show that the Supervisor has taken inadequate steps to maintain voter rolls.

47.     Media reports and complaints to the Supervisor of Elections show that the Supervisor of Elections has knowledge of specific deficiencies in her list maintenance programs, and she has not taken reasonable steps to address known, and often pervasive, problems.

**Use of Driver's License Data**

48.     One of the most powerful tools that are available for obtaining accurate address information and  removing duplicate voter registrations is driver's license information. The ERIC database provides an important example of this. In order to belong to ERIC, a state must provide both voter registration information and driver's license information. By using minimum matching criteria, ERIC can match names and other personal information to identify errors in voter rolls. In my experience, the comparison between these two state databases – voter rolls and driver licenses – is far and away the most powerful tool for cleaning and maintaining voter rolls.

49.     The Supervisor of Elections cannot participate in ERIC because the system is available only to states (including Washington D.C.), and Florida has chosen not to participate thus far. Nonetheless, the Supervisor of Elections can get most of the benefit of participating in ERIC simply by comparing her voter rolls to Florida's driver's license information.

50.     Currently the Supervisor does not seek or receive driver license information. For example, a person may move and update their driver's license, and the Supervisor will not have this information to update the voter rolls. [36]

51.     The Supervisor does not use the Driver and Vehicle Information Database ("DAVID") provided by the Florida Department of Highway Safety and Motor Vehicles to check for duplicate registrations and address accuracy. [37] This database is available to the Supervisor and it is free of charge. [38]

52.     In my opinion, use of DAVID to compare voter information to driver license information is not only a reasonable, but also very important step to take as part of a list maintenance program. In my opinion this tool will greatly help list maintenance efforts. It

---

[36] Snipes Deposition 155:10-25.
[37] Snipes Deposition 61:13-25; 62:1-15; 63:1-22.
[38] Snipes Deposition 62:20-63:13.

is free of charge. Further, other Florida counties already use DAVID,[39] and thus the Supervisor will be able to learn from their experiences.

**Jury notices**

53.     When called for jury duty, people will sometimes seek to recuse themselves because they no longer live in the jurisdiction or are not a citizen. Likewise, relatives or friends may inform the court that the person called for jury duty has died. This is all extremely valuable information to help maintain voter rolls. The information is a direct admission of ineligibility, or in the case of a deceased person the information comes from a highly credible source. Indeed, Florida law expressly empowers Supervisor Snipes to obtain and use jury notice information for list maintenance purposes.[40] Despite concluding that it would be helpful to utilize this data, she does not.[41]

54.     Currently the Supervisor does not obtain jury excusal forms or information from courts, including the local circuit court.[42] This information can easily be obtained, because the clerk of the county court and Supervisor's office are very near one another.[43] Furthermore, the Supervisor already has at least one staff member who is familiar with the forms and understands what information is available.[44]

55.     In my opinion, use of jury recusal forms is a reasonable step to maintain voter rolls and reduce the bloated registration numbers.

**Duplicate voter registrations**

56.     Duplicate voter registrations are generally divided into two categories: instances where the voters have two registrations within the same state and instances where voters are registered in two or more states.

57.     The Supervisor relies heavily upon the Florida Secretary of State to identify voters who are registered at more than one Florida address.[45] Nonetheless, the Supervisor is the election official who determines whether or not to remove a duplicate voter registration. By relying upon the Secretary, it seems that the Supervisor takes reasonable steps to remove duplicate voter registrations.

57.     But my opinion must be qualified, because I have not received information about the specific matching criteria that the Secretary or the Supervisor uses to identify

---

[39] Snipes Deposition 63:3-13.
[40] Fla. Stat. 98.065(4)(a)-(b).
[41] Snipes Deposition 31:19-32:9.
[42] Def. Resp. to Request for Admission No. 3; Def. Resp. to Production Request No. 5; Snipes Deposition 31:19-25.
[43] Gibson Deposition 34:24-35:7.
[44] Gibson Deposition 10:1-19:20.
[45] Snipes Deposition 151:15-154:6; Hall Deposition 53:20-54:10

duplicate voters. The effectiveness and reasonableness of efforts to remove duplicate voter registrations depend heavily upon the matching criteria used. Absent knowledge of these criteria, I cannot form an opinion as to whether this activity is a reasonable step towards maintaining accurate voter rolls.

59.     With respect to duplicate registrations in which a voter has registered in Florida and another state, the Supervisor has been made aware of many duplicate registrations in Florida and New York.[46] Nonetheless, the Supervisor has not sought or obtained any information regarding potential duplicate registrations in Broward County and other states.[47]

60.      If the Supervisor were to receive information regarding an out-of-state duplicate voter registration, she would send that voter a piece of mail to confirm residence in Broward County, or alternatively begin the removal process.[48]

61.     In my experience, every state[49] except Alabama makes their voter registration databases publicly available at low cost. Because there are known problems with duplicate voter registrations in New York, it is my opinion obtaining the New York voter registration database and comparing it to the Broward County database is a reasonable step that will reduce the bloated registration rolls and address a known problem. Obtaining and using this information for list maintenance purposes is expressly permitted under Florida law.[50]

**Felon Registrations**

62.     As with in-state duplicate information, the Supervisor relies entirely upon the Florida Secretary of State for felon voting information. This is her primary source of information and the only consistent database check that she conducts.[51] In addition, she will occasionally receive news reports or complaints about felons who are illegally registered to vote.[52]

63.     At this point, I am unable to form an opinion as to whether reliance upon the Secretary of State is reasonable, because I do not know whether the Secretary transmits only felons convicted under state law, or also includes felons convicted under federal law. In my experience, the two types of convictions come from separate databases, and some states have occasionally failed to use federal conviction data. The Supervisor herself does

---

[46] Snipes Deposition Exhibit 7; Plaintiff's Production ACRU00165-00166, 00183, 00185.
[47] Hall Deposition 54:11-22.
[48] Hall Deposition 56:15-18.
[49] As used here, the term "state" includes Washington D.C. and United States territories.
[50] Fla. Stat. 98.045(2)(b).
[51] Hall Deposition 48:11-14, Cahuasqui Deposition 20:9-23.
[52] Snipes Deposition Exhibit 4; Plaintiff's Discovery Production ACRU00194-00195, 00223-00225.

not request or directly receive any information or communications form the U.S. Attorney or federal courts regarding felony convictions.[53]

64.     Although there is some fluctuation in the yearly number of felons removed from the Broward County voter rolls, Exhibit A shows generally shows a consistent pattern of activity that does not, in my opinion, give rise to concerns.

65.     In my opinion, the Supervisor should confirm that the Secretary of State felon updates include felons convicted in federal courts. If the Secretary of State does not include that information in felon updates, then the Supervisor should take reasonable steps to obtain that information and regularly use it to remove convicted felons from the Broward County voter rolls.

**Non-Citizen Registrations**

66.     The Supervisor does not check voter registrations for citizenship and does not verify citizenship,[54] despite the fact that as of 2015, there were 259,115 noncitizens in Broward County, which represented 14.1% of the population.[55]

67.     There is substantial confusion regarding whether there are any checks to determine whether voters are citizens. At one point, Dr. Snipes surmised that potential voters were vetted for citizenship based upon a driver license comparison or Social Security number comparison,[56] but she later admitted she did not know.[57] In my experience, none of the comparisons described by Dr. Snipes provide citizenship information.

68.     In any event, the Supervisor does not check for citizenship, but Dr. Snipes believes that it would be a good idea for Broward County to independently check for citizenship.[58]

69.     I agree, and my opinion is that the Supervisor should take reasonable steps to identify non-citizens on the Broward County voter rolls, for at least the following reasons:

      a.     Non-citizens form a very large percentage of Broward County's population.

---

[53] Def. Resp. to Production Request No. 4.
[54] Hall Deposition, 29:3-5.
[55] ACS data for 2015, available at
https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml.
[56] Snipes Deposition, 46:12-19, 76:14-17, 77:20-24
[57] Snipes Deposition, 77:25-78:3
[58] Snipes Deposition, 80:4-7.

b.    The Supervisor has specific knowledge that non-citizens may be on her voter rolls. In response to inquiries by the Department of Homeland Security, the office has identified registered voters who are seeking to become citizens or whose registration status is being investigated by the Department of Homeland Security.[59]

c.    As shown in Exhibit A, the Supervisor has removed very few non-citizens from Broward County's voter rolls. From 2011 until mid-2016, the Supervisor removed a total of 19 non-citizens. In my experience, a county the size of Broward County very likely has far more than 19 non-citizens on its voter rolls over the course of over five years.

70.    In 2012, Florida (along with Colorado), was one of the first states to obtain access to the federal Systematic Alien Verification for Entitlements ("SAVE"). Authorized officials may use this program to determine the citizenship of legal and formerly-legal residents. Currently, the Supervisor does not use this program in connection with removal of ineligible voters from the rolls, nor does she request or obtain any other type of information from the Department of Homeland Security regarding ineligible noncitizen registrants.[60]

71.    As an election official who has substantial experience with the SAVE program, in my opinion the SAVE program can be a very valuable tool to identify potential non-citizens.

72.    In addition, the Florida Department of Motor Vehicles verifies the citizenship status of all non-citizen driver's license applicants.[61]

73.    It is my opinion that because of the known issues with non-citizens on Broward County voter rolls, the Supervisor use both the SAVE program and driver's license data to check for, and remove, non-citizens from the county voter rolls.

**Deceased Voters on Voter Rolls**

74.    Currently, the Florida Secretary of State provides information to the Supervisor regarding deceased voters. The Supervisor only uses information received from Florida Secretary of State regarding deaths in the state.[62] She does appear to take consistent and regular action to remove deceased voters from the county registration rolls based on this information.[63]

---

[59] Snipes Deposition, 127:18-22
[60] Def. Resp. to Request for Admission No. 4; Def. Resp. to Production Request No. 6.
[61] Florida Department of Motor Vehicles, Florida DMV Online Guide, available at: http://www.dmvflorida.org/drivers-license-nc.shtml.
[62] Snipes Deposition, 75:12-76:11
[63] Snipes Deposition, 49:21-50:17.

75.     Nonetheless, the Supervisor does not take reasonable steps to remove deceased voters from the voter rolls, for the following reasons.

76.     Initially, the number of older voters on the Broward County voter rolls is extremely – and implausibly – high. The following table shows that the number of centenarians (voters 100 years old or older), far exceeds the expected number of voters in that age category.[64] This is an example of bloated voter rolls with respect to this demographic group:

|  | National | Broward |
|---|---|---|
| Population, 2015 | 321,418,297 | 1,896,425 |
| 85+ population | 6,161,617 | 45,071 |
| Percentage of 85+ | 1.917% | 2.377% |
| County 85+ population rate increase for Broward County | | 24% |
| | | |
| Centenarians (ACS data 2015) | 76,974 | |
| National rate of centenarians | 0.0239% | |
| Expected Broward rate of centenarians | 0.0297% | |
| Expected Broward number of centenarians | | 563 |
| Actual number of centenarians on Broward voter rolls | | 3,044 |

77.     The ACS data does not provide the specific number of centenarians living in Broward County. Accordingly, the above table adjusts the expected number of centenarians living in Broward County by comparing the national and county percentages of those 85 years and older. Using this measure, Broward County's percentage of centenarians should be 24% higher than the national number.

78.     Even using these adjusted numbers, the above chart shows that Broward has approximately 563 centenarians, compared to 3,044 centenarians on the voter rolls.[65] In other words, the number of centenarians on the Broward County voter rolls is 8.5 times the expected centenarian population.

79.     The exceptionally bloated voter rolls, combined with problems identified below, show that the Supervisor is not taking reasonable steps to remove deceased voters from the voter rolls.

80.     Although the Supervisor receives updates of deaths from the Secretary, there is no indication that she compares the cumulative, total universe of deceased voters against the voter rolls. It is necessary to periodically compare the cumulative list of deceased voters against the voter rolls, because; (1) the Supervisor can identify deceased voters who were overlooked during the update process, and (2) the Supervisor can identify deceased voters

---

[64] Data obtained from ACS 2015.
[65] Plaintiff's Discovery Production ACRU00189.

whose names were fraudulently or mistakenly registered after their names had been removed during the update process.

81.     In my experience, state authorities generally receive information about deaths that occur within the state. But they can only obtain information about deaths occurring outside of the state by accessing other state records or the U.S. Social Security Administration's Social Security Death Index ("SSDI"). Accordingly, information about a Florida voter who dies outside of the state will not automatically be forwarded to Florida authorities.

82.     The Supervisor is aware that the information received from the Florida Secretary of State does not adequately identify out-of-state deaths. For example, the office regularly receives calls from relatives of registered Florida voters who died in another state.[66] Without these calls, the Supervisor does not remove names from the voter rolls.

83.     In another instance, in 2012 the Supervisor received information that 23% of a sample that included about one quarter of all County voters who passed away in 2011 remained on the voter rolls. This constituted 481 voters.[67]

84.     The Supervisor does not obtain or use the U.S. Social Security Administration's Social Security Death Index (SSDI).[68] She also does not obtain or use data provided by the State and Territorial Exchange of Vital Events (STEVE) program, which also contains notices of deaths.[69]

85.     It is my opinion that the Supervisor should take two reasonable steps: First, periodically compare cumulative death information against voter rolls. Second, use both the SSDI and the STEVE program to identify voters who have died outside of Florida.

### Recommendations

86.     No single list maintenance activity can reasonably address the potential problems of inaccurate and incorrect voter registration data. For example, information about deceased voters is useless in identifying ineligible voters or non-citizens, or duplicate voter registrations. Accordingly, any general program that contains reasonable list maintenance steps must include a variety tools that address known problems and potential issues. For these reasons, a reasonable program should address all of the issues identified above.

---

[66] Snipes Deposition, 47:18-48:9.
[67] Plaintiff's Discovery Production ACRU00207.
[68] Def. Resp. to Interrogatory No. 5; Hall Deposition 49:19-50:5; Snipes Deposition 61:7-14.
[69] Def. Resp. to Interrogatory No. 5; Snipes Deposition 47:10-25.

87.     Based upon the opinions expressed above, it is my opinion that the following actions are reasonable steps that Broward County should take in order to develop a general program and maintain the accuracy of the county voter rolls.

    a.      Develop written training materials for staff engaged in list maintenance activities.

    b.      Develop written policies and procedures for list maintenance activities.

    c.      Ensure that key office personnel, to include the Supervisor of Elections and the Director of Voter Services are familiar with the information and reports filed with the Florida Secretary of State regarding list maintenance activities.

    d.      Conduct regular and consistent list maintenance programs.

    e.      Conduct at least one of the required activities under Florida law. In my experience, use of NCOA data is cheaper and more effective than the other methods. Further, these activities should be done at least once each year.

    f.      Obtain access to DAVID and compare driver license data to the county voter rolls to identify errors and inaccuracies in the voter rolls.

    g.      Obtain jury recusal information and use that as part of the process to remove ineligible voters, update voter information, or merge duplicate voter registrations.

    h.      Confirm whether the Secretary of State provides felon information that includes felons convicted under federal law. If not, the Supervisor should directly contact the U.S. Department of Justice to obtain that information.

    i.      Use driver license information and use the SAVE program to identify voters who are non-citizens.

    j.      For deceased voters, periodically compare the voter rolls to a cumulative index of deceased voters, to remedy past errors and weed out attempts to register deceased voters. Also, use both the SSDI and the STEVE program to obtain information about voters who have died outside the State of Florida.

