**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| AMERICAN CIVIL RIGHTS UNION, in its individual and corporate capacities, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Civil Action No. 16-cv-61474 |
| BRENDA SNIPES, in her official capacity as the SUPERVISOR OF ELECTIONS of BROWARD COUNTY, FLORIDA, | ) ) ) ) | |
| *Defendant,* | ) ) | |
| v. | ) ) | |
| 1199SEIU UNITED HEALTHCARE WORKERS EAST, | ) ) ) | |
| *Intervenor-Defendant* | ) ) | |

**PLAINTIFF AMERICAN CIVIL RIGHTS UNION'S OPPOSITION TO DEFENDANT
BRENDA SNIPES'S AND DEFENDANT-INTERVENOR 1199SEIU'S MOTION FOR
AND MEMORANDUM OF LAW IN SUPPORT OF PARTIAL SUMMARY JUDGMENT
ON COUNT I OF PLAINTIFF'S FIRST AMENDED COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff American Civil Rights Union ("ACRU"), by and through counsel, hereby submits the following opposition to Defendant Brenda Snipes's and Defendant-Intervenor 1199SEIU United Healthcare Workers East's (collectively, "Defendants") Motion for and Memorandum of Law in Support of Summary Judgment on Count I of Plaintiff's Amended Complaint.

Defendants' Motion for Summary Judgment on Count I should be denied for several reasons. First, evidence in the record shows an abundance of genuine issues of material fact concerning the extent and conduct of Defendant Snipes's list maintenance programs. Second,

Defendants improperly ignore the import of ACRU's expert testimony from consideration in summary judgment. Third, Defendants' interpretation of an election official's list maintenance obligations under 52 U.S.C. § 20507 is incorrect and would lead to absurd results.

## ARGUMENT

### I.      Standard of Review

In deciding whether summary judgment is appropriate, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986). The Court must view all facts in the light most favorable to the non-moving party and must draw all inferences in the non-moving party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Summary judgment is inappropriate where the Court would be required to weigh conflicting testimony, because the nonmovant's evidence is to be accepted for purposes of summary judgment. *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Furthermore, it is incorrect to exclude expert testimony at the summary judgment stage, as Defendants have sought to do here. ECF No. [142] at 17 n.6. As this Court has held "*Daubert* governs the admissibility *at trial*, not at summary judgment, and accordingly, the Court may consider the testimony." *Nat'l Union Fire Ins. Co. v. Tyco Integrated Sec., LLC*, 2015 LEXIS 82646 *78 n.32 (S.D. Fla. 2015) (emphasis in original). Indeed, ACRU's presentation of expert testimony concerning the facts in this matter, opining on the reasonableness of Defendant Snipes's list maintenance programs under the NVRA, constitutes direct evidence in this case. *Nat'l Union Fire*, at 77. Evidence from expert testimony must be included and taken in the light most favorable to the non-moving party.

2

**II.      Defendant Snipes's List Maintenance Program Violates the NVRA.**

**A.      The NVRA Creates a National Standard for Voter List Maintenance.**

Under Section 8 of the NVRA, election officials are required to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of (A) the death of the registrant; or (B) a change in residence of the registrant." 52 U.S.C. § 20507(a)(4). Other subsections impose obligations to remove other categories of ineligible registrants, such as felons and those who request removal, while establishing that eligible registrants are not to be removed except in the circumstances established in the statute. 52 U.S.C. § 20507(a)(3). These list maintenance obligations serve to achieve the explicit legislative purpose of ensuring that "accurate and current voter registration rolls are maintained" and to "protect the integrity of the electoral process." 52 U.S.C. § 20501(b)(3) and (4).

Contrary to Defendants' arguments, this statute creates a national standard for voter list maintenance. While the particular means and tools that each state may adopt to achieve the end of accurate and current rolls may vary, the statute creates an obligation and standard to reasonably maintain clean rolls that applies equally to all election officials in the states subject to the NVRA.[1] A local election official in Colorado, for example, is subject to the same obligation to reasonably maintain clean voter rolls as Defendant Snipes. Both can be challenged in federal court for failure to comply with the same standard to reasonably maintain voter rolls.

Defendants are wrong that the NVRA imposes no "results based" standard for its list maintenance obligations. ECF No. [142] at 17. According to the Defendants, the only question

---

[1] Six states are exempted from the NVRA: Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin and Wyoming.  *See,* 52 U.S.C. § 20503(b).

