# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.  16-cv-61474-BLOOM/Valle

ANDREA BELLITTO and
AMERICAN CIVIL RIGHTS UNION,

      Plaintiffs,

v.

BRENDA SNIPES, in her official capacity
as the Supervisor of Elections of
Broward County, Florida,

      Defendant,

v.

1199SEIU UNITED HEALTHCARE
WORKERS EAST,

      Intervenor Defendant.
_____/

## ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT
## AND MOTION TO EXCLUDE OPINIONS AND TESTIMONY

**THIS CAUSE** is before the Court upon Plaintiff American Civil Rights Union's

("Plaintiff" or "ACRU") Motion for Partial Summary Judgment on Count II of the First

Amended Complaint, ECF No. [117] ("ACRU's Motion"), Defendant Brenda Snipes'

("Defendant" or "Snipes") Motion for Summary Judgment as to Count II of Plaintiff's First

Amended Complaint, ECF No. [145] ("Snipes' Motion"), and Snipes and Intervenor Defendant

1199SEIU United Healthcare Workers East's ("Intervenor Defendant" or "United") Motion for

Summary Judgment on Count I of Plaintiff's Amended Complaint, ECF No. [142] (the

"Snipes/United Motion").  United has also filed a Motion to Exclude Opinions and Testimony of

Proposed Experts, ECF No. [144] (the "*Daubert* Motion").  The Court has carefully reviewed the

Motions, the record, all supporting and opposing filings, the exhibits attached thereto, and is otherwise fully advised in the premises. For the reasons that follow, ACRU's Motion, Snipes' Motion, and the Snipes/United Motion are denied. United's *Daubert* Motion is granted in part and denied in part.

## I.  BACKGROUND

ACRU is a non-profit corporation "which promotes election integrity, compliance with federal election laws, government transparency, and constitutional government." ECF No. [12] at ¶ 4. Snipes is the Supervisor of Elections of Broward County, Florida and has been since November 2003. United is a labor union that focuses on representing healthcare workers and those who work in healthcare facilities.[1] Defendant Snipes' and Defendant-Intervenor United's Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment, ECF No. [143] ("Snipes/United Count I Supporting SOF") at ¶¶ 2-3.[2]

### A.  ACRU's Initial Requests and the Commencement of this Lawsuit

On January 26, 2016, the President of ACRU, Susan A. Carleson ("Carleson"), sent a letter to Snipes notifying her that, based on ACRU's research, Broward County was "in apparent violation" of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507.[3] ECF No. [12-1]. The letter explained that based on ACRU's "comparison of publicly available information published by the U.S. Census Bureau [("Census Bureau")] and the federal Election Assistance Commission [("EAC")]," Broward County at the time "ha[d] an implausible number of registered voters compared to the number of eligible living citizens." *Id.* at 2. The letter

---

[1] On September 19, 2016, United filed a motion to intervene, which the Court granted on September 20, 2016. *See* ECF Nos. [23], [29]; *see also* ECF No. [53].

[2] Where a fact, as it is specifically incorporated herein, is uncontroverted by the opposing party, the Court cites only to the originating statement of facts.

[3] As do the parties, the Court refers to 52 U.S.C. § 20507 interchangeably as "Section 8," reflecting the statute's original location at Section 8 of Pub. L. 103-31, May 20, 1993, 107 Stat. 77.

expressed ACRU's hope that the Broward County Supervisor of Elections' Office ("BCSEO") would work toward compliance with Section 8 of the NVRA as well as ACRU's intention to file a lawsuit under the statute if such compliance was not achieved. *Id.* at 3. The letter also stated that if the information referenced therein was no longer accurate, "it would be helpful if [Snipes] could provide" documents related to the following: updated registration data since the publication of information reported by the EAC for 2014 from the November 2014 election (the "2014 EAC Report"); records obtained or received from federal and state courts, including jury recusal forms, regarding lack of citizenship, death, or relocation; the number of ineligible voters removed by category and by date; the source agency that provided the identifying information of the removed deceased and when the data was provided; the number of notices sent to inactive voters since the publication of the 2014 EAC Report, including the date, scope, and contents of any mailing sent to all registered voters; the names of the staff responsible for conducting list maintenance obligations; the number of ineligible voters removed for criminal conviction, together with the underlying data and communications with law enforcement agencies; the total number of voters registered in Broward County as of the date of any response; any records indicating the use of citizenship or immigration status for list maintenance activities; and all list maintenance records including federal voter registration forms containing citizenship eligibility questionnaires for the previous 22 months. *Id.* at 3-4. Citing Section 8 of the NVRA, the letter informed Snipes of the requirement that her office "make available for public inspection all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* at 4. The letter invited Snipes to call Carleson in order to arrange a time to discuss the matter and to arrange an inspection. *Id.*

On February 8, 2016, Snipes responded to ACRU's letter with a letter of her own. *See* ECF No. [12-2] at 1-2. Snipes' letter refuted as "implausible" the assertion that Broward County's voter rolls were filled with more voters than living persons residing in the county, advising ACRU that the State of Florida "has a statewide database" and that Broward County "adheres strictly to the State of Florida guidelines regarding management of the voter rolls." *Id.* The letter included two forms of certifications spanning the previous several years—"Address List Maintenance Activities" certifications and "Eligibility Records Maintenance" certifications—which it characterized as "documenting actions taken by [Snipes'] office to manage removal of voters no longer eligible to vote in Broward County." *Id.* at 2; *see also id.* at 3-23. The letter also stated that Broward County "follows up on information received from credible sources that a person may no longer be eligible to vote." *Id.* at 2. The letter closed by directing ACRU to BCSEO's General Counsel "[s]hould [ACRU] require further information" and BCSEO's website as "an additional source of information." *Id.* at 3.

About two months after the exchange of letters, legal representatives of ACRU contacted Snipes via telephone on April 5, 2016, "offer[ing] to set up a meeting to discuss [ACRU's] letter and inspect the requested records." Plaintiff's Statement of Undisputed Material Facts Supporting Motion for Partial Summary Judgment on Count II, ECF No. [118] ("ACRU Count II Supporting SOF") at ¶ 6. According to Snipes, during that phone call she "provided the contact information for [her] General Counsel in order to coordinate inspection and follow-up" and mentioned that there would be a cost for "technology time." Defendant Snipes' Response to Plaintiff's Statement of Material Facts, ECF No. [128] ("Snipes Count II Response SOF") at ¶ 6. ACRU asserts, however, that Snipes "refused to meet to discuss remedies and permit inspection of records[,] . . . stat[ing] that she would meet with ACRU's representatives only if election

officials from six other Florida counties were also present at the meeting." ACRU Count II Supporting SOF at ¶ 7 (emphasis omitted). Snipes denies that she ever refused to provide documents or allow for an inspection of records, asserting that she "explained that an inspection meeting needed to be coordinated with [General Counsel] given the threat of litigation and the fact that the caller was an attorney." Snipes Count II Response SOF at ¶ 7.

Nearly three months later, on June 27, 2016[4]—and apparently without any further communications having taking place between ACRU and Snipes—ACRU and Andrea Bellitto ("Bellitto"),[5] one of ACRU's members, initiated these proceedings, bringing two claims against Snipes under Section 8 of the NVRA. *See* ECF No. [1]. Under Count I of its Amended Complaint, ACRU claims that Snipes "has failed to make reasonable efforts to conduct voter list maintenance programs, in violation of Section 8 of NVRA, 52 U.S.C. § 20507 and 52 U.S.C. § 21083(a)(2)(A) [Help America Vote Act ("HAVA")]." ECF No. [12] at ¶ 28. Under Count II of the Amended Complaint, ACRU claims that Snipes "has failed to respond adequately to Plaintiffs' written request for data, [and] failed to produce or otherwise failed to make records available to Plaintiffs concerning Defendant's implementation of programs and activities for ensuring the accuracy and currency of official lists of eligible voters for Broward County, in violation of Section 8 of the NVRA, 52 U.S.C. § 20507(i)." *Id.* at ¶ 33. For relief, ACRU seeks an order from this Court (1) declaring that Snipes is in violation of Section 8 of the NVRA; (2) ordering Snipes to implement reasonable and effective registration list maintenance programs to cure failures to comply with the NVRA and ensure that non-citizens and ineligible registrants are

---

[4] As a matter of timing, the NVRA requires a potential plaintiff to "provide written notice of [a] violation [of this chapter] to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1). "If the violation is not corrected within 90 days after receipt of [the] notice[,]" the aggrieved person may file a civil suit. 52 U.S.C. § 20510(b)(2).

[5] On October 26, 2016, the Court dismissed all claims brought by Bellitto after finding that Bellitto lacked standing to bring suit. *See* ECF No. [64].

not on Broward County's voter rolls; (3) ordering Snipes to substantively respond to ACRU's written request for records concerning her implementation of programs and activities to ensure the accuracy and currency of Broward County's voter registration list and providing access to election records; and (4) additional relief. *See id.* at 9-10.

**B. BCSEO Records Produced throughout Discovery**

Following this case's inception, the discovery conducted by the parties revolved primarily around ACRU's records requests. First, on October 31, 2016, ACRU served discovery requests on Snipes requesting admissions and responses to interrogatories regarding list maintenance activities as well as any new documents. ACRU Count II Supporting SOF at ¶ 9. In response to ACRU's discovery requests, Snipes did not produce any new documents other than the certifications she had provided with her February 8, 2016 letter, though Snipes did offer to allow an inspection of BCSEO's voter registration database. *See id.* at ¶¶ 12-13.

On January 13, 2017, ACRU conducted an in-person inspection of BCSEO's voter registration database. *Id.* at ¶ 14. Certain categories of documents were not available during the inspection because they were either not contained in the registration database or required "additional assembly" before they could be made available. *Id.* Shortly thereafter, on January 26, 2017, Snipes provided ACRU with a CD containing a PDF file of a current active voter roll for Broward County and a PDF file of a table list of mailings sent out by BCSEO. *Id.* at ¶ 15.

