**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-cv-61474-BLOOM/Valle**

ANDREA BELLITTO and
AMERICAN CIVIL RIGHTS UNION,
Plaintiffs,


v.


BRENDA SNIPES, in her official capacity as
the SOE of Broward County, Florida,


Defendant,


v.


1199SEIU UNITED HEALTHCARE
WORKERS EAST,

     Intervenor Defendant.
_____/


## <u>ORDER</u>


    **THIS CAUSE** is before the Court following the presentation of law and disputed facts

during a five-day bench trial. The parties have each submitted proposed findings of fact and

conclusions of law. *See* ECF Nos. [236], [237] and [238]. The Court has carefully considered

the testimony, the exhibits admitted into evidence, arguments of counsel, and is otherwise duly

advised. For the reasons that follow, judgment is entered in favor of Defendant and Intervenor

Defendant.

## I. BACKGROUND

Plaintiff, American Civil Rights Union, Inc. ("ACRU"), is a non-profit corporation that promotes election integrity, compliance with federal election laws, government transparency, and constitutional government. Since November 1, 2003, Defendant Brenda Snipes ("Snipes") has been the Supervisor of Elections ("SOE") for Broward County, Florida.  *See* ECF No. [184] at 9.  Snipes holds an office created by Florida Statutes § 98.015 and is one of sixty-seven SOEs throughout the State of Florida.  Intervenor Defendant 1199SEIU United Healthcare Workers East ("United") is a labor union that focuses on representing healthcare workers and those who work in healthcare facilities.  *Id.*

On June 27, 2016, ACRU and Andrea Bellitto ("Bellitto"),[1] one of ACRU's members, initiated these proceedings, bringing two claims against Snipes under Section 8 of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507.[2]  *See* ECF No. [1].  Under Count I of its Amended Complaint, ACRU claims that Snipes "has failed to make reasonable efforts to conduct voter list maintenance programs, in violation of Section 8 of NVRA, 52 U.S.C. § 20507 and 52 U.S.C. § 21083(a)(2)(A), the Help America Vote Act ("HAVA")."  ECF No. [12] at ¶ 28.  It is undisputed that Snipes is responsible for performing list maintenance of Broward County's voter rolls in accordance with the NVRA.  *See* ECF No. [184] at 9.  Under Count II of the Amended Complaint, ACRU claims that Snipes "has failed to respond adequately to Plaintiffs' written request for data, [and] failed to produce or otherwise failed to make records available to Plaintiffs concerning Defendant's implementation of programs and activities for ensuring the accuracy and currency of official lists of eligible voters for Broward County, in violation of

---

[1] Bellitto's claims have since been dismissed based on her lack of standing to bring suit.  *See* ECF No. [64].
[2] The Court refers to 52 U.S.C. § 20507 interchangeably as "Section 8," reflecting the statute's original location at Section 8 of Pub. L. 103-31, May 20, 1993, 107 Stat. 77.

Section 8 of the NVRA, 52 U.S.C. § 20507(i)." *See* ECF No. [12] at ¶ 33. On September 19, 2016, United filed a Motion to Intervene, which the Court granted. *See* ECF Nos. [23] and [29]. This Court later dismissed Count II, *sua sponte*, after determining that ACRU's notice letter to Snipes did not constitute sufficient notice for purposes of its failure to disclose claim under the NVRA. *See* ECF No. [198]. The Court found that, as ACRU's notice letter was the only written correspondence sent to Snipes prior to the commencement of this lawsuit, Snipes was never provided written notice of the potential NVRA violation claimed under Count II, nor was she afforded ninety days after such written notice to cure the alleged violation—a requirement under 52 U.S.C. §§ 20510(b)(1), (2). *Id.* As such, the bench trial proceeded solely as to Count I - ACRU's contention that Snipes failed to make reasonable efforts to conduct voter list maintenance programs in violation of Section 8 of NVRA and HAVA.

The genesis of this lawsuit stems from a brief series of interactions that took place between the President of ACRU, Susan A. Carleson ("Carleson"), and Snipes back in early 2016. On January 26, 2016, Carleson sent a letter to Snipes notifying her that, based on ACRU's research, Broward County was "in apparent violation" of Section 8 of the NVRA. *See* ECF No. [12-1]. Carleson's letter explained that, based on ACRU's comparison of publicly available information, Broward County "ha[d] an implausible number of registered voters compared to the number of eligible living citizens." *Id.* The letter expressed ACRU's hope that the Broward County Supervisor of Elections Office ("BCSEO") would work toward compliance with Section 8 as well as ACRU's intention to file a lawsuit under the statute if such compliance was not achieved. *Id.* The letter further stated that, if the information referenced therein was no longer accurate, "it would be helpful if [Snipes] could provide" documents related to the following: updated registration data since the publication of information reported by the United States

Election Assistance Commission ("EAC") for 2014 from the November 2014 election (the "2014 EAC Report"); records obtained or received from federal and state courts, including jury recusal forms, regarding lack of citizenship, death, or relocation; the number of ineligible voters removed by category and by date; the source agency that provided the identifying information of the removed deceased and when the data was provided; the number of notices sent to inactive voters since the publication of the 2014 EAC Report, including the date, scope, and contents of any mailing sent to all registered voters; the names of the staff responsible for conducting list maintenance obligations; the number of ineligible voters removed for criminal conviction, together with the underlying data and communications with law enforcement agencies; the total number of voters registered in Broward County as of the date of any response; any records indicating the use of citizenship or immigration status for list maintenance activities; and all list maintenance records including federal voter registration forms containing citizenship eligibility questionnaires for the previous 22 months. *Id.* Citing Section 8 of the NVRA, the letter informed Snipes of the requirement that her office "make available for public inspection all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* It also invited Snipes to call Carleson to arrange a time to discuss the matter as well as an inspection. *Id.*

On February 8, 2016, Snipes responded to ACRU's letter with a letter of her own. *See* ECF No. [12-2] at 1-2. Among other things, Snipes's letter refuted the assertion that Broward County's voter rolls contained more voters than living persons residing in the county and included two types of BCSEO certifications spanning the previous several years—which the letter characterized as "documenting actions taken by [Snipes's] office to manage removal of voters no longer eligible to vote in Broward County." *Id.* The letter closed by directing ACRU

to BCSEO's General Counsel and BCSEO's website for any further information.  *Id.*  About two months after the exchange of letters, legal representatives of ACRU contacted Snipes via telephone on April 5, 2016, and the parties discussed the possibility of arranging a meeting and an inspection of the records ACRU requested in its January 26, 2016 letter.  Those efforts proved unfruitful, however, as no further communications (at least not written) between ACRU and Snipes took place in the nearly three months that followed.

In June 2016, ACRU commenced this lawsuit and the parties engaged in discovery and other pretrial proceedings over the course of one year.  ACRU seeks the following relief: (1) declaring that Snipes is in violation of Section 8 of the NVRA by failing to conduct a reasonable general program of voter list maintenance and (2) ordering Snipes to implement reasonable and effective registration list maintenance programs to cure failures to comply with the NVRA and ensure that only eligible registrants are on Broward County's voter registration rolls and that those registrations are accurate and current.

The bench trial proceeded before this Court on July 25, 2017. ACRU presented eleven witnesses and Snipes and United presented five witnesses.  The Court's focus, and its resulting analysis in this Opinion, center on whether Snipes, as the SOE for Broward County, conducted a general program that makes a reasonable effort to remove ineligible voters by reason of death or change of address as required by Section 8 of the NVRA.

## II.  CONCLUSIONS OF LAW AND FINDINGS OF FACT

### A.  Section 8 of the NVRA

 The NVRA was enacted with the following purposes in mind:

(1) to establish procedures that increase the number of eligible citizens who register to vote in elections for federal office;

(2) to make it possible for federal, state, and local governments to implement the NVRA in a manner that enhances the participation of eligible citizens as voters in elections for federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registrations rolls are maintained.

52 U.S.C. § 20501(b).

The NVRA's goals can, at times, be in tension with one another. *ACRU v. Philadelphia City Comm'rs*, 872 F.3d 175, 178 (3d Cir. 2017). Although the maintenance of clean voter rolls can ensure the integrity of the election process, the purging of voter registration from those rolls can also require voters to re-register, thereby limiting their ability to participate in elections. *Id.* The NVRA's legislative history reveals that "Congress was wary of the devastating impact purging efforts previously had on the electorate," noting that such efforts were frequently "highly inefficient and costly" to the states and recognizing "a long history of such cleaning mechanisms used to violate the basic rights of citizens." *Id.* (citing S. Rep. No. 103-6, at 18 (1993)). Thus, "the NVRA both protects registered voters from improper removal from the rolls and places limited requirements on states to remove ineligible voters from the rolls." *Id.* at 179.

To accomplish these goals, Section 8 of the NVRA provides that "the name of a registrant may not be removed from the official list of eligible voters except— [1] at the request of the registrant; [2] as provided by State law, by reason of criminal conviction or mental incapacity; or . . . by reason of—[3] the death of the registrant; or [4] a change in the residence of the registrant." 52 U.S.C. § 20507(a)(3)-(4). "In short, once a person is properly registered to vote, a state is only permitted to remove him or her from the voting list for narrowly specified reasons. Specifically, Congress allows removal if: the person dies, changes residence, asks to be

6

taken off the list, or becomes ineligible under state law because of criminal conviction or mental incapacity." *ACRU*, 872 F.3d at 179.  The NVRA further requires states to "conduct a general program that makes a reasonable effort to remove the names" of voters who are deceased or have changed residence.  52 U.S.C. § 20507(a)(4).  The NVRA permits, but does not require, states to make an effort to remove voters who are ineligible by reason of felony conviction or mental incapacity.  *See ACRU*, 872 F.3d at 181-82.  *See also id.* at 182 ("By its terms, the mandatory language in Section 8(a)(4) only applies to registrants who have died or moved away. Removal due to criminal conviction is not included on this list of mandatory purging.").  Likewise, while the NVRA undoubtedly permits states to remove any non-citizen who somehow becomes registered to vote when such individuals come to the state's attention, it does not require a generalized program that attempts to identify such voters.  *See id.*; *Arcia v. Detzner*, 772 F.3d 1335, 1346-47 (11th Cir. 2014).

A state's general program must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965" and must not "result in the removal of the name of any person from the official list of voters registered to vote . . . by reason of the person's failure to vote." *Id.* § 20507(b).  In addition, all programs for the systematic removal of ineligible voters from the registration rolls must be completed no later than ninety days prior to a federal election. *Id.* § 20507(c)(2).  Finally, states may not remove a voter who appears to be ineligible due to a change in residence unless the voter confirms the change in writing or the state first sends the voter "a postage prepaid and pre-addressed return card, sent by forwardable mail" and the voter fails to return the card and then fails to vote during the next two federal election cycles. *Id.* § 20507(d).  When a voter changes residence "to another address within the same registrar's jurisdiction, the registrar shall correct the voting registration list accordingly, and the registrant's name may not

7

be removed from the official list of eligible voters by reason of such a change of address." *Id.* § 20507(f).

To ensure that election officials are fulfilling their list maintenance duties, the NVRA contains public inspection provisions. 52 U.S.C. § 20507(i). These provisions are available to any member of the public, including ACRU, and they convey Congress's intention that the public should be monitoring the state of the voter rolls and the adequacy of election officials' list maintenance programs. *Id.* Accordingly, election officials must provide full public access to all records related to their list maintenance activities, including their voter rolls. *Id.* This mandatory public inspection right is designed to preserve the right to vote and ensure that election officials are complying with the NVRA. *Project Vote v. Long*, 682 F.3d. 331, 335 (4th Cir. 2012). If someone has discovered sufficient facts to support a claim that an election official failed to adequately maintain the voter rolls, that person may bring a claim in federal court to seek enforcement. 52 U.S.C. § 20510(1).

The NVRA's requirements strike a balance between protecting eligible voters' right to vote and protecting them from improper removal from the rolls while ensuring that ineligible voters are removed from the rolls once their ineligibility has been confirmed. The NVRA does not define what constitutes a "reasonable effort" to maintain accurate and current voter rolls within the meaning of section 8(a)(4), but it provides a model program by which a state may "meet the requirement" to make such an effort while complying with the other restrictions and requirements of Section 8. Under the model program, a state may satisfy the "reasonable effort" requirement if it establishes a program "under which –

> (A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and

(B)  if it appears from information provided by the Postal Service that –

> (i.)   a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

> (ii.)  the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) of this section to confirm the change of address.

*Id.* § 20507(c)(1).