## Supplementation

88.     To my knowledge, not all relevant documents in this case have been produced as of the date of this report. Those documents include:

    a.      Copies of all invoices and statements from Commercial Printing and VR Systems from 2009-present. (Plaintiff's Request for Production 8.)

   b.  Records of complaints received regarding list maintenance issues from 2015-present. (Plaintiff's Request for Production 6 and 11.)

   c.  Communications from and to the Florida Secretary of State's office, including the Florida Bureau of Voter Registration Services, concerning list maintenance in Broward County from 2009-present. (Plaintiff's Request for Production 10.)

   d.  Records related to United States Postal Service National Change of Address database requests from 2009-present. (Plaintiff's Request for Production 1; Defendant also referred to using the NCOA database in the deposition on January 26, 2017.)

   e.  A current list of all registered voters (active and inactive). (Plaintiff's Request for Production No. 3.)

89. Following a review of those documents or any other relevant information, I will supplement this report if the new information leads me to believe this report is incomplete or inaccurate.

I Scott Eric Gessler, under penalty of perjury under the laws of the United States of America, attest that the foregoing is true and correct.

Executed on February 10, 2017

_____

Scott E. Gessler

# EXHIBIT C

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF FLORIDA

3                FORT LAUDERDALE DIVISION

4

5    AMERICAN CIVIL RIGHTS UNION, in its    Civil Action

6    individual and corporate capacities,  No. 16-cv-61474

7        Plaintiff,

8    v.

9    BRENDA SNIPES, in her official

10   capacity as the SUPERVISOR of

11   ELECTIONS of BROWARD COUNTY,

12   FLORIDA,

13        Defendant,

14   v.

15   1199SEIU UNITED HEALTHCARE WORKERS

16   EAST,

17        Intervenor-Defendant.

18   ------------------------------ x

19

20        DEPOSITION OF STEVEN A. CAMAROTA, Ph.D.

21                Washington, D.C.

22                March 10, 2017

23

24   Job No. 120738

25   Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR

Page 2

1

2

3

4                       STEVEN A. CAMAROTA, Ph.D.

5                         March 10, 2017

6                           1:11 p.m.

7

8

9

10

11          The following is the transcript of the

12    deposition of STEVEN A. CAMAROTA, Ph.D. held at the

13    offices of Jenner & Block LLP, 1099 New York

14    Avenue, NW, Suite 900, Washington, DC 20001, and

15    reported by Linda S. Kinkade, RDR, CRR, RMR, RPR,

16    CSR, and Notary Public within and for the District

17    of Columbia.

18

19

20

21

22

23

24

25

1    A P P E A R A N C E S:

2

3    On Behalf of Plaintiff AMERICAN CIVIL RIGHTS UNION,

4    in its individual and corporate capacities:

5             Public Interest Legal Foundation

6             360 N. Washington Street

7             Alexandria, Virginia 22314

8             BY:  J. Christian Adams, Esq.

9

10

11

12

13

14

15   On Behalf of Defendant BRENDA SNIPES, in her

16   official capacity as the Supervisor of Elections of

17   Broward County, Florida:

18             Burnadette Norris-Weeks

19             401 NW 7th Avenue

20             Fort Lauderdale, Florida 33311

21             BY:  Burnadette Norris-Weeks, Esq.

22             (Telephonic appearance)

23

24

25   ///

1    A P P E A R A N C E S (continued):

2    On Behalf of Intervenor 1199SEIU United Healthcare

3    Workers East:

4              Demos

5              80 Broad Street

6              Fourth Floor

7              New York, New York 10004

8              BY:  Stuart Naifeh, Esq. (Telephonic appearance)

9              BY:  Cameron Bell, Esq.

10

11

12

13

14

15

16   On Behalf of Intervenor 1199SEIU United Healthcare

17   Workers East:

18              Project Vote

19              1420 K Street, NW

20              Washington, DC 20005

21              BY:  Michelle Kanter Cohen, Esq.

22

23

24

25   ///

1    A P P E A R A N C E S (continued):

2

3    On Behalf of Intervenor 1199SEIU United Healthcare

4    Workers East:

5             Jenner & Block

6             1099 New York Avenue, NW

7             Washington, DC 20001

8        BY:  Marina Jenkins, Esq.

9        BY:  Kali Bracey, Esq.

10       BY:  Carrie Apfel, Esq.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  INDEX OF EXAMINATION

2

3      EXAMINATION OF STEVEN A. CAMAROTA, Ph.D.   PAGE

4              BY MS. JENKINS                9

5              BY MR. ADAMS                 58

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       E X H I B I T S

2

3    NO.            DESCRIPTION                      PAGE

4    Exhibit 1      Expert Rebuttal Declaration of ....   12

5                   Steven A. Camarota, Ph.D.

6    Exhibit 2      Center for Immigration Studies, ...   19

7                   Director of Research, Steven A.

8                   Camarota

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

S. CAMAROTA

P R O C E E D I N G S

1

2

3        THE REPORTER:  Good afternoon.  The

4  transcript will reflect our date, time and location.

5  If counsel would state their appearances, please.  And

6  if you would like to start, Marina.

7        MS. JENKINS:  Sure.  Marina Jenkins with

8  Jenner & Block representing Intervenor 1199SEIU.

9        MS. BRACEY:  Kali Bracey, Jenner & Block,

10  representing Intervenor 1199SEIU.

11        MS. KANTER COHEN:  Michelle Kanter Cohen

12  from Project Vote, also representing Intervenor.

13        MS. BELL:  Cameron Bell from Demos also

14  representing Intervenor 1199SEIU.

15        MS. APFEL:  Carrie Apfel, Jenner & Block,

16  also representing Intervenor.

17        MR. NAIFEH:  Stuart Naifeh from Demos for

18  the Intervenor.

19        MS. NORRIS-WEEKS:  Burnadette Norris-Weeks

20  on behalf of the Supervisor of Elections of Broward

21  County.

22        Also, I didn't realize that I had muted my

23  phone.  I will need the deposition from yesterday, a

24  copy of it, please.

25        MR. ADAMS:  Anyone else on the phone?

1          S. CAMAROTA

2     Christian Adams for Plaintiff.

3          STEVEN A. CAMAROTA, Ph.D.,

4      having been first duly sworn, was thereafter

5     examined and testified as follows:

6                    EXAMINATION

7     BY MS. JENKINS:

8     Q.  Good morning -- or good afternoon,

9     Mr. Camarota.  My name is Marina Jenkins, and I

10    represent Intervenor 1199SEIU, UnitedHealthcare

11    Workers East.  I'm going to be taking your deposition

12    today.

13    A.  Okay.

14    Q.  Would you please state and spell your full

15    name for the record?

16    A.  It's Steven, with a V, middle name Andrew,

17    last name Camarota, C-A-M-A-R-O-T-A.

18    Q.  So I'm just going to give you a quick

19    overview of our process today.  We're basically having

20    a conversation.  I'm going to be asking questions.

21    Your only job is to answer them honestly and

22    completely.  Is that okay?

23    A.  Sure.

24    Q.  As you know, the court reporter has sworn

25    you in.  That means everything that you say here today

1                          S. CAMAROTA

2     And I also went to the Census Bureau's website and

3     just again reviewed some of the material related to

4     the American Community Survey, which was the primary

5     data source I used to create the denominators for the

6     analysis.

7          Q.  Did you meet with anyone to prepare for the

8     deposition?

9          A.  I did not meet with anyone.

10         Q.  Okay.  Did you review any other documents

11    other than your rebuttal declaration to prepare for

12    today's deposition?

13         A.  Other than reading information at the

14    Census Bureau's website, I did not review any

15    documents to prepare for today.

16         Q.  Okay.  So do I understand your testimony

17    correctly to say that you did not re-review Dan

18    Smith's expert report --

19         A.  I did not read -- sorry.

20         Q.  -- in preparation for today's deposition

21    today?

22         A.  I did not reread Daniel Smith's testimony.

23         Q.  Now I'd just like to ask you some questions

24    about your background.  Where did you go to college?

25         A.  Juniata College in Pennsylvania.

1                    S. CAMAROTA

2          Q.   What year did you get your degree?

3          A.   1983.

4          Q.   Did you get any advanced degrees?

5          A.   I have, yes.

6          Q.   What are they?

7          A.   I have a master's degree from the

8    University of Pennsylvania and a Ph.D. in public

9    policy analysis from the University of Virginia.

10         Q.   When did you receive those degrees?

11         A.   I got the Ph.D. in '96 and the master's, I

12   believe, was '90.

13         Q.   What was the focus of your research during

14   your Ph.D. studies at UVA?

15         A.   I was focused on analysis of primarily

16   Census Bureau data and some other things too, but

17   mainly Census Bureau, looking at a whole variety of

18   issues associated with U.S. immigration.  What

19   else ... primarily focused on sort of demographic,

20   sociodemographic characteristics of the foreign-born

21   or immigrant population, and trying to, you know,

22   measure a variety of measures -- things -- primarily

23   looking at the labor market consequences of

24   immigration and also the fiscal consequences of

25   immigration.

1                        S. CAMAROTA

2         Q.  Did you write a dissertation as part of

3    your Ph.D.?

4         A.  I did.

5         Q.  What was the subject of your dissertation?

6         A.  The title of the dissertation hopefully

7    sums it up.  It was "The Consequences of Immigration

8    for America's Poor."

9         Q.  Did you have a primary advisor during

10   your --

11        A.  I did.

12        Q.  -- studies?  Who was that?

13        A.  His name was Steven Rhoades.  He was a full

14   professor at the University of Virginia, Department of

15   Government at the time.

16             THE REPORTER:  Please let her finish her

17   entire question before you answer.

18             THE WITNESS:  Sorry.

19        Q.  Did you focus any of your research while

20   you were completing your master's degree on voting?

21        A.  I did not.

22        Q.  Did you focus any of your research while

23   completing your Ph.D. on voting?

24        A.  In the context of coursework we did things

25   on public opinion and voting and things like that, but

S. CAMAROTA

1
2  my dissertation did not deal with voting.

3      Q.  Can you explain what you mean by "public
4  opinion and voting"?

5      A.  Oh, well, when you study political science
6  and government, one of the common topics people focus
7  on is how do people's, you know, their attitudes and
8  ideas influence how they vote, who they vote for,
9  similar kinds of things when you look at Congressional
10  voting, that kind of stuff.

11      Q.  During your studies for your Ph.D. did you
12  do any research or work around voter registration?

13      A.  I did not.

14      Q.  Do you have any other advanced degrees?

15      A.  No.  I mean -- well, let me say this.  I
16  did complete three months of training at the
17  University of Michigan ICPSR.  It's like a statistical
18  boot camp, if you will.  So you get a couple of
19  semesters of statistics in all at once.  So, anyway, I
20  did that while I was at UVA.

21      Q.  Okay.  Can you tell me what ICPSR stands
22  for?

23      A.  Gosh, that was 20 years ago.  I can look it
24  up for you, but it's intercollegiate --

25      Q.  If you don't know, that's fine.

1                        S. CAMAROTA

2        Q.   Okay.  Since you said that, I took the

3   liberty of printing out the webpages from the link

4   that is on your website.

5        A.   Good.

6                  (Exhibit 2 marked for

7                  identification.)

8        Q.   And we can stipulate to this, but for the

9   sake of the record, if you follow the link on page 10

10  that says Center for Immigration Studies, Reports and

11  Papers, there are 26 webpages with ten articles on

12  each page, for a total of 260 articles listed as your

13  publications.  Does that seem right?

14       A.   That seems -- I mean, I can't say that

15  everything's here, but that sounds about right, maybe

16  260, yeah, something like that.

17       Q.   Okay.  Great.  Would these be peer-reviewed

18  articles?

19       A.   No, no, most of these aren't.  We would

20  have to go through and find the ones that are.  Many

21  of them are general-interest articles.  Some of them

22  are CIS publications, which we certainly had outside

23  people give us input and comment, and others are more

24  classically what you would refer to as having been

25  peer reviewed or outside reviewed.

S. CAMAROTA

1

2      A.   Okay.  On page 9 there's one -- I won't

3  write again -- "The Hispanic Vote in the Upcoming 2010

4  Elections."

5      On page 10 -- well, this one just says, "An

6  Examination of Minority Voters' Views on Immigration,"

7  so that's not really quite the same thing.  So maybe,

8  you know, it's related, it looks at voters, but it's

9  not an evaluation of the vote, registration, that sort

10  of thing.

11      Let's see what else ... I'm not looking here --

12  there's a whole series of election polling and opinion

13  polling, but that's of registered voters -- not

14  registered voters -- of likely voters, but here I'm

15  just trying to find the ones that dealt with

16  registration and voting.  See if there's anything back

17  here ...

18      Based on my look-through of this list, that's

19  it, I think.

20      Q.   Okay.  Thank you.  Have you done any

21  research about the impact of voter registration

22  requirements on voter participation rates?

23      A.   I have not.

24      Q.   Have you published any research about voter

25  roll list maintenance?

S. CAMAROTA

1
2   don't think are relevant, and the only things that

3   would be relevant is I worked as a teaching assistant

4   and a researcher for professors.

5        Q.  Do you remember what kind of classes you

6   worked as a teaching assistant for?

7        A.  Yeah, I TA'd for a professor who is kind of

8   well-known, a guy named Larry Sabato at UVA, for his

9   American government class.  I graded for another

10  professor -- what was the title -- it was like, I

11  think, but I'm not sure now, it may have been voting

12  and elections.  I graded for that.  He has passed away

13  now.  So I did that kind of stuff, typical graduate

14  school stuff, TA'd, research assistant, and grader.

15       Q.  Okay.  And so you said you may have graded

16  for a class on voting and elections?

17       A.  Yeah, I think that was the title, but I

18  can't remember now.

19       Q.  Okay.  And what did you do once you

20  completed your doctorate?

21       A.  I came to work for The Center for

22  Immigration Studies.

23       Q.  And you have worked there since?

24       A.  I have.

25       Q.  Have you been employed by anyone else in

1                              S. CAMAROTA

2      addition to The Center for Immigration Studies during

3      your tenure?

4              A.  I have.  I have done other contract work

5      for different organizations.