3

for the Court is whether Defendant Snipes is doing *one* particular mailing pertaining to registrants who have moved, regardless of how well that program is being done, what effect it is having on the state of the voter rolls, or how other categories of registrants are maintained. ECF No. [142] at 10 ("implementation of an NCOA program . . . renders her program compliant with Section 8"). Defendants would excuse the shoddiest implementation of a National Change of Address ("NCOA") program. Defendants would stop the inquiry at *if* a given election official undertakes an NCOA program, not *how* they do it. This position obliterates the purposes of the NVRA and ignores its plain language.

The NVRA clearly states that the end goal is to effect accurate and current voter registration rolls. 52 U.S.C. § 20501(b)(4). But to Defendants, the actual circumstances of the rolls and effectiveness of list maintenance programs are irrelevant to a determination of whether an election official has complied with her list maintenance obligations. Plaintiff contends the law requires an inquiry beyond *if* a program is implemented, to *if and how* a program is implemented.

There are two very significant reasons why Defendants' so-called "safe harbor" argument must be incorrect. First, as a list maintenance tool, an NCOA mailing, by definition, only treats those registrants who have moved. But NVRA certainly imposes list maintenance obligations relating to registrants who have died, 52 U.S.C. § 20507(a)(4), or who are ineligible for other reasons, 52 U.S.C. § 20507(a)(3), to say nothing of the mandate in the Help America Vote Act to remove all ineligible registrants, 52 U.S.C. § 21083(a)(4)(A). But Defendants argue that an election official can become compliant with all her list maintenance obligations under Section 8 simply by doing an NCOA mailing. ECF No. [142] at 10. Defendants seek immunity from a Section 8 claim *if* they do any form of an NCOA mailing. That would mean that an election

official could be doing *nothing* regarding the removal of deceased voters and yet somehow her list maintenance program could be compliant with Section 8.

Second, the ramifications of such an interpretation will strip protections for voters who are wrongfully removed from the rolls. If Defendants were correct, then a person who had been *improperly* removed in a list maintenance program could get no relief under Section 8 of NVRA if the election official simply conducted an NCOA mailing that nevertheless resulted in the voter's wrongful removal. If an election official's program is complaint with Section 8, then she cannot face liability for improper removals any more than for failing to make proper removals. This cannot be the case. *See Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1341 (11th Cir. 2014).

Defendants provide no legal authority for their assertion that the primary purpose of the NVRA is to increase voter registration, while the other purposes are inferior. ECF No. [142] at 16. No such hierarchy exists. Rather, the purposes of the statute are not in conflict and there is no reason that they cannot each be given full weight. Indeed, Defendants' interpretation of the statute puts it at cross-purposes with itself; sacrificing one purpose for the another. Defendant-Intervenor's expert thinks that having incorrect and ineligible registrations is acceptable, without regard for accuracy and correctness. Deposition of Dr. Daniel Smith, March 8, 2017, at 52:12-54:22, 57:1-6, 99:18-22, attached as Exhibit A. Congress cannot have intended such a result.

If Defendants were correct, NVRA would allow for complete incompetence on the part of election officials in executing their voter list maintenance programs. It would also allow wildly inaccurate and obsolete rolls to persist, because the Defendants advance an interpretation of the NVRA that would ignore the actual effectiveness of an election official's list maintenance program. ECF No. [142] at 16. In fact, Defendants' argument suggests that a Court should not even consider the actual accuracy and currency of the rolls in determining whether or not

election officials are fulfilling their list maintenance obligations. It cannot be that Congress passed a law with the purpose of ensuring accurate and current rolls and then provided a useless standard to accomplish that purpose.

**B**.      **The Reasonableness Requirement of NVRA Section 8.**

The NVRA imposes a standard of reasonableness on the Defendant. Reasonableness is ultimately a factual question, and summary judgment is especially inappropriate for statutes using a reasonableness standard. Moreover, the manner in which an election official satisfies her list maintenance obligations under NVRA can take various forms. It can include measures that are best suited to the individual circumstances and operative state laws, as long as those efforts meet the standard of *reasonability. See U.S. v. Missouri*, 535 F.3d at 851. In Florida, list maintenance obligations are delegated to the county and Defendant Snipes has an obligation to implement and conduct a reasonable list maintenance program. Congress enacted the NVRA to achieve the end of having accurate and current rolls throughout the country. To achieve that end, Congress elected to use a reasonability standard, a standard that is ultimately a question of fact.