On February 1, 2017, Snipes supplemented its initial response to ACRU's October 31, 2016 discovery requests. *See* ECF No. [111-2]. In the supplemental response, "which did not include any additional documents, [Snipes] objected to 'the production of documents dating back beyond a period of two years from the date of the filing of subject Complaint' and asserted that responsive documents 'within the last two years [] have already been made available for public

inspection and copying on January 13, 2017.'" ECF No. [126] at 2-3 (quoting ECF No. [111-2] at 3).[6]

On February 9, 2017, Snipes provided ACRU with two CDs containing a number of different responsive documents. *See* ACRU Count II Supporting SOF at ¶ 17. Additionally, on March 8, 2017, Snipes provided ACRU with amended versions of the certifications she had initially provided with her February 8, 2016 letter. *See id.* at ¶ 18 (citing ECF No. [111-4]). Discovery closed on March 10, 2017.

### C. BCSEO's Voter Registration and List Maintenance Procedures

Along with Snipes, BCSEO's responsibilities relating to voter registration and list maintenance are primarily carried out by Jorge Nunez ("Nunez"), BCSEO's Information Technology Director who maintains BCSEO's voter registration database; Mary Hall ("Hall"), BCSEO's Voter Services Director who helps maintain the voter rolls; and Sonia Cahuesqui ("Cahuesqui"), a voter registration clerk. Snipes/United Count I Supporting SOF at ¶¶ 4-7.

In accordance with requirements of the Florida Department of State's ("DOS") Division of Elections ("DOE"), Nunez prepares twice-yearly certifications summarizing Snipes' list maintenance activities, which are in turn signed and certified by Snipes and then provided to DOE. *Id.* at ¶ 6; Plaintiff ACRU's Opposition to Defendant Snipes' and Defendant-Intervenor United's Statement of Undisputed Material Facts in Support of their Motion for Partial Summary Judgment, ECF No. [160] ("ACRU's Count I Response SOF") at ¶ 6. The two types of certifications include: (1) "Certification of Address List Maintenance Activities" that reports the actions taken by Snipes to identify registrants who have changed residence, cancel the registrations of individuals who no longer reside in Broward County, and update the registrations

---

[6] Snipes and ACRU disagree as to the scope of an agreement that took place between them at the January 13, 2017 inspection. *See generally id.* at 4-6. According to Snipes, ACRU agreed to limit *all* documents contemplated in its discovery request to records spanning the previous two years. *See id.* at 5.

of individuals who have moved within Broward County; and (2) "Certification of Eligibility Records Maintenance" that reports the actions taken by Snipes to remove registrants who are or have become ineligible because of death, felony conviction, mental incapacity, or a lack of United States citizenship. Snipes/United Count I Supporting SOF at ¶ 14. Nunez is also responsible for placing orders with, and sending data files to, Commercial Printers, Inc. ("Commercial Printers"), the third-party vendor that performs printing and mailing services related to Snipes' list maintenance. *Id.* at ¶ 6.

With respect to voter registration generally, BCSEO asserts that, like most other Florida counties, Broward County uses a voter registration database system commonly referred to as the "VR System" that was developed by VR Systems, Inc. ("VR Systems"), an outside vendor with which BCSEO contracts. *Id.* at ¶¶ 9-10. According to Snipes, the VR System "interfaces directly with" the Florida Voter Registration System ("FVRS"), a statewide voter registration database that Florida maintains pursuant to HAVA. *Id.* at ¶¶ 8-9. With respect to new voter registration applications, BCSEO sends applications it receives to DOE, which runs certain clearance checks—including screening for duplicate registrations by checking the new applicant's information against the FVRS—before advising BCSEO that the applicant has been cleared for registration. *Id.* at ¶ 11. In addition, DOE regularly provides Florida's election supervisors, including Snipes, with lists of current registrants who are deceased or have been convicted of a felony. *Id.* at ¶ 15. In turn, BCSEO uses that information, which is transmitted electronically by way of direct interaction between FVRS and VR Systems, to update Broward County's voter registration database and to remove voters who have become ineligible. *Id.*

In total, between January 1, 2014 and December 31, 2016, Snipes removed approximately 240,028 registrants from Broward County's voter rolls. *Id.* at ¶ 39. Between

January 7, 2015 and January 10, 2017, Snipes removed approximately 192,157 registrants from Broward County's voter rolls. *Id.* at ¶ 40. With respect to other updates unrelated to registrant removal, approximately 148,645 registered voters living within Broward County who were registered as of January 7, 2015 and who were still registered in Broward County as of January 10, 2017 updated their address on record to a new address within Broward County. *Id.* at ¶ 41.

### 1. Procedures Relating to Residence Changes

According to Snipes, BCSEO uses the following three mailings—all of which are conducted by Commercial Printers—to identify and update or remove voters from the Broward County voter rolls when voters have changed residence: (1) notifications to voters who have filed a forwarding address with the United States Postal Service ("USPS"); (2) mailings related to voting matters to all registrants in the county; and (3) targeted mailings to registrants who have not voted for a certain period of time.[7] *Id.* at ¶¶ 16-17.

BCSEO certifications produced by Snipes reflect that Snipes utilized information received from USPS's National Change of Address ("NCOA") program as part of her list-maintenance activities in 2009, 2011, 2013, and 2015.[8] *Id.* at ¶ 19. "To identify voters with changes of address, Defendant sends voter data from VR Systems to Commercial Printers, which is licensed and certified by [USPS] to use a program called NCOALink. Using NCOALink, Commercial Printers receives updated, computerized change-of-address information on a regular basis." *Id.* at ¶ 20 (internal citation omitted). Snipes then receives an "updated file" from Commercial Printers, which it "imports into a software program called Voter Focus." *Id.* at ¶ 21.

---

[7] ACRU disputes "whether Defendant updates the addresses of registrants before sending out address change notices[,]" asserting that "[a]t the very least, no records have been produced showing [USPS National Change of Address] database information received so that the registrations could be updated first." ACRU's Count I Response SOF at ¶ 16 (citing ECF No. [160-2] at 12).

[8] ACRU asserts that "[t]he source of the supposed NCOA database information are 'yellow stickers' on returned mail and not from the NCOA database." ACRU's Count I Response SOF at ¶ 16 (citing ECF No. [160-3] at 6).

From there, BCSEO's Voter Services team processes records identified based on the "data comparison" as having changes in accordance with VR System's instructions, and "a forwardable notice is automatically scheduled to be sent to the appropriate voters[.]" *Id.* If a voter does not respond to a "Final Notice" within 30 days, the voter's status is changed from "active" to "inactive" in the VR System database. *Id.* at ¶ 22. If the voter does not vote or contact BCSEO in two general election cycles, the voter's status is changed to "ineligible" and the voter is no longer registered to vote. *Id.* at ¶ 23. The most recent "NCOA comparison" was conducted in May 2015. *Id.* at ¶ 24.

### 2. *Procedures Relating to Deceased Voters*

On a daily basis, DOE provides Snipes through FVRS with a verified electronic list of voters who have recently died. *Id.* at ¶ 26. Upon receipt of such lists, Snipes then cancels the relevant voter registration records. *Id.* On an occasional basis, Snipes receives information indicating that a registrant is deceased from sources other than DOE. *Id.* at ¶ 27. In those cases, BCSEO will make efforts to obtain a copy of the death certificate before removing the registrant from the voter rolls. *Id.* If BCSEO is unable to obtain a copy of the death certificate, BCSEO will send additional notices to the registrant's last known address and will request DOE to investigate the voter's status. *Id.* Between January 1, 2014 and December 31, 2016, Snipes removed 37,095 registrants from Broward County's voter rolls that were determined to be deceased. *Id.* at ¶ 28.

### 3. *Procedures Related to Duplicate Registrations and Felony Convictions*

On a daily basis, BCSEO receives notifications of potential duplicate registrations from DOE via FVRS, and then consolidates the registration so that only one registration is active. *Id.* at ¶ 29. BCSEO determines the correct county of residence by the most recent update to the

voter's record.  *Id.*  Between January 1, 2014 and December 31, 2016, Snipes removed more than 9,000 duplicate registrants.  *Id.* at ¶ 30.

Similarly, on a daily basis, BCSEO also receives an electronic list of individuals with a felony conviction from DOE.  *Id.* at ¶ 32.  BCSEO then generates a letter to mail to each registrant on those lists, which a registrant has 30 days to reply to by either confirming or contesting the information contained in the notice.[9]  *Id.*  If no reply is received within 30 days, BCSEO publishes a notice in the newspaper.  *Id.*  If no reply is received within 30 days from the newspaper publication, the registrant is automatically removed from the voter rolls.  *Id.*  Between January 1, 2014 and December 31, 2016, Snipes removed 5,102 registrants from Broward County's voter rolls that were determined to have a felony conviction.  *Id.*

### 4.  *Procedures Related to Non-Citizens*

Like the National Voter Registration Form, Florida's voter registration form requires applicants to affirm their citizenship under penalty of perjury.  *Id.* at ¶ 35.  Occasionally, the U.S. Department of Homeland Security sends individuals applying for United States citizenship to BCSEO in order to obtain documentation indicating whether or not they have registered to vote as non-citizens.  *Id.*  The individuals found to have registered to vote as non-citizens are removed from the voter rolls.  *Id.*  Between January 1, 2014 and December 31, 2016, Snipes removed four registrants from Broward County's voter rolls as non-citizens.  *Id.* at ¶ 37.