As the NVRA's model program is optional, states may use other programs instead of or in addition to the model program. *Id.*; *see also* S. Rep. 103-6, at 19 ("Jurisdictions which choose not to use the NCOA program should implement another reasonable program.").  Examples of such alternative programs include relying on election-related mail returned as undeliverable, canvasses by mail or door-to-door, or interstate data-sharing programs.  *See, e.g.*, *United States v. Missouri*, No. 05-4391-CV-C-NKL (NKL), 2006 WL 1446356, at *8 (W.D. Mo. May 23, 2006), *rev'd on other grounds*, 535 F.3d 844 (8th Cir. 2008) (canvass); *Wilson v. United States*, Nos. 95-20042, 94-20680, at 5-6 (N.D. Cal. Jan. 12, 1996) (order) (returned mail); *see generally Welker v. Clarke*, 239 F.3d 596, 598-99 (3d Cir. 2001) (removal program must be based on reliable information from a government agency).

HAVA sheds further light on what constitutes a reasonable program to remove voters who have died or changed residence.  Under 52 U.S.C. § 21083, states must provide for state death records to be shared with election officials for purposes of removing registrants who have died.  *Id.* § 21083(a)(2)(A)(ii)(1).  Neither the NVRA nor HAVA requires other death records to be made available to election officials. However, other states—including Florida—may and do

consider death information from other sources such as Social Security Administration records or vital statistics records from other states. *See* Fla. Stat. § 98.075(3)(a)(1)(b); Ind. Stat. § 3-7-45-5 (requiring use of State and Territorial Exchange of Vital Events database for purposes of identifying voters who have died out of state).

To satisfy its list-maintenance obligations under the NVRA, a state must have a "general program" of list-maintenance, and that program must make a "reasonable effort" to identify and remove those ineligible voters who have died or who have changed residence. *Id.* § 20507(a)(4). The use of the phrase "reasonable effort" necessarily implies that states are not obligated to continually scour their voter rolls to ensure that every ineligible voter is removed at the earliest possible moment permitted by law. Nor are states required to make use of every available source of change-of-address or death information as part of such "reasonable efforts." They must simply rely on reasonably valid and comprehensive sources of such information, such as the United States Postal Service's ("USPS") National Change of Address ("NCOA") system, which contains all forwarding addresses submitted to the postal service by individuals who move, and state death records, which contain death certificates for the vast majority of residents who have died. The NVRA's "reasonable effort" requirement must be construed in light of the NVRA's goal of ensuring that once registered, eligible voters remain on the rolls and are not erroneously removed. Thus, states may not remove a voter based solely on a claim by a private party that the person is no longer eligible. *See* H. Rep. 103-9, at *15 (NVRA's requirements "may not be avoided by a registrar conducting a purge program or activity based on lists provided by other parties where such lists were compiled as the result of a selective, non-uniform, or discriminatory program or activity."). When scrutinizing the evidence presented at trial below, the Court maintains these overarching principles in mind.

### B.  Florida's List Maintenance Tools

In connection with the state's implementation of the NVRA, Florida has vested power in the SOE to "conduct a general registration list maintenance program to protect the integrity of the electoral process by ensuring the maintenance of accurate and current voter registration records in the statewide voter registration system."  Fla. Stat. § 98.065(1).  For example, § 98.015(3) requires that the SOE "shall update voter registration information;" § 98.015(10) requires that all voter registration and list maintenance procedures be conducted in compliance with any department rule, the Voting Rights Act of 1965, the NVRA or HAVA; and § 98.015(12) requires that the supervisor maintain a list of valid residential street addresses to verify voters' legal addresses. Sections 98.065 and 98.075 describe the procedures and tools available to the SOE and the Florida Department of State ("DOS") for performing list maintenance for removal of registrants who are ineligible to vote.  Specifically, Florida law requires that the SOE incorporate *one or more* of the following procedures in the county's biennial registration list maintenance program:

  a.  Change-of-address information supplied by the USPS to identify registered voters whose address may have changed.

  b.  Change-of-address information identified from returned nonforwardable return-if-undeliverable mail sent to all registered voters in the county.

  c.  Change-of-address information identified from returned nonforwardable return-if-undeliverable address confirmation requests mailed to all registered voters who have not voted in the last two years and who did not make a written request that their registration records be updated during that timeframe.

*See* Fla. Stat. § 98.065(2)(a)-(c).

In addition, Florida law requires the SOEs to take specified list-maintenance actions *if* the supervisor *receives* certain information, such as:

a. Information from an election official in another state indicating that a registered voter in this state has registered to vote in that other state.[3]  *See* Fla. Stat. § 98.045(2)(b).

b. Change-of-address information from jury notices signed by the voter and returned to the courts.  *See* Fla. Stat.  § 98.065(4)(a).

c. Change-of-address information from the Department of Highway Safety and Motor Vehicles ("DHSMV").   *See* Fla. Stat.  § 98.065(4)(a).

d. Change-of-address information from "other sources" indicating that a registered voter's legal residence might have changed to another location within the state.  *See* Fla. Stat. § 98.065(4)(a).

e. Information from the Department of Health or the United States Social Security Administration indicating a voter is deceased.  *See* Fla. Stat. § 98.075(3)(a)2.

f. Notice from the DOS that it has made a determination of initial credibility or reliability that a voter has been adjudicated mentally incapacitated.  *See* Fla. Stat. § 98.075(4).

g. Notice from the DOS that it has made a determination of initial credibility or reliability that a voter has been convicted of a felony and his or her civil rights have not been restored. *See* Fla. Stat. § 98.075(5).

h. Information from other sources indicating that a registered voter is ineligible to vote because he or she is deceased, adjudicated a convicted felon without having his or her civil rights restored, adjudicated mentally incapacitated without having his or her

---

[3] Florida law deems this as a written request from the voter to have his or her name removed from the statewide voter registration program.  *See* Fla. Stat. 98.045(2)(b).

voting rights restored, does not satisfy the minimum age requirement, is not a United States citizen, is a fictitious person, or has not listed a residence as his or her legal residence. *See* Fla. Stat. § 98.075(6).

Significantly, Florida law does not impose an affirmative duty on the SOE to obtain any of the above-listed information. Nor does Florida law require the SOE to take any action to remove voters from the registration rolls until it receives the information listed above. *See* Fla. Stat. § 98.045(2)(b) (emphasis added) ("Information *received* by a voter registration official . . . shall be considered a written request from the voter to have the voter's name removed. . ."); § 98.065(4)(a) (emphasis added) ("*If* the supervisor *receives* change-of-address-information . . . from jury notices . . ., from the Department of Highway Safety and Motor Vehicles, or from other sources . . ."); § 98.075(3)(a)2 (emphasis added) ("Within 7 days *after receipt of such information* through the statewide voter registration system, the supervisor shall remove the name of the registered voter"); § 98.075(4)-(5) (emphasis added) ("*Upon receipt of the notice* that the department has made a determination of initial credibility and reliability, the supervisor shall adhere to the procedures set forth in subsection (7) . . . ");§ 98.075(6) (emphasis added) ("*If* the department or supervisor *receives* information from other sources . . . , the supervisor must adhere to the procedures set forth in subsection (7)").

In light of the text, structure, purpose and history of the NVRA, the Court determines that a state's list maintenance program makes a "reasonable effort" sufficient to satisfy the requirements of Section 8(a)(4) of the NVRA if it does the following:

(1) Complies with all mandatory list-maintenance tools established by the governing state to remove the names of ineligible voters by reason of death or change in residence;

(2) Uses NCOA information supplied by the USPS, or similarly reliable information garnered from other sources, such as mass mailings or targeted mailings, to identify registrants whose addresses have changed to update its voter rolls; and

(3) Uses information from the state health department or other similarly reliable sources to identify voters who have recently died to update its voter rolls and remove deceased individuals from the rolls.

### C.  Evidence Presented At Trial

Having determined what constitutes a "reasonable effort" sufficient to satisfy the requirements of Section 8(a)(4) of the NVRA, the Court now examines the evidence presented. ACRU carries the burden of proof to show that Snipes violated the NVRA.  *Prickett v. U.S.*, 111 F. Supp. 2d 1191, 1192 (M.D. Ala. 2000) ("The burden of proof in civil cases is the same regardless of whether the finder of fact is a judge in a bench trial or a jury").  ACRU contends that it has satisfied this burden by (1) presenting evidence that the number of registrations on the list of eligible voters exceeds the number of eligible citizen residents of Broward County; (2) establishing, through expert testimony, how a reasonable election administration official would carry out his or her duties; (3) demonstrating Snipes's failure to adequately process and respond to citizen complaints and submissions of information; (4) pointing to Snipes's failure to use certain available list-maintenance tools; and (5) Snipes's admissions to inaccuracies and lack of effective policies and procedures.  Much of ACRU's evidence overlaps in the five categories.

### a.  __ACRU's Evidence__

i.  Broward County's Registration Rates

At trial, ACRU presented evidence that the registration rate in Broward County was at or near 100% of the 18-and-older citizen population and used this evidence to argue that the high

registration rate is evidence of an unreasonable list maintenance program. ACRU's calculation of the "registration rate" was based upon a comparison of the total voter registration figures for Broward County with contemporary population data provided by the United States Census Bureau. Dr. Steven A. Camarota ("Dr. Camarota"), an expert in population studies and statistics, analyzed the population and registration data for Broward County for the last several election cycles, specifically 2010, 2012, and 2014. *See* ECF No. [229] at 50-51. Dr. Camarota retrieved and compared official population and registration figures from the Census Bureau and the United States Election Assistance Commission to analyze the registration rate in Broward County. *Id.*

Dr. Camarota's analysis concluded that:

1. In 2010, Broward County had a total registration of 1,214,714, and an active registration of 1,042,290.[4] *See* ECF No. [229] at 54. Broward County had a total 18-and-older population of 1,361,787, resulting in an 89.2% total registration rate compared to the total adult population. *Id.* at 53, 55. For 2010, the estimated 18-and-older citizen population for one year was 1,119,528 and for five years was 1,098,140, resulting in a citizen population registration rate of 108.5% to 110.6%. *Id.* at 56-59.

2. In 2012, there was an active registration of 1,140,454, as the total registration was not reported to the Election Assistance Commission that year. *Id.* at 53, 55. Broward County had a total 18-and-older population of 1,421,895, resulting in an 80.2% active registration rate compared to the total adult population. *Id.* at 53, 56. For 2012, the estimated 18-and-older citizen population for one year was

---

[4]  Dr. Camarota testified that the difference between total registration numbers and active registration numbers was that the latter reflected those voters who voted in a more recent election cycle. *See* ECF No. [229] at 54.

1,187,350 and for five years was 1,134,383, resulting in a citizen population active registration rate of 96.1% to 100.5%.  *Id.* at 57, 59.

3.  In 2014, Broward County had a total registration of 1,198,616, and an active registration of 1,071,305.  *Id.* at 54-55. Broward County had a total 18-and-older population of 1,467,042, resulting in an 81.7% total registration rate compared to the total adult population.  *Id.* at 54, 56.  For 2014, the estimated 18-and-older citizen population for one year was 1,239,345 and for five years was 1,187,020, resulting in a citizen population total registration rate of 96.7% to 101.0%.  *Id.* at 57, 59.

4.  Based on the one-year data for 2010, 2012, and 2014, Dr. Camarota testified that Broward County had more people registered to vote than citizens over the age of 18 within the county.  *Id.* at 58.

Dr. Camarota also compared registration ratios in other jurisdictions to those found in Florida.  In doing so, he concluded that, according to Census Bureau reports, 65% of the 18-and-older citizen population on a nationwide-basis was registered to vote in 2010.  *Id.* at 59. Similarly, in 2012, a presidential election year, this national figure was 71.2% while the 2014 figure was 64.6%.  *Id.* By comparison, Dr. Camarota testified that in Florida, 63% of the 18-and-older citizen population was registered to vote in 2010 with 68.3% in 2012 and 62.6% in 2014. *Id.* at 60.

United, in turn, presented the testimony of Professor Dan Smith, an expert in the areas of political science and elections at the state and local level. Professor Smith's testimony, in part, focused on Dr. Camarota's registration rate calculations.  Dr. Camarota used EAVS data, a survey conducted by the Election Assistance Commission at the "book-closing date" for a

16

general election in an even-numbered year, to determine the number of registered voters in Broward County. *See* ECF No. [233] at 105. Professor Smith explained that the "book-closing date" is the last time an individual can register to vote prior to an election. *Id.* at 106. Because this data is obtained in October of an election year, it reflects a high point in a county's number of registered voters compared to almost any other time in a two-year cycle. *Id.* at 111-112. These numbers reflect a rise in newly registered voters and a limitation placed on SOEs that does not allow them to complete systematic list maintenance ninety days before an election. *Id.* Professor Smith opined that other sources may provide a more accurate registration count, such as the Statewide Voter Registration Database, which provides the number of registered voters by county as reported by the individual SOEs in any given month. *Id.* at 108-109.