6              Q.  Is it okay if I refer to The Center for

7      Immigration Studies as CIS for shorthand?

8              A.  Yes, that would be fine.

9              Q.  Great.  What kind of work does CIS do

10     generally?

11             A.  We cover pretty much a whole panoplea of

12     issues, whether they be demographic, economic, social,

13     administrative, some historical analysis, but mainly

14     kind of the whole breadth, hopefully -- let me try to

15     be -- of immigration, looking at immigration in the

16     United States but only in the United States.  We don't

17     do a lot of international comparisons.

18             So, you know, if you would look over that list,

19     you'd see I've done a whole series of areas, whether

20     they be demographics, economics, voting registration,

21     you know, but we have other people who focus on

22     administrative stuff, you know, things dealing with

23     court cases, so very broad.

24             Q.  Sorry.  What do you mean by "things dealing

25     with court cases"?

1                          S. CAMAROTA

2          A.  Oh, so we have people who cover issues like

3    asylum law or other areas of immigration law,

4    enforcement.

5          Q.  How many people work at CIS?

6          A.  Yeah, you know, I'm not exactly sure, but I

7    will say 14 -- 15.  Fifteen, I think it's 15.

8          Q.  Okay.  And what is your current role at

9    CIS?

10         A.  I'm the director of research at CIS.

11         Q.  And have you always had that -- held that

12   position?

13         A.  No.  I was originally hired as a resident

14   scholar.

15         Q.  When did you become director of research?

16         A.  I believe in '98-'99, right around that

17   time.

18         Q.  Did you have a title in between being hired

19   and when you became director of research?

20         A.  Resident scholar.

21         Q.  Right.  Sorry.  Was there -- so you were

22   hired as a resident scholar --

23         A.  And then I became --

24         Q.  -- and then you became director of

25   research.

1                          S. CAMAROTA

2    policy.

3          Q.   And what do you mean by "engage in public

4    discourse"?

5          A.   Yeah, so that would be like write

6    general-interest articles, op-eds for The Washington

7    Post, The Chicago Tribune, USA Today.  We also appear

8    on television, you know, The News Hour on PBS or CNN

9    or Fox News, and also radio stations.

10         Q.   Does that include your work providing

11   testimony to Congress?

12         A.   Yes, that would be another example.  I'm

13   sorry.  I should have thought of that.  Testimony

14   before Congress, House and Senate.

15         Q.   Okay.  Anything else?

16         A.   I mean, as the major responsibilities, I

17   think we've covered them.

18         Q.   Does anyone else weigh in when you decide

19   what to write about?

20         A.   Well, besides the Center's executive

21   director and also my -- the demographer who works

22   under me, other Center staff will weigh in depending

23   on the subject matter.

24         Q.   Do you confer with anyone at CIS about

25   whether or not to serve as an expert in litigation?

                          S. CAMAROTA

1
2        A.   No.   I make that decision myself.   I'm on

3   my own time.

4        Q.   You mentioned earlier that you've worked as

5   a contractor in addition to working at CIS during your

6   tenure there.

7        A.   Yes.

8        Q.   Who have you worked for?

9        A.   I am outside consultant for a market

10  research company called GLG, Garrison Lehman Garrison,

11  and I provide expertise to their clients on

12  immigration and, generally, you know, likely policy

13  administrative changes.   And I have also given expert

14  testimony in some other court cases.

15       Q.   Can you give me a time frame for your work

16  for GLG?

17       A.   When you say "time frame," what do you

18  mean?

19       Q.   When did you start working as a consultant

20  for them?   Are you still working as a consultant for

21  them?

22       A.   I am still working for them, and it's very

23  episodic.   So when there's an immigration issue or

24  when it seems there's going to be a changeover, I work

25  a lot more.   I believe I've worked for them, I want to

                            S. CAMAROTA

1

2    say, six years.

3         Q.  So when you say "episodic," do you mean as

4    projects arise they will contact you for work?

5         A.  Yes.

6         Q.  You mentioned that you sometimes serve as

7    an expert in litigation.

8         A.  Mm-hmm.

9         Q.  Can you tell me about those cases in which

10   you have served as an expert?

11        A.  Yes.  The first time I did that was for the

12   City of Hazleton, Pennsylvania.  They asked me to

13   prepare a report estimating the size of the illegal

14   immigrant population in their community.

15        Q.  When was that?

16        A.  I think I put that -- I think it's listed

17   here, but I believe that's '99-2000, sometime around

18   there.

19        Q.  Okay.  I think, just so we're clear, in

20   your report there is -- you do identify other cases in

21   which you have testified in the past four years.  So

22   just as we have this conversation -- that's on page 2

23   of Exhibit 1.

24        A.  Okay.

25        Q.  As we have this conversation, we're clear

S. CAMAROTA

1
2   that only two cases are identified and those --

3       A.   Right.   Okay.

4       Q.   -- are in the past four years, but I am

5   interested in past work beyond that.

6       A.   That was the first time.   And then the

7   other two places here, as you can see, one was for

8   Maricopa County.   That went on for a number of years.

9   I believe it concluded about four years ago.   That was

10  looking at -- I did a detailed Hispanic surname

11  analysis with -- based on traffic stop information,

12  and compared it to population estimates and Census

13  Bureau data with the county to try to come up with the

14  incidence of stops and things like that.

15      And then I did work in litigation for the state

16  of Kansas trying to estimate voter registration and --

17  well, registration rates and then voting rates in the

18  state before and after the implementation of

19  citizenship and some other requirements that they had

20  at the time.

21      Q.   You've mentioned three cases.   Are there

22  others?

23      A.   They are the only cases where I've ever

24  given sworn deposition.

25      Q.   Okay.   Have you served as an expert in

1                        S. CAMAROTA

2      other cases when you have not given sworn testimony?

3             A.  Have I ever prepared testimony is what

4      you're asking?  I have.

5             Q.  Can you tell me about those cases?

6             A.  Yes.  One involved looking at voter

7      registration rates in a county in Texas and whether

8      they, you know, just calculating mainly registration

9      rates over time relative to population figures from

10     census.

11            Q.  Do you know the name of that case?

12            A.  What is the name of that case?  Sistava

13     County?  I always pronounce it wrong.  Sistava?

14     Zavala County.  I'm sorry.  It's Zavala County.

15            Q.  Is that case ongoing?

16            A.  I don't believe so, no.

17            Q.  When did you prepare your testimony for

18     that case?

19            A.  I would say four years ago maybe, but I was

20     never called to give a deposition or anything.

21            Q.  Okay.  Who hired you for that?

22            A.  Let's see.  I believe that was, yeah, I

23     think it was -- it's the American Civil Rights Union,

24     I believe, was the people I -- who hired me for that.

25            Q.  Is that the same entity that hired you for

1                          S. CAMAROTA

2      this case?

3              A.  Yes.

4              Q.  Are there other cases in which you have

5      prepared testimony but have not been deposed?

6              A.  I can't think of any.  I have not.  I think

7      that's it.

8              Q.  Have you given a deposition, other than

9      these cases, not as an expert, have you been in a

10     deposition before?

11             A.  I have not, only as an expert.

12             Q.  So you said that you were hired in this

13     case by the American Civil Rights Union, and you were

14     also hired in this case -- I'm sorry -- you were also

15     hired by the American Civil Rights Union, ACRU, in the

16     Zavala County case.

17             A.  Yes.

18             Q.  Are there other cases for which you have

19     been hired by the ACRU?

20             A.  No, I have not been hired for any specific

21     case by them other than those two.

22             Q.  Other than those two cases, have you ever

23     done work for ACRU?

24             A.  I have.

25             Q.  Was that paid work?

1                              S. CAMAROTA

2    whether they should ask citizenship on the census

3    form.  So it wasn't exactly an immigration question,

4    how feasible is that.

5         Q.  Okay.  Have you ever testified before

6    Congress on issues relating to voting?

7         A.  That has never been the primary focus.  It

8    may have come up in talking, you know, if a senator or

9    member asked me, but that was not the primary focus of

10   the testimony.

11        Q.  I think you may have just been referring to

12   this, but in your declaration you also state that you

13   served as the lead researcher on a contract with the

14   Census Bureau examining the quality of immigration

15   data in the American Community Survey.

16        A.  Right.

17        Q.  When was that?

18        A.  That was, I believe, about 2000 to -- 2000

19   to 2007, I think.  I can get you the exact dates on

20   that.

21        Q.  Who hired you to do that?

22        A.  The person at Census that I dealt with was

23   named Kevin Deardorff.  He worked in the population

24   division, and I was a subcontractor for Sabre Systems

25   Incorporated.  And that's been a number of years.

1                        S. CAMAROTA

2   you ask that again?  Have I ever worked for a

3   campaign?

4           Q.  Sure.  Have you ever worked for a campaign?

5           A.  I did briefly, yes.

6           Q.  Have you ever worked for a county elections

7   office?

8           A.  I have not.

9           Q.  Have you ever participated in a voter

10  registration drive?

11          A.  I have not.

12          Q.  Have you ever worked in an elections

13  administration office?

14          A.  I have not.

15              MS. JENKINS:  Can we take a five-minute

16  break?

17          (Proceedings recessed at 1:59 p.m.)

18          (In session at 2:27 p.m.)

19  BY MS. JENKINS:

20          Q.  In your research have you ever studied

21  voter registration efforts?

22          A.  Voter registration efforts ... again, I've

23  looked at voter registration data, but I don't -- I

24  would not have studied voter registration efforts.

25          Q.  What kind of voter registration data have

1                          S. CAMAROTA

2      you studied?

3              A.  Yeah, so I've looked at -- make sure I get

4      the survey name right.  I've looked at the Election

5      Administration and Voting Survey, and, of course, I've

6      looked at the Census Bureau's November Supplement to

7      the Current Population Survey where they ask people,

8      you know, a whole series of demographic questions,

9      including are you registered and did you vote in the

10     just past election.  They collect that at the

11     beginning of November in the years of federal

12     elections.  So I've looked at that.  I've looked at

13     some registration and voting data from Kansas as well

14     when I prepared for that testimony.

15             Q.  Have you ever looked at voter registration

16     records from other states?

17             MR. ADAMS:  Objection, asked and answered.

18             A.  I cannot recall doing so.

19             Q.  You mentioned that you did some work for

20     ACRU on a contract basis a few years ago, I think you

21     said.

22             A.  Yes, for a county in Texas.

23             Q.  For a county in Texas.  Was that the scope

24     of your work for ACRU?

25             MR. ADAMS:  Objection.  This has been asked

1                     S. CAMAROTA

2    and answered.

3         A.  No.  As I indicated, I also looked at the

4    EVAS survey for them and compared it to population

5    estimates and citizenship -- citizen populations by

6    state.

7         Q.  Okay.  I just want to make sure I'm clear.

8    So there were two times prior to this litigation that

9    you did work for ACRU; is that right?

10        A.  That sounds right, yes.

11        Q.  So I think what we've gone over is that you

12   did the work for the Texas case and then you also did

13   separate contract work?

14             MR. ADAMS:  Objection, asked and answered.

15        A.  Yes.

16        Q.  Great.  So in the scope of your work that

17   you did as contract work, as distinct from the work

18   that you did for Texas --

19        A.  I didn't work for Texas.

20        Q.  I'm sorry.  I thought you said that you did

21   work for a case in Texas.

22        A.  Yes, that was for American Civil Rights

23   Union.

24        Q.  ACRU.

25        A.  Yes, if we're looking at a Texas county,

1                          S. CAMAROTA

2    and then this whole thing looking at virtually all the

3    counties in the United States.

4          Q.   Okay.   That's what I'm interested in

5    talking about.

6          A.   Okay.

7          Q.   So you said you did -- you looked at

8    virtually all counties in the United States?

9          A.   Yes, that have registration.

10         Q.   What did you look at?

11         A.   I looked at registration and number of

12   people who they reported, as they, you know, are

13   required to do.  And then I looked at the 18 and plus

14   population, and I also looked at the 18 plus citizen

15   population, and then reported the registration rates.

16   So that's what I did.

17         Q.   What were the data sources that you used?

18         A.   To my memory was the EVAS survey and

19   Census -- American Community Survey.

20         Q.   Did you look at voter data collected from

21   -- directly from states?

22         A.   No.  I looked at data that the states had

23   reported on EVAS.

24         Q.   Have you published anything using EAVS

25   data?

S. CAMAROTA

1

2      A.   I have not published anything using that

3  data.

4      Q.   Have you published anything using the

5  November Supplement to CPS data?

6      A.   Yes.

7      Q.   What was that?

8      A.   Several of the things that we had gone over

9  where I tried to project or tried to evaluate the

10  demographic profile of voters and registrants in

11  elections.

12      Q.   But nothing specifically comes to mind that

13  you used that data for as opposed to other things?

14      A.   No, those are the things I used it for.

15  Several reports that we had -- that I checked for you

16  on that list of publications that did that.

17      Q.   Have you ever studied the official list of

18  registered voters in a state?

19      A.   Have I ever studied the official list ...

20  yes -- no, I have not done that.

21      Q.   Have you ever studied the official list of

22  registered voters provided by a county?

23      A.   Yes, as in the EVAS survey.  Those are all

24  reported by county, I'm pretty certain.

25      Q.   But you don't get data directly from a

S. CAMAROTA

1

2     Q.   That is real participation.  That's great.

3     A.   That is.  I had in my evaluation work --

4  this is way more than you want to know so I'll make it

5  very quick.  I had interviewed many Census employees

6  who do collect this data.  Fascinating stories they

7  have.  And so I wanted to be on the other end now,

8  not just -- wanted to be the person interviewed.  So,

9  anyway ...

10    Q.   When is ACS data collected?

11    A.   ACS data is collected throughout the year

12  and then totaled back and weighted back to a midyear

13  control point.

14    Q.   Are there different -- is ACS data, once

15  collected, combined into different time periods?  For

16  example, is there a one-year ACS?

17    A.   There is.

18    Q.   Are there -- is there a two-year ACS?

19    A.   No.

20    Q.   Is there a three-year ACS?

21    A.   There is, and then there's a five-year ACS.

22    Q.   Okay.  So how do the three- and five-year

23  ACS numbers and what they -- strike that.

24         How would a three-year ACS survey differ in

25  what it results in as compared to a one-year ACS?

S. CAMAROTA

1

2      A.   I'm not exactly sure I understand the

3   question.   They ask the same questions, and the

4   results pretty much always match up.

5           So if that's what you're asking, there isn't

6   a -- there isn't a substantive difference, but the

7   survey is larger.   And the reason for that, which

8   you're not asking, but -- maybe I shouldn't volunteer,

9   but the reason is for small places -- not a gigantic

10  county like Broward; they get estimates there every

11  year -- but if you want to know Huntington,

12  Pennsylvania where I went to college, only seven

13  thousand people, you need several years of data to put

14  together to get a statistical profile of the residents

15  of Huntington, and that's why they use the multiyear

16  file.   So they give you smaller geographic areas,

17  again, not for a place like Broward.