**1.      Reasonableness Under a "Plain Meaning" Standard.**

The NVRA does not define "reasonable" or prescribe a specific set of list maintenance activities necessary for states to conduct and coordinate in order to satisfy the reasonableness standard of Section 8. Congress recognized that a "reasonable effort" will vary from time to time and based on the condition of the voter rolls. *See U.S. v. Missouri*, 2007 U.S. Dist. LEXIS 27640, *19 (W.D. Mo. April 13, 2007) *aff'd in part, rev'd in part on other grounds, U.S. v. Missouri*, 535 F.2d at 851. Accordingly, courts may give the term "reasonableness" its ordinary meaning when analyzing NVRA Section 8 claims. *Id*. "'A fundamental canon of statutory construction is

that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'" *Id*. (*quoting Perrin v. United States*, 444 U.S. 37, 42, (1979).)

A "reasonable" effort is one that is "fair and sensible," "fairly or moderately good," "in accordance with reason," and "possessing sound judgment." Merriam-Webster Dictionary, definition of "reasonable," available at http://www.merriam-webster.com/dictionary/reasonable (visited June 9, 2017). Antonyms for "effort" include inaction, inactivity, indolence, inertia, languor, laziness, and quiescence. Merriam-Webster Dictionary, definition of "effort," available at http://www.merriam-webster.com/dictionary/effort (visited June 9, 2017). Adopting a plain meaning of reasonableness is a fact-intensive inquiry making summary judgment inappropriate.

### 2.    Reasonableness Under Industry Standards.

In cases such as this one, where professionals labor within realms of specialized knowledge, a determination of reasonableness is informed by industry standards. Deducing those reasonable standards is well suited to the aid of an expert assessment of election administration practices. In such cases, the "reasonable person under the circumstances" test can be assessed based upon how a reasonable *professional* under the circumstances would have acted under "prevailing professional norms." *United States v. Williams*, 698 F.3d 374, 386 (7th Cir. 2012). In cases where professionals use specialized knowledge to perform their jobs, expert testimony is probative of questions concerning the reasonableness of conduct for evaluating whether defendants' actions met their duty under law. *Musser v. Gentiva Health Servs*., 356 F.3d 751, 760 (7th Cir. 2004). Contrary to the positions of the Defendants, expert testimony is particularly appropriate when the statute at issue uses a reasonableness standard.

Use of experts is appropriate in the field of election administration. Because the field of election administration relies on specialized and complex knowledge of voter list maintenance

technologies and methods, the opinions of expert witnesses are probative in determining liability. *Ins. Co. of the West v. Island Dream Homes, Inc.*, 679 F.3d 1295, 1298 (11th Cir. 2012) ("Expert testimony is required to define the standard of care when the subject matter is beyond the understanding of the average juror."). This technical complexity is especially pronounced in the area of voter registration list maintenance, which requires responsible officials to take advantage of different technologies and methods for keeping accurate, non-static lists of millions of individuals to maintain public confidence in the integrity of elections.

Similar to the standards of care applied in other areas of the law using a reasonableness standard, first there is an assessment of what is considered reasonable or prudent by members of the same group in a similar situation. *Island Dream Homes*, 679 F.3d at 1298. Second, the question of whether the professional is utilizing all reasonable currently available methods and technologies is brought to bear as well. *See Ward v. United States*, 838 F.2d 182, 187 (6th Cir. 1988) (in determining whether a doctor exercised due care, "regard must be given to the state of medical science at the time"); *Klisch v. MeritCare Med. Group*, 134 F.3d 1356, 1359 (8th Cir. 1998) ("due regard for the state of medical technology at the time of treatment should be the standard by which a physician's actions are judged"). Examining reasonableness using industry standards is a fact-based inquiry and summary judgment is inappropriate.

### 3.    Defendants' Have Argued a Non-Existent Standard of Care

Defendants have not set out any standard of care to which Defendant Snipes is subject when executing her list maintenance obligations under the NVRA. They simply assert that Defendant Snipes is taking reasonable steps, without establishing a standard. Essentially, the standard appears to be whatever is adequate according to the Defendants. Smith Deposition at 182:5-13. Regardless, even this amorphous and undefined standard invites a factual dispute and,

therefore, forecloses summary judgment. But this cannot be the standard contemplated by the NVRA as it would lead to wildly differing results nationwide. The list maintenance obligations of the NVRA would be unenforceable if they were satisfied when an election official has sent enough mailings and taken off enough registrants in their own estimation.