## II.  LEGAL STANDARDS

### A.  Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony

---

[9] The mailings to individuals convicted of a felony are handled by BCSEO directly, rather than by Commercial Printers.  *Id.*

bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To determine whether expert testimony or any report prepared by an expert may be admitted, the Court engages in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert*, 509 U.S. at 589). The Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the Court must individually analyze each concept. *See id.*

An expert in this Circuit may be qualified "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007); Fed. R. Evid. 702). "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id.* (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Kilpatrick v. Breg, Inc.*, 2009 WL 2058384 (S.D. Fla. June 25, 2009)). "After the district court undertakes a review of all of the relevant issues and of an expert's qualifications, the determination regarding qualification to

testify rests within the district court's discretion." *J.G.*, 2013 WL 752697, at *3 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).

When determining whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261-62 (internal formatting, quotation, and citation omitted). To make this determination, the district court examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Id.* at 1262 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Thus, the aforementioned factors are non-exhaustive, and the Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability. *See id.* Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable. *Id.* at 1258 (citing *Kumho*, 526 U.S. at 152)).

The final element, helpfulness, turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262) (formatting omitted). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.* (quoting *Cook ex rel. Estate of Tessier v. Sheriff of*

*Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). To be appropriate, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591). "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *Id.* (citing *General Electric Co. v. Joiner*, 522 U.S. 136 (1997)).

Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (internal quotations and citations omitted). Through this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (internal quotations and citations omitted). Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293, n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596); *see Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988) ("On cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.")).

## B. Summary Judgment

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 Fed. Appx. 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories,

and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343.

A district court's disposition of cross-motions for summary judgment, like the cross-motions filed with respect to Count II in this case, employs the same legal standards applied when only one party files a motion. *See United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.") (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)).[10]  A court must consider each motion on its own merits, "resolving all reasonable inferences against the party whose motion is under consideration." *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014) (citing *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)).  "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Id.* (citing *Oakley*, 744 F.2d at 1555-56); *see also Bricklayers*, 512 F.2d at 1023.

## III.  DISCUSSION

With this backdrop in mind, United moves for summary judgment on Count I (ACRU's claim for failure to make reasonable efforts to conduct voter list maintenance programs), and ACRU and Snipes, respectively, move for summary judgment on Count II (ACRU's claim for failure to disclose).  In addition, United moves to strike ACRU's two proposed expert witnesses who it appears will, if allowed, offer testimony that supports ACRU's claim under Count I.  The

---

[10] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the court adopted as binding precedent all decisions of the Fifth Circuit issued prior to October 1, 1981.

Court will therefore address ACRU's *Daubert* Motion first, and will then turn to the parties' respective motions for summary judgment.

### A. United's *Daubert* Motion[11]

United seeks to exclude ACRU's proposed experts, Dr. Steven Camarota ("Dr. Camarota") and Scott Gessler ("Gessler"), on the bases that both are unqualified to offer any opinion in this case and that the entirety of their respective opinions is unreliable, speculative, and/or unhelpful. For the most part, the Court disagrees.[12]

#### 1. Dr. Camarota

United challenges the testimony of Dr. Camarota under the first two elements of *Daubert*—that is, qualifications and reliability. In United's view, because Dr. Camarota "is not versed in voter registration policy and is not a statistician, he is [] wholly unqualified to offer an opinion—let alone an expert opinion—on the issues in dispute in this case." ECF No. [144] at 2. United's assessment, however, misconstrues the primary purpose for which ACRU seeks to introduce Dr. Camarota's testimony and, in turn, understates Dr. Camarota's credentials to that effect. As ACRU correctly points out, the essence of Dr. Camarota's expert opinion is an

---

[11] The Court notes that United failed to meet and confer with ACRU prior to filing its *Daubert* Motion as required by Local Rule 7.1(a)(3) and this Court's initial Scheduling Order, ECF No. [127] at 2—an independent basis for denial. The Court will nevertheless consider the *Daubert* Motion on the merits.

[12] The merits aside, ACRU argues that because this case is set for a bench trial, United's *Daubert* Motion is inappropriate, and that "the prudent course is to permit ACRU's experts to offer testimony during trial, where its relevance and reliability can be judged in the context of ACRU's legal arguments in support of its claims." ECF No. [156] at 2-4. However, none of the cases ACRU cites to in support of this proposition involved evidentiary determinations made in contemplation of summary judgment. Here, by contrast, resolution of the Snipes/United Motion turns in part on the admissibility of ACRU's proposed experts. It is axiomatic, as explained by the Eleventh Circuit, that "[e]vidence inadmissible at trial cannot be used to avoid summary judgment." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) (quoting *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 661 (5th Cir.1976)) (alteration in original); *see also* Fed. R. Civ. P. 56(c)(1)(B) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . showing that . . . an adverse party cannot produce admissible evidence to support the fact."); Fed. R. Civ. P. 56(c)(5)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Thus, the Court finds it both appropriate and necessary to consider United's *Daubert* Motion.

assessment, based in part on data provided by the U.S. Census Bureau, of the ratio in Broward County of the total number of registered voters to the voting-eligible citizen population as a whole, compared to the same ratios elsewhere in Florida and throughout the country. *See id.* at 34 ("Taken at face value, these numbers indicate that nearly every eligible person in Broward County is registered to vote. . . . In sum, the registration rates for Broward County . . . are much higher than the rates in Florida, the nation, and any other state.").  It is with this specific purpose in mind that the Court will measure the qualifications of Dr. Camarota and the reliability of his testimony.

Regarding qualifications, Dr. Camarota received a master's degree in political science from the University of Pennsylvania and a doctorate in public policy analysis from the University of Virginia.  While completing his doctorate, Dr. Camarota "was focused on analysis of primarily Census Bureau data . . . looking at . . . issues associated with U.S. immigration." *Id.* at 70.  Dr. Camarota is currently the Director of Research for the Center for Immigration Studies (CIS)—a research institute that focuses on examining the consequences of immigration on the United States—where he has worked since completing his doctorate.  Notably, Dr. Camarota has previously served as an expert witness in a number of lawsuits, at least one of which required him to analyze "population estimates and Census Bureau data[.]" *See id.* at 80-81.  Dr. Camarota has also "served as the lead researcher on a contract with the Census Bureau examining the quality of immigration data in the [Census Bureau's] American Community Survey [("ACS")]." *Id.* at 27.  As is evident, Dr. Camarota has extensive experience and familiarity with analyzing data provided by the Census Bureau, including the Census Bureau's ACS.  In light of that experience, the Court is satisfied that Dr. Camarota is at least minimally qualified. *See Furmanite*, 506 F. Supp. 2d at 1129 ("An expert is not necessarily unqualified simply because

[his] experience does not precisely match the matter at hand."). Specifically, it is a Census Bureau ACS estimate—namely, the total number of voting-eligible citizens in Broward County—that serves as the denominator of the voter registration rates from which Dr. Camarota intends to testify. Although United is not wrong to point out that Dr. Camarota is not a statistician and "has no formal statistical training outside of a three-month [course] he attended . . . during graduate school[,]" *id.* at 6, the voter registration rates he seeks to offer constitute a straightforward division calculation. Above the denominator mentioned above, the numerator purports to be the total number of actual registered voters—an EAC Election Administration Voting Survey ("EAVS") estimate that is based on data compiled and submitted by state and local election officials themselves. *See* ECF No. [144] at 2-3. In this sense, the Court finds Dr. Camarota's statistical background, or lack thereof, to be largely irrelevant. Dr. Camarota is therefore qualified to offer testimony as to the purported voter registration rates he has compiled.

That said, Dr. Camarota's lack of statistical expertise is relevant insofar as Dr. Camarota intends to take his voter registration rates a step further by testifying as to their overall accuracy. In defending Dr. Camarota's qualifications, ACRU initially contends that his testimony "is *simply* what the publically available data, including statements by the Defendant herself, *show the ratio of registrants over eligible voters to be*." *Id.* at 16 (emphasis added). But even ACRU recognizes that Dr. Camarota intends to testify to more than that. *See id.* (characterizing the "subject matter" of Dr. Camarota's testimony as "repeating publically available registration and demographic data *and why they are reliable*") (emphasis added). This concern with the reliability of the voter registration rates speaks to opinions offered by United's expert, Dr. Daniel A. Smith ("Dr. Smith"). Dr. Smith asserts that population counts from the ACS should not be used to calculate registration rates because the ACS, being a survey, contains sampling error.

*See* ECF No. [150] at 9-10. In an effort to rebut that position, Dr. Camarota opines that the margins of error for the ACS estimates are easily quantifiable and small, thereby rendering the ACS estimates accurate overall. *See* ECF No. [144] at 34-35. Dr. Camarota may be right about this, but the statistical nature of this opinion, which is obvious, renders it beyond the scope of his expertise. *See id.* at 9 ("[A] survey's natural imprecision can be quantified using *basic statistics* to produce a *confidence interval* around any particular estimate. . . . Table 2 and Table 3 report confidence intervals using *margins of error* at different *significance levels*. The margins of error are small, and subsequently the variation in likely registrations rates in the county is also small.") (emphasis added). Thus, although Dr. Camarota is qualified to offer testimony as to the purported voter registration rates he has compiled (e.g., presenting the figures themselves and comparing them to similar figures related to other localities), he is not qualified to offer testimony as to the degree of accuracy of those rates—a statistical inquiry. *See, e.g.*, *IMPACT v. Firestone*, 893 F.2d 1189, 1192, 1195 (11th Cir. 1990) (finding no error in excluding testimony from a political scientist regarding statistical disparities in employment decisions where the witness did not have training or significant experience as a statistician); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) ("While [the excluded expert] may have used statistics in his work (as most people do to one extent or another) this does not mean that he is sufficiently qualified to testify to the statistical significance of [his proposed expert findings].").[13]

Turning to reliability, United challenges the reliability of Dr. Camarota's testimony by attacking the methods he employed to calculate the voter registration rates and, to an extent,

---

[13] ACRU also argues that "if a degree in statistics was necessary to opine on the voter registration and population data relevant to this case, [Dr. Smith] would need to be disqualified[] [because he] is not a statistician and his credentials are similar to Dr. Camarota. . . ." ECF No. [156] at 16. However, for purposes of this Order, it is Dr. Camarota's testimony, not Dr. Smith's, that is under scrutiny.

some of the underlying data upon which he relied for those calculations.  *See* ECF No. [144] at

16-19.  United asserts: "Simply put, the analysis used by [] Dr. Camarota . . . compares different

sets of numbers reflecting different periods of time, which therefore are not at all comparable."