Professor Smith opined on the use of the American Community Survey ("ACS") data to determine the population count of voting-age citizens in Broward County. The ACS is a monthly survey sent to a sample population of households tied back to the decennial census. *Id.* at 114-115. The ACS provides estimates of population, including the voting-age population in a jurisdiction. *Id.* The one-year ACS data reflects the midpoint population of that year - July. *Id.* The five-year ACS data contains sixty months of monthly surveys and then uses the midpoint of that five-year period. *Id.* at 115-116. Thus, the 2014 ACS survey reflects the population at its mid-point - July of 2012. *Id.* For that reason, Professor Smith opined that a registration rate analysis that uses the 2014 ACS for the denominator should use a numerator that reflects registration numbers in July of 2012. *Id.* at 116, 120. Otherwise, it underestimates the population in existence in 2014 in a growing county, such as Broward County. *Id.* Professor Smith further opined that it would be improper to use a numerator at its highest possible point

(the EAVS data) divided by a denominator that underestimates a growing population at that same snapshot in time (the ACS data).  *Id.* at 121-122.

On summary judgment, this Court previously observed that the high registration rate is sufficient to support an initial claim that Snipes did not fulfill her duties to maintain voter rolls. However, unreasonably high voter registration rates, without more, do not prove that Snipes violated the NVRA. In scrutinizing the evidence, the Court finds Professor Smith's analysis persuasive and finds Dr. Camarota's calculations to be misleading. The data source used for the number of registered voters in Dr. Camarota's numerator is not commensurate with the source used for the number of eligible voters in his denominator. This is because the sources include different groups of voters from different time periods.  As explained above, Dr. Camarota obtained his numerator from the EAVS database, reflecting the number of registered voters as of the close of registration prior to the federal election when voter registration is at its highest.  *See* ECF No. [229] at 49, 68-70; ECF No. [233] at 121.  In fact, Dr. Camarota agreed that there is an increase in voter registration immediately before a federal election.  *Id.* at 68.  Federal law also requires that all programs that systematically remove ineligible voters from the registration rolls must be completed no later than ninety days prior to a federal election. 52 U.S.C. § 20507(c)(2). Dr. Camarota further agreed that the EAVS data includes all individuals registered to vote in Broward County regardless of whether they are physically present, such as military personnel living overseas, individuals who are temporarily non-residents such as students, and people who live in Florida seasonally.  *Id.* at 67-68.

A consideration of the testimony reveals that a snapshot of voter registration taken from the EAVS database in October of a federal election year will necessarily yield a greater number of registered voters than a snapshot taken in January of that same year prior to the surge in

registration and prior to the halt of systematic list-maintenance activities. The same would hold true for a snapshot taken several months after the election when systematic list maintenance has resumed and voter registration rates have decreased. Although the BCSEO's website contains the registration data for Broward County broken down by month, Dr. Camarota chose not to use such data. *Id.* at 70-71. He likewise did not use the voter registration information from the Florida Division of Elections ("DOE") to measure the number of registered voters in Broward County in a given month. *Id.* at 71.

To reflect population estimates for his denominator, Dr. Camarota relied upon the ACS database. *Id.* at 74-77. Professor Smith explained that in a growing county, such as Broward County, using a population estimate centered on July of 2012 does not accurately represent the population estimate in existence in late 2014. *See* ECF No. [233] at 116, 119-120. In addition, Professor Smith clarified that, unlike the EAVS data, the ACS data only counts those individuals physically present in the county during the two months immediately preceding the data collection. *Id.* at 117-119. This means it excludes individuals living overseas but registered to vote in Broward County, college students who are studying away from but registered in Broward County, as well as other seasonal residents registered in Broward County. *Id.*

The Court agrees with Professor Smith that Dr. Camarota's chosen denominator – the ACS data – underestimates the population in Broward County by *excluding* those registered voters who are not physically present at the time of the survey while, at the same time, his chosen numerator inflates the number of registered voters by *including* the same population excluded in the ACS data. These data sets do not allow for an accurate comparison. Similarly, Dr. Camarota's use of the five-year 2014 ACS data, which accounts for population in July of 2012, does not reflect the population numbers in existence in October of 2014 – the timeframe

used for the numerator.  The net effect here is that Dr. Camarota compared voter registration numbers when they are at their all-time high in October of 2014 to population estimates from July of 2012.  However, the comparison of these two different data sets, reflecting snapshots at two different points in time, does not allow for an accurate calculation.  Given the foregoing, the Court finds that the registration rates presented by ACRU are inaccurate.  ACRU's argument that Broward County's registration rates are unreasonably high is, therefore, unsupported by any credible evidence and necessarily fails to support ACRU's contention that Snipes failed to comply with the NVRA's list-maintenance requirements.

ii.  ACRU's Evidence Regarding Reasonable List Maintenance Procedures

At trial, ACRU presented the testimony of Scott Gessler ("Mr. Gessler"), the former Secretary of State for Colorado, as an expert witness in the area of election administration.  Mr. Gessler opined that Snipes's list-maintenance efforts are not reasonable under industry standards applicable to election administration officials in light of the state of the voter rolls, the procedures used at the BCSEO, and the tools available to Snipes.  For these reasons, he concluded that Snipes lacks a general list-maintenance program.  *See* ECF No. [229] at 135, 145.

Mr. Gessler first based his opinion on his understanding of Snipes's compliance with Florida Statute § 98.065.  This provision of Florida law requires that a SOE incorporate "one or more" of the following procedures during the county's biennial list-maintenance program: (a) use of change-of-address information supplied by the USPS through its licensees to identify those voters whose address has changed, (b) use of change-of-address information identified from returned nonforwardable return-if-undeliverable mail sent to all registered voters within the county, or (c) use of change-of-address information identified from returned nonforwardable undeliverable address confirmation requests mailed to all registered voters who have not voted in

20

the last two years and who did not request that their records be updated during this timeframe. Fla. Stat. § 98.065(2).  Importantly, Florida law only requires that a SOE utilize *one* of these three methods.  Mr. Gessler opined that Snipes does not conduct reasonable list maintenance to identify those registered voters who have moved whether inside or outside of Broward County. His opinion, however, is belied by the evidence introduced at trial demonstrating that the BCSEO effectively employs the first two methods outlined within § 98.065(2).  Section II(C)(b)(iii) of this Order, *infra*, details the procedures used at the BCSEO to identify voters whose addresses have changed and its compliance with § 98.065(2).

The Court, however, agrees with the opinion of Mr. Gessler that the BCSEO did not effectively complete the third statutory method – the mailing of change-of-address information identified from returned nonforwardable undeliverable address confirmation requests mailed to all registered voters who have not voted in the last two years and who did not request that their records be updated during this timeframe.  Mr. Gessler pointed out the number of individuals who did not vote in the 2014 and 2012 elections, 592,463 and 378,111 respectively.  In theory, those individuals who did not vote and did not request that their records be updated should have received a mailing from the BCSEO.  ACRU argues that, despite the number of notices mailed using this method - 14,704, and the number of individuals who contacted the office to have their information updated, approximately 150,000, there is still a sizable, unexplained gap of several hundred thousand voters who did not receive a mailing.  Thus, the Court finds that the BCSEO failed to reasonably implement this third statutory procedure as a list-maintenance tool. Nonetheless, Florida law does not require that a SOE employ all three methods as part of its list maintenance.  Rather, Florida law only requires the use of one such tool and, as further explained below, the Court finds that Snipes reasonably implemented two of these three tools.

Next, Mr. Gessler based his opinion on the BCSEO's lack of consistent and written policies and procedures regarding list maintenance. *See* ECF No. [229] at 110-112.  He opined that, "any general program of list maintenance must include written or online training programs, written or online policies and procedures, and adequate recordkeeping and reporting to allow for later examination, analysis, or audit." *See* ECF No. [217-10] at ¶14.  However, the evidence presented at trial contradicted the basis for Mr. Gessler's opinion in that there *was* evidence regarding the policies and procedures for list maintenance found in the Voter Registration System, known as the VR System.  Every employee in the Department of Voter Services at BCSEO who works on list maintenance has access to the VR system, including the policies and procedures online as needed. *See* ECF No. [232] at 23, 185, 195-196.  The VR System has an online help system that employees at BCSEO use to answer any questions on a specific process involving voter registration and processing information. *See* ECF No. [233] at 11.  The help system is word searchable with built-in topics and indices. *Id.*  At trial, ACRU admitted that, during the discovery phase of the proceedings, when asked for the production of all manuals, Snipes disclosed the use of the VR Manual. *See* ECF No. [230] at 67.  Despite the disclosure of the VR Manual, Mr. Gessler testified that he had not reviewed a copy of it and had no personal knowledge of its contents. *Id.* at 85. Curiously, his report specifically references the need for written or *online* policies and procedures.  The VR Manual fits the definition of online policies and procedures, and based on the testimony of the witnesses discussed below, the list maintenance personnel at BCSEO regularly referenced the VR Manual to answer questions about list maintenance policies and procedures.  The Court rejects ACRU's claim that a software manual produced by a third-party equates to an unreasonable standard of care or otherwise demonstrates a lack of policies.  This manual and the procedures and policies contained therein

are copies of documents accessible online to each employee and provide the necessary information to keep each abreast of changes in procedures. Thus, the Court finds that the record evidence does not support Mr. Gessler's opinion that there was a lack of policies and procedures pertaining to list maintenance at BCSEO.

At trial, there was significant debate about the admissibility of the Voter Services Procedures Manual, a written manual disclosed during the second day of trial after Mr. Gessler completed his direct examination. The Court allowed Mr. Gessler an opportunity to review the written manual and to testify about whether and how the written manual impacted his opinion. Ultimately, however, the Court finds this issue to be irrelevant as the employees in charge of list maintenance at BCSEO did not regularly review or rely upon this written manual in their execution of their functions. In fact, the vast majority of them seemed unaware of its existence. Rather, they testified that they reviewed and relied upon the VR Manual for list maintenance policies and procedures – a manual that Mr. Gessler did not review and could not, therefore, comment upon.[5] *See* ECF No. [232] at 82; ECF No. [232] at 11. In its analysis, the Court does not give any weight to the belatedly produced Voter Services Procedures Manual.

Next, Gessler based his opinion on Snipes's biannual certifications of list maintenance submitted to the DOS, stating that the certifications themselves reveal a lack of consistent list maintenance. He testified that the certifications reveal fluctuating and inconsistent numbers of registrants moved from active to inactive status and from inactive to ineligible status. *See* ECF

---

[5] Mr. Gessler testified he was aware of the existence of the VR Manual before he drafted his expert report and that Snipes had advised it was proprietary. *See* ECF No. [231] at 91. At no point in time prior to trial did ACRU file a motion to compel claiming that Snipes committed a discovery violation by failing to produce the VR Manual, a manual disclosed as proprietary. *See* ECF No. [230] at 13. In fact, the only request for a confidentiality order related to the disclosure of the VR Manual was made during the second day of trial by Snipes. *Id.* at 155-156. Likewise, ACRU had the opportunity to depose Jorge Nunez, BCSEO's Information Technology Director who maintains the voter registration database, but chose not to do so. *See* ECF No. [233] at 65. As further discussed below, Mr. Nunez provided detailed testimony about the VR System, including information about its online policies and procedures.

No. [229] at 163-166.  For example, in the second half of 2011, Snipes removed 141,939 inactive voters from the rolls but from the second half of 2013 until the second half of 2015, she did not remove any inactive voters.  *See* ECF No. [217-3] at 8.  This one example, however, does not paint a full picture of the list maintenance activities contained within the certifications.  Within each biannual certification between 2011 and 2016, there is evidence that the BCSEO mailed thousands of address confirmation requests, address confirmation notices, and final notices to active voters before placing them on the inactive list.  *Id.* at 22.  Similarly, although some biannual certifications reflect a small number of voters being placed on the inactive list in the second half of 2011, 2012, 2014 and first half of 2015, the BCSEO placed thousands and even tens of thousands of voters on the inactive list in 2011, 2012, 2013, 2014, 2015, and 2016.  *Id.* When viewed in isolation, the unexplained gap in the removal of inactive voters between the first half of 2013 and the second half of 2015 is suggestive of a lack of list maintenance.  However, when the certifications are viewed in their totality, there is sufficient evidence demonstrating that the BCSEO has an ongoing list-maintenance program in place.

As to list-maintenance tools, Mr. Gessler opined that it was unreasonable for Snipes not to avail herself of certain tools under Florida law.  In particular, Mr. Gessler suggested that Snipes employ the DAVID database from the DHSMV, the Social Security Disability Index ("SSDI"), the ERIC database to compare information from state to state, and the SAVE program to determine a voter's citizenship.  *See* ECF No. [217-10] at 20.  However, the evidence at trial revealed that Snipes was either using the suggested databases through the VR System, applying to use the system or does not have the power to implement the system.  For example, the Florida DOS – at the state level - receives reports from the SSDI and then forwards that information from the national database to the individual counties through the Florida Voter Registration

System ("FVRS").  *See* ECF No. [233] at 150.  At trial, Sharon Fleming ("Ms. Fleming"), Snipes's Voter Services Coordinator, testified that the BCSEO receives this information about deceased voters on a daily basis from the DOS.  *See* ECF No. [232] at 200.  Thus, the BCSEO already uses the SSDI through information provided at the state level.