18          Q.   So do they add the year over year?   Do they

19  average it?

20          A.   Actually they create a population total.

21  So it takes somewhat complicated methodology.   But

22  think of it this way: it has basically the same effect

23  as if you were to take all the years and average them

24  together.

25          Q.   And that is the same for the five-year as

Page 50

S. CAMAROTA

1    it is for the three, what you're describing?

2        A.  Yes.  So you can think of it as the midyear

3    of that year.

4        Q.  Okay.  Is the ACS different in methodology

5    than the decennial census?

6        A.  Well, the decennial census is not a survey.

7        Q.  Okay.

8        A.  It is an attempt to have a complete count

9    of the U.S. population.  The American Community Survey

10   is a survey.  It may be enormously large, but it's

11   still a survey.

12       Q.  Is "census" a defined term in data

13   collection?

14       A.  Well, could you re-ask that question?  I'm

15   not sure what you mean.

16       Q.  Sure.  You said that it's a survey, not a

17   count.

18       A.  The U.S. Census done on a decennial basis

19   every ten years is not a survey.  It is an attempt to

20   enumerate or count the entire population.

21       Q.  Okay.  Does ACS gather different

22   information than what the decennial census gathers?

23       A.  Yes.

24       Q.  How does the information gathered differ?

Page 63

C E R T I F I C A T E

I, LINDA S. KINKADE, Registered Diplomate
Reporter, Certified Realtime Reporter, Registered
Merit Reporter, Certified Shorthand Reporter, and
Notary Public, do hereby certify that prior to the
commencement of examination the deponent herein was
duly sworn by me to testify truthfully under penalty
of perjury.

I FURTHER CERTIFY that the foregoing is a true
and accurate transcript of the proceedings as reported
by me stenographically to the best of my ability.

I FURTHER CERTIFY that I am neither counsel for
nor related to nor employed by any of the parties to
this case and have no interest, financial or
otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand
and affixed my notarial seal this 16th day of March,
2017.

My commission expires:  July 31, 2017

_____

LINDA S. KINKADE
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

# EXHIBIT D

```
 1           IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
 2
     Case No. 0:16-cv-61474-BB
 3
     _____
 4
     DEPOSITION OF:  SCOTT E. GESSLER - March 7, 2017
 5   _____

 6   AMERICAN CIVIL RIGHTS UNION, in its individual and
     corporate capacities
 7
     Plaintiff,
 8
     v.
 9
     BRENDA SNIPES, in her official capacity as the
10   SUPERVISOR OF ELECTIONS of BROWARD COUNTY, FLORIDA,

11   Defendant,

12   v.

13   1199SEIU UNITED HEALTHCARE WORKERS EAST,

14   Intervenor-Defendant.
     _____
15
              PURSUANT TO NOTICE, the deposition of
16   SCOTT E. GESSLER was taken on behalf of the
     Intervenor-Defendant at 1536 Wynkoop Street,
17   Conference Room 5B, Denver, Colorado 80202, on
     March 7, 2017, at 9:07 a.m., before Sandra L. Bray,
18   Registered Diplomate Reporter, Certified Realtime
     Reporter, and Notary Public within Colorado.
19

20

21

22   H+G

23

24   Hunter + Geist, Inc.

25
```

303.832.5966    1900 Grant Street, Suite 1025    ▪ www.huntergeist.com
800.525.8490    Denver, CO 80203                 ▪ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**SCOTT E. GESSLER - 3/7/2017**
**American Civil Rights Union v. Brenda Snipes, et al.**

---

**1**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:16-cv-61474-BB

_____

DEPOSITION OF:  SCOTT E. GESSLER - March 7, 2017
_____

AMERICAN CIVIL RIGHTS UNION, in its individual and
corporate capacities

Plaintiff,

v.

BRENDA SNIPES, in her official capacity as the
SUPERVISOR OF ELECTIONS of BROWARD COUNTY, FLORIDA,
Defendant,
v.
1199SEIU UNITED HEALTHCARE WORKERS EAST,
Intervenor-Defendant.

_____

PURSUANT TO NOTICE, the deposition of
SCOTT E. GESSLER was taken on behalf of the
Intervenor-Defendant at 1536 Wynkoop Street,
Conference Room 5B, Denver, Colorado 80202, on
March 7, 2017, at 9:07 a.m., before Sandra L. Bray,
Registered Diplomate Reporter, Certified Realtime
Reporter, and Notary Public within Colorado.

---

**2**

A P P E A R A N C E S
For the Plaintiff:
    J. CHRISTIAN ADAMS, ESQ.
    Public Interest Legal Foundation
    300 North Washington Street
    Suite 405
    Alexandria, Virginia 22314
    NOEL JOHNSON, ESQ.
    Public Interest Legal Fund
    32 East Washington Street
    Suite 1675
    Indianapolis, Indiana 46204

For the Intervenor-Defendant:

    STUART C. NAIFEH, ESQ.
    SCOTT NOVAKOWSKI, ESQ.
    Demos
    80 Broad Street
    4th Floor
    New York, New York 10004
    CATHERINE M. FLANAGAN, ESQ.
    Project Vote
    805 15th Street NW
    Suite 250
    Washington, D.C. 20005
    KALI BRACEY, ESQ.
    MARINA K. JENKINS, ESQ.
    Jenner & Block
    1099 New York Avenue, NW
    Suite 900
    Washington, D.C. 20001
    (Appearing Telephonically)

---

**3**

I N D E X
EXAMINATION OF SCOTT E. GESSLER:               PAGE
March 7, 2017

By Mr. Naifeh                                   4, 234

By Mr. Adams                                    198

DEPOSITION EXHIBITS:                          INITIAL
                                             REFERENCE

Exhibit 1   Expert Declaration of                 7
            Scott E. Gessler
Exhibit 2   Article:  "Gessler asks 4,000        62
            prove eligibility or get off
            Colorado voter rolls," 8/16/12
Exhibit 3   Article:  "Database: 88 percent      64
            of questioned people on voter
            rolls are U.S. citizens," 8/29/12
Exhibit 4   Article:  "Republicans look for      68
            voter fraud, find little,"
            9/24/12
Exhibit 5   Deposition transcript of Mary        78
            Hall, 1/27/17

Exhibit 6   Exhibit A                            81

Exhibit 7   West's F.S.A. Subsection 98.065,    114
            Registration list maintenance
            programs, Effective:  July 1,
            2016, Currentness
Exhibit 8   Defendant's Responses to            116
            Plaintiff's First Set of
            Interrogatories to Defendant,
            and attached documents

Exhibit 9   Defendant's Responses to            119
            Plaintiff's First Set of
            Interrogatories to Defendant

---

**4**

 1         WHEREUPON, the following proceedings
 2    were taken pursuant to the Federal Rules of Civil
 3    Procedure.
 4         *    *    *    *    *
 5         (At this time Ms. Bracey was not
 6    present.)
 7              SCOTT E. GESSLER,
 8    having been first duly sworn or affirmed to state the
 9    whole truth, testified as follows:
10         (Deponent's reply to oath:  "Yes, I
11    do.")
12         MR. NAIFEH:  We'll just let the record
13    reflect that we're dialed into a conference line
14    available for counsel for the Defendant, and she has
15    not yet joined, but we are starting the deposition at
16    about 9:07 a.m.  It was scheduled for 9:00.
17              EXAMINATION
18    BY MR. NAIFEH:
19         Q.   Mr. Gessler, can you state and spell
20    your name for the record?
21         A.   Sure.  That's Scott Gessler; S-c-o-t-t,
22    G-e-s-s-l-e-r.
23         Q.   Can you state your address?
24         A.   2027 East 11th Avenue, Denver, Colorado.
25         Q.   And you understand you're under oath

1 (Pages 1 to 4)

SCOTT E. GESSLER - 3/7/2017
**American Civil Rights Union v. Brenda Snipes, et al.**

---

**5**

1  today?
2       A.  Yes, I do.
3       Q.  **And do you understand what that means?**
4       A.  Yes, I do.
5       Q.  **And can you tell me what it means to be**
6  **under oath?**
7       A.  Just for the record, I am an attorney.
8  I have given depositions.  I am familiar with these
9  procedures.  I'm happy to answer your questions.  It
10  means that you are to tell the truth to the best of
11  your knowledge.
12       Q.  **And I won't go through all the**
13  **background, but just quickly to remind you --**
14       A.  Sure.
15       Q.  **-- answers should be audible.  The court**
16  **reporter can't take down nods and head shakes.  If I**
17  **ask a question and it's not clear, you don't**
18  **understand it, ask me to repeat or rephrase it.  If**
19  **you've answered a question, I'll assume you've**
20  **understood it.  If you need to take a break at any**
21  **point, that's fine.  Let me know.  I only ask that you**
22  **don't ask for a break while a question is pending.**
23           **Have you been deposed before?**
24       A.  I don't believe so.
25       Q.  **Have you given testimony in a trial**

---

**6**

1  before?
2       A.  Yes, I have.
3       Q.  **And what was -- when was that?**
4       A.  I think it was around 2007.
5       Q.  **And what was the nature of the case?**
6       A.  It had to do with a campaign finance
7  rule that had been promulgated by the Secretary of the
8  State involving membership in organizations.
9       Q.  **Okay.  And that was -- and what was your**
10  **role in that?**
11       A.  I was a witness.
12       Q.  **You were a witness.  And have you given**
13  **any testimony in any kind of administrative**
14  **proceeding?**
15       A.  I may have.  I don't recall any at the
16  moment, though, but I very well may have at some
17  point.
18       Q.  **Okay.**
19       A.  Let me -- testimony, yeah, I may have.
20  I don't recall right now.
21       Q.  **Okay.  How did you prepare for today's**
22  **deposition?  Or did you prepare for today's**
23  **deposition?**
24           MR. ADAMS:  Objection, compound.
25       Q.  **(BY MR. NAIFEH)  Did you prepare for**

---

**7**

1  today's deposition?
2       A.  Yes, I did.  I reviewed my report.  I
3  reviewed the expert rebuttal report.  I briefly
4  reviewed some of the earlier depositions -- deposition
5  transcripts of some of the personnel from the
6  supervisor of elections.  I reviewed some additional
7  information that had been brought to my attention with
8  respect to the number of people who had not voted in
9  past elections and some of the other procedures that
10  are followed by the Florida Secretary of State with
11  respect to voter maintenance activities, and I spoke
12  with counsel as well.
13           MR. NAIFEH:  Can we mark this as
14  Exhibit 1?
15           (Deposition Exhibit 1 was marked.)
16       Q.  **(BY MR. NAIFEH)  Handing you what's been**
17  **marked as Gessler Deposition Exhibit 1.  Is that your**
18  **expert report?**
19       A.  I haven't read every word of it, but it
20  looks to be my expert report, yes.
21       Q.  **And on the second-to-last page,**
22  **actually, is that your signature at the bottom?**
23       A.  On Page 21?
24       Q.  **Yes.**
25       A.  Yes, it is.

---

**8**

1       Q.  **Can you tell me about your educational**
2  **background?**
3       A.  Sure.
4       Q.  **Starting with college.**
5       A.  Starting with college.  So I went to
6  college at Yale University from 1983 to 1987, majored
7  in history and political science.  Then directly to
8  law school at University of Michigan where I, of
9  course, did law.  I worked in Washington, D.C.  I took
10  a couple courses in statistics that were given by the
11  Department of Agriculture, I believe.
12           And from 1990 -- I'm trying to get the
13  exact dates.  From '93 to '95, I got my M.B.A.  At
14  northwestern University, J. L. Kellogg's Graduate
15  School of Management at Northwestern University, and
16  then I've attended various CLEs and given talks at
17  CLEs as well, including election related -- election
18  law related CLEs.
19           And then in 20-- I believe it was -11,
20  got a certificate for senior and state local electives
21  at Harvard Kennedy School of Government.  That was a
22  three-week program.
23       Q.  **Okay.**
24       A.  I may have misstated that last one.
25       Q.  **In terms of what the --**

---

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

SCOTT E. GESSLER - 3/7/2017
American Civil Rights Union v. Brenda Snipes, et al.

9

1    A.  I think it's a called a certificate for
2  senior state and local officials, but my nomenclature
3  may be off on that.
4    Q.  So it's just the name of the
5  certificate --
6    A.  Right.
7    Q.  -- is what you're not sure of?
8    A.  Yes.  It was for that school called
9  Harvard.
10    Q.  Okay.  2011, you're clear on that?
11    A.  I think it was 2011.  I may be off by a
12  year, but I'm pretty sure it was 2011.
13    Q.  Okay.  So I'm sorry.  You said you did
14  the M.B.A.  Was that immediately after law school?
15    A.  No.  That was from '93 to '95 that I
16  took classes, and I got my degree in '96.
17    Q.  Okay.  And between law school and the
18  M.B.A. program, what did you do?
19    A.  Sure.  So directly out of law school, I
20  worked at -- well, professionally what I did is I
21  worked at the Department of Justice in the criminal
22  division.  I did that for two and a half years, until
23  early '93.  Then moved back to Chicago and helped
24  manage a family construction company.
25    Q.  And then, were you working while you

10

1  were getting the M.B.A.?
2    A.  Yes, I was.
3    Q.  Was that also at the family construction
4  company?
5    A.  Yes.
6    Q.  And what did you do after you finished
7  the M.B.A., again professionally?
8    A.  So I finished my classwork at the very
9  end of calendar 1995 and then was almost immediately
10  deployed to Bosnia -- I was an Army reservist at the
11  time -- and did that until the middle of '96.  So I
12  received my degree in '96, but it was in absentia
13  basically.  I didn't stand for graduation because I
14  was overseas at the time.
15    Then I moved out to Colorado and worked
16  as a consultant in some ways in a small company and
17  then large company, which sometimes is another way of
18  saying unemployed, but I did do some of that for about
19  four years.
20    Then in very early 2001, I resumed
21  practice of law here in the state of Colorado.  Just
22  to anticipate any other questions, I did that until
23  2011, practiced law -- I was at two different law
24  firms -- and then served as Colorado Secretary of
25  State from January 2011 to 2015, and then resumed

11

1  practicing law.
2    Q.  When you were consulting, what were --
3  what was the nature of the firms you were consulting
4  for?
5    A.  I did a software small company -- I was
6  a principal there -- and then also a business-to-days
7  Internet company.
8    Q.  Okay.  And what was the nature of your
9  law practice between 2001 and 2011?
10    A.  So it was primarily litigation-based and
11  focused on election law.  So I did a lot of different
12  aspects of election law as well as, you know, what is
13  sometimes referred to as public policy law, so, for
14  example, open records litigation, things that aren't
15  necessarily election-related but involve governmental
16  processes.
17    Q.  And who were your clients primarily just
18  in terms of -- you don't have to give me names, but
19  the types of clients?
20    A.  The types of clients.  Sure.  Public
21  officials, candidates, independent groups.  For a very
22  short period of time, I represented a political party,
23  individuals seeking to be involved in the political
24  process, trade associations, other, you know,
25  501(c)(6)s or 501(c)(4)s, some nonprofit charitable