Contrary to the Defendants' unsupported assertions,[2] the NVRA does not contain a "safe-harbor," whereby an election official can relieve themselves of all responsibility for maintenance of their rolls by simply checking a box that they did a particular mailing pertaining to registrants who have moved, regardless of the actual accuracy and currentness of their rolls. This interpretation of 52 U.S.C. § 20507(a)(c) would fundamentally frustrate the purposes of the NVRA. More importantly, in order to achieve the ends of the statute, it is imperative to ensure that list maintenance programs are being done properly. Even if there were a "safe-harbor," Defendants have done nothing more than assert in an affidavit and by a check-box that a mailing was done. No records or evidence have shown that such mailings were done properly and effectively. Indeed, conflicting evidence exists, as will be shown below.

### III.   Facts Presented in Evidence Creating a Genuine Issue of Material Fact as to Whether Defendant Snipes Is Conducting a Reasonable List Maintenance Program.

Defendant Snipes's list maintenance efforts have not been reasonable under any standard of care. She has violated NVRA Section 8's requirement to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of

---

[2] The only court to have made reference to the concept of a "safe harbor" in Section 8 has been from the Sixth Circuit in quite another context. *See A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 707 (6th Cir. 2016), *petition for cert. granted*, (U.S. May 30, 2017) (No. 16-980). That case is currently under review by the United States Supreme Court.

eligible voters." 52 U.S.C. § 20507(a)(4). There is certainly a genuine issue of fact regarding whether she is conducting a reasonable list maintenance program.

In fact, Defendant Snipes denies that NVRA imposes list maintenance obligations on her. ECF No. [118-4] at 1. She maintains that she need only make minimal efforts to conduct a limited number of list maintenance practices permitted by Florida law. ECF No. [118-5] at 4.

Furthermore, Defendant and Defendant-Intervenor have filed motions for summary judgment on Count I in this case regarding whether or not the Defendant has engaged in reasonable list maintenance. In circumstances such as this, when a federal statute provides a right to information relevant to underlying liability, a plaintiff is prejudiced in establishing underlying liability when an election official refuses to comply with public inspection obligations. The continuing failure by Defendant Snipes to comply with public inspection obligations should weigh *against* granting Defendant Snipes's motion for summary judgment on Count I.

**A.      Registration Rate Indicative of Inadequate Maintenance.**

ACRU has presented evidence showing an impossible, or at least improbable, registration rate in Broward County. *Report of Steven Camarota*, ECF No [144] at 26-36. According to his testimony, Broward County has more persons registered to vote than it has citizens of voting age. Population data comes from the American Community Survey conducted by the U.S. Census Bureau, which carries with it a presumption of validity. *Johnson v. DeSoto County Bd. of Comm'rs*, 204 F.3d 1335, 1341 (11th Cir. 2000). Contemporaneous registration numbers are taken from the data reported by the Election Assistance Commission ("EAC"). These numbers are reported to the EAC directly from the counties through the states. Defendants have offered no argument as to why they would have provided inaccurate data to the EAC.

Other courts have found that implausibly high registration rates create an inference that an election official has neglected her duty to reasonably maintain an accurate and current voter registration rolls. *See Am. Civ. Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 793 (W.D. Tex. 2015) (finding a "strong inference"); *see also Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*, No. 5:16-CV-683-BR, 2017 U.S. Dist. LEXIS 23565, at *17 (E.D.N.C. Feb. 21, 2017).[3] Not only that, but other courts have recognized the validity and utility of population registration rates in other election law contexts. *Johnson*, 204 F.3d at 1342 n.13.

Defendants' arguments against this evidence are unfounded. First Defendants argue that the data and methodology itself is somehow unreliable. This argument must be rejected, however, because Defendant has offered nothing to support its claim that the data used is inaccurate, when it carries a presumption of validity. Absent some evidence that the data is unreliable or inaccurate, Defendants' argument must be set aside.

Defendants next take issue with the methodology used. Considering that there is no better way to derive the registration rate other than by comparing the number of registrants with the contemporaneous citizen voting age population, what Defendants are really objecting to is the entire concept of a registration rate as a relevant consideration. Smith Deposition at 171:13-20. Again, to ACRU's knowledge, every court to have considered the concept have found otherwise, and Defendants point to no authority to the contrary.