*Id.* at 19.  The Court does not share United's reliability concerns.

First, United calls into question the reliability of Dr. Camarota's testimony on the basis

that there is no evidence that Dr. Camarota's methodology has been subject to peer review, used

by other statisticians, or involves reliable, recognized statistical techniques.  *Id.* at 16.  With

respect to peer review and use by other statisticians, the Court does not find the absence of such

to be dispositive under the circumstances.  *See Am. Gen. Life Ins. Co. v. Schoenthal Family,*

*LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009) ("Standards of scientific reliability, such as

testability and peer review, do not apply to all forms of expert testimony. For nonscientific

expert testimony, 'the trial judge must have considerable leeway in deciding in a particular case

how to go about determining whether particular expert testimony is reliable.'") (quoting *Kumho*,

526 U.S. at 151) (internal citation omitted); *see also Frazier*, 387 F.3d at 1262.  What Dr.

Camarota has essentially done is take publically available data that was compiled by

governmental agencies and perform straightforward division calculations with that data.  Dr.

Camarota then seeks to offer figures reflecting those calculations.  In the Court's view, this does

not necessarily require peer review.

As for the purported lack of recognized statistical techniques in Dr. Camarota's

methodology, there is a presumption that the data sets used by Dr. Camarota—particularly the

Census Bureau's ACS voting-eligible population estimates—are accurate and involve reliable

statistical techniques.  *See, e.g., Johnson v. DeSoto Cty. Bd. of Comm'rs*, 204 F.3d 1335, 1341-42

(11th Cir. 2000) ("The presumption is that census figures are continually accurate. . . . And, this

court has previously said, in a voting rights case, that statistical evidence derived from a sampling method, using reliable statistical techniques, is admissible on the question of determining the relevant population.") (citing *Negron v. City of Miami Beach, Florida*, 113 F.3d 1563, 1570 (11th Cir. 1997)); *Voter Integrity Project NC, Inc. v. Wake Cty. Bd. of Elections*, 2017 WL 684185, at *5 (E.D.N.C. Feb. 21, 2017) ("The court notes that there is nothing inherently wrong with VIP-NC's reliance on census data to support its claim.") (citing *Am. Civil Rights Union v. Martinez–Rivera*, 166 F. Supp. 3d 779, 791 (W.D. Tex. 2015)).  United argues that Dr. Camarota's comparison of the EAVS registration number to the ACS population estimate is flawed because it compares "an *actual* registration number to an *estimated* population number[.]"  ECF No. [144] at 18 (emphasis in original).  As such, United appears to take issue with the use of *estimates* in Dr. Camarota's figures.  Contrary to what United suggests, however, there is nothing inherently problematic with the use of a population estimate in measuring data, especially where, as here, there is no indication that the estimate was tainted in any way.  The Eleventh Circuit has explained in another voting rights case:

> [W]e would [] uphold the district court's consideration of the citizenship statistics, even though those statistics are based on sample data. The use of sample data is a long-standing statistical technique, whose limits are known and measurable. We will not reject the citizenship statistics solely because they are based on sample data without some indication that the sample was tainted in some way. There were no arguments before the district court that the sample was skewed in a statistically significant way due to improper sampling method, small sample size, or sheer random error.

*Negron*, 113 F.3d at 1570 (recognizing that because the challenged Miami Beach citizenship information from the Census Bureau was "based upon a sample population, it [could not] be as precise as [] census data[] . . . based upon the entire population[,]" but nevertheless rejecting the plaintiff's attempt to call into question the accuracy of that information).  Thus, to the extent that the ACS population estimates used by Dr. Camarota do not lend to the kind of precision an exact

value might, such a concern speaks to the weight of Dr. Camarota's figures, not their admissibility. *See Johnson*, 204 F.3d at 1342 ("If the evidence is admissible, that voter registration data might not be as reliable as some other measures of population goes to the weight of the evidence, but does not preclude use of the figures by the district court.").

Second, United argues that Dr. Camarota's comparison of the EAVS registration number to the ACS population estimate is flawed because it compares "a registration number at *a single point in time* when registration rates are highest to an average population number over a five-year period." ECF No. [144] at 18 (emphasis in original). Regarding that five-year period, Dr. Camarota's "five-year" ACS data—which include five-year estimates reported in 2010, 2012, and 2014—reflects information collected during the five-year period of time that ends in the respective reporting year that is then "totaled back and weighted to a midyear control point." *See id.* at 29 n.8; *id.* at 48; *id.* at 49-50 ("[T]hink of it this way: [the five-year ACS data] has basically the same effect as if you were to take all the years and average them together. . . . So you can think of it as the midyear of that year."). United contends that it is problematic that Dr. Camarota, in calculating the voter registration rates, "divide[d] the EAVS registered voter figure by ACS eligible population estimates *for the same year.*" *Id.* at 18 (emphasis in original). "In other words, the 2006-2010 5-year ACS estimate, the median year of which is 2008, should not be used as a denominator for a 2010 EAVS numerator." *Id.* According to United, "the 2010 EAVS numerator should be compared against a denominator that more closely estimates the 2010 population, which would come from the 2008-2012 5-year ACS data." *Id.* Importantly, however, Dr. Camarota used "single-year ACS data" as well, which appears to do just that—that is, offer a denominator that more closely estimates the EAVS numerator. *See id.* at 33 (calculating voter registration rates based on both one-year and five-year ACS eligible

population estimates for the years 2010, 2012, and 2014). The Court notes that United makes no mention of Dr. Camarota's use of single-year ACS data. To the extent that Dr. Camarota will testify as to voter registration rates he calculated using both single-year ACS data and five-year ACS data, the Court believes that "vigorous[] cross-examin[ation]" and the testimony of United's own witnesses, such as that of Dr. Smith, are the proper vehicles to address United's concerns. *Quiet Tech.*, 326 F.3d at 1341.

Based on the foregoing, the Court concludes that the testimony Dr. Camarota seeks to offer is admissible, but with one qualification. Dr. Camarota may testify as to the voter registration rates that he has calculated (as reflected in his expert report), but he may not testify as to the degree of accuracy of those rates.

### 2. Gessler

After reviewing Florida's law on voter list maintenance and the evidence in this case related to the voter list maintenance practices utilized by BCSEO, *see* ECF No. [144] at 4-12, Gessler opines that Snipes "has not . . . taken reasonable steps to address well-known or easily identified problems with its list maintenance programs[,]" including "[b]loated voter rolls"—which "serve as a warning sign that problems exist"—and the presence of deceased voters on the voter rolls, *id.* at 49, ¶¶ 42, 45; *id.* at 55, ¶ 75. Gessler concludes his proposed expert report with recommendations of "reasonable steps Broward County should take in order to develop a general program and maintain the accuracy of the county voter rolls." *Id.* at 57, ¶ 87. United challenges the testimony of Gessler on all three prongs of *Daubert*.

Turning first to qualifications, Gessler's general credentials include a law degree from the University of Michigan and an M.B.A. from Northwestern University. *Id.* at 38, ¶ 4. More pertinent to the issues involved in this case, Gessler served as Colorado's Secretary of State from

January 2011 to January 2015. *Id.* at 39, ¶ 5. In that capacity, Gessler was Colorado's chief election officer, a position that required him to oversee election officials in Colorado counties, review the election practices and procedures of Colorado counties, maintain the voter database and voter registration systems for Colorado, and maintain Colorado's voter rolls. *Id.* Additionally, Gessler handled "statewide coordination and compliance with all federal election laws, including the [NVRA] [and] the [HAVA] . . . ." *Id.* Gessler details in his expert report his experience in identifying, creating, and implementing list maintenance policies and practices as well as his experience identifying and responding to perceived deficient policies and practices related to the voter registration lists he oversaw—including responding to the threat of a lawsuit alleging noncompliance with Section 8 of the NVRA. *See generally id.* at 39, ¶¶ 9-10.

Despite the particular experiences of Gessler as the chief elections officer of Colorado, United argues that Gessler "is unsuited to provide an expert opinion in this case." *Id.* at 3. The primary rationale for that argument is that Gessler "lacks any knowledge of Broward County's voting registration policy or voter roll maintenance, the voting policy of any state other than Colorado, or the implementation of such policy at the county level[.]" *Id.* at 2-3. United elaborates that, "[e]xcluding his preparation for this case, Mr. Gessler has little—if any— knowledge of Florida's or Broward County's voter registration and voter roll maintenance systems[,]" and emphasizes that in Colorado, "the duty of implementing election policy belongs to the state's counties." *Id.* at 9. Nevertheless, the Court finds that Gessler is at least minimally qualified to offer an expert opinion in this case (with one caveat, as explained below) given the apparent overlap between his unique experiences as Colorado's Secretary of State and the issues in this case. Most notably, Gessler's knowledge and expertise in the field of voter roll list maintenance are tied directly to the same federal standard under the NVRA with which Snipes is

required to comply.  In the Court's view, the particular concerns raised by United speak to the level of Gessler's expertise, and therefore the weight to be afforded his opinions.  *See* Fed. R. Evid. 702 (basing qualifications on a proposed expert's "knowledge, skill, experience, training, or education"); *Frazier*, 387 F.3d at 1260-61 (explaining that, in addition to scientific training or education, "experience in a field may offer another path to expert status"); *Waite v. AII Acquisition Corp.*, 194 F. Supp. 3d 1298, 1304 (S.D. Fla. 2016) ("[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility.") (quoting *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012)) (alteration in original).