With regard to ERIC, Mr. Gessler agreed that an individual SOE cannot join ERIC and instead the whole state must choose to participate in the database.  *See* ECF No. [230] at 87-88.  Mr. Gessler did not dispute that Florida has chosen not to join ERIC and Snipes confirmed that Florida has not implemented it.  *Id.; see also* ECF No. [232] at 101.  Similarly, it was unclear whether the SAVE system can be implemented at the county level as opposed to the state level.  *See* ECF No. [233] at 155 (testifying that access to SAVE is through the Florida Division of Elections ("DOE")).  With regard to DAVID from the DHSMV, Snipes testified that she has learned of the database in the last year or two, the BCSEO is in the process of applying for DAVID access, and she is only aware of one SOE in Florida using it to date in Orange County.  *See* ECF No. [232] at 99-101.  There is no evidence that any other SOEs in Florida are currently using DAVID.  Even though Snipes does not currently use DAVID, the Florida DOE receives change-of-address, registration, and change-of-party information from the DHSMV and supplies that information to BCSEO through the FVRS.  *Id.* at 34, 178.  Nevertheless, while it may be the "gold standard" to use many of these tools, the NVRA's requirement of a *reasonable* list-maintenance program does not mandate the use of such tools, especially at the county level.

Finally, Mr. Gessler based his opinion regarding Snipes's lack of reasonable list-maintenance efforts on the registration rate in Broward County, relying upon Dr. Camarota's computations.[6]  In his opinion, the ratio of voter registration to citizen voting-age population

---

[6] The Court previously excluded Mr. Gessler's computation of Broward County's voter registration rates, finding that he was not qualified to offer such a data-driven opinion.  *See* ECF No. [182] at 26, 29.  At

serves as a warning that there are inadequate procedures or activities for list maintenance, especially when the ratio is at or above 100%. *Id.* at 135-138. As explained in § II(C)(a)(ii) *supra*, the Court finds that Dr. Camarota's computations are not reliable in that they use an inflated voter registration number and a deflated voter-eligible population number, leading to a misleading result. By relying upon an inaccurate registration rate as a basis to suggest a lack of list maintenance, the entire premise of this opinion is flawed from the start.[7]

In sum, the Court is not persuaded by Mr. Gessler's opinion that Snipes did not comply with § 98.065(2)(c) and that several list-maintenance tools should have been implemented. The Court finds his ultimate opinion that Snipes does not maintain an adequate list-maintenance program to be unsupported by the weight of the evidence.

### iii.   Citizen Complaints about the Broward County Voter Rolls

ACRU's next bundle of evidence consists of the testimony from several Florida and Broward residents who acquired and reviewed the official lists of registered voters in Broward County: Richard DeNapoli, Richard Gabbay, William Skinner, Kirk Wolak, Logan Churchwell, and Gregg Prentice. These witnesses testified about the registrations they observed on the voter

---

trial, Mr. Gessler testified that he was present in the courtroom when Dr. Camarota testified about Broward County's registration rates and thereafter referenced Dr. Camarota's computation of those rates as support for his opinion. *See* ECF No. [229] at 134, 135, 138.

[7] ACRU's Proposed Findings of Fact and Conclusions of Law argue that neither Snipes nor United offered testimony from an election administration expert witness. *See* ECF No. [237] at 19-20. This argument, however, flips the burden of proof in the case. ACRU – not Snipes or United – bears the burden of demonstrating that Snipes does not have a reasonable list maintenance program in effect. Neither Snipes nor United has an affirmative duty to proffer expert witness testimony to prove that Snipes has such a program in place. To find otherwise would require the Defendant and Intervenor-Defendant to disprove Plaintiff's case rather than requiring that Plaintiff prove its case. Significantly, the Eleventh Circuit opinion upon which ACRU relies for this argument required that the plaintiff therein, *not the defendant*, provide evidence either by expert testimony or testimony of custom to establish the appropriate standard of care. *See Insurance Co. of the West v. Island Dream Homes, Inc.*, 679 F.3d 1295, 1298 (11th Cir. 2012).

lists and, in some cases, submitted the records they observed into evidence.[8]  ACRU introduced

into evidence citizen reports in support of its position that Snipes's list maintenance program is

inadequate.  According to ACRU, "[w]hen citizens discover defects in the voter rolls, how an

election official processes that information provided by helpful third parties is an important part

of its list maintenance."  ECF No. [237] at 30.

  With regard to information provided by third parties, such as citizens, Florida law

provides the following:

> If the department or supervisor receive information from sources other than those
> identified in subsections (2)-(5) that a registered voter is ineligible because he or
> she is deceased, adjudicated a convicted felon without having had his or her
> voting rights restored, does not meet the age requirement pursuant to s. 97.041, is
> not a United States citizen, is a fictitious person, or has listed a residence that is
> not his or her legal residence, the supervisor must adhere to the procedures set
> forth in subsection (7) prior to the removal of a registered voter's name from the
> statewide voter registration system.

Fla. Stat. § 98.075(6).  Subsection 7, in turn, requires that a supervisor receiving information

under subsection (6) "[n]otify the registered voter of his or her ineligibility by mail within 7 days

after receipt of notice or information" and then details the information that must be included

within the notice.  Fla. Stat. § 98.075(7).  The Court recognizes that information supplied by

citizens is valuable to the general list maintenance process under § 98.075(6). However, not all

information is relevant to the list maintenance process required by Section 8 of the NVRA – the

sole issue in this lawsuit.  The NVRA only requires "a general program that makes a reasonable

effort to remove the names of ineligible voters from the official lists of eligible voters *by reason

of (A) the death of the registrant; or (B) a change in the residence of the registrant*."  52 U.S.C. §

20507(a)(4) (emphasis added).  Thus, the Court considers ACRU's evidence of citizen

complaints in light of the NVRA's list-maintenance requirements.

---

[8] Many of these records were not admitted for the truth of the matter asserted but were instead admitted to
show the information these citizens provided to Snipes.  *See* ECF No. [230] at 174.

As evidence of such citizen complaints, ACRU presented the testimony of Richard DeNapoli ("Mr. DeNapoli"), an attorney who cross-referenced information available on the SSDI with voter information on the BCSEO's website and then analyzed data involving voters who died in 2011. *See* ECF No. [230] at 246. Upon reviewing a data set of 2,100 deceased individuals, he determined that 481 were still listed as active voters on the Broward County rolls as of May of 2012. *Id.* at 247. According to Mr. DeNapoli, within one month of presenting the data to Snipes, the voters were removed from the voter rolls. *Id.* at 247-248. Mr. DeNapoli's submission of information to BCSEO relates to the removal of a registered voter by reason of death – an area specifically covered by the NVRA's list-maintenance requirement. His testimony demonstrates that the BCSEO quickly responded to information about ineligible voters received from a third-party. The Court finds that such evidence supports Snipes's position that the BCSEO has an adequate list-maintenance program as required by the NVRA.

Similarly, ACRU presented the testimony of Richard Gabbay ("Mr. Gabbay"), a registered voter in Broward County Precinct F004. Mr. Gabbay researched whether registration records of voters in his retirement community were accurate. *See* ECF No. [231] at 98-99, 104. He obtained a list of voters in his precinct from the state and compared it to the social registry published for his retirement community to determine whether there were any inaccuracies in the voter rolls. *Id.* at 104-105. Based on this comparison, Mr. Gabbay compiled a list of 629 voters whose registration appeared to be inaccurate because the person no longer lived at the address or was deceased – both areas covered under the NVRA's list-maintenance requirement. *Id.* at 103-105. He then presented that list in an Excel spreadsheet to Snipes on October 6, 2015 pursuant to § 98.075(6). *Id.*

Two days later, Snipes personally responded to his request in writing as follows: "Mr. Gabbay: Thank you for forwarding the results of your research on the status of voters who are members of Precinct F004 in Coconut Creek. We will review your findings and take the appropriate steps under Florida law to update the voters' records as deemed necessary. Thank you again for the work that you have done on this project and for sharing your findings." *See* ECF No. [224-42] at 6. Thereafter, on December 1, 2015, Snipes sent Mr. Gabbay a letter informing him that all active voters had been sent a Vote-By-Mail mass mailing in October of 2015 – the same month that he reported his findings - and that if that piece of mail was returned as non-deliverable, a process of changing the voter's status would begin that would take approximately ninety days. *Id.* at 136-137. Two months later, on February 4, 2016, Snipes emailed Mr. Gabbay to inform him that she was in the process of rechecking the list he provided to determine how many records were changed as a result of the Vote-By-Mail mailing. *Id.* at 137. Thereafter, on March 21, 2016, Snipes mailed Mr. Gabbay the results of her research and list-maintenance activities in response to his submission, which revealed that 196 voters were removed from the active voter list due to returned mail from the mass mailing; four voters were removed from the list because they moved out of Broward County; three voters were removed because they had a duplicate registration; thirteen voters were removed because they were deceased; three voters remained on the active voter list but did not vote in the March of 2016 election; three voters remained on the active voter list and voted in the March of 2016 election; and the remaining 407 voters were already on the inactive voter list and were scheduled to be removed from the voter list in May of 2017. *Id.* at 139-140; ECF No. [224-42] at 5. Mary Hall ("Ms. Hall"), BCSEO's Director of Voter Services, and Snipes also testified that, in response to Mr. Gabbay's submission, Voter Services looked through the database and notified every voter

on that list via a written notice.[9]  *See* ECF No. [232] at 62-63, 212.  In addition, in February of

2017, Snipes forwarded a spreadsheet to Mr. Gabbay revealing the names of all voters removed

from the voter rolls within Mr. Gabbay's October of 2015 submission.[10]  *See* ECF No. [231] at

109. The Court finds that the evidence presented of Mr. Gabbay's submission of voter research

to the BCSEO demonstrates responsiveness to this citizen complaint. The BCSEO reviewed the

submitted information, mailings were sent out to the individuals on the list, and action was taken

to remove ineligible voters from the rolls based on the results of the research.

ACRU next presented the testimony of citizen William Skinner ("Mr. Skinner"), an

attorney who worked with another Broward County voter, Kirk Wolak ("Mr. Wolak"), to

analyze and compare voter data in New York and Florida.  Pursuant to Freedom of Information

Act requests, Mr. Skinner obtained copies of both the New York voter rolls and the Florida voter

rolls.  *See* ECF No. [230] at 161-162.  He then asked Mr. Wolak to create a file, using the New

York and Florida data, containing the first name, middle name, last name, and date of birth of the

person for both jurisdictions.  *Id.* at 164.  The purpose of this data was to locate voters who were

registered to vote in both states.  *Id.* at 167.  On August 11, 2016, Mr. Skinner provided this

information to three individuals at the BCSEO via email.[11]  *Id.* at 168; ECF No. [217-1].

According to Mr. Skinner, he did not receive a response to this email, so he sent a follow-up

email on September 21, 2016 to which he did not receive a response either.  *See* ECF No. [230]

at 170.  He then followed up a third time on February 22, 2017 via email and received a

---

[9] Ms. Hall testified that the BCSEO does not maintain copies of the notification cards sent to the voters. *See* ECF No. [232] at 75-76.

[10] ACRU's Proposed Findings of Fact and Conclusions of Law raise issues surrounding Snipes's lack of compliance with Mr. Gabbay's request to inspect list maintenance records pursuant to Section 8 of the NVRA.  However, the sole issue in this lawsuit is whether Snipes maintains a reasonable list-maintenance program under Section 8 of the NVRA – not whether Snipes provided a non-party with access to list-maintenance records.

[11] Mr. Skinner also submitted the information to Palm Beach County and Miami-Dade County as the data was not limited to Broward County.  *Id.* at 167-168.

telephone call from Dolly Gibson at the BCSEO who indicated that the spreadsheet files had not been received.  *Id.*  Mr. Skinner then emailed the attachments a second time to the BCSEO.  *Id.* Snipes emailed him on March 6, 2016 to state she did not receive the files, and Mr. Skinner testified he did not receive any further response from her office.  *Id.* at 170-171.