12

1  organizations, 501(c)(3)s.  Those really, for obvious
2  tax reasons, weren't really involved in the election
3  law practice as much, but more in the public policy
4  side of things and some in the educational area too.
5    Q.  Okay.  And what were the types of issues
6  you were dealing with in that work beyond the --
7    A.  Election law issues in particular?
8    Q.  Yes.
9    A.  Because I did do some commercial
10  litigation as well.  You name it, I pretty much did
11  it, ranging from redistricting, campaign finance,
12  administrative procedures, did a Voting Rights Act
13  case.  I don't know what other areas of election law
14  there are, but if you ask me particular examples, I
15  can tell you whether or not I was involved in a case
16  in that area, but my sense is most areas of election
17  law, I've been involved in as an attorney in one way
18  or another over that time.
19    Q.  Okay.  Administrative procedures, what
20  kind of issues were those, more specifically?
21    A.  Oftentimes in the election context.  So,
22  for example, being involved in rulemaking, appearing
23  before bodies.  You asked me if I testified.  I don't
24  think that qualified as testimony.  It usually was in
25  the capacity as an attorney making argument before

3 (Pages 9 to 12)

SCOTT E. GESSLER - 3/7/2017
**American Civil Rights Union v. Brenda Snipes, et al.**

13

1  that.
2       We have a very robust ballot initiative
3  process here in the state of Colorado. The titles of
4  the ballots are set by the title board, and that
5  consists of the Secretary of State or his or her
6  designee -- normally it's the Deputy Secretary of
7  State -- a designee from the attorney general, and a
8  person or designee from legislative legal services.
9  They form a title board. So people will appear before
10 the title board advocating for a particular title that
11 may or may not appear on the ballot.
12      Q.  Can you tell me, what does that mean, a
13 title?
14      A.  So when you look at the ballot and
15 you're a voter, there is a title and ballot question,
16 submission clause, and the submission clause is
17 basically titled turned into a question. Shall there
18 be an amendment to the Colorado constitution and in
19 connection -- involving X and in connection therewith
20 doing the following things? That's a submission
21 clause, for example, and the exact language is set by
22 the title board.
23      Q.  Okay. So that's for ballot initiative
24 type stuff?
25      A.  Correct. Localities will have ballot

14

1  initiatives as well. Those are set by the -- usually
2  the county commission, if it's a county ballot title
3  or city council. So sometimes there's advocacy or
4  sometimes even lawsuits involving that as well.
5      Q.  Did you -- did any of your work involve
6  voter registration in any way as an attorney?
7      A.  As an attorney.
8      Q.  Again, we're talking prior to your time
9  as Secretary of State.
10     A.  I certainly have advised clients on
11 voter registration issues as an attorney. I'm trying
12 to think if I was actually involved in any specific
13 litigation involving voter registration activities. I
14 can't think of any litigation that I was involved in
15 offhand, but definitely have been involved providing
16 advice to clients with respect to that.
17     Q.  Okay. And without revealing any
18 attorney-client communications, can you describe the
19 types of voter registration issues that you would
20 advise clients on?
21     A.  Usually they fell into two broad
22 categories. One would be clients looking to develop
23 or put forward a voter registration effort, and what
24 that would require, how -- the regulatory environment
25 that they had to face. Sometimes that involved tax

15

1  issues, for example -- whether their specific entity
2  could do certain activities under the tax laws, what
3  the state and county procedures were for voter
4  registration, you know, how to most efficiently deploy
5  people within that regulatory or legal context to be
6  able to register people to vote. So that's sort of
7  one-half of the equation.
8      And then the other half of the equation
9  is sometimes people were concerned -- usually their
10 political opponents or political adversaries, however
11 you describe it, were fraudulently registering people
12 and how to put in place a monitoring system or at
13 least reviewing that to be sure that laws were being
14 followed. So those are sort of the two sides of the
15 same coin.
16     MR. NAIFEH:  Okay. Just quickly, did
17 someone just dial in?
18     MS. BRACEY:  Yes, this is Kali Bracey
19 from Jenner & Block.
20     THE DEPONENT:  As if we didn't have
21 enough attorneys.
22     Q.  (BY MR. NAIFEH) And did your -- your
23 practice before you got into your time as Secretary of
24 State, since you left the office, the Secretary of
25 State's office, has your legal practice -- is it any

16

1  different than it was prior to your time as Secretary?
2      A.  It is different, but I still spend a
3  substantial amount of time in the election law
4  context. I certainly have this last year, last year
5  and a half, sort of reviewing my client base and
6  things that I've done, so, yes, there's been fair
7  amount of that.
8      Q.  Okay. In what ways has it been
9  different?
10     A.  I'm doing more nonelection law stuff
11 than I used to.
12     Q.  And that would be commercial?
13     A.  Some commercial litigation, some
14 transactional law. If I can supplement as well,
15 actually, one of the areas where voter registration
16 comes up a lot -- and I was very involved in this --
17 is ballot access issues and title ballot qualification
18 issues because, you know, a lot of candidates --
19 Colorado has two ways of getting on a ballot. One is
20 through an assembly process, and one is by petitioning
21 on. When you petition on, obviously, you have to go
22 to voters and get them to sign a petition, and they
23 have to be registered voters. And depending on the
24 office or the ballot issue, there may be certain
25 requirements. So, for example, if it's a Republican

4 (Pages 13 to 16)

**SCOTT E. GESSLER - 3/7/2017**
**American Civil Rights Union v. Brenda Snipes, et al.**

17

primary petition, the people who sign it have to be
registered Republican voters. So there are sometimes
issues as to whether or not that person is or is not
registered to vote, whether the information they
provided is the same as on file with the Secretary of
State, can that be -- if it's different, can it
nonetheless be rehabilitated because they are still a
voter, things along those lines.

So when I've said I've never been
involved in litigation or I couldn't remember being
involved in litigation with respect to voter
registration issues, that's probably not correct.
I've been involved in a substantial amount of
litigation with respect to ballot access, and that
necessarily contains oftentimes a very important
component of voter registration.

Q. And have you been involved in -- what
sides of that issue have you been involved in?

MR. ADAMS: Objection, vague.

Q. (BY MR. NAIFEH) So have you been
involved in challenging the registration status of
voters who sign petitions?

A. I'm trying to think. In one instance, I
was -- I was defending a Secretary of State's
determination that certain voters were ineligible to

18

sign a petition -- or to circulate a petition, and
that was in 2006. Usually because of the nature of
just private practice, you usually get hired by
clients who have been denied access to the ballot and
therefore are seeking access to the ballot. So I've
usually been in the position of try to go rehabilitate
voters and usually with a particular focus on
circulators because that's really where a lot of the
focus and this litigation revolves around.

Q. Can you explain what a circulator is?

A. Certainly. So a candidate seeks to
access the ballot through the petition process. He or
she will oftentimes hire a company -- perhaps they'll
manage it themselves, internalize the campaign. The
people who stand on the street, okay, or go door to
door holding the ballot petition are called
circulators. They're the ones who collect the
signatures. Various requirements are placed upon them
by state law. So there are circulators both for
ballot initiatives, which involve a large number of
signatures, and when I say a large number, I think the
number now is around 93,000 signatures, which means an
organization seeking to qualify a ballot -- qualify an
issue for a ballot, Colorado will usually collect
about 140 to it's been as high as 180,000 signatures.

19

So the people that are out on the street collecting
signatures, those are the circulators.

The circulators themselves, depending on
whether it's a candidate or ballot issue, oftentimes
need to be registered voters, although not always for
ballot issues. They have to -- you know, they have to
fill out an affidavit and take an oath, they follow
certain procedures.

Q. Okay. Thank you. The case you
mentioned in 2006 where I think you had said you were
defending a Secretary of State's determination that
certain individuals who had signed petitions were not
registered or not properly registered or -- is that
correct?

A. So let me explain to it -- explain it.
So that was a gubernatorial election in 2006. One of
the candidates had petitioned on. They -- the
Secretary had reviewed those signatures and determined
that that candidate had an inadequate number of
signatures. For a statewide campaign in Colorado, you
have to have a certain amount of valid signatures,
1500 signatures, from members of that party in each of
our seven Congressional districts. So not only do you
have to have an adequate raw number of signatures, but
they have to be distributed within each Congressional

20

district.

So in that case, the Secretary of State
had determined that the candidate -- his name was Mark
Holtzman -- had not obtained enough signatures,
whether because certain -- and I don't recall all the
details because it's been 11 years -- either that
certain people who had signed the petition were not
registered to vote or were not registered to vote at
that address or that the circulators, there were
irregularities among the circulators, that they had
either made mistakes or they were themselves not
eligible to circulate a petition.

So I represented that candidate's
opponent in the primary, and we intervened in order to
help defend the Secretary's decision.

Q. Okay.

A. Oh, let me step back, if I may.

Q. Please.

A. No, I'm not going to amend my answer.
I'm sorry. I'm just trying to remember the cases I've
gone through.

Q. Did your legal practice either before
you were Secretary of State or since involve election
law issues outside of Colorado?

A. Normally not. I have been asked to

5 (Pages 17 to 20)

SCOTT E. GESSLER - 3/7/2017
**American Civil Rights Union v. Brenda Snipes, et al.**

---

21

1  provide advice or confer with other attorneys out of
2  the state of Colorado, either people I know, sort of
3  saying, "Hey, can you help us think through this issue
4  that we're facing here in the state?" I don't
5  remember specific examples of that, but I know that's
6  occurred.
7      **Q.  Okay.**
8      A.  I've not litigated outside of the state
9  of Colorado with respect to election law issues,
10 however.
11     **Q.  Have you dealt with any -- other than**
12 **what you just described, have you dealt with any cases**
13 **or litigated any cases -- I should just say litigated**
14 **any cases that involved state law other than Colorado**
15 **state law?**
16     MR. ADAMS:  Objection, asked and
17 answered.
18     A.  I don't recall litigating cases
19 involving non-Colorado election law.
20     **Q.  (BY MR. NAIFEH)  Okay.**
21     A.  I may have, but I don't recall.
22     **Q.  Okay.  You were elected Secretary of**
23 **State in 2011; is that correct?**
24     A.  I was elected in 2010.  I took office in
25 2011.

---

22

1      **Q.  Okay.  Can you describe your duties as**
2  **Secretary of State of Colorado?**
3      A.  Sure.  The Secretary of State in the
4  state of Colorado is the chief election officer for
5  the state and has supervisory authority over all of
6  the clerks and recorders in the state.  So it is
7  responsible for every single aspect of running
8  elections in the state.  It is not -- Secretary of
9  State is not responsible for running elections for
10 home rule municipalities.  That falls outside the
11 Secretary of State's purview.  For most of my time as
12 Secretary of State, we also had purview over special
13 district election and those procedures, although
14 that's no longer part of Secretary of State's duties.
15     **Q.  Okay.  Did you have any duties that were**
16 **unrelated to elections for voting?**
17     A.  As Secretary of State?
18     **Q.  Yes.**
19     A.  The answer is yes.  So within the state
20 of Colorado, the Secretary of State not only serves as
21 the chief election officer, also serves as the
22 office -- officer and office for all business
23 registrations, for -- we license -- I say we, the
24 Secretary of State's office licenses notary publics,
25 for example.  All bingo and raffle gaming that's not

---

23

1  nonprofit gaming is registered through the Secretary
2  of State's office.  There's some other duties as well.
3  For example, the Secretary of State publishes the
4  administrative code for the State of Colorado.  I'm
5  trying to think of all the programs.  For a short
6  time -- I think for the first six, eight months while
7  I was secretary, we handled what's called ACR.  It was
8  basically for people who had been in litigation,
9  oftentimes domestic litigation, oftentimes women who
10 needed to hide their identity, and that was, you know,
11 through official documents.  So that was at least a
12 short while administered by my office while I was
13 there, Secretary of State.
14     I'm just trying to think what else falls
15 within the Secretary of State's purview.  Those are
16 the main ones.
17     **Q.  Do you regulate charities?  Does the**
18 **Secretary of State regulate charities?**
19     A.  Yes, charitable solicitations.  Thank
20 you very much.  I'm surprised I forgot that one.
21 Charitable solicitations all run through the Secretary
22 of State's office.
23     **Q.  Okay.  And then you said you published**
24 **the state's administrative code.  Does the Secretary**
25 **have responsibilities with respect to the**

---

24

1  administrative code other than publishing?
2      A.  The Secretary of State certainly has
3  responsibilities with the administrative code that
4  falls under that Secretary's purview with respect to
5  rule-making.  Beyond that, no, with the caveat,
6  however, that over time, the office has promulgated
7  guidelines or guidance for how agencies should
8  construct grammatically or organizationally, I should
9  say, not so much grammatically, organizationally, the
10 code so we can compile and it's not just a hot mess.
11 So there's some level of consistency there, but beyond
12 that, the Secretary's office is not involved in the
13 substance of administrative code outside of its own
14 particular purview with respect to, for example,
15 charities, elections, business registrations.
16     **Q.  Okay.  Can you describe -- do you have**
17 **an election director working for you as Secretary of**
18 **State?  Or did you when you were Secretary of State?**
19     A.  I did.  Yes, I did.
20     **Q.  Can you describe the election director's**
21 **duties?**
22     A.  Certainly.  The election director's
23 duties were to manage the elections office and the
24 Secretary of State's office.
25     **Q.  And can you describe sort of the**

---

SCOTT E. GESSLER - 3/7/2017
American Civil Rights Union v. Brenda Snipes, et al.

25

1  division of responsibilities between yourself and the
2  election director -- or the Secretary of State and the
3  election director?
4      A.   Well, I was actually -- obviously, the
5  Secretary is in charge of everything.  The elections
6  director is a subordinate to the Secretary of State.
7  When I was in office, I had a chief of staff, and then
8  the elections director reported directly to the chief
9  of staff.
10      What you may be getting at is with
11  respect to the policies promulgated by the office, the
12  elections director had very limited latitude in that.
13  That was usually run through both myself and then the
14  deputy director of elections on the policy side of the
15  office.
16      Q.   Thank you.  That's helpful.  I was also
17  trying to get at kind of your day-to-day
18  responsibilities with respect to elections versus the
19  election director's day-to-day responsibilities.
20      MR. ADAMS:  Objection; form, vague.  No
21  question asked.
22      A.   That's hard to answer.  If you want to
23  ask more specific, this duty versus that duty, that
24  might be a little bit more helpful for me to be able
25  to answer.