Finally, ACRU submits the expert testimony of Dr. Steven Camarota, an expert in population studies, who submitted a report describing the methodology and data sources he used

---

[3] ACRU's citations on this point in its response to Defendant-Intervenor's *Daubert* motion were inadvertently incorrect at ECF No. [156] at 20. Those citations should match the ones preceding this footnote.

in calculating the registration rate. Dr. Camarota also opines that, in his experience, the rate in Broward is very high and improbable.

The condition of Broward County's voter registration rolls creates a strong inference that Defendant Snipes has violated NVRA Section 8's reasonableness requirement. Voter registration rolls in Broward County are highly inaccurate. The fact that Broward County has more, or nearly more, persons registered to vote than citizens of voting age is indicative by itself of a NVRA Section 8 violation. Taken in the light most favorable to ACRU, this fact alone creates a genuine issue of material fact regarding whether adequate list maintenance is being done. If Defendant Snipes had made reasonable efforts to conduct voter list maintenance programs, such a result would be virtually impossible, and certainly improbable. A *per se* finding of a NVRA Section 8 violation is warranted based on this undisputed fact alone.[4]

**B.      Broward County's Voter Rolls Are Not Accurate or Current.**

Examples of evidence from multiple sources shows that the voter rolls in Broward County are not accurate or current.

▪    In a community of roughly 9,000, Mr. Richard Gabbay found over 600 registrants who had either died or moved away. Plaintiff's Opposition to SUMF ¶ A-2 ("SUMF Opp.").

---

[4]A *per se* standard for establishing violations of federal law has been applied in the antitrust context. *See generally Continental T.V., Inc. v. GTE Sylvania Inc*., 433 U.S. 36, 57-59 (1977) (discussing effects-based and formal threshold *per se* rules). Once a *per se* violation is established, no further inquiry need be made into the practices of the parties or the effects of their actions in order to support a finding of illegal conduct. *United States v. Nat'l Soc. of Prof'l Eng'rs*, 404 F. Supp. 457, 460 (D.D.C. 1975) ("Price fixing is a *per se* violation of the Sherman Act, requiring no further inquiry by a court into the activities, origin, history, or purpose") (*citing United States v. Nat'l Assoc. of Real Estate Bds.*, 339 U.S. 485, 489 (1950)).

- Comparing contemporaneous official data from the Florida Division of Elections and the New York State Board of Elections, Mr. William Skinner found that 600 persons had voted in both the New York and Broward County 2016 presidential primary elections. He found that well over 7,000 persons were registered in both New York and in Broward County by matching first name, middle name or initial, last name, and date of birth. SUMF Opp.¶ A-3.

- Official voter extract data from the Florida Department of Elections for December 2016 shows that there are over 3,000 persons on the Broward County roll who are 101 and older. This far exceeds the expected 100+ *total* population for Broward County by roughly eight times. SUMF Opp. ¶ A-4.

- Mr. Richard DiNapoli used the official Social Security Death index and the official voter extract data from the Florida Division of Elections and found that, of 2,100 persons who died in Broward County in 2011, 481 remained on the rolls in mid-2012. SUMF Opp. ¶ A-10.

- Official voter extract data from the Florida Division of Elections from May 2016 shows that there are 2,082 likely duplicate registrations in Broward County (meaning the same person registered multiple times); 2,208 persons likely voted multiple times in the same election; 862 registrants were over 105 years old and half of those were active registrants; 1 person was active on the rolls and was 12 years old and had been registered from age 8; 21 registrants had no first name listed. SUMF Opp. ¶ A-11.

### C.    Defendant Snipes Lacks a General Program of List Maintenance.

Whether an election official violates NVRA Section 8 depends on whether the official has a reasonable list maintenance program—a question that is wholly factual in nature. What makes an election official's program of list maintenance efforts "reasonable" under the plain meaning of that term differs depending on the circumstances and context. *U.S. v. Missouri*, 2007

U.S. Dist. LEXIS 27640, *19 (2007). If it is demonstrated that the rolls are inaccurate and obsolete, the Court should look to whether election officials are taking reasonable steps to remedy those problems. The extent of the efforts should match the extent of the problem. If a given jurisdiction's voter rolls appear to be accurate and current, then it would be reasonable that fewer efforts may be needed to keep them so. On the other hand, if a jurisdiction's rolls are rife with demonstrable inaccuracies and obsolescence, then the reasonable response is to do more than the bare minimum. These are questions of fact.