That said, the Court notes that like Dr. Camarota's expert report, Gessler's expert report compares Census Bureau ACS data with EAVS data to support some of the opinions stated therein, such as the following: "An unusually high percentage of registered voters serves as one of the main indicators that a jurisdiction does not take reasonable steps to maintain voter registration lists. Broward County is a classic example of a jurisdiction that has alarmingly high voter registration rates . . . ."  ECF No. [144] at 49, ¶ 43.  The Court is not convinced that Gessler has the requisite expertise in analyzing this kind of data to offer opinions that make assessments as to Broward County's voter registration rates.  By comparison, ACRU has shown that Dr. Camarota has extensive experience in analyzing Census Bureau data, like the ACS, and other population related data.  No comparable showing has been made with respect to Gessler, a lawyer by trade.  Thus, although Gessler is certainly qualified to offer opinions concerning the specific list maintenance policies and procedures utilized (and not utilized) by Snipes, the Court does not find that he is qualified to offer data-driven opinions relating to Broward County's voter registration rates.

With respect to reliability, United contends: "No clear methodology is discernible from Mr. Gessler's opinion. He appears to have arrived at his conclusions by simply applying his personal knowledge of Colorado's voter registration system at the state level and his review of Florida law to the information about Broward County found in documents produced and the data sources generated for this case." *Id.* at 10. Importantly, United's reliability attacks focus almost entirely on Gessler's opinions concerning Broward County's voter registration rates—a subject that in any event Gessler is unqualified to testify about. *See, e.g.*, *id.* at 10 (describing Gessler's methodology as "rel[ying] on two data sets drawn from calculations and analysis of population statistics"); *id.* at 11 (emphasizing that "Mr. Gessler is not a statistician[,]" "has little familiarity with EAVS data[,]" and "has no basis for determining at what level a registration rate becomes potentially problematic"); *id.* at 16 (collectively addressing "Dr. Camarota's and Mr. Gessler's methodology" by noting, among other things, that "the methodology used in both reports" lacks evidence of an "error rate" and "reliable, recognized statistical techniques"); *id.* at 17 (stating that "Dr. Camarota's and Mr. Gessler's methodology consists of a flawed comparison between dissimilar data points"). The only discernible challenge by United as to the reliability of Gessler's opinions concerning the list maintenance policies and procedures employed by Snipes—a subject that Gessler is qualified to testify about—is that Gessler "[cites] no comparative studies of state voter registration systems, no national guidelines, and no widely accepted best practices . . . [and offers] no explanation of how his limited Colorado experience suffices as support for his opinions on Broward County's practices." *Id.* at 14. However, the Court finds that Gessler's testimony is sufficiently reliable based "upon [his] personal knowledge [and] experience." *Kuhmo*, 526 U.S. at 151. He has formed his opinions based on his personal experiences in attempting to maintain compliance with the NVRA as Colorado's chief elections

officer and his review of the evidence in this case. The Court does not find that Gessler's testimony is rendered unreliable simply because he has not served as an election official in Florida or Broward County or cited comparative studies or national guidelines. *See Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001) ("[Defendants] assert that Schwartz's testimony is not reliable because it is based largely on his personal experience rather than verifiable testing or studies. Although *Daubert* applies to all expert testimony, . . . there is no question that an expert may still properly base his testimony on 'professional study or personal experience.' Defendants' objection is unfounded on this record. . . . Defendants' objections plainly go to the weight and sufficiency of Schwartz's opinions rather than to their admissibility.") (quoting *Kumho*, 526 U.S. at 151) (internal citations omitted).

Finally, United argues that Gessler's testimony will not assist the factfinder, but will instead "improperly usurp[] the role of the fact-finder." ECF No. [144] at 19. Specifically, United suggests that Gessler has merely weighed the evidence in this case by "review[ing] only the documents and sources of data prepared for or generated by this litigation, and evaluat[ing] the veracity of statements made by Dr. Snipes and other witnesses regarding Broward County's voter registration and voter roll maintenance practices." *Id.* But Gessler's expert report purports to do more than just simply weigh the evidence in this case. For example, Gessler intends to identify list maintenance practices that in his opinion Snipes should employ, but does not. *See, e.g.*, *id.* at 50, ¶¶ 48-52 (use of driver license data); *id.* at 51, ¶¶ 53-55 (use of jury notices). In doing so, Gessler will opine on industry practices he is familiar with, what he perceives as deficiencies in BCSEO's list maintenance program, and how he believes such deficiencies can be remedied. *See id.* at 51-57. In the Court's view, this kind of testimony, though not scientific, is

"beyond the understanding of the average lay person" and will lend assistance to the factfinding in this case. *Frazier*, 387 F.3d at 1262.

However, as United correctly points out, Gessler also provides an opinion on the ultimate legal question raised by ACRU's claim under Count I. *See* ECF No. [144] at 41, ¶ 12 (opining that Snipes "has failed to conduct a general program and has failed to take reasonable steps to maintain the accuracy of the county voter rolls"). Gessler is precluded from giving testimony that ultimately states legal conclusions. *See Cordoves v. Miami-Dade County*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015) ("[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied.") (citation omitted) (alteration in original).

Based on the foregoing, the Court concludes that the testimony Gessler seeks to offer is admissible, so long as that testimony does not relate to Broward County's voter registration rates or to any legal conclusions.

### B. Summary Judgment Motions

#### 1. *Claim for Failure to Make Reasonable Efforts to Conduct Voter List Maintenance Programs (Count I)*

##### a. *The Snipes/United Motion*[14]

"Congress' stated purposes in enacting the NVRA were, *inter alia*, 'to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office; ... [and] to ensure that accurate and current voter registration rolls are maintained." *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 705 (6th Cir. 2016), cert. granted, No. 16-980, 2017 WL 515274 (U.S. May 30, 2017) (quoting 52 U.S.C. § 20501(b)).

---

[14] Although Snipes and United have requested a hearing, *see* ECF No. [142] at 19, the Court finds the matters presented in the Snipes/United Motion suitable for a determination on the papers and without oral argument.

"These purposes counterpose two general, sometimes conflicting, mandates: To expand and simplify voter registration processes so that more individuals register and participate in federal elections, while simultaneously ensuring that voter lists include only eligible . . . voters." *Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1274 (D. Colo. 2010). "Those sometimes conflicting mandates are reflected in the language of Section 8 of the NVRA . . . ." *Husted*, 838 F.3d at 705.

Subsection (a) of Section 8 states that "[i]n the administration of voter registration for elections for Federal office, each State shall . . . provide that the name of a registrant may not be removed from the official list of eligible voters except" under certain circumstances. 52 U.S.C. § 20507(a)(3); *see also* S. Rep. No. 103–6, at 19 (1993) ("[O]ne of the guiding principles of [the NVRA is] to ensure that once registered, a voter remains on the rolls so long as he or she is eligible to vote in that jurisdiction."); H.R. Rep. No. 103–9, at 18 (1993). Section 8 then provides an exhaustive list of the circumstances justifying removal: "criminal conviction or mental incapacity as provided by state law, the death of the registrant, or . . . a change of the registrant's residence." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 376 (6th Cir. 2008) (citing 52 U.S.C. §§ 20507(a)(3)-(4)). Under subsection (a)(4)—which ACRU's claim under Count I is brought pursuant to—states are required to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of (A) the death of the registrant; or (B) a change in the residence of the registrant[.]" 52 U.S.C. § 20507(a)(4).

Finally, as noted by the Sixth Circuit in *Husted*, "in subsection (c)(1) of Section 8, Congress provided states with an example of a procedure for identifying and removing voters who had changed residence that would comply with the NVRA's mandates and accompanying

constraints. That subsection provides that '[a] State *may* meet the requirement of subsection (a)(4) by establishing a program under which' voters who appear to have moved based on information contained in the NCOA database are sent subsection (d) confirmation notices."[15] 838 F.3d at 707 (quoting 52 U.S.C. § 20507(d)(1)) (alteration and emphasis in original). This procedure, which the Snipes/United Motion relies upon first and foremost, has been come to known as the "'safe-harbor' procedure." *Id.*; *see* ECF No. [142] at 3 ("Because the undisputed facts of this case demonstrate that Defendant is implementing the NCOA program in accordance with the safe harbor provision, the county's program meets the requirements of subsection (a)(4). For this reason alone, summary judgment is warranted on Count I.").

As a preliminary matter, both Snipes and United initially raised the safe-harbor provision when they previously moved to dismiss Count I. *See Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1365-66 (S.D. Fla. 2016). Agreeing with the Sixth Circuit's reasoning in *Husted*, this Court noted that "full compliance with subsection (c)(1) [(the safe-harbor provision)] would *comply* with the NVRA's mandates and accompanying constraints." *Id.* at 1365 (citing *Husted*, 838 F.3d at 707) (internal quotation marks omitted) (emphasis added). The Court nonetheless declined to dismiss Count I on the basis of the safe-harbor provision, explaining that whether Snipes fully complied with the safe-harbor provision "is a fact-based argument more properly addressed at a later stage of the proceedings." *Id.* at 1366. Even in addressing Snipes and United's reliance on the safe-harbor provision at this stage of the proceedings, however, the Court does not take the

---

[15] Subsection (d) establishes that states "shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence" without first subjecting the registrant to the confirmation notice procedure outlined in that subsection. 52 U.S.C. § 20507(d)(1). That mandatory confirmation notice procedure is as follows: "a forwardable postage prepaid and pre-addressed form is sent to a voter, and the voter is removed from the rolls if (1) he or she does not respond to the confirmation notice or update his or her registration, and (2) he or she does not subsequently vote during a period of four consecutive years that includes two federal elections." *Husted*, 838 F.3d at 707 (citing 52 U.S.C. § 20507(d)).

view that, as a matter of law, full compliance with the safe-harbor provision necessarily absolves an election official of any liability under subsection (a)(4) of Section 8.