In this instance, the Court recognizes that Snipes failed to adequately respond to information of potential duplicate voters provided by Mr. Skinner. This certainly suggests a lack of diligence in investigating information received from a third-party source under Florida Statute § 98.075(6), (7).   However, Snipes's lack of responsiveness to information about potential duplicate voters is not probative of whether Snipes implemented a reasonable list-maintenance program *under Section 8 of the NVRA,* as it is neither relevant to a registrant's change of death or a change of address. Unlike the information supplied by Mr. DeNapoli or Mr. Gabbay that was directly tied to the NVRA's list-maintenance requirement, the possibility of duplicate registrations is not material to the Court's analysis. Both Mr. Skinner and Mr. Wolak recognized that there is no prohibition in Florida to be registered in two states at one time.  *See* ECF No. [230] at 141-142, 183.   Moreover, both witnesses agreed that Florida has many seasonal residents who reside in New York for part of the year and in Florida for another part of the year as well as residents from New York who retire in Florida.[12]  *Id.* at 141; 188-189.  While Florida law provides a mechanism to remove voters who register in another state, this provision of Florida law falls outside the scope of the NVRA's narrow list-maintenance focus.  *See* § II(C)(iv) *infra* (explaining the distinction between the NVRA's *authorization* to remove certain registered voters under Section 8(a)(3) versus the *mandatory requirement* to remove certain registered

---

[12] The Court also questions the accuracy of the data.  Both Mr. Wolak and Mr. Skinner recognized that they were limited in the data they were provided. When comparing the voter rolls of the two states, they did not have access to the last four digits of voter social security numbers, DMV numbers, or access to their signature cards to ensure that these were indeed duplicate voters.  *Id.* at 147; 197-198.

voters in Section 8(a)(4) pursuant to reasonable list-maintenance efforts).  While the submission

of this information would have required that Snipes take specific steps under Florida law,

Section 8(a)(4) of the NVRA – the provision at issue in this lawsuit - does not mandate the

purging of duplicate voters from the rolls.  Thus, Snipes's non-responsiveness to Mr. Skinner's

submission does not run afoul of the NVRA's list-maintenance requirements.

Additional evidence in the form of citizen complaints came from Mr. Wolak, who also

reviewed the Broward County voter roll for implausible birth years.  *See* ECF No. [230] at 111-

112.   Unlike the New York versus Florida duplicate voter submission, this data could be

evidence of the need to remove deceased voters from the rolls – a list maintenance requirement

under Section 8 of the NVRA.  Mr. Wolak testified that he sorted the data he obtained from an

official Voter Extract File and reduced the list to reflect all registrants having a date of birth of

101 years of age or older.  *Id.* at 121.  This list contained 3,045 entries.  Among these entries

were three registrants with dates of birth in 1886, 1889, and 1896 and two registrants who were

127 and 120 years old and listed as active voters.  *Id.* at 122.  Mr. Wolak did not independently

review his data to determine whether these individuals identified were living or deceased and had

no personal knowledge of such information.  *Id.* at 137-138.  Mr. Wolak also admitted he did not

know if any of these individuals' dates of birth were entered into the database incorrectly, did not

verify any of the dates of birth, and admitted that some voters who fill out their registration cards

by hand may have difficult-to-read handwriting leading to an incorrect date-of-birth entry.  *Id.* at

149-152.   But even if this evidence were based on personal knowledge or otherwise

corroborated, there was no evidence presented that Mr. Wolak submitted his spreadsheet to the

BCSEO and, if he did, what response he received.  *Id.* at 144-145.  Mr. Wolak only testified that

he provided this spreadsheet to Mr. Skinner; however, there was no evidence that Mr. Skinner

submitted this data to Snipes.  *Id.* at 119, 145.  Mr. Skinner only testified that he supplied evidence of the New York-Florida voter comparison to the BCSEO, making no mention of this other data set.  *Id.* at 168; ECF No. [217-1].  Mr. Skinner's email in which he provided the New York-Florida data to the BCSEO made no mention of the implausible voter-age spreadsheet that Mr. Wolak created.  *See* ECF No. [217-1]. As such, Mr. Wolak's spreadsheets regarding implausible voter age are not relevant to Snipes's responsiveness to citizens' complaints.  This is because there is no evidence that this data was ever submitted to Snipes for further action or verification.

Next, ACRU presented evidence from Logan Churchwell ("Mr. Churchwell"), an employee of the Public Interest Legal Foundation.  In March of 2017, Mr. Logan reviewed Broward County's voter registration list from May of 2016 and created a spreadsheet reflecting possible duplicate voter registrations, deceased voters, one underage voter, voters age 105 or older, and voters with commercial addresses.[13]  *Id.* at 201-205, 217.  Mr. Churchwell testified that ACRU's counsel instructed him to create this spreadsheet in March of 2017 in support of this lawsuit.  *Id.* at 213.  According to Mr. Churchwell, "in the mid-summer of 2016," he presented some form of the information contained within the spreadsheet to the BCSEO but received no response.  *Id.* at 216, 240.  Mr. Churchwell's unidentified submission of information occurred long before he compiled the spreadsheet, which was created in March of 2017.  Sometime after May of 2017, Mr. Churchwell spot checked his spreadsheets and found about two dozen of those voters still on the rolls.  *Id.* at 216-217.

---

[13] Mr. Churchwell additionally reviewed the spreadsheet that Mr. Wolak compiled and randomly searched the names of individuals on that list in the SSDI to determine whether they were deceased.  *See* ECF No. [230] at 206-207.  As stated, there was no evidence presented that Mr. Wolak's list was supplied to the BCSEO.

The vast majority of Mr. Churchwell's spreadsheets pertained to list maintenance falling outside the purview of the NVRA's list-maintenance requirement, such as duplicate voter registrations, underage voters, and voters residing at a commercial address. The Court emphasizes that its focus remains on the list maintenance required under Section 8 of the NVRA – removal of citizens ineligible to vote by reason of death or change of address. As such, the relevant portions of Mr. Churchwell's data are limited to deceased voters and those of a voting age of 105 or older to the extent those voters may be deceased. Based on Mr. Churchwell's testimony, however, the Court is unable to discern whether this specific subset of data was ever provided to the BCSEO as Mr. Churchwell never specified exactly what information he provided in the summer of 2016. Further, Mr. Churchwell testified that he completed his analysis in March of 2017 – approximately nine months after he submitted data to the BCSEO. Similarly, Mr. Churchwell's unclear testimony makes it impossible to determine whether the two dozen individuals he found on the voter rolls during his spot checking after May of 2017 were within the category of deceased voters or voters of an implausible age. *Id.* at 217. Without more precise testimony, the Court cannot determine whether Snipes received information from Mr. Churchwell about deceased voters or those of an implausible age, and if so, whether Snipes removed any or all such voters from the rolls in response to Mr. Churchwell's submission. For these reasons, the Court concludes that this evidence fails to support ACRU's position.

The final witness who testified about citizen complaints was Gregg Prentice. Mr. Prentice testified that he gave Snipes's office certain data in which he identified 1,200 voters who listed a UPS store as their address. *See* ECF No. [231] at 149. He submitted this information in December of 2013 but did not receive a written response from Snipes. *Id.* at 153. Rather, he received a telephone call from Snipes in May of 2014 in which he was informed that a

letter had been mailed advising these voters that, if they did not respond within thirty days, their address would be changed to the BCSEO's address. *Id.* at 153-154. On cross-examination, Mr. Prentice admitted he did not know if any of those identified voters were homeless, lived in a mobile home or boat, or were military personnel living overseas receiving mail at the UPS location. *Id.* at 158-160. He likewise did not know whether any of those voters were legal residents of Broward County without a permanent residence, and he was not aware of the responses Snipes received from the mailer or what procedures Snipes employed when changing their addresses from the UPS store to the BCSEO. *Id.* at 161-163, 167. Mr. Prentice also assisted Mr. Gabbay in presenting his submission of 629 voters to Snipes, but testified that he did not personally submit the information. *Id.* at 155. He recalled receiving a summary sheet from Snipes in response to Mr. Gabbay's submission. *Id.* at 175-176. Finally, Mr. Prentice was involved in a third submission to the BCSEO involving 204 active registrants who no longer lived in the Wynmoor retirement community, Precinct 004. *Id.* at 155. Mr. Prentice agreed that Snipes responded to this submission by providing an email containing five categories along with detailed spreadsheets with each registrant color coded. *Id.* at 175.

Looking at Mr. Prentice's testimony in light of the NVRA's list-maintenance requirements, the Court concludes that the first submission - a voter's use of a non-residential address – is not relevant. A voter's listing of a UPS store as his or her address does not make the voter ineligible to vote *by reason of death or change of address*. On the other hand, the Court finds that the two sets of data that Mr. Gabbay submitted in conjunction with Mr. Prentice involving potential deceased voters or voters who changed their address are indeed relevant to the NVRA's list-maintenance requirement. Mr. Prentice's testimony, however, establishes that Snipes investigated both submissions, responded to Mr. Gabbay and Mr. Prentice, and explained

the actions taken on the voter rolls.  Thus, the testimony establishes that Snipes was indeed undertaking reasonable list-maintenance efforts required by the NVRA.

iv.  Snipes's Admissions of List-Maintenance Tools Not Used

As its fourth bundle of evidence, ACRU argues that Snipes and her staff made numerous admissions reflecting a lack of list-maintenance activities, such as lack of knowledge about all of the databases used by the state FVRS system; failing to use multiple list-maintenance tools available to her, such as jury recusal forms, out-of-state registration information, and the DAVID database; failing to process information received from citizen complaints, and failing to monitor the registration rate within Broward County.  The Court will address each of these admissions in turn.

ACRU first argues that the BCSEO is not competent in the use of the state FVRS system because Jorge Nunez ("Mr. Nunez"), BCSEO's Information Technology Director who maintains the Broward County voter registration database, could not identify the specific databases used in the DOS' FVRS system.  *See* ECF No. [237] at 37.   The Court disagrees with this characterization of Mr. Nunez's testimony.  Mr. Nunez testified that the VR System, which is the BCSEO's portal, interfaces directly with the FVRS, the state's portal, and allows the BCSEO to receive transactions from the state and to, in turn, report transactions to the state.  *See* ECF No. [233] at 10, 49, 90.  In response to the Court's inquiries, Mr. Nunez explained that he is not familiar with the specific databases or technology the DOS uses in its FVRS database or how the DOS obtains the data it inputs into FVRS.  *Id.* at 90.  The Court finds nothing extraordinary about Mr. Nunez's testimony on the subject.  He is not an employee of the DOS who should be familiar with the databases used at the state level and incorporated into the FVRS – the state's portal.  Rather, he is a Broward County employee who demonstrated familiarity with and

knowledge of the VR System, the BCSEO's portal.   The Court finds that Mr. Nunez's unfamiliarity with the inner workings of the FVRS at the DOS level is not evidence of any failure or inability to use the information DOS supplies through the FVRS to the BCSEO's VR System.  To the contrary, Mr. Nunez provided detailed testimony, further discussed below, as to how the information received from the DOS through the FVRS is used on a daily basis at the BCSEO.

Next, ACRU argues that there were multiple list maintenance tools that Snipes could have used but admittedly failed to use, including jury recusal forms, the DAVID database,[14] and out-of-state registration information.  Starting with recusal forms, the Court finds that Florida law does not require a SOE to use such forms as part of its list-maintenance tools.  Section 98.065(4)(a) does not impose an affirmative duty on election officials to seek out jury notices signed by a voter and returned to the courts.  Rather, the statute authorizes a supervisor to change a voter's registration records to reflect a new address and requires the mailing of an address change notice "*if* the supervisor *receives* change-of-address information . . . from jury notices signed by the voter and returned to the courts."   Fla. Stat. § 98.065(4)(a) (emphasis added). Significantly, earlier this year, the Florida Legislature attempted to enact House Bill No. 709, which would amend § 98.065 and require that supervisors enter into agreements with the local clerk of court to receive monthly change-of-address information and a list of potential jurors who identified themselves as aliens.  The proposed legislation would have further required that the supervisor compare this information with the statewide voter registration system.  However, on March 10, 2018, the legislation was indefinitely postponed and withdrawn from consideration. The Florida Legislature had the opportunity to impose such a requirement on its own supervisors

---

[14] The Court has already addressed the use of the DAVID database when discussing Mr. Gessler's opinions *supra*.

and declined to do so.  Thus, not only does the text of § 98.065(4)(a) demonstrate that Florida does not require that supervisors use jury recusal forms, but withdrawn House Bill No. 709 is a further indicator that this is not a required list-maintenance tool under Florida law.  When considering whether Snipes has implemented a reasonable list-maintenance program under Section 8 of the NVRA, the Court rejects ACRU's argument that the failure to use jury recusal forms is unreasonable.