26

1      Q.   (BY MR. NAIFEH)  Okay.  I can do a
2  little bit of that.  Are you familiar with a Colorado
3  statewide voter registration database?
4      A.   I am.
5      Q.   And is that database known as SCORE?
6      A.   Yes, it is.
7      Q.   Did your duties as Secretary of State
8  involve direct interaction with that database?
9      A.   With respect to the data in the
10  database, the answer is no.  In the state of Colorado,
11  both the Secretary of State and local election
12  officials -- elected election officials generally stay
13  away from specific mucking around inside the database.
14      Briefly, the way -- the database was
15  developed and created by an outside vendor prior to my
16  arrival of Secretary of State.  That outside vendor
17  was Saber.  It was later purchased by Hewlett Packard.
18  What happened while I was Secretary of State very
19  early on is we essentially hired the people directly
20  who had formerly been outside vendors.  So the
21  database is developed, and the criterion -- the
22  criteria used for the database, the search
23  capabilities, everything like that is done inside the
24  IT department.  And the IT department, information
25  technology, IT department, is outside the purview of

27

1  the elections.  So IT does not report to the elections
2  director at all.  Rather, the head of IT reports to
3  the chief of staff and then to me.
4      Now, obviously, elections has
5  substantial input with respect to how that database is
6  updated.  And when I say "updated," that means -- we
7  certainly have a specific design, but over time,
8  additional modules are added to allow clerks and
9  recorders, the Secretary's office to do certain things
10  with that data to add to it, to extend its
11  capabilities.  So that's developed within IT in
12  consultation with elections, but also the major
13  decisions would always come to me to decide how that
14  system should be -- the performance criteria, I should
15  say, for that system.
16      Then elections, their job was to -- with
17  respect to the database, couplefold.  One was to
18  provide support to clerks and recorders, because the
19  clerks and recorders are actually the ones who handle
20  the data.  Each clerk and recorder handles its own
21  county data.  Neither the Secretary, myself, not the
22  elections office actually handles that data, although
23  the office would provide guidance and regulations on
24  what to do.
25      And then the office -- the elections

28

1  side of the office has two people that are capable of
2  running queries against the database to extract data
3  from that.  So that's what -- that's how the office
4  would operate there.  With that said, for example,
5  even within the elections, and this is why -- I guess
6  my point is that there are a lot of cooks in the
7  kitchen, and they don't all run through the elections
8  division.  Let me put it that way.
9      So, for example, we -- during my time,
10  we as the office, we rewrote the regulations for
11  elections.  Basically changed the grammar,
12  consolidated it, made it more concise, more readable,
13  things along those lines, and there were some policy
14  changes as well.
15      The person who took on the laboring or
16  the draft of that was not within the elections
17  division.  Rather, that person fell directly under the
18  Deputy Secretary of State, who then directly reported
19  to me.  So it was very collaborative, and the
20  elections division was very involved in rewriting
21  those elections -- election regulations, but it was
22  not done within the elections division.
23      Q.   Okay.
24      A.   So that's why you have to sort of ask me
25  very specific examples, and I can tell you how that

7 (Pages 25 to 28)

SCOTT E. GESSLER - 3/7/2017
American Civil Rights Union v. Brenda Snipes, et al.

29

1  was handled in the office.
2      Q. Okay. Did those revisions to the
3  election regulations entail or require changes to the
4  voter registration database?
5      A. I don't remember whether they did or
6  not. They may have.
7      Q. Okay. And are you familiar with the
8  functions and capabilities of the SCORE database?
9      A. Generally speaking, yes. It's a big
10 database with a lot of functionality and capability.
11 The true experts are -- there's probably three or four
12 people who are sort of true experts embedded within
13 the elections division.
14     Q. Okay. Did -- were there ever mailings
15 generated that went out to voters who were registered
16 in the SCORE database at the state level from within
17 the Secretary of State's office?
18     A. Usually not. We did do some direct
19 mailings with respect to noncitizens. There may have
20 been some others as well.
21     Q. Okay. Can you describe the division of
22 responsibilities between the Secretary of State's
23 office and the county election officials?
24     A. Sure. So county election officials, the
25 best way to think of them are boots on the ground. So

30

1  Colorado has a population base of about 5.2, 5.3
2  million people, around 3 million or so registered to
3  vote. The Secretary of State's office has around 30
4  to 35 people within the elections division and another
5  30 to 35 within the IT. IT handles all of the IT
6  support for elections, and it also handles IT support
7  for business registration, so you can't allocate all
8  of those people to election functions, but thumb in
9  the air, you're talking, you know, 45-ish people. And
10 you compare that to the number of people among clerks
11 and recorders -- we have 64 counties within the state.
12 Each county has its own clerk and recorder. They
13 deploy a number of people. So those are the boots on
14 the ground, the people who are taking in the
15 registration information. For example, they're the
16 people who staff voter service centers during election
17 time. They're the ones who recruit election judges.
18 They're the ones who train election judges. There
19 are, depending on the topic, divisions of labor where
20 it's intermingled. So, for example, training of
21 judges, the Secretary of State's office has come out
22 with training modules for judges for use by clerks and
23 recorders that can handle a lot of the training, but
24 not necessarily all of it because there's specific
25 needs depending on the county. We have counties

31

1  ranging from Ouray or Jackson that have a couple
2  thousand population total to, you know, El Paso or
3  Denver Counties, which have 620, 640,000 people. So
4  there's a big variance in the county needs.
5      Counties will also -- they themselves
6  make determinations as to what type of equipment they
7  will use for voter tabulation, for example. However,
8  that equipment has to be certified by the State under
9  certain criteria. So there's an intermingling there.
10     The general division of labor is the
11 state office provides the policy and the guidance,
12 provides the statewide voter database, and the
13 counties generally implement that.
14     Now, Colorado belongs to the ERIC
15 system. I'm sure you're familiar with that.
16     Q. Yes.
17     A. That's a statewide system. That
18 information has come in. It's managed by our IT
19 department, by the Secretary of State's IT department,
20 various matches for additions or merging that is sent
21 down to the county clerks and recorders, and then it's
22 up to the county clerk and recorder to actually
23 implement that.
24     Same with on-line voter registration,
25 for example, we have on-line voter registration where

32

1  people can register to vote if they have a driver's
2  license with a signature on file. They can register
3  to vote online or they can modify their voter
4  registration online or they can remove their voter
5  registration online. They will do that through the
6  Secretary of State's on-line website. That
7  information is not automatically updated in SCORE
8  based upon that transaction.
9      What, rather, happens is that
10 transaction information is then sent to the county
11 clerk and recorder, who will eyeball that information,
12 then make the determination to add, change, remove
13 person as appropriate.
14     Q. Okay.
15     A. So that's an example of how a process
16 works.
17     Q. In your experience as Secretary of State
18 of Colorado, does the number of voters -- of voter
19 registrations or voters registering to vote fluctuate
20 over a two-year election cycle?
21     A. It will fluctuate. It will change.
22 And, of course, it changes by county. Generally, it's
23 a continued growth pattern, however, the number of
24 registered voters. It's really voter turnout that
25 fluctuates substantially over time.

8 (Pages 29 to 32)

SCOTT E. GESSLER - 3/7/2017
American Civil Rights Union v. Brenda Snipes, et al.

37

1    Q.  Understood.
2    A.  I would say generally yes.  However, in
3  my opinion, we've seen more of a trend away from
4  periodic intensity in surges for particular elections
5  and more towards organizations that are just
6  continually registering people to vote throughout the
7  entire two-year cycle on a consistent basis as opposed
8  to a sudden surge at the end.
9    Q.  And when did that trend begin, would you
10 say?
11   A.  I would guess it's been over the last
12 four to six years.  There's just been more focus on
13 voter registration nowadays, and organizations -- and
14 again, this is my view on it, and I know this would
15 not apply to all organizations, but many organizations
16 say, well, we're no longer going to do it the last few
17 months before registration cutoff or before the
18 election as it may be; we're just going to do it on a
19 continual basis year-round.
20   Q.  Have you ever been -- I think the answer
21 to this is no, because you've told me about your
22 experience, but have you ever been a county election
23 official?
24   A.  I have not.
25   Q.  Do you have any familiarity with other

38

1  state's voter roll maintenance practices or policies?
2    A.  Not current.  In 1994, I believe -- it
3  may have been '94 -- I was an independent observer,
4  election monitor for an organization, and I don't even
5  remember the name of the organization now -- for
6  Chicago elections during a general election.  So I
7  would go around and visit various election precincts
8  and their operations and compare the number of people
9  who had voted to the number of people who had signed
10 in to their registration numbers.  So I have done that
11 before.  That's been a while.
12   Q.  And then --
13   A.  And then I'm also familiar, to the
14 extent that I've had -- during my four years as
15 Secretary of State, at least twice a year, you know, I
16 would attend National Association of Secretary of
17 States.  There were also other conferences in addition
18 to that where Secretaries would get together, exchange
19 ideas, talk about what their state was like, what
20 other states were like.
21      So if you ask me specific questions
22 about different states, I may be able to answer some
23 of that, you know, depending on that, and we would
24 receive presentations on how other states operate and
25 how their systems work just as a matter of course

39

1  during those presentations and conversations.  And
2  then there's times you just pick up the telephone and
3  call another Secretary of State or something to find
4  out what other states do.
5      The other thing that we did within the
6  Secretary of State's office in Colorado is we'd
7  often do two things.  One, sort of survey other state
8  practices to try to get a sense of best practices and
9  ideas, and then we would look at other states to
10 benchmark when we did find someone who was doing
11 things that we liked.  We'd look at other states to
12 benchmark that and compare our procedures against
13 that.
14   Q.  So can you tell me a little more about
15 that?  How would you identify the states that you
16 thought had good practices?
17   A.  Two ways.  One, myself attending
18 conferences, attending -- for example, even before I
19 became Secretary of State, I attended a PEW
20 conference.  I remember that was in Austin, Texas, and
21 they had a lot of ideas about how states can do this
22 or that to improve, and I thought that was great and
23 viewed conferences.  I viewed NASS conferences --
24 National Association of Secretary of States
25 conferences -- both our regular conferences and

40

1  special conferences as opportunities to learn about
2  and harvest good ideas that I could bring back to
3  Colorado.  So that was one way to do it.
4      The other way is a lot of times, you
5  know, we'd have an idea within the office, whether it
6  came from me or someone else within the office, and I
7  would say, "Hey, go research what other states are
8  doing.  Let's learn about other state's practices and
9  come back with some ideas, if there are ideas, about
10 what's going on or what's not going on."  Sometimes
11 that research would be done by the elections division.
12 Sometimes it would be done more in the policy shop, as
13 it were, directly through the Deputy Secretary of
14 State.
15   Q.  And do you remember specific states that
16 you surveyed in that process?
17   A.  That's hard to remember.  You'd have to
18 ask me sort of on a case-by-case basis.  With respect
19 to on-line voter registration, for example, I do know
20 we looked at a lot of different states, what they were
21 doing, and one of the points at that time, for
22 example, was did we want to have on-line voter
23 registration or an app because some states were going
24 toward an app for voter registration.  We decided that
25 on-line was by far the better way to go because a

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

SCOTT E. GESSLER - 3/7/2017
**American Civil Rights Union v. Brenda Snipes, et al.**

---

41

1   voter registration event is something that people
2   really only do once every two years or so.  It's not
3   like they regularly log into their app, like a banking
4   app or an Uber app or something where there's a
5   regular, consistent interaction.  It's only once every
6   two years.  So it didn't seem to make sense to get an
7   app for that type of behavior.  Our thought, online
8   would be better to drive people to a website, which is
9   what we did.  So that's an example of where we
10  surveyed a lot of other states, and I think our
11  analysis was correct.  So, for example, Louisiana was
12  very keen on its Geaux Vote -- or Geaux Louisiana.  It
13  was spelled G-e-a-u-x.  You know, it was sort of a --
14          Q.  Cajun?
15          A.  -- Cajun thing.  And they had an app.
16  And when I questioned them pretty intensively about
17  the numbers and the traffic, it didn't compare at all
18  to the state of Colorado, and so we thought we did the
19  right thing.  So that's an example of looking at other
20  states.
21          Q.  Okay.  And you mentioned that after you
22  had identified a state that you thought was doing
23  something particularly well, you would benchmark that
24  against other states?
25          A.  You know, I say "benchmark."  Benchmark

---

42

1   normally applies sort of in the business of a
2   continuing, ongoing comparison of behavior, but it
3   would probably be more accurate to say we'd look at
4   their procedures very carefully and draw -- learn what
5   we could from it, see what we could incorporate into
6   Colorado and what we couldn't.
7           Q.  Okay.
8           A.  Let me give you an example on the voter
9   registration side.  There was a consent decree out of
10  Mississippi requiring either the state or particular
11  counties to do certain things for voter registration.
12  We looked at that very carefully to see if there's
13  anything we could learn from that that would improve
14  our voter roll maintenance efforts.  Ultimately, we
15  concluded we were doing everything already that
16  existed in that consent decree.
17          Q.  Okay.  You mentioned you took some
18  statistics courses with the Department of Agriculture.
19  Can you tell me about those?
20          A.  They were basic statistics courses.  Let
21  me put it this way.  They helped me a lot when I went
22  to business school for statistics there.  So I have a
23  familiarity with some of the statistics lingo.  To be
24  frank, though, it's a perishable skill, and unless you
25  maintain that on a regular basis, you forget some of

---

43

1   it.
2           Q.  And do you have any other background or
3   education in statistics aside from --
4           A.  Aside from graduate business school?
5           Q.  And the --
6           A.  And the Department of Agricultural
7   (sic)?  No.
8           Q.  Do you have any background in
9   information technology?  You mentioned you consulted
10  for a software company.
11          A.  Yeah, that was more on the marketing
12  side of things.  Beyond managing the Secretary of
13  State's office, I'd say no.  However, within that
14  office, I was pretty involved in a lot of the nuts and
15  bolts of things that were going on.
16          Q.  Can you describe how you were involved
17  in the nuts and bolts?
18          A.  Sure.  So, for example, on the voter
19  registration, on the IT maintenance side, you know, a
20  lot of times there were issues that would ultimately
21  percolate up to my position within the office;
22  backups, times out -- outage times.  We had a big
23  issue -- so, for example, when I was running for
24  office in 2010, the voter system -- the statewide
25  voter database shut down just before close of polls in