In this case, the relevant circumstances and context includes Broward County's past, systemic failures to conduct reasonable list maintenance programs required by federal law; readily identifiable and demonstrable inaccuracies and obsolescence in the rolls; and failures to properly execute the procedures set out in Florida's statutes relating to list maintenance programs. It also includes the fact that Defendant Snipes, over the years, has received information from multiple sources indicating that the county's voter rolls were in poor condition.

ACRU's expert, former Colorado Secretary of State Scott Gessler, has opined that Defendant Snipes's list maintenance efforts were not reasonable in light of the state of the rolls, the procedures used by the office, and the tools available to Defendant Snipes under industry standards applicable to election administration and that Defendant Snipes lacks a general program of list maintenance. SUMF Opp. ¶ A-14.

Specifically, Defendant Snipes's office has no written policies or procedures for list maintenance. SUMF Opp. ¶ A-15. Defendant Snipes is unable to search her database for registrants based on reason for termination. SUMF Opp. ¶ 36. The certifications of list maintenance show wildly fluctuating numbers of mailings and removals without any semblance of consistency, showing a lack of a regular program of list maintenance. SUMF Opp. ¶ A-8.

14

Defendant-Intervenor's expert opined that if no removals occurred in a two-year period, then he would suspect that inadequate list maintenance was being done. Smith Deposition at 169:13-170:14. Yet that is precisely what has happened in Broward County, not once, but twice: during the period from early 2009-early 2011 and then again from late 2013-early 2015. SUMF Opp.¶ A-12. Official certifications of list maintenance submitted to the state have apparently been significantly inaccurate year after year and were ostensibly corrected only because of this litigation. SUMF Opp. ¶ 14. All of these facts demonstrate a lack of a general program.

Under these circumstances and given this context, the list maintenance efforts undertaken by Defendant Snipes should have included more than the bare minimum outlined by Florida law. She does not claim to be doing more than the bare minimum mandated under Florida law and the evidence in the record suggests that she was not even doing that. Defendant Snipes should have at least been using the tools available to her under Florida law and following those procedures to improve the condition of the rolls.   These facts make summary judgment wholly inappropriate.

### 1.    Given the Condition of the Rolls, a Reasonable List Maintenance Program Would Use the Tools Available Under Florida Law.

Florida law expressly provides many list maintenance tools:

- Request and use information from out-of-state voter registration officials in order to identify duplicates. Fla. Stat. 98.045(2)(b). Defendant Snipes does not do this, despite receiving information that many duplicates exist. SUMF Opp. ¶ 29.

- Obtain and use information from returned jury notices for list maintenance purposes. Fla. Stat. 98.065(4)(a). Defendant Snipes does not do this, despite acknowledging that some kind of maintenance should be done regarding non-citizens on the rolls and despite the fact that these forms are easily obtainable. ECF No. [118-4] at 2.

15

- Obtain and use information from the Department of Highway Safety and Motor Vehicles for list maintenance purposes. Fla. Stat. 98.065(4)(a). The DHSMV has such a system that is free for Supervisors to use. Snipes does not use this free system, despite the fact that she would like access to a paid system that would provide the same information. SUMF Opp. ¶ A-17.

- Obtain and use information regarding inaccurate registrations from "other sources" for list maintenance purposes. Fla. Stat. 98.065(4)(b). Supervisor Snipes is required to follow up on information received from other sources and send notices to verify registrations accordingly. Fla. Stat. 98.075(7). She has routinely ignored such information. SUMF Opp. ¶ 27, A-2, A-3.

- Obtain and use information regarding death, felony status, non-citizen status, or change of address from "sources other than those identified." Fla. Stat. 98.075(6). Supervisors are required to send notices to follow up on this information if received. Fla. Stat. 98.075(7). Defendant Snipes does not seek or use any such information other than what is passively received from the state through FVRS. Defendant Snipes has frequently ignored such information, including information related to felons on the rolls, deceased registrants, duplicate registrants, and registrants who have moved. SUMF Opp. ¶ 31, 27, A-2, A-3

- Obtain and use information to verify citizenship of registrants. Defendant Snipes does nothing other than passively receive information regarding potential non-citizens on the rolls. Non-citizens form a very large percentage of Broward County's population: 259,115 or 14.1% of the population from 2015 American Community Survey data. ECF No. [144] at 41-57. The Supervisor has expressed that it would be a good idea to verify citizenship status. SUMF Opp. ¶ A-16. Over a five-year period, Defendant Snipes removed just 19 non-citizens from the rolls. Defendant Snipes has access to the federal Systematic Alien Verification for Entitlements system, but does not use it. ECF No. [118-4] at 2.