As the Sixth Circuit explained in *Husted*, "Section 8's language pairs the mandate that states maintain accurate voter rolls with multiple *constraints* on how the states may go about doing so." 838 F.3d at 705-06 (emphasis added). In this Court's view, the Sixth Circuit's attentiveness to the constraints imposed upon election officials in their efforts to maintain accurate voter rolls directly informed its treatment of the safe-harbor provision. More specifically, the Sixth Circuit viewed the safe-harbor provision as Congress having provided states with "an example" of a residence-change procedure "that would *comply* with the NVRA's mandates and accompanying *constraints*." *Id.* at 707 (emphasis added). But the Sixth Circuit did not appear to view the safe-harbor provision—though an example of a procedure that *complies* with the NVRA (including its constraints on election officials)—as an example of a procedure that *satisfies* all of an election official's duties under subsection (a)(4). Indeed, quite the contrary, the Sixth Circuit appeared to take a much more limited view, merely recognizing that the defendant's NCOA process, in mirroring the safe-harbor procedure, "is thus *permissible* under the NVRA." *Id.* (emphasis added). It is also worth noting that *Husted* concerned alleged violations of Section 8 based on the removal of (as opposed to a failure to remove) registered voters from the subject voter rolls—in particular, removals that were based only on changes of residence. *See id.* at 706.

Here, with no authority having been presented to suggest otherwise, this Court holds that although an election official's particular NCOA process for identifying and removing voters who have changed their residence is "permissible under the NVRA" if it mirrors the safe-harbor provision outlined in subsection (c)(1) of Section 8, such a process does not necessarily

demonstrate full satisfaction of all the duties owed by that election official under subsection (a)(4). *Id.* Subsection (a)(4) contemplates removal of ineligible voters from a state's voter rolls based on two specific circumstances: a registrant's change of residence *and* the death of a registrant. *See* 52 U.S.C. § 20507(a)(4). As "an example" of a "permissible" change-of-residence procedure under the NVRA, *Husted*, 838 F.3d at 707, the safe-harbor provision says nothing of an election official's "mandates and accompanying restraints" as they relate to deceased registrants. *Husted*, 838 F.3d at 707. The point is made especially apparent in this case, as the Amended Complaint specifically alleges that Snipes inadequately removed the names of registrants who have died. *Cf. id.* at 706 ("This case concerns the final circumstance justifying removal—change of residence—which is subject to its own mandate and accompanying constraints."). Accordingly, even if Snipes has fully complied with Section 8's safe-harbor provision—a determination the Court need not make at this point—such compliance does not in and of itself entitle her to judgment as a matter of law on Count I.

Compliance with Section 8's safe-harbor provision aside, Snipes and United also move for summary judgment on Count I on the basis that the undisputed facts definitively establish that Snipes' removal program is "reasonable under the statutory standard."[16] ECF No. [142] at 13. Snipes and United emphasize the evidence pertaining to all of the list maintenance activities that Snipes employs, and those activities are undoubtedly extensive. *See id.* at 14-15 (e.g., receiving and acting on daily updates from DOE; soliciting responses from registrants with felony convictions; reviewing and consolidating registration records identified as duplicates; employing specific procedures for registrants who appear to have died). Snipes and United further contend that "[t]he objective results of Defendant's general program and list maintenance

---

[16] Notably, Snipes and United make no effort to identify exactly what that statutory standard for reasonableness is and what its parameters are.

activities demonstrate that her program has a real, substantial outcome in terms of the removal of registrants deemed ineligible". They point out that Snipes removed from the Broward County voter rolls over 240,000 registrants between January 1, 2014 and December 31, 2016, and 192,000 registrants between January 7, 2015 and January 10, 2017. *Id.* at 15.

Notwithstanding the extensiveness of Snipes' removal efforts and the substantial amount of removals that those efforts have resulted in, ACRU has presented admissible evidence—by way of the analyses of Dr. Camarota—of very high voter registration rates in Broward County compared to voter registration rates throughout the country. *See* ECF No. [144] at 26-36. In some instances, according to Dr. Camarota, Broward County has had more or close to the same amount of persons registered to vote as it has had voting-age citizens in total. *See id.* at 33-4 (calculating rates in Broward County at 108.5% in 2010 and 96.7% in 2014, and opining that, "[t]aken at face value, these numbers indicate that nearly every eligible person in Broward County is registered to vote"). As for the voter registration rates nationally and in Florida as a whole, according to Dr. Camarota's expert report: "Nationally, the [Census] Bureau reported 65.1% of voting-age citizens were registered in 2010, 71.2% were registered in 2012 (a presidential election year), and 64.6% in 2014. In Florida as a whole, the corresponding figures for these same years were 63%, 68.3%, and 62.6%." *Id.* at 34. Of course, Dr. Smith—Snipes and United's expert witness—claims that Dr. Camarota's analyses are misleading. But, in addressing whether Snipes and United are entitled to summary judgment on Count I, the Court must accept the evidence provided by ACRU, the non-movant, and draw all reasonable inferences in its favor. *See Montgomery v. Noga*, 168 F.3d 1282, 1289 (11th Cir. 1999). Other than moving to exclude Dr. Camarota and his expert report, Snipes and United do not address the voter registration rates in Dr. Camarota's expert report other than to say, without any supporting

authority, that "the NVRA has no outcome-based criteria for compliance." ECF No. [142] at 16. The Court does not agree with Snipes and United that outcomes bear no significance whatsoever when it comes to determining whether an election official has met her duties under a statute through which one of Congress' stated purposes is to "ensure that accurate and current voter registration rolls are maintained." *Husted*, 838 F.3d at 705 (quoting 52 U.S.C. § 20501(b)). In any event, such a position undercuts Snipes and United's own emphasis on the amount of registered voters that BCSEO has removed—which this Court also deems relevant to such a determination.

Ultimately, taking ACRU's evidence as true, the voter registration rates extrapolated from Broward County's voter rolls at the very least create a reasonable inference that Snipes, despite all of the stated list maintenance efforts she has undertaken, has failed to meet the reasonableness requirement under subsection (a)(4) of Section 8. *See, e.g.*, *Martinez–Rivera*, 166 F. Supp. 3d at 793-94 ("The high registration rate in Zavala County creates a strong inference that the Defendant has neglected her duty to maintain an accurate and current voter registration roll."); *Wake Cty. Bd. of Elections*, 2017 WL 684185, at *4-5 (drawing inference in favor of the plaintiff alleging an NVRA violation where the plaintiff alleged that "voter rolls maintained by [the defendant] contain or have contained more registrants than eligible voting-age citizens" and disregarding at the motion to dismiss stage the "potentially reasonable explanation for the high registration rate"). As such, the Court finds that Snipes and United have not shown the absence of a genuine issue of material fact as to whether Snipes, in light of those voter registration rates, has conducted a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of a

registrant's death or a resident's change in residence.  *See* 52 U.S.C. § 20507(a)(4).  As such, Snipes and United are not entitled to judgment as a matter of law with respect to Count I.

>            2.  *Claim for Failure to Disclose (Count II)*

Subsection 8(i)(1) of the NVRA mandates public disclosure of all records related to voter registration and list-maintenance activities.  It provides in relevant part as follows: "Each State shall maintain for at least 2 years and shall make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters . . . ."  52 U.S.C. § 20507(i)(1). "This language embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies."  *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 334-35 (4th Cir. 2012).

In moving for summary judgment on Count II, ACRU argues that Snipes has failed to comply with this public disclosure mandate by failing to provide or make available for inspection the following categories of documents it requested in its January 26, 2016 letter:

>    (1) updated registration data since the publication of information reported by the EAC for 2014 from the 2014 EAC Report;
>
>    (2) the number of notices sent to inactive voters since the publication of the 2014 EAC Report, including the date, scope, and contents of any mailing sent to all ("not just []" active") registered voters;
>
>    (3) the total number of voters registered in Broward County as of the date of any response;
>
>    (4) any records indicating the use of citizenship or immigration status for list maintenance activities; and
>
>    (5) all list maintenance records including federal voter registration forms containing citizenship eligibility questionnaires for the previous 22 months, which, according to ACRU, contemplates the following: (a) copies of all invoices and statements from

any outside vendors Snipes works with in doing list maintenance mailings; (b) records of complaints received regarding list maintenance issues; (c) communications from and to the DOS office; (d) records related to USPS NCOA database requests and usage; and (e) a current list of all registered voters (active and inactive).

ECF No. [117] at 14-15. Snipes counters in her motion for summary judgment on Count II by emphasizing that "thousands of public records have been produced" to ACRU thus far, and further claiming that "there are no documents requested and available from Defendant Snipes that has not already been provided." ECF No. [145] at 2-3. The Court will address each motion and their respective arguments in turn.