Similarly, the Court finds that Section 8 of the NVRA does not require Snipes to review duplicate data in or out of the state as ACRU suggests.  In making this argument, ACRU attempts to shift a duty that Florida has delegated to the DOS to the individual county supervisors.  Florida Statute § 98.075(2) provides that the DOS "shall identify those voters who are registered more than once or those applicants whose registration applications would result in duplicate registrations."  Notably, the statute does not impose any similar requirement to search for duplicate registrations on the individual SOEs.  In support of its argument, ACRU directs the Court to Florida Statute § 98.045, which authorizes the removal of a voter from the statewide registration system *if* "information [is] *received* by a voter registration official from an election official in another state indicating that a registered voter in this state has registered in that other state." Fla. Stat. ¶ 98.045(2)(b) (emphasis added).  Florida law considers the receipt of such information to be "a written request from the voter to have the voter's name removed from the statewide voter registration system." *Id.* Significantly, Section 8(a)(3) of the NVRA authorizes, but does not require, the removal of a registrant from the voter rolls "at the request of a registrant." 52 U.S.C. § 20507(a)(3).  By deeming voter registration in another state as the equivalent to the voter's written request for removal, Florida law authorizes voter removal in conformity with Section 8(a)(3) of the NVRA.  Much like this provision of the NVRA, which

"places no affirmative obligations on states (or voting commissions) to remove voters from the rolls," *ACRU*, 872 F3d at 182, Florida law places no affirmative obligation on SOEs to seek out voter registration information in other states for the purpose of removing voters. *Id.* at 182 ("By its terms, the mandatory language in Section 8(a)(4) only applies to registrants who have died or moved away. [Voter r]emoval . . . [authorized by Section 8(a)(3)] is not included on this list of mandatory purging."). Authorizing the removal of a registrant from the voter rolls upon the receipt of certain information, such as the voter's written request for removal, is not the same as imposing a list-maintenance duty on SOEs to seek out such information for the purpose of removing the voter. "[T]he NVRA was intended as a shield to protect the right to vote, not as a sword to pierce it." *Id.* And with that principle in mind, the Court declines to impose a requirement on Snipes to seek out voter registrations in other states as part of a mandatory voter purge program. This is particularly so given that Section 8(a)(3) of the NVRA allows, but does not require, voter removal upon the written request of the voter.

Finally, ACRU argues that Snipes admittedly did not process information obtained from citizen complaints and did not monitor Broward County's registration rates. The Court has already addressed whether the NVRA's list-maintenance requirements necessitated any response to citizen complaints or follow up by Snipes, finding that Snipes appropriately followed up on information provided about deceased voters, voters of an implausible age, and voters whose address changed. As to ACRU's registration rates proffered by Dr. Camarota and relied upon by Mr. Gessler, the Court has already rejected such evidence as set forth above. Thus, the Court finds that neither of these constitutes an admission of list maintenance failures.[15]

---

[15] The Court takes notice that ACRU's Proposed Findings of Fact and Conclusions of Law contain an extensive section detailing Snipes's purported discovery violations. Indeed, this appears to be a new sixth bundle of evidence. The Court has already addressed Snipes's belated production of the Voter Services Procedure Manual during trial. Not only is there no procedural prejudice in that Mr. Gessler had time to

v.   List-Maintenance Certifications

As its final bundle of evidence, ACRU points to Snipes's records to prove unreasonable list-maintenance practices, specifically referring to the certifications provided to the DOS.[16] Florida law requires each SOE to prepare and submit Certifications of List Maintenance activities.  Fla. Stat. § 98.065(6).  These certifications consist of two pages and are filed with the DOS no later than July 31 for the first six-month period of the year and January 31 for the second six-month period of the preceding year.  *Id.*  Their purpose is to allow the DOS to review the list-maintenance activity conducted by each SOE and determine whether that activity is adequate under the statute. *Id.*

In accordance with these requirements, Mr. Nunez prepares twice-yearly certifications summarizing BCSEO's list maintenance activities, which Snipes signs, certifies, and provides to the DOS.   *See* ECF Nos. [217-5] and [217-6]. The two types of certifications include: (1) "Certification of Address List Maintenance Activities" and (2) "Certification of Eligibility Records Maintenance."  *Id.*  The certifications reflect numbers from the VR System, revealing the number of address confirmations, change notices, and final notices mailed out during that time period as well as the number of voters changed from inactive to ineligible status, and the number of registrants deemed ineligible to vote because of death, felony conviction, mental incapacity, or lack of citizenship.  *Id.*; *see also* ECF No. [233] at 34.

_____

review the written manual and the opportunity to opine on its contents, but there is also no substantive prejudice as the Court has not given the manual any significance in its analysis.  Similarly, ACRU argues that Snipes did not properly disclose Sharon Fleming's job title, which led to its decision not to depose her during discovery.  Again, the Court allowed ACRU to depose Ms. Fleming during trial in advance of her testimony, curing any potential prejudice.  With that said, ACRU also raises miscellaneous arguments about other discovery issues in its Proposed Findings of Fact and Conclusions of Law – issues that were not argued to prove Snipes implemented an unreasonable list-maintenance program.  For that reason, the Court declines to address these other miscellaneous alleged discovery violations.

[16] Although ACRU raises additional arguments within this bundle of evidence, such as disputing Snipes and United's evidence pertaining to training, policies and procedures, and list-maintenance practices for the removal of ineligible voters, these arguments overlap with other evidence presented at trial.  For that reason, the Court's findings with regard to such evidence are addressed in other sections of this opinion.

During the course of this lawsuit, there is evidence that Snipes's original certifications submitted to the DOS were amended. *Compare* ECF No. [217-5] *with* [217-6]. Snipes originally produced thirteen sets of biannual certifications spanning from 2009 through mid-2016. *See* ECF No. [217-5]. Toward the end of the discovery period, Snipes then amended five of the thirteen Certification of Address List Maintenance Activities forms for the periods ending in December of 2011, December of 2012, December of 2013, June of 2014, and December of 2015. *See* ECF No. [217-6]. ACRU concedes that "[f]rom the original certifications to the amended versions there were no changes to the numbers reported." *See* ECF No. [237] at 56.

In addition to the numbers, the certifications also feature three checkboxes, which correspond to the three types of list-maintenance mailings outlined in § 98.065(2). The three checkboxes are labelled (1) "Change-of-address information from U.S. Postal Service/NCOA" corresponding to § 98.065(2)(a); (2) "Mass (nonforwardable) mailing to all registered voters in county" corresponding to § 98.065(2)(b); and (3) "Targeted address confirmation request (nonforwardable) mailing to registered voters who have not voted or requested an update to their records within the last 2 years" corresponding to § 98.065(2)(c). Five of the thirteen biannual certifications were amended to check off one or more of these categories omitted from the original certifications. *See* ECF No. [217-6]. The following changes were made:

1. The December of 2011 certification was amended from certifying NCOA and targeted mail list-maintenance activities to add mass mailing list maintenance. *Compare* ECF No. [217-5] at 22 *with* ECF No. [217-6] at 8.

2. The December of 2012 certification originally failed to check off any specific method of list-maintenance mailings. Despite this, there was clearly ongoing list maintenance occurring as the following were mailed to voters: 572 address confirmation notices,

2,704 address change notices, 4,996 final address confirmation notices, 21 registered voters who responded to final address confirmation notices, one registered voter placed on the inactive list, and 17,091 voters removed from the statewide voter registration system.  *See* ECF No. [217-5] at 18.  The amended certifications were modified to specify that mass mailings and targeted mailings were used during this timeframe.  *Compare* ECF No. [217-5] at 18 *with* ECF No. [217-6] at 6.

3.  The December of 2013 certification similarly did not check off any specific method of list-maintenance mailings.  Once again, list-maintenance mailings were clearly ongoing as the numbers reflect the following: 5,043 address confirmation notices, 31,689 address change notices, 24,763 final address confirmation notices, 5,772 registered voters who responded to final address confirmation notices, 31,885 registered voters placed on the inactive list, and zero voters removed from the statewide voter registration system.  *See* ECF No. [217-5] at 18.  In the amended version, Snipes certified that she used all three forms of list-maintenance mailings during this time period.

4.  The June of 2014 certification reflected that a targeted mailing was completed during this timeframe while the amended certification added that a mass mailing was also completed.  *Compare* ECF No. [217-5] at 9 *with* ECF No. [217-6] at 12.

5.  The December of 2015 certification originally stated that an NCOA mailing was completed while the amended certification added that a mass mailing and a targeted mailing were completed.  *Compare* ECF No. [217-5] at 6 *with* ECF No. [217-6] at 4.

While five of the thirteen certifications were amended subsequent to the lawsuit being filed, the number of list-maintenance documents mailed out and the actions taken with respect to

voters remained identical in the amended version.  The only modification was an amendment as to the mailing method employed during the specified time period – the type of box checked off at the top of the form.  It is apparent to the Court that omissions in the original certifications came to light as a result of this litigation.  A more careful review of the certifications prior to their submission would have prevented the need for amendment.  The sole purpose of providing this information to the DOS is to report accurate information about list-maintenance. As such, the Court finds nothing improper about an amendment to a certification upon the discovery of an error.   To find otherwise would deter SOEs from correcting errors and would result in the submission of inaccurate information to the state.  This is especially true in this case when the numbers were not modified – only the boxes checked off at the top.  For example, it is clear to the Court that the BCSEO was performing significant list-maintenance mailings during the period reported in the December of 2012 and December of 2013 certifications.  The former indicates that 17,091 voters were removed from the rolls while the latter indicates that 31,885 were placed on the inactive list, and both reflect that thousands of notices were mailed.  Despite the obviousness of ongoing list-maintenance mailings, none of the boxes on the form were checked off.  The Court finds nothing improper about Snipes's amendment of the certifications to correct omissions that went unnoticed until they were pointed out during the pendency of this lawsuit.  Scrutiny of records during litigation often brings clerical errors to light.

Even if the Court disregarded the amended certifications and reviewed only the original ones in conjunction with other evidence in the record, such as invoices from Commercial Printers, Inc. ("Commercial Printers"), a third-party vendor that performs printing and mailing for BCSEO's list-maintenance program, the result remains the same.[17]  Florida law only requires

---

[17]  The record also contains abundant Commercial Printers invoices documenting the list-maintenance mailings identified in the certifications for the years 2013, 2014, 2015.  *See e.g.* ECF Nos.[217-13],  [221-15] - [221-22],

that, once every two years, Snipes complete one of three forms of list-maintenance mailings.  At a minimum, the Court concludes that the BCSEO completed NCOA mailings in 2009, 2011, 2013, and 2015.  The original June of 2009, December of 2011, and December of 2015 certifications specify that an NCOA mailing was completed during this frame.  *See* ECF No. [217-5] at 6, 22, and 27.  In addition, the Commercial Printers invoices in the record reflect that such mailings were completed in May of 2013 and May of 2015.  *See* ECF No. [217-13].  Regardless of whether Snipes amended the certifications, the Court finds there is sufficient evidence from the invoices and original certifications, in addition to the testimony discussed below, demonstrating that the BCSEO completed biennial NCOA list-maintenance processes as required by Florida law.

### b.  Snipes and United's Evidence

At trial, Snipes and United presented evidence to demonstrate the reasonableness of the BCSEO list-maintenance program and its compliance with Florida law and Section 8 of the NVRA.  In particular, they presented evidence of employee training, their use of the VR system, including the VR Manual, and their list-maintenance policies and procedures followed to update voter rolls when a voter becomes ineligible by reason of an address change, death, felony conviction, mental incapacity, lack of citizenship, and duplicate registration.

### i.  BSCEO Training

Snipes and several other individuals at the BCSEO are responsible for carrying out voter registration and list-maintenance duties, including Mr. Nunez, Ms. Hall, and Sharon Fleming ("Ms. Fleming"), the Voter Services Coordinator.  *See* ECF No. [233] at 8-9; ECF No. [232] at 15, 166-167.  In addition, Snipes has a staff of approximately seventeen to eighteen employees,

---

[221-27] – [221-54].  Export files, including NCOA export files, exchanged with Commercial Printers are also in the record.  *See* ECF Nos. [221-11] – [221-14] and [221-23] – [221-26].

supervised by Ms. Fleming, who work on list-maintenance activities. *See* ECF No. [232] at 166, 167-68. With regard to training, all directors at the BCSEO have attended and graduated from the Florida Certified Election Professional program and thirteen individuals in the office have a Master Certification for Election Professionals, including Snipes. *See* ECF No. [232] at 51-52; 112-115. Snipes has also completed the National Certification for Election Officials and has taught the Fundamentals of Leadership course for the Florida Certified Election Professional program. *Id.* at 113. Additionally, the data processing supervisor on Fleming's staff conducts ongoing in-person training of the processing clerks, teaching them how to process a new registration, an address change, a name change, a party change; how to look up a voter; the process for removal of registered voters; and the procedure used for address confirmation notices. *Id.* at 168, 183-185. The training follows processes found in the VR Manual. *Id.* at 168. Snipes also holds retreats three to four times a year with her staff for training purposes to discuss voter registration, list maintenance, and outreach. *Id.* at 51-52.

ii. The VR System

Similar to other Florida counties, Broward County uses the VR System, a voter registration database system developed by an outside vendor with which BCSEO has a contract. *See* ECF No. [232] at 28; ECF No. [233] at 89-90. The VR System interfaces directly with the FVRS, the statewide voter registration database. *See* ECF No. [233] at 89-90. The VR System contains the BCSEO's list-maintenance policies and procedures. *See* ECF No. [232] at 17-18, 168, 185. Every employee in the Department of Voter Services who works on list-maintenance activities has access to the system, including the online policies and procedures. *See* ECF No. [232] at 23, 185, 195-196. In addition, the VR System has an online help desk to answer any questions on a specific process involving voter registration and processing of information. *See*

ECF No. [233] at 11.  The help system is word searchable and contains built-in topics and indices.  *Id.*  The VR System also contains training modules and a training log.  *See* ECF No. [232] at 23, 45.

    iii.   <u>Procedures Relating to Change of Address</u>

Every two years during odd-numbered years, the BCSEO utilizes information received from the USPS NCOA program as part of its list-maintenance activities.  *See* ECF No. [232] at 148; ECF No. [233] at 89.  To complete this process, BCSEO contracts with Commercial Printers.  *See* ECF No. [232] at 92.  Commercial Printers, a certified NCOA-Link USPS provider, has been the vendor for the BCSEO before Snipes became the SOE.  *Id.* at 150; ECF No. [233] at 20.  To generate a mailing to a voter, Mr. Nunez testified that he first exports files through the VR System containing relevant information about all active voters in Broward County.  *See* ECF No. [233] at 21-24.  Following its receipt of the export file, Commercial Printers then checks each voter against the NCOA database and sends a file to Mr. Nunez containing the forwarding address information for any NCOA matches located.  *Id.*  With this information, Mr. Nunez then converts the file into a Microsoft Excel format and uploads it into the VR System.  *Id.*  Voter Services next reviews each change-of-address record in the queue and flags the record for the appropriate action to be taken, such as sending an address confirmation notice, a final notice, a voter identification card, or other mailings.  *Id.* Once this process is complete, Mr. Nunez runs a report and reviews it to ensure that no records were missed.  *Id.*  The IT Department then exports the information and prepares it so that Commercial Printers can send out the mailings flagged by Voter Services.  *Id.*  As of the date of the trial, the BCSEO last updated its voter rolls using the NCOA program data in May of 2017.  *Id.* at 29-30; ECF No. [232] at 72.