---

44

1   2010.  Delayed a lot of things.  The reason it shut
2   down was not because of the operation of the database
3   itself but was, in fact, because of essentially the
4   Internet pipe that led out to the world, but was not
5   maintained by the Secretary of State's office, but was
6   instead maintained by the Office of Information
7   Technology.  So while I was in office, I spent a lot
8   of time talking in the office with IT and the office
9   about redundant systems to make sure we had Internet
10  connectivity and how we would ensure that and what
11  type of systems we needed to have in place and then
12  when we needed to freeze maintenance activities done
13  by the Office of Information Technology, which comes
14  directly under the governor, which did not fall under
15  the Secretary of State.
16          So, for example, in 2012 -- I think it
17  was 2012 -- the OIT decided that they were going to
18  swap out critical equipment the day before the
19  election, and, of course, they hadn't fully tested it;
20  and we had problems when we started the polls on
21  election day.
22          During the same-day voter registration,
23  when that bill was implemented, what it required
24  Colorado to do is to have -- essentially the first in
25  the country -- on-line poll books statewide.  So if

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

SCOTT E. GESSLER - 3/7/2017
**American Civil Rights Union v. Brenda Snipes, et al.**

---

45

1    you registered in El Paso County, what would happen is
2    that would immediately update the Denver County -- the
3    voter registration database, and it would be available
4    to Denver County.  So assuming you used the same name
5    and all, you would not be able to register immediately
6    again in Denver County.  Creating a statewide system
7    like that, no vendor in the country offered that.  I
8    don't think any vendor does still, and we had a
9    six-month crash course that we had to develop.
10         So I was very involved in the process,
11   not the coding process, but the, you know,
12   administrative how do we make sure this works, but it
13   ultimately fell upon my shoulders to make sure that
14   was implemented correctly.  So I was involved in that.
15         Early on in my tenure, I consolidated
16   our website design team, made sure that they attended
17   training so they would be up to date.  You know, I
18   pushed building process maps throughout the office so
19   we could understand the processes, whether it's a
20   voter registration process or an IT process or
21   whatnot.  I think even today if you were to walk
22   through that office, you would see these 3 foot tall
23   by anywhere from 8 to 22-foot long process maps, which
24   people are mapping out processes within the office,
25   processes within the voter registration, the IT or

---

46

1    business registration side on how the processes should
2    work to then be transferred whether it's to code or
3    administrative rule or guidelines.
4         MR. ADAMS:  If we could let the record
5    reflect that Attorney Noel Johnson has left the
6    deposition.
7         THE DEPONENT:  He has left the building.
8         MR. NAIFEH:  And I believe at a certain
9    point someone dropped off the phone.  Who's still on
10   the phone?
11        MS. JENKINS:  Kali Bracey dropped off.
12   This is Marina Jenkins with Jenner.
13        MR. NAIFEH:  Okay.
14        Q.  (BY MR. NAIFEH)  Is there a jurisdiction
15   that you consider a model for how it maintains its
16   voter registration rolls?
17        MR. ADAMS:  Objection, vague.
18        Q.  (BY MR. NAIFEH)  By jurisdiction, it
19   could be a state, could be a county.
20        A.  Yes.
21        Q.  Is there a jurisdiction you consider
22   doing a particularly good job?
23        A.  Yes.
24        Q.  Which one?
25        A.  I think Colorado does a good job.

---

47

1         Q.  And does that apply to every county in
2    Colorado?
3         A.  Generally, yes, and I say generally,
4    yes, we have -- so, for example, comparing it to
5    Florida, we have a more centralized system, and the
6    clerks and recorders have a little bit less latitude
7    than it seems the supervisor of elections within
8    Florida has.  So I think we do a good job.
9         Q.  Okay.
10        A.  Now I will say this, however.  You talk
11   to any Secretary of State across the country -- and,
12   of course, not all states have Secretaries of State
13   that run elections, but anyone that does run elections
14   will probably say the same thing, that theirs is a
15   model --
16        Q.  Understood.
17        A.  -- but they're wrong, and Colorado is
18   correct.
19        Q.  Okay.  That's good to know.  I'm going
20   to refer you to your report, which is Exhibit 1.  And
21   if you look at Paragraph 9f.  You describe new
22   legislation and some of the actions that the Secretary
23   of State's office took in response to that new
24   legislation.
25        In that paragraph, are you referring to

---

48

1    what was known as Colorado House Bill 13-1303?
2         A.  Yes.
3         Q.  In Colorado, are counties instructed to
4    stop taking step list maintenance activities during
5    the 90 days immediately prior to an election?
6         A.  In compliance with federal law.  We do
7    follow federal law.
8         Q.  And which activities are not allowed in
9    that period in Colorado?
10        A.  As generally systemwide voter
11   maintenance, that's severely limited during those 90
12   days.
13        Q.  So what -- can you describe what follows
14   under systemwide list maintenance?
15        A.  I don't remember the exact details.
16   You'd have to ask me specific questions on that.
17        Q.  Okay.  Would that entail national change
18   of address -- updates based on the national change of
19   address system?
20        A.  I think we do limit it during those 90
21   days.
22        Q.  Would it entail removals of voters who
23   had not responded to a notice and had not voted for a
24   two-year period?
25        A.  That is not done within the 90 days

---

12 (Pages 45 to 48)

SCOTT E. GESSLER - 3/7/2017
**American Civil Rights Union v. Brenda Snipes, et al.**

---

85

1      Q.   -- that totals the number of voters
2  removed for each reason?
3      A.   Yeah, I don't remember looking at that.
4      Q.   Okay.  Does Florida have a statewide
5  voter registration database?
6      A.   My understanding is they do.
7      Q.   Are you familiar with it?
8      A.   In what aspect?
9      Q.   What functions are built into it, what
10  sort of -- who the vendor is, what type of database it
11  is.
12         MR. ADAMS:  Objection, compound.
13      A.   If I may, I don't know who the vendor
14  is.  I don't know how the database is constructed.
15  The functionality that I'm familiar with is the stuff
16  that I've been able to derive from the depositions.
17      Q.   (BY MR. NAIFEH)  Okay.  Now, I believe
18  that the statewide database is referred to in Florida
19  as FVRS.  Is it okay if I use that term to refer --
20      A.   Yes.
21      Q.   -- statewide database?
22      A.   Sure.  It's a lousy acronym, but you're
23  welcome to use it.
24      Q.   SCORE is a better --
25      A.   We have a much better acronym in

---

86

1  Colorado.  There is no doubt about that.
2      Q.   Is that one of the things that leads you
3  to believe Colorado's system is superior?
4      A.   Superior as far as getting off the
5  tongue, yes.
6      Q.   Does the Broward County supervisor, the
7  Defendant in this action, use a voter registration
8  database to manage the voter rolls?
9      A.   My understanding is that she does.
10      Q.   And are you familiar with that database?
11      A.   Is that the FVR --
12      Q.   Well, this is the county database.  I'm
13  just asking if you're familiar with the database the
14  county uses.
15      A.   If it is a separate database, no, I'm
16  not.
17      Q.   Okay.  Do you know if they use the FVRS
18  database at the county level to manage their voter
19  registration rolls?
20      A.   It seems -- the answer is no, I'm not
21  absolutely sure.  There seemed to be some confusion,
22  and perhaps on my part, but certainly within the
23  depositions, it seemed that way, so I do not know.
24      Q.   Okay.  And do you know if all counties
25  in Florida used the same database for managing voter

---

87

1  registration rolls?
2      A.   I do not know that.
3      Q.   Are you familiar with how the county
4  voter registration and list maintenance activities are
5  coordinated with the statewide database?
6      A.   To the extent that it was discussed in
7  the depositions, I'm aware of that.  Beyond that, I do
8  not know.
9      Q.   Do you have an understanding of what it
10  means for a voter to be designated active in FVRS?
11      A.   I believe so, but you're welcome to ask
12  me specific questions, and I can tell you whether or
13  not.
14      Q.   Well, can you tell me what you believe?
15      A.   I believe an active voter is one who has
16  either voted or has some form of communication with
17  the director -- with the supervisor of elections
18  within the last two elections, and if they do not have
19  that level of communication or voting view as I -- or
20  voting, then they're designated as inactive.
21      Q.   And when a voter is designated
22  ineligible in FVRS, do you have an understanding what
23  that means?
24      A.   What I do understand is that someone is
25  deemed as ineligible if they have been designated as a

---

88

1  felon who has not served their sentence or another
2  criterion that would cause them to be ineligible, for
3  example, they no longer reside in Broward County, so
4  they would be ineligible to vote in Broward County,
5  but they would be eligible to vote in another county.
6      Q.   Okay.  I'm going to refer you back to
7  Exhibit 1, your report, and I'm specifically going to
8  refer you to Paragraph 13, which is on Page 4.  And
9  the last sentence of Paragraph 13 states that,
10  "Election officials must follow state and federal law,
11  and oftentimes are constrained by technological issues
12  or local public opinion."  Can you explain how
13  election officials are constrained by local public
14  opinion," or what you mean by that?
15      A.   Well, let me give you an example is
16  probably the best way to do that.  During the
17  noncitizenship analysis that we did, we sent names to
18  various clerks and recorders.  We sent a name down to
19  the clerk and recorder in El Paso of a guy who had
20  recently registered to vote using a noncitizenship
21  information.  That person got very angry, provided
22  information that he had served in Vietnam, provided
23  information about his mother's birth, which was in
24  Mexico, provided information that he had, you know,
25  lived a good life in Colorado since Vietnam, and

---

22 (Pages 85 to 88)

**SCOTT E. GESSLER - 3/7/2017**
**American Civil Rights Union v. Brenda Snipes, et al.**

129

1    County is less, than the vote turnout statewide for
2    Florida.  So the number is actually larger than the
3    one I had in here, and I'll supplement the report with
4    these specific numbers.  It does not in any way change
5    the conclusion, however, or the method of analysis.
6    It's a more direct number to identify the number of
7    nonvoters, but there are in the hundreds of thousands,
8    mid six figures, and yet you're looking at a very
9    small number, by comparison, of the number of ACRs
10   that are sent out.
11           I then said, well, what if we assume
12   that every single one of these pieces of mail was sent
13   out to a nonvoter.  Even then, that didn't reach the
14   number of nonvoters, but statutorily, (2)(c) says
15   address confirmation requests, and that's very
16   specific ACR on the certifications, very small
17   numbers.
18         **Q.  Okay.  And just so the record is clear,**
19   **your conclusion that the number of mail pieces is**
20   **impossibly small is based on the analysis that you**
21   **describe in Paragraph 35?  You just described the**
22   **analysis, but I just want to be clear for the record**
23   **that your conclusion is based on that analysis.**
24         A.  I think it would be fair to say 32
25   through 41 paragraphs.

130

1         **Q.  Okay.**
2         A.  I think that would be more accurate.  35
3    is part of that analysis, yes.
4         **Q.  Okay.  And you alluded to this a second**
5    **ago, but you're assuming that turnout in the**
6    **odd-numbered years is similar to or lower than turnout**
7    **in the federal election years?**
8         A.  That would be correct.
9         **Q.  And are you also assuming that the**
10   **nonvoters in the federal election years are the same**
11   **people as the nonvoters in the odd-numbered years?**
12         A.  For the most part, yes.  I mean when you
13   look at voter patterns and behavior, if someone
14   doesn't vote in a federal election, it's highly
15   unlikely that they're going to vote in an odd-year
16   election.  Now, I don't know all the specifics of
17   Florida's elections and what they do and don't have in
18   odd years.  I do know Colorado -- and this is
19   consistent with my conversations with people in other
20   states.  Colorado, we will oftentimes have extremely
21   contentious ballot issues in what we call the odd-year
22   coordinated election that draw lots and lots of
23   attention, multimillion dollar advertising campaigns,
24   issues with respect to raising taxes, and there, the
25   voter turnout comes nowhere near federal elections.

131

1         **Q.  But my question is more, is it the same**
2    **people who don't turn out in those years as the people**
3    **who don't turn out in the federal elections?**
4         A.  Likely, yes.  Look, there may be some
5    people who vote in an odd-year election who didn't
6    vote in the federal election, maybe someone who has
7    moved in as a consistent voter and now votes in the
8    odd-year election and did not vote in the even-year
9    election prior because they weren't there, or maybe
10   someone really gets an interest in some issue in an
11   odd-year election, but very unlikely that they're
12   completely different -- it's a different universe.
13   Usually if a person doesn't vote in a federal
14   election, they're very unlikely -- it's very unlikely
15   that they're going to vote in an odd-year election as
16   well.
17         **Q.  Fair to say that there may be some**
18   **people?**
19         A.  There may be some.
20         **Q.  And that would reduce the total number**
21   **of nonvoters who needed to get mailings?**
22         A.  Yeah, that might happen, but the reason
23   why I say it's impossibly small, look, the number of
24   ACRs sent is so small compared to the number of
25   nonvoters, okay, 4 to 600,000 nonvoters versus maybe

132

1    10,000 ACRs sent out, 1/40, 1/60, depending on that.
2    If -- I would change my conclusion if the number of
3    nonvoters were, let's say, 400,000 and the number of
4    ACR mailings sent out were, let's say, 390,000.  That
5    would be relatively close, and I'd say yes, it's
6    within the realm of possibility that those 10,000
7    people perhaps voted in an odd-year election or maybe
8    contacted the clerk and recorder and said please
9    change my address.  That would fall within, in my
10   experience, the realm of possibility, but when you're
11   talking 1/40, 1/60, depending on your numerator and
12   denominator, that's a huge disparity.
13         **Q.  Okay.  And you just brought me very**
14   **nicely to my next question.  In Paragraph 37 of your**
15   **report, Exhibit 1, you say, "In my experience, there**
16   **is no possibility that nearly all of non-voters in the**
17   **preceding two years requested a change of address."**
18         **Can you explain what you mean by that?**
19         A.  Well, the statute says that you mail
20   out -- Section(2)(c), I'm talking about -- that you
21   mail nonforwardable, return deliverable address
22   requests -- confirmation requests to all registered
23   voters who have not voted in the last two years and
24   who did not make a written request.  I cannot imagine
25   hundreds and hundreds of thousands of nonvoters making

SCOTT E. GESSLER - 3/7/2017
**American Civil Rights Union v. Brenda Snipes, et al.**

---

149

1  guidance on how to do that when they're switching
2  methodology.  If I were Secretary of State in Florida,
3  I would say that's an adequate program.  You can
4  switch methodology as long as you're definitely using
5  one or those other methodologies.
6      **Q.  So my question isn't can they switch**
7  **methodologies, but that's also helpful to have your**
8  **view on that.  My question is, in 2016, when they're**
9  **sending mailings to two-year nonvoters, do they have**
10  **to send those to people who previously received a**
11  **mailing?  So, say, in 2015, they sent a million pieces**
12  **of mail to every voter in the county.  2016, they've**
13  **got some subset of those people who haven't voted in**
14  **two years.  Do they have to send a notification -- an**
15  **ACR to every single one of those nonvoters even though**
16  **they just sent them a piece of mail saying update your**
17  **address?**
18      A.  I don't know.  I don't know.  That would
19  be -- that's where I come down on.  That would
20  probably require interpretative guidance from the
21  Florida Secretary of State.  I told you my guidance
22  would be if I were the Florida Secretary of State,
23  which, of course, I'm not, but -- so on one hand, I
24  would say if I were the Secretary of State and were
25  interpreting, I would say no, they don't have to