16

### 2.    Genuine Issue of Material Fact as to Whether Defendant Snipes Does Any of the Minimum Required Mailings Under Florida Law.

Florida law prescribes a bare minimum for list maintenance for registrants who have moved requiring supervisors to do one of three kinds of mailings in every odd-numbered year.

### a.    NCOA Mailings

Under Fla. Stat. 98.065(2)(a): "Change-of-address information supplied by the United States Postal Service through its licensees is used to identify registered voters whose addresses might have changed[.]" If the Supervisor receives change-of-address information, "the supervisor must change the registration records to reflect the new address and must send the voter an address change notice[.]" Fla. Stat. 98.065(4)(a).

The evidence in the record shows that there is a genuine issue of material fact as to whether Defendant Snipes is in fact doing these NCOA mailings in accordance with the statute.

- According to Mary Hall, the Director of Voter Services, the Supervisor obtains change-of-address information from "yellow stickies" that are put on returned mail by USPS and that they do not receive NCOA database information from any other source. SUMF Opp. ¶ 19. This is not "change-of-address information supplied by the United States Postal Service through its licensees. ECF No. [144] at 45.

- According to Defendant Snipes, registrations are not updated with new addresses before address change notices are sent out. SUMF Opp. ¶ 19.

- ACRU specifically requested records of NCOA data received from USPS vendors and did not receive any. Yet Jorge Nuñez stated that the Supervisor "receives an updated data file" from a vendor containing NCOA data. ECF No. [143] at 16.

- ACRU served interrogatories on Defendant Snipes on October 31, 2016, including a request to describe any process for obtaining and using commercial change-of-address database information. SUMF Opp. ¶ 18. Defendant Snipes response indicated that she does not use NCOA data obtained from licensed vendors. ECF No. [118-5] at 8. But now, in the Declaration of Jorge Nuñez, he provides a description of the very details requested on October 31, 2016, which, at a minimum, demonstrate that Defendant Snipes's interrogatory responses were grossly incomplete. *See* FRCP 26(e)(1) and 33(b)(3).[5]

- The original certifications filed with the state show checked boxes for NCOA mailings for late 2011 and late 2015. ECF No. [122-2]. In response to this litigation, Defendant Snipes revised the certifications to add an NCOA mailing in late 2013. SUMF Opp. ¶ 14. No documents showing NCOA database requests or data received related to the 2011 or 2013

---

[5] Defendant cannot rely on new factual statements that should have been provided in response to ACRU's discovery requests. The Federal Rules of Civil Procedure state that, if a "party *fails to provide information* or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (emphasis added); *see also, United States ex rel. S. Site & Underground, Inc. v. McCarthy Improvement Co*., No. 3:14-cv-919-J-PDB, 2017 U.S. Dist. LEXIS 13762, at *23 (M.D. Fla. Feb. 1, 2017) (noting "that Rule 37(c)(1) allows sanctions for failure to supplement discovery responses, even without a discovery order."). "When a party fails to comply with Rule 26, the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation was either justified or harmless." *Companhia Energetica Potiguar v. Caterpillar Inc*., No. 14-CV-24277, 2016 U.S. Dist. LEXIS 72102, at *14-15 (S.D. Fla. June 2, 2016). Defendant Snipes makes no attempt to explain why she did not supplement or correct her discovery responses. ACRU explicitly requested a description of all mailings programs under 52 U.S.C. §§ 20507(c) and (d). Defendant responded by saying that she "operates in accordance with F.S. §98.065 and § 98.075, regarding registration records maintenance programs and activities." But those sections deal with a plurality of list maintenance tools provided by Florida law. It is clear now from the Declaration of Mr. Jorge Nuñez, however, that this response was, minimally, incomplete. At no time has Defendant Snipes supplemented or updated her interrogatory responses. Accordingly, paras. 9-17 of the Declaration of Mr. Jorge Nuñez, ECF No. [143] at 15-19, must be excluded from the record because the factual details described were not provided despite the fact that they were requested in ACRU's interrogatories, ECF No. [118-5] at 2, 7.

mailing are in the record.The only record related to the requesting or receipt of NCOA database information from 2015 is an invoice from May 2015, that Defendant now claims shows a request for NCOA database information. SUMF Opp. ¶ 19.