As a preliminary matter, however, insofar as ACRU seeks under Count II a declaration from the Court that Snipes has violated the public disclosure requirement under subsection 8(i)(1) of the NVRA, *see generally* ECF No. [12] at 9 (praying for a declaration "that Defendant is in violation of Section 8 of the NVRA"), the Court considers the operative time period to be the time between ACRU's January 26, 2016 letter and the filing of this suit on June 27, 2016. Under 52 U.S.C. § 20510(b)(2), a potential defendant is allowed 90 days following receipt of a notice of a purported NVRA violation to correct that violation before the potential plaintiff may bring suit. In this case, that notice was the January 26, 2016 letter, and so Snipes had at least 90 days from the date she received that letter to correct the potential public disclosure violation identified therein.[17] It is precisely that claimed violation—which encompasses all of the

---

[17] The parties appear to be in agreement that the January 26, 2016 letter constituted sufficient notice for purposes of ACRU's failure to disclose claim under Count II. Nonetheless, and despite the issue having not been raised on summary judgment or at any other time during these proceedings, the Court questions whether the letter can constitute sufficient notice for purposes of ACRU's claim for failure to make reasonable efforts to conduct voter list maintenance programs under Count I *and* ACRU's failure to disclose claim under Count II. Specifically, the letter contemplated one potential NVRA violation, the violation claimed under Count I. *See* ECF No. [12-1] at 2 ("[T]he list maintenance requirements of Section 8 of the NVRA [] ensure that ineligible voters are not participating in the political process . . . . The American Civil Rights Union has [] taken on the task of notifying you of your county's violation."). The letter did not contemplate the NVRA violation claimed under Count II, nor could it have; being the first correspondence between ACRU and Snipes, the letter represents the first time ACRU requested list

communications and interactions that took place between ACRU and Snipes from January 26, 2016 to June 27, 2016—and Snipes alleged failure to correct it up to the commencement of this suit that is reflected in the Amended Complaint. *See, e.g.*, ECF No. [12] at ¶ 33 ("Defendant has failed to respond adequately to Plaintiff's written request for data, failed to produce or otherwise failed to make records available to Plaintiffs concerning Defendant's implementation of programs and activities for ensuring the accuracy and currency of official lists of eligible voters for Broward County, in violation of Section 8 . . . . *Defendant has rebuffed efforts to meet to discuss and implement remedial plans to cure this violation*.") (emphasis added). To the extent that the Court considers the efforts undertaken by Snipes since the filing of this suit—which seems to be the primary focus of ACRU's and Snipes' respective motions for summary judgment on Count II—the Court does so only for the purposes addressing ACRU's request for an injunction requiring Snipes to "substantively respond to [ACRU's] written request for records concerning her implementation of [list maintenance] programs and activities . . . and provide access to election records." ECF No. [12] at 10.

> a. *ACRU's Motion*

At the outset, the Court notes that ACRU's Motion is premised on Snipes' alleged failure to provide records throughout the course of this litigation. *See* ECF No. [117] at 14-15. With that in mind, the Court makes a seemingly obvious but nevertheless important—indeed dispositive—observation. In support of its motion for summary judgment, ACRU cites to

---

maintenance records from Snipes. In other words, although the letter notified Snipes of a potential NVRA violation for her alleged failure to make reasonable efforts to conduct voter list maintenance programs, as far as public disclosure is concerned, the letter merely requested for the first time Snipes' list maintenance records. *See id.* at 4 ("We would like to discuss with your office how to implement a remedial plan which could cure what appears to be a violation of Section 8 of the NVRA. We *also request* the opportunity to inspect the list maintenance documents outlined above.") (emphasis added). It would seem to follow, then, that Snipes was never provided written notice of the potential NVRA violation claimed under Count II or afforded 90 days after such written notice by which to cure the potential violation—the lapse of which gives rise to the private cause of action. *See* 52 U.S.C. §§ 20510(b)(1), (2).

*Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 334-35 (4th Cir. 2012). *See* ECF No. [117] at 10-13. In *Long*, the Fourth Circuit affirmed the district court's granting of summary judgment in favor of the plaintiff organization that sought records under the NVRA, whereby the district court concluded that Section 8's public disclosure requirement applies to completed voter registration applications. 682 F.3d at 333. The plaintiff organization had specifically requested from the defendant—a city official responsible for processing voter registration applications—all voter registration applications submitted during a certain time period, but the defendant repeatedly denied the request. *See id.* at 333-34. The defendant's denial was based on her contention that the text of Section 8(i)(1) does not require public disclosure of completed voter registration applications, but instead applies only to records concerning programs and activities "related to the *purging* of voters from the list of registered voters." *Id.* at 335 (emphasis added). The Fourth Circuit rejected that interpretation, concluding that "the phrase 'all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters' unmistakably encompasses completed voter registration applications[.]" *Id.* at 336 (quoting 52 U.S.C. § 20507(i)(1)). Similarly, in *Project Vote v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016), also cited to by ACRU, *see* ECF No. [117] at 13-14, the Northern District of Georgia rejected the argument that records stored in electronic form are not subject to Section 8's public disclosure requirement. The court reasoned: "Interpreting 'records' to exclude information contained within electronic databases also would allow States to circumvent their NVRA disclosure obligations simply by choosing to store information in a particular manner. Given the ubiquity and ease of electronic storage, this would effectively render Section 8(i) a nullity." *Kemp*, 208 F. Supp. 3d at 1336.

In relying on *Long* and *Kemp*, ACRU appears to imply that Snipes has withheld the production of certain relevant records on the bases that such records either exceed the NVRA's two-year retention period or are stored only in electronic form.  ECF No. [117] at 13.  More specifically, ACRU asserts as follows:

> The same reasoning [in *Long*] should apply to the two-year retention requirement. That is a floor, not a ceiling. If an election official maintains records for longer than two years, they must be subject to disclosure.
>
> Finally, electronic records housed within databases are also subject to the public disclosure and inspection provisions of the NVRA. To the extent that any records that have not been disclosed by Defendant Snipes are housed electronically, they are subject to the NVRA's disclosure provision.

*Id.*  However, other than these vague assertions, ACRU offers no clarity whatsoever as to which specific category of records it has requested that Snipes has refused to produce *expressly on account of the above mentioned bases*.  Quite the contrary, Snipes' opposition to ACRU's Motion—as well her own motion for summary judgment on Count II—posits that no documents requested by ACRU have been withheld.  *See* ECF No. [129] at 7 ("Snipes has made no attempt to be uncooperative in the production of documents. There has been no refusal or objection to providing any document(s). Even where Plaintiff was not clear in its litigation discovery request, . . . the documents were still provided. Thousands of documents have been provided to date."); ECF No. [145] at 3 ("At this time, there are no documents requested and available from Defendant Snipes that has not already been provided.").  In other words, Snipes—unlike the defendants in *Long* and *Kemp*—does not concede that she has refused to provide records that ACRU has requested, let alone offer an express rationale justifying any refusal on her part to provide such records.  In this sense, this case is very different from those cases.  In both *Long* and *Kemp* there was no dispute that a certain and definitive category of records had been withheld from the requesting plaintiffs—i.e., voter registration applications and all information

contained within electronic databases—and the defendants maintained their reasoning for refusing disclosure of the requested records throughout the respective litigations in unequivocal fashion. The courts' respective rulings were specific to those circumstances. *See Long*, 682 F.3d at 332-33 ("The question here is whether Section 8(i)(1) . . . applies to completed voter registration applications."); *Kemp*, 208 F. Supp. 3d at 1335-41 (rejecting defendant's "implicit[] argu[ment] that the Requested Records maintained in electronic format on the Database are not 'records'[under Section 8(i)(1)] because that term is limited to physical documents"). The same simply cannot be said here. To that extent, ACRU's reliance on *Long* and *Kemp* is inapposite.

Importantly, the distinction illuminates what amounts to a factual dispute that is material with respect to the injunctive relief ACRU seeks under Count II—that is, an injunction "commanding Defendant to permit inspections of election records pursuant to 52 U.S.C. § 20507(i)." ECF No. [12] at ¶ 1. Down to its simplest form, the parties dispute whether in fact Snipes has provided all of the records requested by ACRU—a dispute that goes to the heart of the relief ACRU seeks in under its Section 8(i)(1) claim. *See* 52 U.S.C. § 20507(i)(1) (requiring that each State "make available for public inspection . . . all records" concerning programs and activities related to voter registration and list maintenance). As alluded to earlier, Snipes claims that she has fully complied with ACRU's records requests, having handed over to ACRU thousands of BCSEO documents. To the extent that there are requests by ACRU that have gone unfulfilled, Snipes contends that some of the requests in ACRU's January 26, 2016 letter required "the creation of new records . . . or required the reviewer to guess the nature of the [request]." ECF No. [129] at 5. ACRU contends, on the other hand, that the January 26, 2016 letter "did not call for the creation of new records or require any guessing as to what was

requested. . . . [and] outlined specific categories of list maintenance records."[18]  ECF No. [130] at

3.  However, it is not for the Court to weigh at the summary judgment stage the competing

interpretations as to the achievability or clarity of ACRU's requests.  Rather, in this context, the

Court must draw all reasonable inferences against ACRU, whose motion for summary judgment

is under consideration.  *See Group*, 408 F.3d at 1331.  Other than its own conclusory assertions,

ACRU has made no meaningful attempt to explain why Snipes' contention that some of ACRU's

requests call for records that are not in existence or are otherwise unclear is an unreasonable one.

And the Court does not consider such an inference unreasonable given the circumstances,

especially in light of the fact that ACRU has received from Snipes—through substantial

discovery—documents numbering in the thousands.  For example, ACRU offers no explanation

as to why or how the thousands of documents that Snipes has provided are not responsive to any

of the categories of documents that ACRU maintains that Snipes has continued to withhold.  Nor

has ACRU specified whether any of those categories of documents are indeed both in existence

and in the possession of Snipes.  *See generally United States v. Dunkel*, 927 F.2d 955, 956 (7th

Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Chavez v. Sec'y*

*Florida Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("Likewise, district court judges

are not required to ferret out delectable facts buried in a massive record.") (citing *Dunkel*, 927

F.2d at 956).