Among the mailings sent by Commercial Printers is the address confirmation notice, which seeks to confirm whether a voter is at a certain address. *See* ECF No. [232] at 207. If the address confirmation notice is received as undeliverable, the BCSEO will process the notice according to the information on the USPS yellow sticker and prepare an information card or a final notice. *Id.* The BCSEO usually makes three attempts to verify a voter's address before the voter is moved from "active" to "inactive" status. *Id.* at 208. If the voter does not respond to the final notice within thirty days or the final notice is returned as undeliverable, the voter is moved to "inactive" status. *Id.* Voters who do not respond to final notices will be removed from the voter rolls after remaining inactive for two general elections. *Id.* at 208-209.

In addition, the BCSEO uses mass mailings as part of its list-maintenance process. *See* ECF No. [232] at 57-58, 173. In 2013 and 2015, it completed mass mailings to more than one million voters in Broward County, sending them voter identification cards via forwardable first-class mail and Vote By Mail forms via nonforwardable first-class mail. [18] *Id.* at 20, 57-58; ECF No. [233] at 30. If the mailings are returned as non-deliverable, the BCSEO will send out an initial request card, followed by a change-of-address notice, and then a final notice. *See* ECF No. [232] at 57-58. The BCSEO also sends out change-of-address information identified from returned nonforwardable return-if-undeliverable address confirmation requests mailed to all

---

[18] During trial, Mr. Gessler testified that compliance with this statute requires a mailing to all active and inactive voters. *See* ECF No. [229] at 222-223. However, Mr. Gessler also testified that he was not familiar with Rule 1S-2.041 of the Florida Administrative Code. *Id.* at 240. Rule 1S-2.041 "provides procedures to maintain current and accurate addresses of legal residence for registered voters, eliminate duplicate registration records for the same voter, and identify and remove ineligible registered voters." FAC Rule 1S-2.041(1). Subsection (e)(1) provides that "[o]nce a voter has been made inactive through this subsection, third-party address changes processes shall not apply to change an inactive voter's legal residence until he or she is restored to active status." An "inactive voter" is defined as "a registered voter whose registration record has been placed on inactive status after procedures in Section 98.065(4)(c), F.S., and this rule were followed." Thus, Rule 1S-2.041, which provides the procedures for list maintenance, does not require that a SOE mail further change-of-address notices to an inactive voter once he or she is placed in "inactive" status.

registered voters who have not voted in the last two years and who did not request that their registration records be updated during that time. *Id.* at 59. This was most recently done in 2015. *Id.* In addition to the above procedures, the Florida DOE also provides DHSMV data to the BCSEO regarding voter change of address. *Id.* at 34.

The BCSEO does not remove a registered voter from the rolls by reason of change of address unless the registrant confirms in writing that the registrant has changed residence to a place outside of Broward County or has failed to respond to a final notice and has not voted or appeared to vote in the last two general elections for federal office occurring after the notice is mailed. As a result of its list-maintenance activities, between January 1, 2014 and December 31, 2016, the BCSEO removed 85,484 registrants who moved out of the county, 2,739 registrants who moved out of the county and requested a change of address, 1,886 voters who requested to be removed, and 97,941 voters whose mail was returned and remained inactive for two general elections. *See* ECF No. [221-3] at 5770.

The evidence presented at trial reflects that the BCSEO uses the following three mailings to identify, update, and remove, if needed, voters from the Broward County voter rolls due to change of residence: (1) notifications to voters who have filed a forwarding address with USPS; (2) mass mailings related to voting matters to registered voters; and (3) targeted mailings to registered voters who have not voted for a certain period of time. As explained above, the Court questions whether this third procedure has been effectively implemented given the number of registrants who did not vote in 2012 and 2014 when compared to the number of the targeted mailings and the number of individuals who requested an address change. Nonetheless, Florida law only requires the implementation of one of these three methods every other year. As such,

the weight of the evidence supports the finding that the BCSEO effectively implemented the first two methods.

    iv.   <u>Procedures Related to Deceased Voters</u>

Florida's DOS obtains reports of deceased individuals from the Florida Health Department and from SSDI. *See* ECF No. [233] at 150. The DOS, in turn, forwards that information to the counties, including the BCSEO, after identifying individuals who become deceased both in and out of Florida. *Id.* Deceased data is transmitted through the VR System and the BCSEO uses that information to remove deceased voters from the voter rolls on a daily basis. *See* ECF No. [232] at 200. When the DOS notifies the BCSEO that a voter is deceased, the office inputs the information into the database, matches the date of birth, address, and last four digits of the social security number, and then removes the deceased voter from the rolls. *See* ECF No. [232] at 65-66. If there is any irregularity in the decedent's information, the BCSEO sends the family a letter requesting the individual's death certificate. *Id.* If it receives information that a voter is deceased from sources other than the DOS, the BCSEO makes efforts to confirm the death and obtain a copy of the death certificate before removing the registrant from the voter rolls. *Id.* If the BCSEO is unable to obtain a copy of the death certificate, it checks with the state and, if the death still cannot be confirmed, it sends a death notice to the registrant's last-known address to verify whether the voter is indeed deceased prior to removal. *Id.* at 168-169. Between January 1, 2014 and December 31, 2016, Snipes removed 37,095 registrants from Broward County's voter rolls that were determined to be deceased. *See* ECF No. [221-3] at 5770.

49

v.  Procedures Related to Convicted Felons

Similarly, on a daily basis, BCSEO receives an electronic list of individuals with a felony conviction from the DOS through the VR System.  *See* ECF No. [232] at 123, 201.  The BCSEO then mails a letter to each voter on that list, giving them thirty days to reply by either confirming or contesting the information contained in the notice.  *Id.* at 125.  If no reply is received within thirty days, the BCSEO mails a second notice.  *Id.*  If no reply is received after the second notice, it then publishes a notice in the newspaper and waits another thirty days for a reply.  *Id.*  If no such reply is received, the voter is then removed from the voter rolls.  *Id.*  At the end of every month, the BCSEO removes all voters who are ineligible to vote due to a felony conviction pursuant to the above ninety-day verification period.  *Id.* at 201.  Between January 1, 2014 and December 31, 2016, Snipes removed 5,102 registrants from Broward County's voter rolls that were determined to have a felony conviction.  *See* ECF No. [221-3] at 5770.

vi.  Procedures Related to Non-Citizens

Like the national voter registration form, Florida's voter registration form requires applicants to affirm their citizenship under penalty of perjury.  *See* ECF No. [232] at 35-36.  Occasionally, the U.S. Department of Homeland Security sends individuals applying for citizenship to the BCSEO to obtain documentation indicating whether they have registered to vote as non-citizens.  *Id.* at 90-91.  Those non-citizens who registered to vote are then removed from the voter rolls.  *Id.*  Between January 1, 2014 and December 31, 2016, Snipes removed four non-citizen registrants from Broward County's voter rolls. *See* ECF No. [221-3] at 5770.

vii.  Procedures Related to Mental Incapacity

Florida's DOS regularly sends information to the counties about individuals who are ineligible to vote by reason of mental incapacity.  *See* ECF No. [232] at 190, 202.  Upon receipt

of such information from the state, the BCSEO follows the same ninety-day verification procedure it follows for convicted felons. *Id.* Once the verification process is complete, the BCSEO then removes the voter from its rolls. *Id.* at 203. Between January 1, 2014 and December 31, 2016, Snipes removed 238 registrants from Broward County's voter rolls that were determined to be mentally incapacitated. *See* ECF No. [221-3] at 5770.

viii.   Procedures Related to Duplicate Registrations

On a daily basis, the BCSEO receives notifications of potential duplicate registrations from the DOS via FVRS and, upon receipt of such information, it consolidates the registrations so that only one remains active. *See* ECF No. [232] at 66-67. The BCSEO determines the correct county of residence by looking at the most recent update to the voter's record. *Id.* Between January 1, 2014 and December 31, 2016, Snipes removed 5,225 voters registered elsewhere and 4,407 duplicate registrants. *See* ECF No. [221-3] at 5770.

ix.   Voter Removal

On a regular basis, Mr. Nunez runs an "inactive process" within the VR System to move those voters who have been flagged as potentially ineligible to vote from "active" status to "inactive" status. *See* ECF No. [233] at 13-14. An "inactive" voter is one who has not maintained contact with the BCSEO by either not voting or not responding to its notices. *See* ECF No. [232] at 170. Similarly, Mr. Nunez runs an "ineligible process" in the VR System, which moves "inactive" voters who are no longer eligible to vote in Broward County to "ineligible" status.[19] *See* ECF No. [233] at 13-14. The voter is officially removed from the voter rolls and must fill out a new voter registration form to be re-added to the rolls. *Id.* at 19. To complete the "ineligible" process, Mr. Nunez goes into the VR System and uses the date of the

---

[19] However, ninety days prior to a primary or general election for federal office, BCSEO does not remove any registered voters from the voter rolls. *See* ECF No. [233] at 24.

penultimate general election to identify those inactive voters who have not voted during the last two general elections.  *Id.* at 16.

At trial, United introduced a summary of all voters moved to "ineligible" status along with the basis for such ineligibility, revealing the number of voters removed from the voter rolls based on the loss of civil rights, death, mental incapacitation, or other ineligible status.  *Id.* at 19; *see* ECF No. [221-1]. Between January 1, 2014 and December 31, 2016, the BCSEO removed 239,868 registrants from Broward County's voter rolls.  *See* ECF No. [221-3] at 5770; ECF No. [233] at 151-153.  Between January 7, 2015 and January 10, 2017, the BCSEO removed 192,157 registered voters from Broward County's voter rolls.  *See* ECF No. [233] at 142.  Thus, approximately 16% of all registered voters were removed during this two-year period.  In addition, during this same time period, 148,645 registered voters in Broward County changed their address from one location within Broward County to a new address within the same county, which is evidence of additional list maintenance.  *Id.* at 145.

## III. ANALYSIS

Throughout this Order, the Court has focused on the one issue properly before it: whether Snipes, as the SOE for Broward County, conducts a general program that makes a reasonable effort to remove the names of ineligible voters from its voter rolls *by reason of (1) the registrant's death or (2) a change in residence of the registrant*.  Section 8 of the NVRA does not define what constitutes a "reasonable effort."  ACRU suggests that "accuracy and currency of the voter rolls [should] dictate the degree of list maintenance activity that should be reasonably undertaken."  ECF No. [237] at 76.  It proposes that the required degree of list-maintenance activity should be lower if a jurisdiction "has a relatively static population, with an ordinary registration rate, low transience, and there is no evidence of problems or inaccuracies on

the rolls," but a heightened list-maintenance standard should apply if there is "an implausible registration rate, together with evidence of inaccurate and non-current rolls."  *Id.*  Although ACRU advocates for a jurisdiction-by-jurisdiction standard of reasonableness, it also argues that "the NVRA applies nationally [and therefore], it creates a national standard of care."  *Id.* at 77. These two concepts are in conflict.

The Court recognizes that the NVRA has nationwide application, and for that reason, it declines to apply a subjective approach that would vary widely from jurisdiction to jurisdiction. Applying such an approach would hold election officials to widely different standards under the same federal statute.  For example, a SOE in a rural county with a static population in North Florida would be held to a lower list-maintenance standard than a SOE on the Gulf Coast with a high number of seasonal residents or a SOE in a county with a large transient population of college students, such as Alachua County.  Such a fluid, subjective, county-by-county test would leave local election officials guessing as to what constitutes reasonable list-maintenance efforts, providing no uniformity or predictability among SOEs within the same state.