---

150

1  because they'd sent a countywide mailing just
2  previously.  However, I would also say I cannot
3  discern that hypothetical in any manner looking at
4  these reported numbers.
5      **Q.  Now, I'm going to turn your attention to**
6  **Paragraph 43 of your report, which is on Page 12.**
7  **Again, we're back to Exhibit 1.  There's a table just**
8  **below Paragraph 43.  Can you explain the analysis you**
9  **used to create that table?**
10      A.  Okay.  Let me spend a . . .
11          Yes.  What I did is I compared the ACS
12  data, which is census estimates of population, against
13  the number of registered voters based on reports to
14  the election assistance commission from the State of
15  Florida, to the Election Assistance Commission.
16      **Q.  Okay.  I'm going to direct your**
17  **attention to below the actual data, there's a couple**
18  **of notes on sources.**
19      A.  Uh-huh.
20      **Q.  And looking at the first one, it says,**
21  **"ACS data, 5-year CVAP estimates for 2010, 2012, and**
22  **2014."  Can you explain what the five-year CVAP**
23  **estimate -- and that's C-V-A-P -- for 2010, 2012, and**
24  **2014 show?**
25      A.  Sure.  CVAP data is the Citizen Voter

---

151

1  Age Population.  So those are just voter age
2  populations who are citizens based on the ACS
3  estimates for those years, and those were provided to
4  me from the ACRU --
5      **Q.  And what does --**
6      A.  -- Plaintiff's production.
7      **Q.  Thank you.  And what does it mean that**
8  **it's a five-year CVAP estimate?**
9      A.  It's the methodology they use.  It's an
10  estimate.  So if you look at 2012, it says 1,134,385
11  people.  I understand that it goes out to seven
12  significant digits, and they come to the individual.
13  I think anyone using that data knows that it's not
14  quite that precise, but it's an estimate and based on
15  the methodology that they use.
16      **Q.  Okay.  And then the next note under**
17  **Sources in that table says, "EAC data, 2010, 2012, and**
18  **2014 Election Administration and Voting Survey**
19  **Comprehensive Report."  What is your understanding of**
20  **what that data shows?**
21      A.  That data is information that shows
22  active and inactive voters that's reported from the
23  State of Florida's database from the State of Florida
24  to the voter assistance commission, which is a federal
25  agency, that collects this data.

---

152

1      **Q.  Do you know when the states report**
2  **their -- those numbers -- those voter registration**
3  **numbers to the EAC or what time period that covers?**
4      A.  I think it's either just before or just
5  after a federal election.  And again, like all these
6  numbers, it's a snapshot in time.  You know, the
7  number -- let's take 2014 for the total active and
8  inactive voter.  1,198,616.  I'm sure at least at one
9  second at one point in time that was an exact, precise
10  number, but I would be surprised if that number had
11  remained stable for even a single day in any day of
12  2014, but it's an estimate.
13      **Q.  And just to be clear -- my question was**
14  **compound, so I'll break it down.  When you say it's**
15  **just before or just after the election, is that the**
16  **time period that's covered by the reporting?  In other**
17  **words, are they -- so, say, it's just before the**
18  **election sometime in October.  Is it from**
19  **October 2014 -- is it covering average registration**
20  **over a two-year period or is it at that point in time,**
21  **this is how many people were on the voter rolls?**
22      A.  I'd have to review the data set
23  description to give you that answer.  I don't have it
24  off the top of my head.
25      **Q.  Okay.  Would it make a difference in**

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

SCOTT E. GESSLER - 3/7/2017
**American Civil Rights Union v. Brenda Snipes, et al.**

---

153

your analysis?

A.   Probably not.  I mean if they were off by a magnitude, like 300,000 or 400,000, yes.  Off by 10 or 20,000, 30,000, it doesn't make that much of a difference, and the reason why is because my opinion is not as soon as you hit 100 percent, your efforts are by definition unreasonable.  That's not my point.  My point is when you look at something -- when you look at registration rates approaching or exceeding 100 percent -- and that's not exact.  I'm not saying it's 95.82 percent, but when it's approaching and certainly exceeding 100 percent, that's a warning sign that you need to good look at your processes and procedures and see what's going on.  And if you're not -- if you're not looking at that and taking a close look at what you're doing and making sure that you're taking reasonable steps, then you've got some real problems.

Now, I may be taking reasonable steps and have as your county, you know, Summit County, Colorado, which is home to, you know, multiple ski resorts where you have this huge turnover in population.  So even though you're taking a lot of reasonable steps, the numbers may still be high, but if they're that high, you need to be looking at this.

---

154

Q.   Is there sort of a threshold above which you think it merits a closer look?

A.   I would guess 90 percent or higher, but I think you have to have a little bit of a local read as to what's going on, and by that, I mean -- and again, I'll use Colorado examples.  San Miguel County, okay?  Small county populationwise, but it's got Telluride ski resort there, so you're going to have a sizable population churn, as it were, in a very important part of that county in Telluride, which is going to really goose your numbers.  It's a small county, and relatively small differences can make big changes in your percentages.

Now, if I'm looking at El Paso or Denver County, it's a different story, because I know innately that that population base while it's growing, definitely, doesn't have quite that type of churn despite all of the people from Connecticut and New York who want to move here.

THE DEPONENT:  That was directed at you.

Q.   Why would you conclude that 90 percent registration rate was potentially problematic?

A.   I'm just using that as a rule of thumb.  I'm just using that as a rule of thumb.

Q.   But you reasonably conclude that that

---

155

was a county that was doing a good job of reaching out to voters?

A.   Absolutely, but in my experience, no matter how good of a job you're doing, it's unlikely that that 90 percent is an accurate representation.  And again, you know, I'll -- I think the best example -- and probably the best example nationwide -- is what I did in 2012 here in the state of Colorado, and I've talked to other Secretary of States across the country.  I'm not familiar with any state ever historically or contemporaneously doing a level of intense voter registration that the State of Colorado did leading up to the 2012 election cycle.  Never.  I mean there's no state that has spent that amount of money in raw numbers or comparative population, not even close.  I'm certainly welcome to be disabused of that.  And even then, we didn't have numbers that even reasonably approached these from a statewide basis, and that was intensive media outreach, which dwarfs anything that any private organization was doing, it dwarfs anything that I'm familiar that any other state has done.  So when it comes to voter outreach efforts, we've done it in Colorado under my tenure, and even then, the numbers didn't approach anything like this.

Q.   I think you said a moment ago that

---

156

EAC -- the EAC data includes active and inactive registrations; is that correct?  And I --

A.   Yeah, some of it.  You can see some where there's not available.  It includes active and inactive voters.

Q.   And does it break it -- we'll just ask a more simple question.  You have two rows in the table in Paragraph 43 of your report.  One is using total -- is listing total active voters and the total is total active and inactive.  Did those come from different data sources?

A.   I believe they all came from EAC data.  No, wait a minute.  I take that back.  So the 2016 total current active was taken from the supervisor of elections website.

Q.   Let's leave aside 2016 because I don't think the data has gone to the EAC yet.  So for the years of 2016 -- all of your 2016 data comes from different places.

A.   Yeah, it's a little bit extrapolated for 2016 data, which I did some extrapolation there.

Q.   Okay.  And I also wanted to ask you about that.  In -- let's see.  About the fourth bullet in that sources list in the table in Paragraph 43, you say, "Citizen voting age population was estimated,

---

39 (Pages 153 to 156)

SCOTT E. GESSLER - 3/7/2017
**American Civil Rights Union v. Brenda Snipes, et al.**

---

161

```
1    these, if you'd like.
2         Q.  Is it your opinion that other counties
3    should be doing these things as well to have
4    reasonable programs or just Broward County?
5         A.  It depends on the county.  I can tell
6    you that within the state of Colorado, every county we
7    have in the state does this.  Either they do it
8    themselves or the State handles those functions and
9    more.
10        Q.  Okay.  We're going to go backwards.
11        A.  You don't want to go through each one of
12   those items?
13        Q.  Well, I think we're going to go through
14   a lot of them as we go through kind of where you --
15        A.  Okay.
16        Q.  -- talk through some of them in more
17   detail.  I'm going to turn your attention to Paragraph
18   48, which is on Page 13.  And this is under the
19   heading Use of Driver's License Data.  And the first
20   two paragraphs -- I'll just characterize -- they
21   discuss ERIC.  And in Paragraph 49, you say the
22   supervisor cannot participate in ERIC because the
23   system is available only to states, and then in
24   Paragraph 50, you say current -- well, continuing
25   Paragraph 49, you say, "Nonetheless, the Supervisor of
```

---

162

```
1    Elections can get most of the benefit of participating
2    in ERIC simply by comparing her voter rolls to
3    Florida's driver's license information."  And then in
4    Paragraph 50, you say, "Currently the Supervisor does
5    not seek or receive driver license information."
6         Under the NVRA, aren't state motor
7    vehicle agencies required to send change of address
8    information to election officials unless the person
9    says it's not a change for voter registration
10   purposes?
11        A.  There is -- the NVRA does require that
12   the state driver's license rolls -- well, voter rolls
13   and driver's license rolls are coordinated to some
14   fashion.  Okay?  And part of that is -- my
15   understanding of NVRA is that when someone goes to a
16   driver's license or other public agency, they are
17   required to be afforded the opportunity to update
18   their voter registration rolls at the same time.  The
19   voter is not required to do that, to elect to update
20   their voter rolls at the same time they do driver's
21   license updates.  And my understanding of NVRA is that
22   NVRA does not mandate that the DMV data is
23   automatically used to update voter registration rolls,
24   but rather that the NVRA says you are afforded the
25   opportunity -- that the voter is afforded an
```

---

163

```
1    opportunity to register or update their voter rolls,
2    whenever they go to a driver's license bureau or any
3    other agency that provides, for example, public
4    welfare benefits.
5         Q.  Okay.  Do you know how that coordination
6    happens in Florida?
7         A.  I don't for sure.
8         Q.  And if it turned out that the Florida
9    motor vehicle agency was sending changes of address
10   automatically to the Secretary of State, would that
11   change your conclusion that the supervisor is not
12   seeking or receiving driver's license information?
13        A.  Probably, yes -- no, I'm sorry.
14   Probably not.  What my point there is directed towards
15   is updates are one thing, okay, but updates don't
16   capture historical data, and I can tell you from
17   Colorado's experience -- remember, when we joined
18   ERIC, we had an integrated DMV and voter rolls, to the
19   extent HAVA requires those types of updates and
20   activity, and yet even then, we found a massive number
21   of people who were on the driver's -- who had driver's
22   licenses but were not registered to vote in the state
23   of Colorado.  Sometimes that was the same person had
24   different information in the two voter rolls, so the
25   comparison viewed them as two separate people.  I
```

---

164

```
1    understand that happened based upon your use of
2    matching criteria, but even then, there is a -- even
3    under NVRA -- and you talk to PEW when they were
4    rolling out this program, they themselves recognized
5    this issue, that simply that comparison would create
6    huge benefits for states, even though states were --
7    almost all states -- I mean New Hampshire, for
8    example, is an exception -- were under NVRA compliance
9    requirements.
10        Q.  And we're using some acronyms now that I
11   want to make sure are clear for the record.  You just
12   mentioned HAVA, and for the record, is that the Help
13   America Vote Act?
14        A.  Yes.
15        Q.  And NVRA is the National Voter
16   Registration Act?
17        A.  Correct.
18        Q.  Okay.
19        A.  So Paragraph 20 -- I'm sorry.  Paragraph
20   50, the supervisor may, in fact, receive information
21   from the Florida Secretary of State, and the Florida
22   Secretary of State receives that information from
23   driver's license updates.  That may be possible, but
24   the supervisor herself does not directly receive that
25   driver's license information.  So technically, that's
```

---

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**SCOTT E. GESSLER - 3/7/2017**
**American Civil Rights Union v. Brenda Snipes, et al.**

237

        I, SCOTT E. GESSLER, do hereby certify
that I have read the above and foregoing deposition
and that the same is a true and accurate transcription
of my testimony, except for attached amendments, if
any.

        Amendments attached  (   ) Yes   (   ) No

        _____

        SCOTT E. GESSLER

        The signature above of SCOTT E. GESSLER
was subscribed and sworn to before me in the county of
_____, state of _____,
this _____ day of _____, 2017.

        _____

        Notary Public
        My commission expires:

American Civil Rights Union 3/7/17 (sb)

238

        REPORTER'S CERTIFICATE
STATE OF COLORADO          )
               ) ss.
CITY AND COUNTY OF DENVER  )

        I, SANDRA L. BRAY, Registered Diplomate
Reporter, Certified Realtime Reporter, and Notary
Public ID 20084001729, State of Colorado, do hereby
certify that previous to the commencement of the
examination, the said SCOTT E. GESSLER was duly sworn
by me to testify to the truth in relations to the
matters in controversy between the parties hereto;
that the said deposition was taken in machine
shorthand by me at the time and place aforesaid and
was thereafter reduced to typewritten form; that the
foregoing is a true transcript of the questions asked,
testimony given, and proceedings had.
        I further certify that I am not employed by,
related to, nor of counsel for any of the parties
herein nor otherwise interested in the outcome of this
litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 21st of March, 2017.

        My commission expires January 16, 2020.

\_\_X\_\_  Reading and Signing was requested.

_____  Reading and Signing was waived.

_____  Reading and Signing is not required.

60 (Pages 237 to 238)

REPORTER'S CERTIFICATE

STATE OF COLORADO        )
                         ) ss.
CITY AND COUNTY OF DENVER )

        I, SANDRA L. BRAY, Registered Diplomate
Reporter, Certified Realtime Reporter, and Notary
Public ID 20084001729, State of Colorado, do hereby
certify that previous to the commencement of the
examination, the said SCOTT E. GESSLER was duly sworn
by me to testify to the truth in relations to the
matters in controversy between the parties hereto;
that the said deposition was taken in machine
shorthand by me at the time and place aforesaid and
was thereafter reduced to typewritten form; that the
foregoing is a true transcript of the questions asked,
testimony given, and proceedings had.

        I further certify that I am not employed by,
related to, nor of counsel for any of the parties
herein nor otherwise interested in the outcome of this
litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 21st of March, 2017.

        My commission expires January 16, 2020.


__X__  Reading and Signing was requested.

_____  Reading and Signing was waived.

_____  Reading and Signing is not required.




                    Sandra L. Bray
                    Certified Realtime Reporter
                    Registered Diplomate Reporter