### b.      Mass Mailings to All Registered Voters

Under Fla. Stat. 98.065(2)(b): "Change-of-address information is identified from returned nonforwardable return-if-undeliverable mail sent to all registered voters[.]" If the Supervisor receives such information, "the supervisor must change the registration records to reflect the new address and must send the voter an address change notice[.]" Fla. Stat. 98.065(4)(a).

The evidence in the record shows that Defendant Snipes has not done any mailings in conformity with Fla. Stat. 98.065(2)(b). Indeed, Defendant Snipes is unaware of any correlation between the three checkboxes on the certifications and the three subsections of 98.075(2).

- In the original certifications of list maintenance going back to 2009, not once is the box for mass-mailings to all registered voters checked. SUMF Opp. ¶ A-9. The records produced by Defendant Snipes in fact support these original certifications, as no records have been produced showing mass mailings to all registered voters. SUMF Opp. ¶¶ 14, 16.

- Defendant Snipes' "amended" certifications purport to show that a mass mailing under 98.075(2)(b) was done six times since 2011. The invoices produced only show mailings to all active registrants, not to all registered voters. Defendant Snipes also stated unequivocally that her office never sends any mailings to inactive registrants. SUMF Opp. ¶¶ 14, 16.

### c.      Targeted Mailings

Under Fla. Stat. 98.065(2)(c): "Change-of-address information is identified from returned nonforwardable return-if-undeliverable address confirmation requests mailed to all registered voters who have not voted in the last 2 years and who did not make a written request that their

registration records be updated during that time." If the Supervisor receives change-of-address information, "the supervisor must change the registration records to reflect the new address and must send the voter an address change notice[.]" Fla. Stat. 98.065(4)(a).

The evidence in the record does not support Defendant Snipes's certifications that she does targeted mailings in accordance with Fla. Stat. 98.065(4)(a).

- The original certifications produced by Defendant Snipes claim that targeted mailings under 98.065(2)(c) were done during seven time periods from 2011-2016. These certifications were apparently inaccurate, however, and were amended as a result of this litigation to show targeted mailings in all time-periods from 2011-2016. SUMF Opp. ¶ 14.

- The numbers on the certifications show an impossibly small number of "address confirmation requests." Based on the number of address confirmation requests sent, it is impossible that Defendant Snipes sent such requests to "all registered voters who have not voted in the last 2 years and who did not make a written request that their registration records be updated during that time." The number fluctuates in each six-month time period from 456 to a maximum of 7,025. In the 2014 general election, for example, 592,463 of Broward County's 1,067,083 voters did not vote and in the 2012 general election, 378,111 registrants did not vote. Yet from 2013-present, Defendant Snipes has only sent out 14,704 address confirmation requests. SUMF Opp. ¶ A-8.

- The certification for the second half of 2016 has the "targeted mailing" checkbox checked, and yet no address confirmation requests were sent. SUMF Opp. ¶ A-7.

- Defendant has not produced any response to discovery requests describing the process for how the list of targeted voters is created. ACRU requested a description of this process in interrogatories and in depositions. SUMF Opp. ¶ A-6.

20

Dated: June 9, 2017

 /s/ William E. Davis
William E. Davis (Fla. 191680)
FOLEY & LARDNER LLP
Two South Biscayne Boulevard, Suite 1900
Miami, FL 33131
(305) 482-8404 (telephone)
(305) 482-8600 (fax)
wdavis@foley.com

H. Christopher Coates*
LAW OFFICE OF H. CHRISTOPHER COATES
934 Compass Point
Charleston, SC 29412
(843) 609-7080 (telephone)
curriecoates@gmail.com

Respectfully submitted,

J. Christian Adams*
Joseph A. Vanderhulst*
Kaylan L. Phillips*
PUBLIC INTEREST LEGAL FOUNDATION
32 East Washington Street, Suite 1675
Indianapolis, IN 46204
(317) 203-5599 (telephone)
(888) 815-5641 (fax)
adams@publicinterestlegal.org
jvanderhulst@publicinterestlegal.org
kphillips@publicinterestlegal.org

Kenneth A. Klukowski*
American Civil Rights Union
3213 Duke Street #625
Alexandria, Virginia 22314
Telephone (877)-730-2278
kklukowski@theacru.org

* Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I certify that on June 9, 2017, I caused the foregoing to be filed with the United States District Court for the Southern District of Florida via the Court's CM/ECF system, which will serve all registered users.

> /s/ William Davis
> William Davis