Accordingly, the Court is satisfied that, with respect to ACRU's Motion on Count II,

Snipes has raised a material issue of fact as to whether she has, throughout the course of this

---

[18] To be sure, ACRU does not argue in its motion for summary judgment on Count II that Snipes has, in addition to allegedly failing to provide requested records, failed to *maintain* any records that Section 8 requires the maintenance of.  *See generally Kemp*, 208 F. Supp. 3d at 1343 n.35 ("Whether a record is required to be maintained is different from a claim that a maintained record is required to be disclosed. The question whether Defendant failed to maintain one or more records is not presently before the Court.").

litigation, sufficiently provided all of the records requested by ACRU as required under Section 8(i)(1) so as to potentially render moot ACRU's request for an injunction requiring Snipes to substantively and completely respond to its written request for records.

### b. Snipes' Motion

The Court begins with another obvious observation. Inexplicably, despite aptly describing the material issue of fact outlined above as a "tremendous factual dispute" in arguing against ACRU's Motion, ECF No. [129] at 6, Snipes makes an about-face in her own motion for summary judgment, asserting that "there are no genuine issues of material fact related to Count II[,]" ECF No. [145] at 1-2. As mentioned, Snipes claims that she has provided all of the records requested by ACRU. According to Snipes, ACRU has "attempt[ed] to 'game' the NVRA law by seeking and pursuing less [sic] information than is actually available and then claiming that Snipes is somehow negligent in her duty to produce documents." ECF No. [145] at 3. Overall, Snipes' Motion does not alter the Court's view that Count II is not without at least one genuine issue of material fact.

First, with respect to the interactions that occurred prior to the commencement of this suit, Snipes asserts that following ACRU's January 26, 2016 letter, "[a]t no time did [she] refuse to provide documents or allow for an inspection of documents." *Id.* at 6. This assertion speaks to the phone call that took place between Snipes and ACRU's legal representative on April 5, 2016. *See generally* ECF No. [12] at ¶ 24 (alleging that on the April 5, 2016 phone call Snipes "declined to set up [] a meeting" to discuss remedial steps and the current status of the voter rolls). According to Snipes, during that phone call she "provided the contact information for [her] General Counsel in order to coordinate inspection and follow-up." ECF No. [145] at 6

(citing ECF No. [129-2] at 2-3). According to ACRU's counsel, however, the phone call went as follows:

> I just got off the phone with Brenda Snipes. The general theme of the call was "why are you singling out Broward when you sent letters to 6 other counties." She even said that Miami-Dade has more people. That aside, *she declined to meet with us to discuss only Broward*. She said she would meet only if representatives from the other 6 counties were included.

ECF No. [131-1] at 3 (emphasis added); *see also* ECF No. [118-1] at 3, ¶ 12 ("*Defendant refused to meet to discuss remedies and permit inspection of records*. Defendant Snipes suggested that ACRU should focus on Miami-Dade County instead . . . .") (emphasis added). But Snipes denies that she ever refused to provide documents or allow for an inspection. *See* ECF No. [129-2] at 3, ¶¶ 7-8. As ACRU correctly points out, then, "[t]he characterization of that phone call differs profoundly between the parties . . . ." ECF No. [157] at 10. Importantly, the nature of that phone call is germane to ACRU's claim under Count II, as the Amended Complaint specifically alleges under Count II that Snipes "failed to produce or otherwise failed to make records available . . . . [and] rebuffed efforts to meet to discuss and implement remedial plans to cure this violation." ECF No. [12] at ¶ 33. Relatedly, ACRU argues that Snipes' February 8, 2016 letter in response to ACRU's January 26, 2016 letter, which only provided to ACRU certain certifications, constituted a "less-than-complete response to ACRU's record request." ECF No. [157] at 11. Given that Snipes has since produced thousands of more records throughout discovery in response to ACRU's initial requests in the January 26, 2016 letter, such an inference is far from unreasonable. In any event, whether Snipes' initial response in her February 8, 2016 letter and her alleged refusal to arrange a meeting with ACRU during the April 5, 2016 phone call—both occurring before this suit was ever filed—would constitute an insufficient response

for purposes of Section 8's public disclosure requirement remains a material issue of fact to be determined at trial.[19]

Second, with respect to the discovery conducted as part of this litigation, Snipes asserts that "[a]ny documents that Plaintiff believes it does not have are a part of the VR System for which Plaintiff has not performed any due diligence to understand." ECF No. [145] at 3. Snipes then elaborates on how ACRU, in making "little effort to determine how the VR System stores computer documents relating to NVRA[,]" has elected not to "take depositions of anybody associated with the computer system operations" (such as Nunez) and declined to "conduct a computer inspection of the VR System containing a great majority of the records related to NVRA disclosure requirements" at the January 13, 2017 inspection, despite having the opportunity to do so. *Id.* at 3-4. Implicit in Snipes' focus on records stored electronically in the VR System is the notion that Snipes is not required to (perhaps because she is unable to) produce such records.[20] *See id.* at 3(citing ECF No. [111-2] at 8); *see also* ECF No. [111-2] at 8 (Snipes' objection to ACRU's request for production relating to written policies and manuals: "[U]ser guides are contained within the VR System for which *the VR System third party contracted vendor considers confidential and proprietary information requiring court intervention for a final determination*.") (emphasis in original). However, Snipes does not cite to any supporting case law, nor has the Court found any, to indicate that records stored within the database of a

---

[19] ACRU takes this point a step further in its opposition to Snipes' Motion by arguing that it entitles ACRU to summary judgment on Count II. *See id.* ("Defendant Snipes's violation of the NVRA is readily apparent: not only did she not produce all records requested, she refused to meet with ACRU to permit inspection of records. On this record, ACRU is entitled to judgment as a matter of law."). However, the factual dispute concerning Snipes' alleged refusal to permit an inspection aside (which ACRU itself recognizes), ACRU did not, in its motion for summary judgment on Count II, raise this specific argument. *See* ECF No. [117] at 9-15. The Court will not afford ACRU a second bite at the apple by attempting to, in seeking summary judgment, rely on an argument that it raises in opposition to Snipes' Motion but that it did not raise in its own motion for summary judgment filed months earlier.

[20] To be sure, however, nowhere does Snipes claim that BCSEO does not have access to records contained within the VR System.

third party whom a NVRA records holder contracts with necessarily fall outside the scope of Section 8's public disclosure requirement.

Finally, Snipes asserts that ACRU abandoned the requests it made in its January 26, 2016 letter when it filed suit, apparently because ACRU has since "[taken] no effort to request or clarify documents that were referenced and a part of [the letter]." ECF No. 145 at 8. Snipes once again argues that "the letter was deficient in its request for documents that would require creation (not in existence)" and further argues, without supporting authority, that "NVRA's 'public disclosure' of voter registration activities requirement relates to records that are actually in existence." *Id.* However, as already discussed, for purposes of the injunction sought by ACRU under Count II, the Court will not weigh at the summary judgment stage the competing interpretations as to whether ACRU's requests sought documents not in existence or were otherwise unclear in nature.

Based on the foregoing, the Court finds that neither ACRU nor Snipes has demonstrated through their respective motions that they are entitled to judgment as a matter of law with respect to Count II. To sum up, and for the sake of clarity moving forward, there exists a genuine factual issue as to whether Snipes indeed refused during the April 5, 2016 phone call to arrange a meeting with ACRU for an inspection of BCSEO's office and records, as ACRU alleges. If true, Snipes' pre-suit refusal along with her initial production of BCSEO certifications in her February 8, 2016 response letter—only to be followed by her production of thousands of admittedly responsive documents *after* this suit was filed—could support a finding that Snipes did violate the NVRA's public disclosure requirement under subsection 8(i)(1) before this suit was filed. *See* 52 U.S.C. § 20507(i)(1). Conversely, Snipes may have never refused to arrange an inspection meeting with ACRU, but instead may have advised ACRU that such a meeting would

need to be arranged through her General Counsel, as Snipes alleges. If true, and if ACRU declined to follow up on that invitation for the nearly three months that passed before ACRU filed suit in June 2016, ACRU's inspection of BCSEO's office and records and Snipes' production of thousands of responsive documents following the commencement of this suit could support a finding that Snipes did not violate the NVRA's public disclosure requirement under subsection 8(i)(1) before this suit was filed. It is the time period between ACRU's January 26, 2016 letter and the filing of this suit—which includes the 90 day curative period contemplated by 52 U.S.C. § 20510(b)(2), the lapse of which gives rise to the private cause of action—that the Court deems operative in determining whether Snipes violated subsection 8(i)(1)'s public disclosure requirement. With respect to the specific injunction ACRU seeks under Count II, to the extent that ACRU claims that Snipes continues to withhold records in her possession that are responsive to its January 26, 2016 letter, ACRU will have to at a minimum (1) itemize with particularity those records and (2) explain how and why the thousands of records that have been produced do not satisfy its purportedly outstanding requests.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. ACRU's Motion, **ECF No. [117]**, is **DENIED**.

2. Snipes' Motion, **ECF No. [145]**, is **DENIED**.

   a. ACRU's Motion to Strike Defendant Brenda Snipes's Partial Motion for Summary Judgment on Count II, **ECF No. [149]**, is **DENIED as moot**.[21]

3. The Snipes/United Motion, **ECF No. [142]**, is **DENIED**.

---

[21] ACRU's Motion to Strike Defendant Brenda Snipes's Partial Motion for Summary Judgment on Count II seeks the same relief as did the motion ACRU filed at ECF No. [153], which the Court denied on June 5, 2017. *See* ECF No. [154].

a.  Snipes and United's Motion to Strike Plaintiff's Summary Judgment Evidence, **ECF No. [164]**, is **DENIED as moot**.[22]

4.  United's *Daubert* Motion, **ECF No. [144]**, is **GRANTED in part** and **DENIED in part**, as set forth in this Order.

**DONE and ORDERED** in Miami, Florida, this 11th day of July, 2017.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record

---

[22] Snipes and United's Motion to Strike Plaintiff's Summary Judgment Evidence requested that the Court strike evidence ACRU submitted in support of its opposition to the Snipes/United Motion that, ultimately, this Court did not consider in denying the Snipes/United Motion.