Equally problematic is ACRU's suggestion that an implausible registration rate and evidence of inaccurate and non-current rolls should require a higher list-maintenance standard. As evidenced by this case, there may not be a consensus about a jurisdiction's registration rate, what constitutes an "implausible" registration rate, or whether the voter rolls are accurate, leading to uncertainty about the applicable list-maintenance standard.  Further, under this standard, the same county's list-maintenance practices could theoretically evolve depending upon current registration rates.  For example, if a county appeared to have an "implausible" registration rate at one point in time, it would be subject to a more stringent list-maintenance test. But, if the same county's registration rate lowered to a "plausible" level, then the same county

would be subject to a lower list-maintenance standard.  The Court finds that ACRU's proposed definition of "reasonable efforts" is too subjective and would lead to an arbitrary, non-uniform, unworkable, and unpredictable application.   The proposed definition would thwart the Congressional intent of Section 8 of the NVRA.

Snipes, in turn, suggests a standard by which (1) compliance with the NVRA's "safe harbor" provision would constitute sufficient evidence of list-maintenance efforts for address changes; and (2) use of deceased voter data would constitute sufficient evidence for purposes of removing deceased voters.  *See* ECF No. [238] at 10-11.  United suggests a similar test.  *See* ECF No. [236] at 45.  With regard to the "safe harbor," "Congress provided states with an example of a procedure for identifying and removing voters who had changed residence that would comply with the NVRA's mandates and accompanying constraints."  *Philip Randolph Inst. v. Husted*, 838 F.3d 699, 707 (6th Cir. 2016), *cert. granted,* 137 S. Ct. 2188 (2017)).  To avail oneself of this "safe harbor," a program must be established under which "voters who appear to have moved based on information contained in the NCOA database are sent subsection (d) confirmation notices." *Id.*  ACRU argues that the Court should "reject the notion that the NVRA creates a 'safe harbor' whereby all of an election official's list maintenance obligations can be satisfied by doing one of the two described mailings" because it does not address registrants who have died and because such an interpretation "strips protections for voters who are wrongfully removed from the rolls."  *See* ECF No. [237] at 78-79.  Addressing ACRU's first point, the Court agrees that the "safe harbor" provision does not address list-maintenance directed at deceased voters.  Neither Snipes nor United suggests that compliance with this provision alone renders the list-maintenance processes in compliance with Section 8 of the NVRA.  They both recognize that list-maintenance directed at removing deceased voters is separately required.

With regard to ACRU's second point, the Court does not find a basis to conclude that the enforcement of this "safe harbor" provision would lead to a violation of voter rights. As part of the NVRA, Congress specifically outlined a procedure by which states can comply with change-of-address list-maintenance requirements through the use of NCOA information. Such language in Section 8(c)(1) of the NVRA cannot be ignored and must be given meaning. While states are not required to adopt an identical list-maintenance procedure and are certainly free to adopt more robust list-maintenance practices, the Court concludes that compliance with this safe-harbor provision satisfies Section 8(a)(4)'s list maintenance requirement for address changes. 52 U.S.C. § 20507(c)(1). As this provision is optional, a state's use of similarly reliable information garnered from other sources, such as mass mailings or targeted mailings, to identify registrants whose addresses have changed to update voter rolls will also satisfy this requirement.

With regard to list-maintenance procedures for the removal of ineligible voters by reason of death, a "reasonable effort" is one that uses information from the social security disability index, state health department, or other similarly reliable sources to identify voters who have recently died.

Finally, a "reasonable effort" also necessitates compliance with all mandatory list-maintenance tools established by the governing state to remove the names of voters who are ineligible due to death or change in residence. The NVRA gives the individual states discretion to determine the means by which they will conduct their list-maintenance efforts so they can best balance the goals of protecting eligible voters' rights to vote, while removing those verified to be ineligible to vote. Thus, "reasonable efforts" under the NVRA also requires compliance with an individual state's mandatory list-maintenance processes for voter change of address and death.

Having defined what constitutes "reasonable efforts" under Section 8(a)(4) of the NVRA, the Court must apply the evidence presented at trial to determine whether Snipes, as the SOE for Broward County, failed to satisfy its requirements.[20]  Plaintiff has the burden of proof, and, for the reasons explained below, the Court concludes that ACRU has not satisfied its burden of demonstrating a violation.

A. <u>Compliance with Mandatory State List-Maintenance Tools for Death or Change of Address</u>

Starting with change of address, Florida mandates that the SOE conduct at least one of the following list-maintenance methods on a biennial basis:

a. Use change-of-address information supplied by the USPS through its licensees to identify registered voters whose address may have changed;

b. Use change-of-address information identified from returned nonforwardable return-if-undeliverable mail sent to all registered voters in the county;

c. Use change-of-address information identified from returned nonforwardable return-if-undeliverable address confirmation requests mailed to all registered voters who have not voted in the last two years and who did not make a written request that their registration records be updated during that timeframe.

*See* Fla. Stat. § 98.065(2).

As explained in detail above, the Court finds that, at a minimum, the BCSEO completed the NCOA list-maintenance process during the years 2009, 2011, 2013, and 2015.  This, standing

---

[20] Throughout the trial, ACRU presented evidence relating to a purported lack of list-maintenance procedures for the removal of voters ineligible to vote because they are underage, not a United States citizen, failed to supply their legal residence, or are registered to vote in another state.  Section 8(a)(4) of the NVRA, however, does not require states to conduct a program that makes a reasonable effort to remove voters who are ineligible for these reasons.  Rather, the list-maintenance requirement is only as to death or change of address, nothing more.  The Court limits its inquiry to the two list-maintenance requirements of the NVRA.  To inquire otherwise would expand the NVRA's requirements beyond what Congress intended.

alone, is sufficient to comply with Florida's mandatory list-maintenance requirements for change of address. In addition, the Court finds that the BCSEO completed at least one mass mailing to more than one million voters in Broward County, sending them Vote-By-Mail forms via non-forwardable first-class mail, in 2015. At trial, Snipes and United presented evidence in the form of certifications, invoices, export files, and testimony demonstrating that the BCSEO implemented these procedures. Between January 1, 2014 and December 31, 2016, its list-maintenance efforts led to the removal of 85,484 registrants who moved out of the county, 2,739 registrants who moved out of the county and requested a change of address, 1,886 voters who requested to be removed, and 97,941 voters whose mail was returned and remained inactive for two general elections. *See* ECF No. [221-3] at 5770.

Though not required, Snipes also routinely conducts mailings to all active voters for a variety of reasons and uses returned undeliverable mail to identify any voters who may have moved, updating the voter rolls accordingly. Such mailings are well documented throughout Snipes's certifications, invoices from Commercial Printers, export files, and testimony of multiple witnesses. Snipes also uses change-of-address information from the DHSMV obtained through the DOS to maintain Broward County's voter rolls. Thus, the Court finds that Snipes's change-of-address list-maintenance procedures are more than reasonable under Florida law.

With regard to mandatory list-maintenance requirements for deceased voters, Florida requires that the DOS – not the SOE – identify those registered voters who are deceased by comparing information received from either the Department of Health or the Social Security Administration. *See* Fla. Stat. § 98.075(3). Within seven days of receiving such information from the DOS, the SOE is required to remove the voter from the statewide voter registration system. *Id.* A SOE is also required to remove the name of any deceased registered voter upon

57

Case 0:16-cv-61474-BB Document 244 Entered on FLSD Docket 03/30/2018 Page 58 of 61

CASE NO. 16-cv-61474-BLOOM/Valle

receipt of a copy of a death certificate issued by a government agency authorized to issue death certificates. *Id.* At trial, the evidence established that Florida's DOS obtains reports of deceased individuals from the Florida Health Department and from SSDI. The DOS forwards information to the BCSEO, which, in turn, uses that information to remove deceased voters from the rolls on a daily basis. BCSEO does so by inputting the information into the database, matching the date of birth, address, and last four digits of the social security number, and then removing the deceased voter from the rolls. Any irregularity in the decedent's information prompts the BCSEO to send the family a letter requesting the individual's death certificate and, upon the receipt of such information, the voter is then removed. Between January 1, 2014 and December 31, 2016, Snipes removed 37,095 registrants from Broward County's voter rolls who were determined to be deceased. Even Mr. Gessler conceded that the procedures the BCSEO follows with regard to the SSDI are proper and *reasonable*. He testified: "Since then, I have learned that the Secretary of State office does provide the Social Security Death Index, which I think is *reasonable* and proper. And I, by no means, think that the Supervisor is in error by relying upon that. I think it's a good thing that that's happening." *See* ECF No. [230] at 34 (emphasis added). Even though Mr. Gessler testified he would like to see Snipes use the Social Security Disability Cumulative Death Index, Florida law does not mandate its use. It may be perfectly reasonable to use such a tool where available, but that does not make it unreasonable *not* to use the tool. The same holds true for Mr. Gessler's testimony that Snipes could or should be using additional tools for list-maintenance, such as jury recusal forms, the ERIC database, or the DAVID database. Neither Florida law nor the NVRA mandate their use.

Florida law also requires that the SOE take certain actions to investigate information supplied by other sources regarding the ineligibility of voters. *See* Fla. Stat. § 98.075(6), (7). Florida authorizes its SOEs to follow up on information about ineligible voters received from

other sources, such as citizen complaints. Because ACRU has only asserted a claim for a violation of Section 8(a)(4) of the NVRA, the Court limits its focus to those citizen complaints disclosing voter ineligibility by reason of change of address or death. Here, the evidence revealed that the BCSEO received citizen complaints on these subjects from Mr. Prentice, Mr. Gabbay, and Mr. DeNapoli.[21]

Starting with Mr. Prentice, he testified that he submitted information to BCSEO of 204 active registrants who no longer lived in the Wynmoor retirement community and that Snipes responded to this submission via email with detailed, color-coded spreadsheets for each registrant. With regard to Mr. Gabbay's submission, Snipes responded to his email within two days informing him that the BCSEO would review his findings and take appropriate steps to investigate the information. Ms. Hall mailed out notices to all individuals identified in his submission. Snipes emailed Mr. Gabbay again to inform him that all active voters were sent a Vote-By-Mail mass mailing during the same month he reported his findings, which would prompt a list-maintenance process. She then emailed him eight weeks later, advising that she was in the process of rechecking his list to determine how many records were changed as a result of the Vote-By-Mail mass mailing. And, approximately one month later, Snipes mailed Mr. Gabbay the results of her research and list-maintenance activities. Finally, as to Mr. DeNapoli's submission, the voters on his list were removed from the voter rolls within one month. ACRU carried the burden to prove that Snipes failed to follow Florida law in response to these citizen complaints. However, ACRU did not come forward with any evidence that Snipes failed to timely investigate these submissions, failed to complete the required list maintenance as a result of these submissions, or otherwise failed to respond to these citizen complaints. Thus, the Court

---

[21] Although Mr. Wolak testified that he compiled a spreadsheet of data revealing deceased individuals on the voter rolls, there was no evidence that such data was provided to the BCSEO.

concludes the evidence established that Snipes took prompt and reasonable action when citizen concerns were brought to her attention, as required by Florida law.

The weight of the evidence supports the conclusion that Snipes's list-maintenance program with regard to the removal of ineligible voters by reason of death or change of address complies with the mandatory requirements of Florida law.

### B.  NCOA, Mass Mailings, and Targeted Mailings

Next, the Court finds that Snipes's biennial use of the NCOA database to locate change-of-address information followed by the mailing of address confirmation notices allows Snipes to avail herself of the safe-harbor provision in Section 8(c)(1) of the NVRA.  This provision allows states to satisfy the list-maintenance requirements of Section 8(a)(4), which Snipes has done.  As detailed above, Snipes also completes several other forms of list maintenance to identify voters whose address has changed, further evidencing the reasonableness of her efforts.

### C.  SSDI and State Department of Health Sources

With regard to the third and final prong, the Court has already determined that Snipes's list-maintenance program for deceased voters complies with Florida's mandatory requirements.  Those same efforts are reasonable under the NVRA.

## IV. CONCLUSION

The Court concludes that Snipes, as the SOE for Broward County, implemented a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of death or change of address.  Accordingly, Plaintiff ACRU has failed to prove a violation of Section 8 of the NVRA, and judgment must be entered in favor of Defendant Dr. Brenda Snipes and Defendant-Intervenor 1199SEIU United Healthcare Workers East.  Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court will enter judgment

for Defendant Dr. Brenda Snipes and Defendant-Intervenor 1199SEIU United Healthcare Workers East by separate order.

**DONE AND ORDERED** in Chambers in Miami, Florida, this 30th day of March, 2018.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of record